**Christopher Lundberg,** OSB No. 941084
(pro hac vice pending)
Email: clundberg@hk-law.com
**Joshua J. Stellmon,** OSB No. 075183
(pro hac vice pending)
Email: jstellmon@hk-law.com
**HAGLUND KELLEY LLP**
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| **METLAKATLA INDIAN COMMUNITY,** a Federally Recognized Indian Tribe,<br><br>Plaintiff,<br><br>v.<br><br>**MICHAEL J. DUNLEAVY**, Governor of the State of Alaska, **DOUG VINCENT-LANG**, Commissioner of the Alaska Department of Fish and Game, and **AMANDA PRICE**, Commissioner of the Alaska Department of Public Safety<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff, Metlakatla Indian Community, by and through its counsel, alleges:

## INTRODUCTION

1. In this case, the Metlakatla Indian Community seeks to restore the full measure of its reserved fisheries rights. Those rights were established in 1891, when Congress "set [the Annette Islands of southeastern Alaska] apart as a reservation" for the benefit of the Metlakatla

PAGE 1 - **COMPLAINT**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 1 of 20

Indian Community. 25 U.S.C. § 495. The federal purpose in establishing the Annette Islands Reserve was to "establish an Indian colony that would be self-sustaining," *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 88 (1918), for the Metlakatlan people, who descended from the wider Tsimshianic peoples and placed great cultural and economic significance on fish. Although Congress did not expressly reserve the Metlakatlan's right to fish in the fishing areas adjacent to the Annette Islands Reserve, given that the Reserve was to serve as the permanent home for them, there is no doubt that Congress also impliedly reserved for the Community the right to use the "adjacent fishing grounds." *Id.* To further that congressional intent, in 1916 President Woodrow Wilson issued a Proclamation establishing an exclusive fishery boundary around the Reserve to protect the Community from the encroachment by outsiders on its close-in fisheries. *Metlakatla Indian Community v. Egan*, 369 U.S. 45 (1962). However, that Proclamation did not establish the outer limits of the Community's implied reserved rights. Rather, the Community's fishing practice, which began in 1887 and continued effectively unfettered until 1973, did so. *Confederated Tribes of Chehalis Indian Reservation v. State of Washington*, 96 F.3d 334 (9th Cir. 1996).

In that regard, since first moving to the Annette Islands Reserve in 1887, the Community fished predominantly in areas within a day's travel of the Reserve - currently designated by the State of Alaska Department of Fish & Game as Areas 1 and 2. Many of those regularly used fishing areas were outside of the exclusive fishery boundary, a fact that was well known to the Territorial, State and federal authorities. Importantly, none of those authorities ever questioned the Community's right to fish in those areas, at least not until the State of Alaska's enactment of its limited entry regulatory program. In fact, the contrary was true as the Territorial and federal

PAGE 2 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 2 of 20

governments consistently recognized the Community's non-exclusive right to fish in those areas as being "unquestioned" and held by the Community since time immemorial.

The defendants continued and prospective enforcement of illegal restrictions on Community members' right to fish in Southeast Alaska has forced the Community to rely on its limited, close-in fishery, which has declined dramatically in recent years. Despite robust management efforts, changing climatic conditions have altered migratory patterns and spawning cycles.

Since the Community's founding in 1887, its members have relied on the fishery resource as their primary source of economic revenue. Because the catch was too small to make a profit in 2016-2018, the Community's partner at the fish plant (Silver Bay Seafoods, LLC) opted out of a 20-year joint-venture processing agreement after merely 5 years of operations. So, for the first time in over 100 years of continuous operation, the Community's fish plant did not operate. As a result, the Community lost the much-needed processing-related revenue and jobs – losses that it cannot sustain. The extent of the Community's fisheries rights has never been lawfully diminished. *See generally, McGirt v. Oklahoma,* 140 S.Ct. 2452 (2020).

The State of Alaska's implementation of its limited entry and IFQ regulatory programs has improperly restricted the Community's ability to access its off-reservation, non-exclusive reserved fishing areas. Accordingly, the Metlakatla Indian Community seeks to restore the full measure of its reserved fishing rights by securing an order from this Court declaring that the Community has a reserved non-exclusive right to fish in Areas 1 and 2, that the Community's rights have never been lawfully diminished, and further enjoining the defendants from the prospective exercise of authority over the Community in unreasonably restricting the Community's right to take fish from those areas. This equitable remedy would provide the

PAGE 3 - **COMPLAINT**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 3 of 20

Community equal (rather than exclusive) access to those fisheries outside of the exclusive boundary. The Community's right would be subject to sound conservation principles and promote the joint management of the fishery resources by the Community and the State of Alaska.

## PARTIES

2. Plaintiff Metlakatla Indian Community is a federally recognized Indian tribe that occupies land on the Annette Islands Reserve, an island situated in Alexander Archipelago in Southeast Alaska. The Community is unique in that it occupies the only federal Indian reservation in the State of Alaska, and is the only Community that declined to participate in the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601-1624. The Reserve was created by Congress in 1891 to allow Metlakatlans to achieve economic self-sufficiency and establish a self-sustaining community.

3. The Community members are a fishing people. Metlakatlans have always relied on commercial and subsistence fishing as a primary means to support themselves and their families. Fishing is also a way Metlakatlans connect with their tribal heritage and traditional culture, ensuring cultural preservation. Simply put, the Metlakatlan people's very existence – economic, cultural, and spiritual – was and remains dependent on fishing.

4. Defendant Michael Dunleavy is the Governor of the State of Alaska. He is the head of the State's executive branch. In that capacity, Governor Dunleavy oversees the development of State agency policies and enforcement of the laws within the State, including within the State-controlled waters in Southeastern Alaska. The Community sues Governor Dunleavy in his official capacity for the State of Alaska.

PAGE 4 - **COMPLAINT**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 4 of 20

5. Defendant Doug Vincent-Lang is the Commissioner of the State of Alaska Department of Fish and Game. In that capacity, Commissioner Vincent-Lang oversees the management of fish resources of the State, including the development of policies and the enforcement of laws concerning the State's commercial fisheries in Southeast Alaska. The Community sues Commissioner Vincent-Lang in his official capacity for the State of Alaska.

6. Defendant Amanda Price is the Commissioner of the State of Alaska Department of Public Safety. In that capacity, Commissioner Price works with the State Department of Fish and Game to enforce laws regulating the State's commercial fisheries in Southeast Alaska. The Community sues Commissioner Price in her official capacity for the State of Alaska.

## JURISDICTION

7. This Court has jurisdiction under 28 U.S.C. § 1331 and § 1362 because this case is brought by a federally recognized Indian tribe and involves questions of federal law arising under the Community's originating statue − 25 U.S.C. § 495 and related regulations − and federal Indian common law.

8. This Court may issue declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), upholding the Community's right to fish in its non-exclusive, historical fishing areas.

9. This Court may issue injunctive relief under 28 U.S.C. § 2201 because no other remedy at law exists to stop the defendants from continuing to unlawfully deprive the Community of its right to fish in its congressionally reserved off-reservation and non-exclusive historical fishing areas.

PAGE 5 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 5 of 20

## VENUE

10. Venue in this court is proper under 25 U.S.C. § 1391(b)(2). Plaintiff resides in this District and the events and omissions giving rise to Plaintiff's claims occurred and continue to occur on areas within this District.

## SUMMARY OF LAW AND FACTS

### *Emigration to the Annette Islands Reserve*

11. In 1887, a group of approximately 820 Tsimshian Indians, facing conflict with the Canadian government over land claims and tribal sovereignty, emigrated from "Old" Metlakatla (which means "place beside calm water" in Tsimshian) in British Columbia, Canada, to what is now the Annette Islands Reserve. With the help of Father William Duncan a missionary of the Anglican Church of England, the Tsimshian people's emigration occurred at the invitation, and with the permission, of President Grover Cleveland and the United States Congress.

12. The Community's current membership includes numerous members who are direct descendants of members of the initial 1887 emigration.

13. From time immemorial, fishing has been the bedrock of the Tsimshian culture and way of life. While the Tsimshian maintained a central village, their fishermen migrated with the fish runs, establishing temporary fishing villages along the coast and rivers of British Columbia. From those locations, the Tsimshian fished throughout the waters of Southeast Alaska, including as far north as 50 miles from what is now the Annette Islands Reserve.

14. The Tsimshian people's decision to relocate to the Annette Islands was not happenstance. An appointed Tsimshian search committee selected the Annette Islands because of its sheltered bay, gently sloped beaches, and nearby waterfall. According to Father Duncan, the goal was to "build up a self-supporting people by honest craft and consequently to render the

PAGE 6 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 6 of 20

community independent of all outside aid." Miscellaneous Senate Doc. No. 55-275, at 6 (1898). Given the cultural, economic, and spiritual significance of fish to the Tsimshian people, a new location required access to adjacent fishing areas.

15. The Annette Islands would have been worthless without access to fish and its adjacent fisheries.

16. From 1887-1891, *before* congressional establishment of the Reserve, the Metlakatlan people fished openly in Southeast Alaska's waters beyond the close-in waters of the Annette Island, as far as 35 miles to the north at Naha Bay.

17. The Metlakatlan people fished predominantly in areas within a day's travel of the Reserve − currently designated by the State of Alaska Department of Fish & Game as Areas 1 and 2. Attached as Exhibit 1 (Map of Chart 5B – Southeast Alaska, Ketchikan Management Area). Many of those regularly used fishing areas were well outside of the exclusive fishery boundary, a fact that was well-known to the Territorial, State and federal authorities.

18. Metlakatlans have always placed great cultural significance on fish. In that regard, Metlakatlans have a tradition of hosting feasts for the transfer of hereditary names and to witness important life transitions (*e.g.*, birth, marriage, and death). Metlakatlans' feasts always include the use, consumption, gifting and exchange of a wide array of fish, including salmon.

19. Fishing continues to play a vital role to the economic well-being, culture and identity of Metlakatlans. In 1917, Community member Thomas Hanbury described salmon fishing as an inheritance that was (and will continue to be) passed on to him and his people:

> The Natives Inheritance is Salmon Fishing. I am one of the thousand native parents of Alaska. We know the salmon. No one is more competent to judge salmon; it was the inheritance from our fathers, and salmon has always been our bread, and our skill and our boat, and net or line, [it] is the only inheritance we can leave to our children.

PAGE 7 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 7 of 20

> Salmon Fishing [is the] only Inheritance to pass [on] to Native[ ] Children. I look into the uncertain future to that only inheritance I can leave my children. To me this subject is sacred and greater than life itself. When the salmon fisheries are exhausted, God only knows what will become of my children and my people.

### *The Federal Purpose in Establishing the Annette Islands Reserve Was to Achieve a Self-Sufficient Homeland for the Community*

20. Congress established the Annette Islands Reserve in 1891 "for the use of the Metlakahtla [*sic*] Indians . . . and such other Alaskan natives as may join them." 25 U.S.C. § 495 (the "Act"). In remarks made during introduction of the bill, Senator Manderson of Nebraska stated that the purpose was "simply to allow this band of Indians to remain [on Annette Island] under such rules and regulations as the Secretary of the Interior may impose, and give them some recognized footing at that place." 21 Cong.Rec. 10092 (1890).

21. In establishing the Reserve, Congress knew that its action would establish a secure home for a fishing culture on an island in the Territory of Alaska, where the people were scarce and aquatic and other natural resources were abundant. Congress also knew that the Metlakatlan people sought protection by the United States so that their fishing activities would be protected.

22. The Act placed no statutory limitations on Metlakatlan people's right or ability to fish in adjacent fishing grounds because to do so would have compromised the purpose of the reservation. *Accord Alaska Pac. Fisheries Co. v. U S*, 248 U.S. 78, 89 (1918) (holding that Metlakatlans "could not sustain themselves from the use of the [reservation's] upland alone. The use of the adjacent fishing grounds was equally essential.") Instead, Congress gave the Secretary unprecedented authority to help Metlakatlans achieve a self-sufficient homeland, which would require the continued exercise of their historic fishing practices for commercial, cultural and subsistence reasons.

PAGE 8 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 8 of 20

23. In 1916, President Woodrow Wilson enhanced the Metlakatlan's fishing rights by issuing a proclamation that established a 3,000-foot exclusive fishing zone ("Exclusive Fishing Zone" or "Zone") around the Reserve. Annette Island Fishery Reserve, Alaska, 39 Stat. 1777 (1916). President Wilson declared that "the Secretary of the Interior, with a view of assisting Metlakahtlans [*sic*] to self-support, has decided to place in operation a cannery on Annette Island[s]" and "it is therefore necessary that the fishery in the waters contiguous to the hereinafter described group comprising the Annette Islands be reserved for the purpose of supplying fish and other aquatic products for said cannery." *Id.* President Wilson further proclaimed that Metlakatlans should have the use of these waters "under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce." *Id.* The purpose of President Wilson's Proclamation establishes the Exclusive Fishing Zone was (and remains) to safeguard the Metlakatlans from encroachment by outside fishermen and fishing corporations on the Reserve's close-in fishery and to help the Metlakatlan people fulfill the promise of self-sufficiency. Attached as Exhibit 2 are multiple maps showing the Exclusive Fishing Zone in relation to the Reserve as a whole and in relation to the State of Alaska.

### *The Territory of Alaska Recognized Metlakatlans' Right to Fish In Historical Fishing Grounds*

24. After the establishment of the Exclusive Zone, the Territory of Alaska made several factual admissions about Metlakatlans' right to fish in a case involving the Territory's attempt to tax the Annette Island Packing Company. *Territory v. Annette Island Packing Co.*, 6 Alaska 585 (D. Alaska 1922), *aff'd sub nom. Territory of Alaska v. Annette Island Packing Co*, 289 F. 671 (9th Cir. 1923). In that case, the Territory of Alaska attempted to impose three distinct series of license taxes to be levied and assessed on the Annette Island Packing Company: (1) a direct license or privilege tax on the maintenance of fish traps, which did not depend on the

PAGE 9 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 9 of 20

value of the traps or the amount of salmon caught; (2) an occupational tax on the gross output of the cannery, which was dependent on the number of cases and kind of salmon canned; and (3) an income tax based on the net income of the person or corporation engaged in the business of canning. *Id.* The Secretary of Interior was granted leave to intervene in the action on behalf of the Community and filed a Complaint in Intervention.

25. In the Answer to the Secretary of Interior's Complaint in Intervention, the Territory of Alaska made the following factual admissions:

> That the inhabitants of Annette Island, ever since their settlement on said Island, have been and yet are in the habit of fishing outside of said reserve, and a large percentage of fish canned from year to year by the defendant company [Annette Island Packing Company] was caught in waters outside of said reserve . . . . [T]he right of the inhabitants of said Annette Island[s] Reserve to catch fish outside of the reserve . . . *has always been and is now recognized by the intervenor [Secretary of the Interior] and by the Government of the United States, and such right is and at all times has been claimed by the Metlakatla people*. (Emphasis added).

26. In the Alaska District Court's opinion *denying* the Territory of Alaska the right to tax the Annette Island Packing Company, it was a stipulated fact that "for more than 10 years prior to 1917 the salmon cannery at Metlakahtla [*sic*] was operated, for which fish were secured from any waters; during the season of 1919 defendant canned at Metlakahtla [*sic*] cannery approximately 130,000 salmon caught by Indian residents of Metlakahtla [*sic*] outside of the Annette Indian reserve and its reserved waters, and approximately 13,000 caught by other persons outside said reserved area; that the total pack of defendant company at Metlakahtla [*sic*] in the year 1919 was 81,465 cases of salmon."

27. Not a single document submitted by the Territory of Alaska or any other party, including the Secretary of the Interior, challenged Metlakatlans' right to fish outside of the

PAGE 10 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 10 of 20

Exclusive Zone. In fact, all government entities explicitly recognized Metlakatlans' right to fish in those waters.

*Applicable Legal Authority Supporting the Metlakatlans'*
*Right to Fish in its Historical Fishing Grounds*

28. Indian canons of construction provide important guidance on how to interpret the Community's right to fish in its reserved, non-exclusive, fishing grounds. The rules of Indian canons of construction "are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). Courts have held that treaties, statutes, and executive orders must be liberally construed in favor of Indian rights. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985). Any ambiguities in construction must be resolved in favor of the Indians. *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996).

29. In interpreting the Community's originating statue, the Supreme Court has recognized that Congress's establishment of the Reserve included the protection of appurtenant fishing rights in two noteworthy opinions. In *Alaska Pac. Fisheries Co.*, the Supreme Court acknowledged that Metlakatlans were a fishing people who "could not sustain themselves" without fishing rights. *Id.* at 89. The Supreme Court held that the "[t]he use of the adjacent fishing grounds was equally essential" to the purpose of the Annette Island Reserve, which the court viewed as providing Metlakatlans with the means to become self-sustaining. *Id.* The Supreme Court made no mention of the President's proclamation in 1916 or to any limitation on the extent of the waters that were part of the fishing grounds of the Reserve.

30. In *Metlakatla Indian Community v. Egan*, 369 U.S. 45 (1962), the Supreme Court addressed a challenge by Alaska on the Secretary's regulation allowing Metlakatlans to operate fish traps, which were illegal under Alaska law. The Supreme Court noted that unlike in other

PAGE 11 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 11 of 20

states the creation of a reservation in Alaska "was not to confine the Indians for the protection of white settlers but to safeguard the Indians against exploitation." *Id.* at 51. The court acknowledged that the creation of the Exclusive Zone "was prompted by the threatened encroachment of non-Indian fishermen into Metlakatla waters and the fear that the reservation of the islands might not protect the Indians against such intrusions." *Id*. at 55.

31. The Supreme Court in *Egan* also determined that the Secretary's authority over the Reserve was extremely broad and "extended to the waters surrounding the islands." *Id.* at 54. The court noted that the President's proclamation of the Exclusive Fish Zone was an attempt to "assist and promote the plans of the Secretary of the Interior to develop the reserve under his statutory authority, not to limit or destroy that authority." *Id.* at 55.

32. Later, the Ninth Circuit set out an analytical framework for identifying implied fishing rights based on a reservation created by an executive order or statute. In *Confederated Tribes of Chehalis Indian Reservation v. State of Wash*., 96 F.3d 334 (9th Cir. 1996), the Chehalis and Shoalwater tribes argued that the executive order creating their reservations impliedly reserved off-reservation fishing rights. The executive orders did not contain any explicit fishing rights either on or off the reservation. The issue on appeal was, absent express reservation of off-reservation fishing rights, whether the executive orders issued before Washington became a state contained implied off-reservation fishing rights. 96 F.3d at 342. The court noted that, unlike reservations created by treaties, the specific purpose of reservations created by executive order was often unarticulated. *Id.* Relying on canons of construction favoring Indian tribes, the Ninth Circuit determined that when attempting to discern the intent of Congress in the face of scant legislative history, it is necessary to look not only at the words of

PAGE 12 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 12 of 20

the statute, but also at *the circumstances surrounding its creation and the history of the people for whom it was created.  Id.*

33. The Indian law canons of construction, the U.S. Supreme Court's decisions recognizing the Metlakatlans' fishing right, and the 9th Circuit's holding in *Confederated Tribes of Chehalis Indian Reservation* all point to the same conclusion: the Metlakatlans have a reserved right to fish in the waters surrounding the Annette Islands Reserve. That is so because the Community's fishing right is directly linked to the federal purpose in establishing the Reserve, their fishing culture, and their fishing practice since 1887. When a reserved right exists, only an act of Congress can diminish or reduce that right. *McGirt*, 140 S.Ct. at 2462 (reiterating this longstanding principle).

### *Metlakatlans' Right to Fish in Historical Fishing Areas Beyond the Exclusive Zone is Well-Established*

34. During the Annette Islands Reserve's formative years and beyond, Community members continued to fish at fishing grounds outside of the Exclusive Zone with the knowledge and approval of the federal government. Specific examples of historical evidence reflecting those circumstances include, but are not limited to the following:

### *Pre-establishment of the Reserve* **(1887 - 1891)**

a. Father Duncan's 1891 letter to an unidentified party describing a Metlakatla member's issues regarding fishing at Naha Bay, approximately 35 north of the Annette Islands and explaining "that so far as [he knew] he has a perfect right to fish at Naha Bay."

b. Father Duncan's 1892 letter to his attorney, Thomas N. Strong of Portland, Oregon, relating that the Community obtained a steamer, which would help the Community obtain salmon from the "farthest fishing station" located 35 miles from Metlakatla. Father

PAGE 13 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR  97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 13 of 20

Duncan had additional correspondence reflecting members fishing on Prince of Wales Island, Cape Fox, Skeena River, and Naha Bay.

### *Establishment of the Reserve to Alaska Statehood* (1891 - 1959)

### Official Reports of the Federal Government

c. An 1896 "Report on the Salmon Fisheries of Alaska," prepared five years after the Reserve was established acknowledged Metlakatlans' use of fishing grounds outside the Reserve's adjacent waters, including fishing at Naha Bay (35 miles north of the Reserve), Karta Bay on Prince of Wales Island, and Kah Shakes Cove (35 miles southeast of the Reserve). The report noted that Metlakatlans "have equal [fishing] rights" with others in Alaska waters and "had equal fishing rights within the limits prescribed by law as to distances between nets, etc."

d. An 1899 report to the United States Secretary of the Treasury commenting on the positive state of the Metlakatla cannery and noting that the Metlakatlans fished not only around the Annette Islands, but in Quadra Bay (35 miles from Annette Island), Cape Fox, Karta Bay, and Moira Sound.

e. Multiple reports in the late 1890s through early 1900s from Lieutenant Commander Jefferson Moser of the United States Navy identifying Metlakatlans fishing in the following streams in Alaska: Tamgas, Quadra, Karta Bay, Kithraum, Peter Johnson, Nowiskay, Old Johnson, Kegan, and Kagahine. Jefferson Moser, *The Salmon and Salmon Fisheries of Alaska, Report of the Alaskan Salmon Investigations of the United States Fish Commission Steamer Albatross in 1900 and 1901* (1902). Attached as Exhibit 3 is a map with a key identifying the Metlakatlan people's historical fishing grounds verified by the Moser report and additional historical documents.

PAGE 14 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 14 of 20

f. An internal Department of the Interior document from 1920 noting that "Metlakatla natives did, as they have from time immemorial, go beyond the three-mile limit [*i.e.*, the Exclusive Zone] to seine fish."

### *Letters from Father Duncan*

g. Two 1898 letters from Father Duncan stating that fisherman from the Community had just returned from Naha Bay.

h. An 1899 letter stating that fishermen from the Community had been fishing at Moira Sound.

i. A 1900 letter reporting on an incident involving a Community fisherman in Karta Bay.

j. A 1903 report from Father Duncan to a U.S. Fish Commission Agent stating that the Community's cannery had processed fish from Nowaskay's Fishing Station, W. Keghan Fishing station, Johnson's fishing station, Pete Johnson's fishing station at Moira Sound, Shaholan's fishing station at Duke Island, Kag-ah-een at the Annette Island fishing station, Tongass Harbor at Annette Island, Nadzaheen at Anette Island, Tain at Anette Island, Boca de Quadra Inlet, at Sundry Petty Streams at Anette Island.

### *Community Members' Statements and Fishing Logs*

k. Numerous Community Members have told of their families' historical fishing practices that consistently included fishing in areas beyond the Exclusive Zone.

l. Fishing logs from vessel PEP, from 1954 through 1957, showed that Metlakatlans fished at Cape Chacon, south of Prince of Wales Island, west of Dall Island, near Ham and Mary Islands, and around Percy Islands.

PAGE 15 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 15 of 20

35. From the time Alaska entered statehood to the establishment of Alaska's limited entry program (1959 – 1973), neither the United States government nor the State of Alaska took any action to suggest that the Metlakatlan people accepted any limitations on their reserved fishing grounds or that that their ability to fish was diminished in any respect.

### *Current Pressures on Fish and Aquatic Resources Show that Fishing Only in the Exclusive Zone Contravenes the Purpose of the Reserve*

36. Community members rely on several species of fish for both subsistence and commercial purposes including, but not limited to, salmon, halibut, cod, rockfish and herring.

37. Confining Community members to harvest fish solely within the Exclusive Zone is inconsistent with important aspects of fish biology and fisheries management. Some very important fishery resources are not available or are very limited within the Reserve's boundary.

38. The Community's salmon fisheries are their most important and main economic resource, harvesting a broad mix of stocks. Salmon are a migratory species that are subject to changes in their migratory routes due to environmental factors, including climate change. If environmental conditions cause salmon routes not to pass through the Reserve's waters, Community member fishermen are unable to redirect their fishing efforts in response to those changes in migratory routes. The Community fishermens' lack of flexibility to respond to the changes in salmon migratory patterns, influenced in part by climate change, has significantly disadvantaged the Community.

39. The Reserve is surrounded on all sides by State-managed fishing areas, making the Community's fisheries extremely vulnerable to State-managed fisheries that intercept fish returning to the exclusive zone. At times, State-managed fisheries have intercepted salmon that would otherwise be passing through Reserve waters, unfairly denying the Community sufficient access to salmon.

PAGE 16 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 16 of 20

40. The Reserve boundary is also not compatible with the behavior of herring, the Community's second most important fishery resource. The Community has adopted a very conservative harvest strategy that has increased herring biomass to more than 20,000 tons. Even though Community-managed stock is one of the largest in Southeast Alaska, when herring escape the Reserve's waters, the Community's fisheries are denied access to harvest the herring biomass, unfairly allowing a windfall to State-managed fishermen.

41. Halibut is a species of considerable importance, both as a commercial and subsistence fishery, but there are few halibut within the Reserve's boundary. The small halibut fishery in the Reserve makes a very minor economic contribution to the Community. Because the Community must give priority to its commercial fishery, there is virtually no halibut for subsistence users.

42. Allowing the Community access to fisheries outside the exclusive boundary would promote the joint management of the fishery resources enjoyed by the Community and the State of Alaska.

43. The Reserve's boundary has confined Community members to harvest only resources that occur within the near-shore environments of the Reserve waters and has denied them access to important fish and aquatic resources that they had always previously enjoyed.

44. In 1972, the State of Alaska passed a constitutional amendment, Article VIII, Section 15 to the Alaska Constitution, allowing for limited entry to any fishery: "No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation[.]"

PAGE 17 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 17 of 20

45. In 1973, the State of Alaska enacted a limited entry program for commercial fishing in state waters. AS § 16.43.010.

46. Community fishermen were unable to participate in the State of Alaska's program because most Community fisherman did not qualify for limited entry permits. Those fishermen did not qualify because, for purposes of issuing permits, the State would not recognize the fish landed by Community fisherman in the Community's reserved waters. Additionally, Community fishermen cannot buy into the limited entry program because the cost of purchasing a permit on the open market is prohibitive.

47. The migratory nature of fish runs, where during any given season the runs may avoid Reserve waters entirely even if runs outside Reserve waters are plentiful, have also resulted in harm to the Community's economic sustainability.

48. While the Exclusive Fishing Zone was created to protect the Community, it has instead become a cage that threatens the ability of the Community to sustain itself through its own economic efforts. The defendants continued, prospective enforcement of the State's regulatory programs and laws concerning commercial fishing in the State waters adjacent to the Reserve put the Community member's way of life in jeopardy and is in direct opposition to Congress's intent in creating the Annette Islands Reserve.

## CLAIM FOR RELIEF

49. The Community realleges and incorporates by reference paragraphs 1 through 48 as if fully set forth herein.

50. When Congress created the Annette Islands Reserve in 1891, it intended to include and reserve the right of the Metlakatlans to fish at fishing grounds adjacent to the Reserve.

PAGE 18 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 18 of 20

51. Congress has never revoked, disestablished, or diminished that fishing right. *See McGirt*, 140 S.Ct. at 2452.

52. The Community members who fish within the Community's non-exclusive fishing grounds without a limited entry permit or other applicable license are subject to criminal prosecution and/or civil liability by the State of Alaska, violating the Community's congressionally-reserved right to fish in those waters.

53. The Community is entitled to access their non-exclusive, historical fishing areas in common with other users and subject to sound conservation principles, a right secured by the establishment of the Reserve.

54. Based on the foregoing, an actual, justiciable, controversy exists for which there is no adequate remedy at law for the damage caused by the defendants, and a declaratory judgment as requested below is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the Community respectfully asks this Court to enter judgment in its favor and to:

(1) Declare that Congress' reservation of the Annette Islands Reserve for the Metlakatla Indian Community included the non-exclusive right to fish in waters adjacent to the Reserve currently designated as Areas 1 and 2, free from unreasonable interference by the defendants, and that such right has not been revoked or diminished;

(2) Issue a permanent injunction barring the defendants from asserting jurisdiction over the Community and its members inconsistent with the Community's reserved fishing rights, and from otherwise unreasonably interfering with the Community's reserved fishing rights;

(3) Granting attorney's fees and costs; and

PAGE 19 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 19 of 20

(4) Granting any additional relief this Court deems just and equitable.

DATED this 7th day of August, 2020.

HAGLUND KELLEY LLP

By: /s/ Christopher Lundberg
    Christopher Lundberg, OSB No. 941084
    (pro hac vice pending)
    Email: clundberg@hk-law.com
    Joshua J. Stellmon, OSB No. 075183
    (pro hac vice pending)
    Email: jstellmon@hk-law.com
    200 SW Market St., Ste. 1777
    Portland, OR 97201
    (503) 225-0777
    *Attorneys for Plaintiff*

PAGE 20 - **COMPLAINT**

HAGLUND KELLEY LLP
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257
PL01-62222

Case 5:20-cv-00008-JMK   Document 1   Filed 08/07/20   Page 20 of 20