CLYDE "ED" SNIFFEN
ACTING ATTORNEY GENERAL

Christopher F. Orman (Alaska Bar No. 1011099)
Jeffrey G. Pickett (Alaska Bar No. 9906022)
Assistant Attorneys General
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-3019
Email: *christopher.orman@alaska.gov*
         *jeff.pickett@alaska.gov*

Attorneys for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| METLAKATLA INDIAN COMMUNITY, a Federally Recognized Indian Tribe,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL J. DUNLEAVY, Governor of the State of Alaska,<br>DOUG VINCENT-LANG, Commissioner of the Alaska Department of Fish and Game, and AMANDA PRICE, Commissioner of the Alaska Department of Public Safety,<br><br>        Defendants. | Case No.: 5:20-cv-00008-JWS<br><br><br>**MEMORANDUM IN SUPPORT OF THE STATE'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................ii

I.     INTRODUCTION..................................................................................... 1

II.    STATEMENT OF FACTS...................................................................... 4

III.   ARGUMENT ......................................................................................... 10

     A.     Rule 12(b)(6) authorizes this Court to interpret Congress' intent
when it created the 1891 Act and to dismiss MIC's complaint for
failure to state a claim. .................................................................... 10

     B.     Congress did not intend to grant the Metlatkatlans an off-reservation
fishing right. .................................................................................... 11

          1.    The circumstances surrounding the Metlakatlans and
creation of the Annette Islands Reserve is unique
compared to other tribes and reservations. .............................13

          2.    Recognizing the unique circumstances surrounding the
history of the Metlakatlans and the Annette Islands
Reserve, a review of the 1891 Act and the 1890
congressional record reveals Congress never intended
to grant off-reservation fishing rights. ....................................17

     C.     If MIC had any aboriginal rights to preserve, those rights did not
survive the Court of Claims' decision in *Tlingit and Haida Indians v.
United States or ANCSA*. .............................................................. 24

     D.     Metlakatlans fishing outside of the Annette Islands Reserve are
subject to State regulation even if Metlakatlans had aboriginal rights.
.......................................................................................................... 28

IV.   CONCLUSION ...................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Alaska Pacific Fisheries v. U.S.*, 240 F. 274 (9th Cir. 1917) ........................... 11,12, 12, 28

*Antoine v. Washington*, 420 U.S. 194 (1975) ................................... 18, 19, 20, 25

*Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977) ........................................... 9

*Choate v. Trapp*, 224 U.S. 665 (1912) ............................................................ 19

*Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970). ................................... 5, 22

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) ...................... 16, 23

*Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*,
96 F.3d 334 (9th Cir. 1996). .................................................... 19, 29, 30

*Dep't of Game of Wash. v. Puyallup*, 391 U.S. 392 (1968) ................................. 6

*Factor v. Labenheimer*, 290 U.S. 276 (1933) ................................................. 18

*Hynes v. Grimes Packing Co.*, 337 U.S. 86 (1949) ................................... 27, 28

*Kennedy v. Becker*, 241 U.S. 556 (1957) ................................................... 6, 34

*May v. State of Alaska*, 168 P.3d 873 (Alaska 2007) ................................... 7, 36

*Metlakatla Indian Community, Annette Islands Reserve v. Egan*,
369 U.S. 45 (1962) ...........................................................12, 13, 34 - 36

*Moore v. U.S.,* 157 F.2d 760 (9th Cir. 1946) ................................................. 23

*Neitzke v. Williams*, 490 U.S. 319 (1989) ................................................. 14, 15

*Native Village of Eyak v. Blank,* 688 F.3d 619 (9th Cir. 2012) ......................... 30

*Oregon Department of Fish and Wildlife v. Klamath Indian Tribe*,
473 U.S. 753, 764 (1985) ........................................................................... 33

*Organized Village of Kake v. Egan*, 369 U.S.60 (1962) ................................... 7

*Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995). ...................... 16, 17, 18

*Pullayup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983) ............... 22, 26

*Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392 (1968) ......................... 34

*Scudero v. State*, 917 P.2d 683 (Alaska 1996). ............................................... 7

*Skokomish Indian Tribe v. France*, 320 F.2d 205, 207 (9th Cir. 1963). ................... 16, 36

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)....................................15

*State v. Antoine*, 511 P.2d 1351 (Wash. 1973)...................................................20

*State v. Tinno*, 497 P.2d 1386 (Idaho 1972)....................................................23

*Tlingit and Haida Indians of Alaska v. U.S.*,
147 Ct. Cl. 315 (Ct. Cl. 1959) .................................8, 13, 14, 15, 29, 30, 31, 35, 36

*Tlingit and Haida Indians of Alaska v. U.S.*, 182 Ct. Cl. 130 (Ct. Cl. 1968)...................35

*Tulee v. State of Washington*, 315 U.S. 681 (1942) .........................................6, 34

*U.S. v. Booth*, 17 Alaska 561 (D. Alaska 1958) ............................................8, 20

*U.S. v. Lara*, 541 U.S. 193 (2004)...........................................................18

*U.S. v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ..............................................15

*U.S. v. Sohappy*, 710 F.2d 816 (9th Cir. 1985)...............................................34

*U.S. v. State of Wash.*, 157 F.3d 630 (9th Cir. 1998) .......................................24

*U.S. v. State of Wash.*, 520 F.2d 676 (9th Cir. 1975) .......................................21

*United States v. Washington*, 759 F.2d 1353 (9th Cir. 1985).................................6

*U.S. v. Winans*, 198 U.S. 371 (1905)..........................................6, 18, 23, 34

*Washington Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ..6, 23, 34

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
443 U.S. 658, 675 (1979). .................................................................16, 24

*Yankton Sioux Tribe v. U.S.*, 623 F.2d 159 (Ct. Cl. 1980) ..................................22

**Other Authorities**

43 U.S.C. § 1603 ....................................................................29, 32, 36

43 U.S.C. § 1603(b) ..........................................................................32

Act of June 9, 1855, 12 Stat. 951, 1855 WL 10420 ...........................................17

Act of June 6, 1924, 43 Stat. 464. ...................................................12, 13, 35

Act of August 8, 1958, 72 Stat. 545 .........................................................13

Act of June 19, 1935, 49 Stat. 388 (June 19, 1935) .....................................14, 30

ADF&G Salmon and Shellfish Fisheries, Chart 5-Region 1, Southeast Alaska
(8th ed. June 2020). ..........................................................................5

Alaska Const. art. VIII, § 17.........................................................................7, 36

An act to repeal timber-culture laws, and for other purposes, ch. 561 § 15, 26
Stat. 1095, 1101 (March 11, 1891).......................................................11, 24, 35

Charles D. Bernholz and Robert J. Weiner, Jr., The Palmer and Stevens "Usual
and Accustomed Places" Treaties in the Opinions of the Courts, 25 Government
Information Quarterly, 778-795 (2008)...........................................................25

Congressional Record, 21 Cong. Rec. 1009 (September 16, 1890). 8, 9, 10, 17, 20, 21, 25,
28, 29, 35, 36, 37

Executive Orders Relating to Indian Reservations, Chehalis Reserve May 17,
1864, 110-11 (Wash. Gov't Printing Office 1902).......................................18, 26

General Allotment Act of 1887, 24 Stat. 388 (1887) ........................................21

Halpin and Seguin, "Tsimshian Peoples: Southern Tsimshian, Coast Tsimshian,
Nishga, and Gitksan," *Handbook of North American Indians* 267 (1990) ........8

Henry S. Wellcome, The Story of Metlakahtla [sic.] (Saxon & Co. 1887) ........9

Proclamation No. 64, 39 Stat. 1777-1778 (Apr. 28, 1916) ..............................12

State of Alaska Community and Regional Affairs, HJR 30, Feb. 12, 2008.........27

*State of Alaska Forest Service, U.S. Dept. of Agriculture*, 1993 WL 417977
(IBLA, July 12, 1993)........................................................................................27

Treaty with the Chippewa, 10 Stat. 1109 (September 30, 1855) .......................29

Treaty with the Chippewa, 7 Stat. 503 (May 9, 1836) .....................................29

Treaty with the Nez Perces, 15 Stats. 693 (1868) ...........................................21

Treaty with the Quinaielt, 12 Stat. 971 (July 1, 1855) ....................................26

Treaty with the Yakima, 12 Stat. 951 (1865) .............................................21, 25

## I.    INTRODUCTION

When a tribe negotiates with the United States to relinquish tribal land claims and the resulting act, treaty, or executive order includes some ambiguous language suggesting the parties intend to preserve the Tribe's aboriginal fishing rights, courts have resolved the ambiguity in the Tribe's favor by finding implied off-reservation fishing rights.[1] Here, Congress understood that the Metlakatlans were a foreign tribe that had no U.S. land claims to settle.  Absent from Congress's 1890 floor debate were discussions about off-reservation fishing rights.  The resulting 1891 Act lacks any ambiguity implying an intent to preserve any off-reservation fishing rights.  Therefore, in 1891, did Congress intend to grant off-reservation fishing rights to the Metlakatlans?[2]

The answer is "no."  No matter how many times the Metlakatla Indian Community ("MIC") amend their complaint, they cannot cure several problems.  First, the 1890 congressional record shows the Congress never intended to grant any off-reservation fishing rights when it created the Annette Islands Reserve. Second, MIC has no aboriginal fishing rights in fishing districts 1 and 2, and if they did, ANCSA extinguished them.

---

[1]    *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970).

[2]    MIC's amended complaint, incorrectly, refers to these areas as "Fishing Areas 1 and 2." *Metlakatla Indian Community v. Michael J. Dunleavy, et. al*., Case No. 5:20-CV-0008-JWS, First Amended Complaint for Declaratory and Injunctive Relief, ¶¶ 1, Prayer for Relief (1) (Sept. 30, 2020). The ADF&G map shows the fishing districts as defined by regulation. 5 AAC 33.200(a)-(b); *see also* ADF&G Salmon and Shellfish Fisheries, Chart 5-Region 1, Southeast Alaska (8th ed. June 2020); available at: http://www.adfg.alaska.gov/static/fishing/PDFs/commercial/maps/chart05_salm_shell_all.pdf (accessed on September 28, 2020).

MIC's core argument rests on federal supremacy. If Congress's 1891 Act granted certain off-reservation fishing rights to the Metlakatlans, those rights would then be established by federal law.[3] The Supremacy Clause could then limit the state's authority to regulate Metlakatlans commercial fishing off-reservation.[4]

Here, there is no congressional intent to grant off-reservation fishing rights to the Metlakatlans. No federal law recognizes Metlakatlans having aboriginal title or off-reservation fishing rights. The Supremacy Clause then does not limit the State's authority to regulate Metlakatlans fishing off-reservation fisheries, *even if* MIC could prove they have some aboriginal rights in Southeast Alaska waters.[5]

In this memorandum, the State does not argue that Metlakatlans are barred from participating in Alaska's commercial fisheries if they comply with state regulations.[6] Like all Alaskans under the Alaska Constitution, Metlakatlans enjoy the right to participate in Southeast Alaska's commercial fisheries outside of the Reserve if they

---

[3]  *United States v. Washington*, 759 F.2d 1353, 1355 (9th Cir. 1985).

[4]  *Id.*

[5]  *Dep't of Game of Wash. v. Puyallup*, 391 U.S. 392 (1968); *Kennedy v. Becker*, 241 U.S. 556, 563-64 (1957); *U.S. v. Winans*, 198 U.S. 371, 384 (1905); *Washington Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 682-84 (1979); *see also Tulee v. State of Washington*, 315 U.S. 681, 684 (1942) (holding that the state had the right to regulate all off-reservation fishing rights, but because the treaty allowed the tribe to fish at all "usual and accustomed places," the state could not impose a fee on the Yakimas for exercising their treaty rights at their off-reservation fishing sites).

[6]  *May v. State of Alaska*, 168 P.3d 873 (Alaska 2007); *Scudero v. State*, 917 P.2d 683 (Alaska 1996).

comply with state regulations, such as purchasing a limited entry permit.[7] And like other Alaskans, they have the choice to invest and participate in these commercial fisheries.

Therefore, the State moves to dismiss because when Congress created the Annette Islands Reserve, it did not grant, nor intend to grant, the Metlakatlans an off-reservation fishing right that would limit the State's authority to require Metlakatlans who commercially fish in fishing districts 1 and 2 to have the appropriate limited entry permit.[8]

## II.    Statement of facts

The Annette Islands Reserve differs from any other reservation in the United States.  The Reserve did not resolve land claims, it was not provided as consideration for extinguishing aboriginal title, and Congress was not relocating the Metlakatlans when it was created.  Unlike other tribes, the "original settlers of Metlakatla came to the Annette Islands, not because they were removed there after losing a war but because they sought religious and economic freedom in the United States as an alternative to oppressive conditions in British Columbia."[9]

---

[7]    Alaska Const. art. VIII, § 17; *May,* 168 P.3d 873. MIC's amended complaint states the limited entry permit requirement is "unfairly restricting Metlakatlans' access to the waters adjacent to the Reserve."

[8]    *Organized Village of Kake v. Egan*, 369 U.S.60, 75-6 (1962).

[9]    *U.S. v. Booth*, 17 Alaska 561, 572-73 (D. Alaska 1958) (noting the problems between Father Duncan and the Bishop of British Columbia which led to the relocation to the Annette Islands and that the Metlakatlans were "not natives of this country."); *see also* Congressional Record, 21 Cong. Rec. 1009 (September 16, 1890).

The Annette Islands Reserve, therefore, is unique: a reservation created for a foreign tribe—a community of Christian Canadian Tsimshian Indians led by an Anglican priest—who emigrated to the United States in search of a safe place to live.[10]

Prior to moving to the Annette Islands, Tsimshian Indians lived in concentrated groups in the areas around the Skeena River, the Nass River and the Portland Inlet in British Columbia.[11] They lived in "a single winter village, moving in the spring to fishing villages on the lower Nass and in the summers to fishing camps on other rivers."[12]

"After many years of labor [William Duncan] succeeded in forming the settlement, known as Metlakahtlan [sic.], in British Columbia. In some difficulty that ensued between himself and the Bishop of British Columbia he deemed it well in the interest of this tribe, amounting to about one thousand at that time, to go to Alaska and come under the protecting influence of the United States Government."[13] Therefore, in "1887 approximately 800 Tsimshian Indians migrated from British Columbia to the Annette Islands."[14]

---

[10]   21 Cong. Rec. 10092; *Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct. Cl. 315, 338 (Ct. Cl. 1959).

[11]   Halpin and Seguin, "Tsimshian Peoples: Southern Tsimshian, Coast Tsimshian, Nishga, and Gitksan," *Handbook of North American Indians* 267 (1990) (available digitally at: http://aashley.weebly.com/uploads/4/3/8/2/4382474/tsimshian_peoples.pdf (accessed on October 7, 2020)).

[12]   *Id.*

[13]   21 Cong. Rec. 10092 (statements of Senator Manderson).

[14]   *Atkinson v. Haldane*, 569 P.2d 151, 153 (Alaska 1977).

4

Father Duncan then went to Washington D.C. "to obtain consent from Congress" authorizing the Metlakatlans to continue to live on the Annette Islands.[15]

In October 1890, Congress held a floor debate about an amendment to create the Annette Islands Reserve for Father Duncan and the Metlakatlans.[16] None of the senators mentioned fishing or asserted that the Metlakatlans—who they described as "not natives of this country" and "foreign Indians"—had aboriginal rights that they needed to preserve.[17] Instead, Congress wanted to grant the Metlakatlans the land because it believed the land had no value to anyone except the Metlakatlans, and wanted to support Father Duncan's work.[18]

When asked about the history of the Metlakatlans, Senator Manderson noted, "They are of course no natives of this country as the native Indians of Alaska are under our treaty or purchase from Russia."[19]

Near the end of the testimony, Senator Dolph asked Senator Manderson, "if these islands were inhabited by any natives of Alaska at the time they were taken by the

---

[15] Henry S. Wellcome, The Story of Metlakahtla [sic.], 347-59 (Saxon & Co. 1887); available at: https://archive.org/details/storymetlakahtla00wellrich (accessed on October 7, 2020) (Wellcome's book includes several letters that provide interesting insight into Father Duncan's connections to the United States and President Cleveland as to the formation of the Annette Islands Reserve); 21 Cong. Rec. 10092.

[16] 21 Cong. Rec. 10092-93.

[17] *Id.*

[18] 21 Cong. Rec. 10092.

[19] *Id.*

Metlakathtla [sic.] Indians."[20] Senator Manderson responded, "Not a living soul was on them or within many miles of them."[21]

To conclude, Senator Dawes supported creating a reserve because the Metlakatlans lived in "constant terror for fear their work and labor upon this island" may be lost like their community in British Columbia.[22] Senator Dawes noted on his trip to Metlakatla that the Metlakatlans constantly asked whether "the Government of the United States can drive us off here at any time?"[23]

Consistent with its' 1890 deliberations, in 1891, Congress adopted a bill creating the Annette Islands Reserve, which reads in full:

> That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla [sic] Indians, and those people known as Metlakahtlans [sic] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may be prescribed from time to time by the Secretary of the Interior.[24]

The Act does not mention the surrounding waters, let alone fishing rights.

---

[20]  *Id.* at 10093.

[21]  *Id.*

[22]  *Id.* at 10092.

[23]  *Id.*

[24]  An act to repeal timber-culture laws, and for other purposes, ch. 561 § 15, 26 Stat. 1095, 1101 (March 11, 1891) (codified at 48 U.S.C. § 358 and later 25 U.S.C. § 495 (omitted)).

6

On April 7, 1916, Alaska Pacific Fisheries, a non-Metlakatlan corporation, placed a fish trap "less than 2,000 feet south of a point of land designated as Cedar Point, and within 3,000 feet from the shore of the [Annette Islands] at mean low tide."[25]

In response to the Alaska Pacific Fisheries' fish trap, on April 28, 1916, President Woodrow Wilson issued a proclamation creating an exclusive fishing zone 3,000 feet from the low tide mark around the Annette Islands Reserve, stating,

> Now, therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the power in me vested by the laws of the United States, do hereby make known and proclaim that the waters within three thousand feet from the shore lines at mean low tide at Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets, located within the area segregated by the broken line upon the diagram hereto attached and made a part of this proclamation; also the bays of said islands, rocks, and islets, are hereby reserved for the benefit of the Metlakahtlans [sic.] and such other Alaskan natives as have joined them or may join them in residence on these islands, to be used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.[26]

President Wilson issued this proclamation for "supplementing efforts of the Secretary of the Interior to assist the Metlakatlans . . . by placing a cannery operation on Annette Island. The contiguous waters were being reserved to supply fish for the cannery."[27]

---

[25] *Alaska Pacific Fisheries v. U.S.*, 240 F. 274, 276-77(9th Cir. 1917), *aff'd* 248 U.S. 78 (1918).

[26] Proclamation No. 64, 39 Stat. 1777-1778 (Apr. 28, 1916).

[27] *Metlakatla Indian Community, Annette Islands Reserve v. Egan*, 369 U.S. 45, 48-49 (1962).

7

With this presidential proclamation, the Alaska Pacific Fisheries' fish trap was now within the Annette Islands Reserve's boundaries.[28]  On May 2, 1916, the U.S. attorney informed Alaska Pacific Fisheries of their trespass.[29]  When they failed to move their fish trap, the U.S. sued Alaska Pacific Fisheries.[30] The Supreme Court affirmed the Ninth Circuit's holding that Congress intended to reserve the adjacent waters—out to 3,000 feet—for the Metlakatlans' exclusive use.[31]

After creation of the Annette Islands Reserve, Congress passed laws in 1924 and 1958, and neither act recognizes an off-reservation fishing right.  In 1924, Congress passed an act "For the protection of the fisheries of Alaska, and for other purposes."[32] About regulation of these Alaska fisheries, the Act states,

> That every such regulation made by the Secretary of Commerce shall be of general application within the particular area to which it applies and that no exclusive or several right of fishery shall be granted therein.[33]

The statute does not recognize Metlakatlans as having an off-reservation fishing right and does not exempt them from any of these fisheries regulations.  In 1958, Congress passed an act "[t]o amend the law with respect to civil and criminal jurisdiction over Indian

---

[28]  *Alaska Pacific Fisheries*, 240 F. at 277.

[29]  *Id.*

[30]  *Id.*

[31]  248 U.S. 78 (1918).

[32]  43 Stat. 464 (June 6, 1924).

[33]  *Id.*

country in Alaska."[34]  The U.S. Supreme Court later explained that this statute protected "against state invasion all uses of Indian property authorized by federal treaty, agreement, statute, or regulation, but only those fishing rights and privileges given by federal treaty, agreement, or statute."[35]  Again, the act never mentioned Metlakatlans having off-reservation fishing rights.

Regarding aboriginal title in Southeast Alaska, there has been significant litigation. However, the litigation determined the Tlingits and Haidas, not the Metlakatlans, had aboriginal title in and around the Annette Islands and Southeast Alaska waters.

After the apparent success of the Annette Islands Reserve, the Tlingit and Haida Indians suggested they had aboriginal title to the lands and waters of Southeast Alaska.[36] However, the Tlingit and Haida Indians could not sue the U.S.[37]  As a result, in 1935 Congress authorized the Tlingit and Haida Indians of Alaska to sue the United States for damages for unconstitutionally taking the Tlingits' and Haidas' aboriginal Southeast Alaska lands and waters.[38]  The Act directed the Court of Claims to hear the Tlingit and Haida Indians' takings claims.[39]

---

[34]  Act of August 8, 1958, 72 Stat. 545.

[35]  *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 56 (1962).

[36]  *Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct. Cl. 315, 338 (Ct. Clms. 1959).

[37]  *Id*. at 339.

[38]  Act of June 19, 1935, 49 Stat. 388 (June 19, 1935).

[39]  *Id*.

In 1959, the Court of Claims found the United States had impermissibly taken aboriginal lands and waters from the Tlingits and Haidas when Congress created the Annette Islands Reserve and again when President Wilson in 1916 created an exclusive fishery within 3,000 feet of the Annette Islands' shoreline.[40] Based on the Court of Claims' decision, the Tlingits and Haidas had exclusive and continuous use of the Southeast Alaska waters, not the Metlakatlans.[41]

## III. ARGUMENT

### A. Rule 12(b)(6) authorizes this Court to interpret Congress' intent when it created the 1891 Act and to dismiss MIC's complaint for failure to state a claim.

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[42] "If as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[43]

Under Rule 12(b)(6), a court reviewing claims for sufficiency of pleading is generally limited to the contents of a complaint.[44] A court may take judicial notice of certain facts or documents "without converting the motion to dismiss into a motion for

---

[40] *Tlingit and Haida Indians*, 147 Ct. Cl. at 342.

[41] *Id.*

[42] *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

[43] *Id.* at 327.

[44] *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

summary judgment."[45] Judicial notice can be taken of facts which are "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot be readily questioned."[46]

This case presents an issue of statutory interpretation: whether Congress intended to create off-reservation rights in the 1891 Act creating the Annette Islands Reserve. The State's review begins by assessing congressional intent. This requires considering the history and circumstances surrounding the creation of the reservation.

Resolving whether Congress intended to grant the Metlakatlans a fishing right should end this Court's inquiry on whether MIC has stated a claim. However, addressing MIC's secondary, aboriginal rights argument further demonstrates that MIC has failed to state a valid claim.[47]

### B. Congress did not intend to grant the Metlatkatlans an off-reservation fishing right.

MIC's amended complaint asserts that in 1891, "Congress intended for Community members to retain their right to fish in the waters surrounding the Annette Islands Reserve."[48] This assertion conflicts with the history and circumstances surrounding the Reserve as well as the congressional record. The 1891 Act also lacks ambiguity that could be inferred as granting off-reservation fishing rights.

---

[45]   *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[46]   *Id.*

[47]   *Tlingit and Haida Indians of Alaska*, 147 Ct. Cl. 315.

[48]   Amended Complaint, ¶¶ 30, 33-34, 51.

Interpreting a statute, executive order, or treaty is similar to contract interpretation.[49]  Intent is derived from considering the "circumstances surrounding [the reservation's] creation, and the history of the Indians for whom it was created."[50]   Again, borrowing contract interpretation principles, the Indian law canons of construction direct that "doubtful expressions" or "ambiguities in construction must be resolved in favor of the Indians" based on the circumstances surrounding the creation of the reservation.[51]  These canons of construction cannot be used to interpret or expand executive orders, statutes or treaties "beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."[52]

To determine congressional intent, the state first addresses the unique history of the Metlakatlans and the creation of the Annette Islands Reserve.  Those circumstances provide the lens for this Court to resolve any ambiguity, if any exists, in the 1891 Act in the Tribe's favor.  This review will reveal Congress wanted to grant Father Duncan and the Metlakatlans safe harbor, but they never intended to grant any off-reservation fishing rights.[53]

---

[49]  *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979).

[50]  *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981).

[51]  *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995).

[52]  *Skokomish Indian Tribe v. France*, 320 F.2d 205, 207 (9th Cir. 1963).

[53]  21 Cong. Rec. 10092.

12

1. **The circumstances surrounding the Metlakatlans and creation of the Annette Islands Reserve is unique compared to other tribes and reservations.**

Reviewing the history of other tribes and their resulting treaties, executive orders, and statutes, provides the best way to explain the uniqueness of the Metlakatlans and the Annette Islands Reserve.  Contract principles often provide the context for explaining the "circumstances surrounding" these reservations to guide in determining congressional intent.[54]

The Treaty of the Yakima, a Palmer-Stevens treaty, provides a good starting point. As negotiated, the Yakima in their treaty did "cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied and claimed by them."[55]  As consideration for ceding these lands, the United States granted the Yakima a reserve for the "exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation."  Regarding fishing, the treaty granted the Yakima "the exclusive right of taking fish in all the streams, where running through or bordering said reservation . . . also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory."[56]  The Treaty with the Yakima reveals a contractual relationship between the United States and the Tribe, where consideration flows between the parties. As a result of that exchange, the Yakima Tribe

---

[54]  *Parravano*, 70 F.3d at 544.

[55]  Act of June 9, 1855, 12 Stat. 951, 1855 WL 10420.

[56]  *Id.*

retained an off-reservation fishing right based on their aboriginal rights—an issue more thoroughly discussed later in this brief.[57]

Negotiations between the parties, almost mirroring a parole evidence rule in contract interpretation, also can help divine the parties' intent.[58] "Negotiations and diplomatic correspondence of the contracting parties relating to the subject matter" can help show congressional intent.[59] For example, the executive orders creating the Chehalis Reserve are devoid of any references to off-reservation fishing rights or even references to fishing.[60] Interpreting these executive orders, the Ninth Circuit affirmed that because there were no negotiations between the Chehalis and the U.S., the rights conferred in the executive orders were limited to the expressed terms of the treaty: reservation lands, some money for each member, and agricultural supplies.[61] The Ninth Circuit reached this conclusion even though the U.S. was relocating the Chehalis and

---

[57] *Winans*, 198 U.S. at 380.

[58] "In 1871, Congress enacted a statute that purported to prohibit entering treaties with the Indian nations or tribes." *U.S. v. Lara*, 541 U.S. 193, 218 (2004). As a result, agreements with tribes were often then made by statute or until 1919 by executive order. *Parravano*, 70 F.3d 539, 545. To be binding, these executive orders had to be ratified by an "Act of Congress." *Antoine v. Washington*, 420 U.S. 194, 204 (1975).

[59] *Factor v. Labenheimer*, 290 U.S. 276, 294-95 (1933); *Winans*, 198 U.S. at 381.

[60] Executive Orders Relating to Indian Reservations, Chehalis Reserve May 17, 1864, 110-11 (Wash. Gov't Printing Office 1902); available at: http://lcweb2.loc.gov/service/gdc/scd0001/2012/20120509002ex/20120509002ex.pdf (accessed on September 11, 2020).

[61] *Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334, 342 (9th Cir. 1996).

resolving their land claims.[62]  Absent a record of negotiations or executive order language suggesting off-reservation fishing rights, the Court determined the U.S. did not intend to grant the Chehalis any off-reservation fishing rights.[63]

In contrast to the Chehalis Reserve, the Colville Reservation's 1891 Agreements and executive orders included off-reservation fishing and hunting rights that corresponded with the parties' negotiations.  In 1890, the Colville Commission was created to address changing the size and shape of the Colville reservation.[64] The Colville were directly involved in all negotiations.[65]  The parties' final agreement, which included financial consideration, granted the Colville "the right to hunt and fish in common with all other persons on lands not allotted to said Indians."[66]  About those off-reservation fishing rights, the agreement noted they would not "be taken away or in anywise abridged."[67] Congress ratified the agreement.[68]  The U.S. Supreme Court determined that the Colville Tribe's right to hunt and fish off-reservation had been retained because of the parties' expressed intent and the inclusion of the phrase: "the right to hunt and fish in

---

[62]  *Id.*

[63]  *Id.*; *see also Choate v. Trapp*, 224 U.S. 665, 673-74 (1912) (noting the importance of negotiations and consideration between the tribe and the United States in determining congressional intent).

[64]  *Antoine*, 420 U.S. at 198 n.5.

[65]  *Id.*

[66]  *State v. Antoine*, 511 P.2d 1351, 1353 (Wash. 1973).

[67]  *Id.*

[68]  *Antoine*, 420 U.S. at 198.

common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged."[69]

Applying these principles here, the facts and circumstances surrounding the creation of the Annette Islands Reserve differ significantly from any of the reservations mentioned above, and relied on in MIC's complaint. The Metlakatlans arrived in the United States on Annette Island with Father Duncan in 1887 seeking "religious and economic freedom in the United States as an alternative to oppressive conditions in British Columbia."[70] The Metlakatlans voluntarily emigrated; they were not forcefully relocated by the U.S. to the Annette Islands.[71] As Congress understood, Metlakatlans were not Alaska Natives and had no claims to U.S. lands.[72] With no land claims, the Metlakatlans did not negotiate with the U.S. to settle any claims.[73] These circumstances differ materially from that of the Yakima, the Nez Pierce, the Colville, or almost all of the Palmer Stevens treaty tribes; tribes who had land claims and aboriginal rights and then relinquished those claims while negotiating for the retention of off-reservation rights.[74]

---

[69]  *Id.* at 207.

[70]  *Booth*, 17 Alaska at 572.

[71]  *Id.*

[72]  *See* 21 Cong. Rec. 10092-93.

[73]  *Id.*

[74]  Treaty with the Nez Perces, 15 Stats. 693 (1868); Treaty with the Yakima, 12 Stat. 951 (1865); General Allotment Act of 1887, 24 Stat. 388 (1887); *see also U.S. v. State of Or.*, 29 F.3d 481, 484 (9th Cir. 1994); and *U.S. v. State of Wash.*, 520 F.2d 676, 682-83 (9th Cir. 1975) ("The Indians west of the Cascade Mountains were known as "fish-eaters"; their diets, social customs, and religious practices centered on the

The Court must consider these circumstances in resolving any potential ambiguity in the 1891 Act.

> **2. Recognizing the unique circumstances surrounding the history of the Metlakatlans and the Annette Islands Reserve, a review of the 1891 Act and the 1890 congressional record reveals Congress never intended to grant off-reservation fishing rights.**

The State next assesses whether the 1891 Act has any ambiguity suggesting off-reservation fishing rights. Any ambiguity must be resolved in the Tribe's favor based on the unique circumstances surrounding the creation and history of the Annette Islands Reserve.[75]

For example, courts have resolved ambiguities about a reservation's boundaries in the tribe's favor based on the circumstances surrounding the creation of the reservation. In *Yankton Sioux Tribe v. U.S.*, the Court resolved a boundary ambiguity in the Tribe's favor because the treaty's lack of call points required that "the final boundaries of the reservation had to be settled in the field by subsequent survey."[76] Similarly, in *Puyallup Indian Tribe v. Port of Tacoma*, the Ninth Circuit resolved determined the reservation's

---

capture of fish. Their fish-oriented culture required them to be nomadic, moving from one fishing spot to another as the runs varied with the seasons . . . . In exchange, [Governor Stevens] promised the tribes money and the benefits of the white man's civilization material goods and education. *Governor Stevens assured them, moreover, that they were restricted to the reservations only for the purpose of residence; he explained that they would remain free to fish off the reservations at their traditional fishing places in common with the white settlers.*" (emphasis added)).

[75]  *Choctaw Nation*, 397 U.S. at 631.

[76]  623 F.2d 159, 166 (Ct. Cl. 1980).

boundaries the tribe a river bed and navigable water.[77]  The Ninth Circuit determined the water provided a necessary fishery resource for the tribe, and thus the U.S. intended to include it as part of the reservation for their benefit.[78]  Without explaining the exact ambiguity, the Ninth Circuit summarized its analysis, finding, "the Government's awareness of the importance of the water resources to the Tribe taken together with the principle of construction resolving ambiguities in transactions in favor of the Indians warrants the conclusion that the intention to convey title to the waters and lands under them to the Tribe is otherwise made very plain."[79]

Courts have held that particular ambiguous phrases in treaties and executive orders preserved off-reservation fishing rights.  For example, the phrase to fish and hunt in all "usual and accustomed places," has been resolved in favor of  tribes to define an off-reservation fishing rights.[80]  Similarly, the phrase "the right to hunt on the unoccupied lands of the United States so long as game may be found thereon" granted a tribe an off-reservation right to hunt and fish on lands which were formerly reservation lands.[81]  Therefore, Courts have found the phrase "sufficient for their wants" should be resolved in the Tribe's favor by reviewing the "circumstances surrounding [the reservation's]

---

[77]  717 F.2d 1251, 1258 (9th Cir. 1983).

[78]  *Id.*

[79]  *Id.*

[80]  *Winans*, 198 U.S. at 378; *Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 675, 678.

[81]  *State v. Tinno*, 497 P.2d 1386, 1390 (Idaho 1972).

creation, and the history of the Indians for whom it was created" to then recognize the intent to preserve off-reservation fishing rights.[82]

A rule on determining congressional intent to grant off-reservation fishing rights can be culled from these cases. First, the Court must find the presence of "a doubtful phrase" which suggests the intent to preserve an off-reservation fishing right. This "doubtful phrase" is then resolved by reviewing the history of the tribe and the circumstances surrounding the creation of the reservation to determine the parties' intent.

When applied to the 1891 Act, there are no doubtful expressions suggesting an off-reservation fishing right, and the circumstances under which the Annette Islands Reserve was created do not support the existence of an off-reservation fishing right. Further, even if a "doubtful expression" existed, the circumstances here – in particular the 1890 congressional record – fails to demonstrate that Congress intended to preserve or grant an off-reservation fishing right to the Metlakatlans.

The 1891 Act, in full, states,

> That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla [sic.] Indians, and those people known as Metlakahtlans [sic.] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may prescribed from time to time by the Secretary.[83]

---

[82] *Moore v. U.S.,* 157 F.2d 760, 762 (9th Cir. 1946); *Colville Confederated Tribes,* 647 F.2d at 47.

[83] 26 Stat. 1101.

The plain language of the 1891 Act undermines MIC's assertion of an off-reservation fishing right, as it contains no language—ambiguous or not—pertaining to off-reservation rights.

If Congress in 1891 intended to grant Metlakatlans off-reservation rights, it certainly knew the appropriate language to use. With the Palmer and Stevens treaties, entered into at least thirty years before Congress created the Reserve preserved off-reservation fishing rights by referring to "usual and accustomed places."[84] Congress was also aware of the 1890 Colville negotiations and the negotiated language to preserve off-reservation fishing rights.[85] Congress could have included similar language in the 1891 Act creating the Annette Islands Reserve, but did not. Furthermore, if Congress intended to preserve off-reservation rights for the Metlakatlans, the issue would have been raised during the 1890 floor debate.[86] It was not.[87]

Instead, the plain language of the 1891 Act supports a finding that Congress intended to provide a land grant of the Annette Islands. The 1891 Act states the Annette

---

[84] *See U.S. v. State of Wash.*, 157 F.3d 630, 647 (9th Cir. 1998) (noting most of the Palmer and Stevens treaties were entered into in 1855); *Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 668; *see also* Charles D. Bernholz and Robert J. Weiner, Jr., The Palmer and Stevens "Usual and Accustomed Places" Treaties in the Opinions of the Courts, 25 Government Information Quarterly, 778-795 (2008), available at: https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1179&context=libraryscience (accessed on September 9, 2020).

[85] *Antoine*, 420 U.S. at 198.

[86] *See* 21 Cong. Rec. 10092-10093.

[87] *Id.*

Islands will be "set apart as a reservation for the use of the Metlakahtla [sic.] Indians, and those people known as Metlakahtlans [sic.] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them."[88]  The phrase "set apart as a reservation for the use" mirrors treaty land grant language.  Article 2 of the Treaty with the Yakima--which the specific article creating the reservation--states, "There is, however, reserved, from the lands above ceded for the use and occupation."[89]  Then, Article 3 of the Treaty grants the Yakima the right to take "fish at all usual and accustomed places."[90]  The Treaty with the Quinaielt, also uses the phrase "use and occupation of the tribes" about the land grant for the reservation, and then addresses off-reservation fishing rights in another article with different language.[91]  The plain language of the 1891 Act, which uses language similar to land grant language in Palmer-Stevens treaties, indicates that Congress intended to grant land to the Metlakatlans and did not intend to create or preserve any off-reservation fishing right.

The 1891 Act's Reserve boundaries, however, were admittedly ambiguous, and this provides a strong counterpoint to the lack of ambiguity related to off-reservation fishing rights.[92]  Other treaties, executive orders, and statutes creating reservations

---

[88]   26 Stat. 1101.

[89]   12 Stat. 951.

[90]   *Id.*

[91]   Treaty with the Quinaielt, 12 Stat. 971 (July 1, 1855).

[92]   717 F.2d at 1258 (addressing the ambiguity as to the Puyallup Tribe's boundaries).

typically include coordinates and obvious markers of the reservation's boundaries.[93]  The

1891 Act lacked such precision.  To resolve this ambiguity, in the 1916 President grant

the Metlakatlans an exclusive fishery.  But with concerns about the legality of the

presidential proclamation, ultimately the *Alaska Pacific Fisheries v. U.S.* decision

resolved the ambiguity in the Metlakatlans' favor.[94]

The Court held that Congress intended to include the immediate and intervening

waters surrounding the islands when it created the Reserve. About the 1891 Act's

boundaries, the Court noted Congress provided the Metlakatlans a "body of lands known

as Annette Islands" and used a "geographical name . . .  as is sometimes done, in a sense

embracing the intervening and surrounding waters as well as the upland—in other words,

as descriptive of the area comprising the islands."[95]  With this being a "doubtful

expression," the Court found Congress intended to include the waters up to 3,000 feet

from the Annette Islands, which happened to be the same boundary created by the 1916

---

[93]     *See Executive Orders Relating to Indian Reservations*, Chehalis Reserve, p. 111
("Beginning at the post concern to sections 1 and 2, 35 and 36, on the township line between
townships Nos. 15 and 16 north, of range 4 west of the Willamette meridian, being the northeast
corner of the   reservation . . ."); Treaty with the Yakima; 12 Stat. 951 ("Commencing at Mount
Ranier, thence northernly along the main ridge of the Cascade Mountains to the point where the
northern tributaries of Lake Che-lan and the southern tributaries of the Methow River have their
rise; thence southeasterly on the divide between the waters of Lake Che-lan and the Methow
River to the Columbia River…").  The text *Executive Orders Relating to Indian Reservations*
cited in this brief includes all of the various tribe's executive orders and provides important
context in showing the ambiguity of the 1891 Act's description of the Annette Islands Reserve's
boundaries.

[94]     *Alaska Pacific Fisheries Co*., 248 U.S. at 88-89; *Hynes v. Grimes Packing Co*., 337 U.S.
86, 113-14 (1949).

[95]     *Alaska Pac. Fisheries*, 248 U.S. at 89.

Presidential Proclamation.[96]  Therefore, the U.S. Supreme Court resolved the one

ambiguity in the 1891 Act—the precise boundary of the Reserve.[97]

Pragmatism drove the *Alaska Pacific Fisheries* decision.  Unlike the district court

and the Ninth Circuit, the U.S. Supreme Court did not rely on the 1916 Presidential

Proclamation to determine the Reserve's boundaries and the area in which the

Metlakatlans enjoy an exclusive right to fish.[98]  Revisiting the *Alaska Pacific Fisheries*

decision thirty years later, the U.S. Supreme Court admitted the Court had concerns about

the legality of the 1916 Presidential Proclamation, which is why the decision does not

rely on it.[99]  Still, the U.S. Supreme Court reached the same result as the 1916

Presidential Proclamation but via statutory interpretation.[100]

Taken together -- the absence of any ambiguity and the circumstances surrounding

creation of the Annette Islands Reserve, the 1890 congressional record, and the plain

language of the 1891 Act -- Congress did not intend to grant Metlakatlans an off-

reservation fishing right. Congress believed the Metlakatlans were not a U.S. tribe, let

---

[96]     *Id.*

[97]     The U.S. Supreme Court's decision in *Alaska Pacific Fisheries* apparently did not resolve
all of the Annette Islands Reserve's boundary disputes. In 1993, the Department of the Interior
issued a decision rejecting MIC's assertion that the Annette Islands Reserve's boundaries
included Warburton Island. *State of Alaska Forest Service, U.S. Dept. of Agriculture*, 1993 WL
417977 (IBLA, July 12, 1993). Then in 2007 and 2008, the Department of the Interior
considered expanding the Annette Islands Reserve's boundaries to basically include fishing
districts 1 and 2. State of Alaska Community and Regional Affairs, HJR 30, Feb. 12, 2008;
available at: http://www.legis.state.ak.us/basis/Meeting/Detail/?Meeting=HCRA%202008-02-
12%2008:00&Bill=HJR%2030 (accessed on Sept. 11, 2020).

[98]     248 U.S. at 88-89; *Alaska Pac. Fisheries v. U.S.*, 240 F. 274, 283-84 (9th Cir. 1917).

[99]     *Hynes,* 337 U.S. at 113-14.

[100]     *Id.*

alone an Alaskan Native tribe, so the U.S. and Metlakatlans had no land claims to settle.[101] The United States was not relocating the Metlakatlans, nor were the Metlakatlans relinquishing aboriginal or land title.[102] The 1890 Congressional Record - the most accurate expression of Congress' intent - never mentions fishing, much less off-reservation fishing.[103] Congress had experience preserving off-reservation fishing rights for the Colville and the Palmer and Stevens treaties tribes and did not do so here.[104] That the 1891 Act and the 1916 Presidential Proclamation were both later deemed takings from the Tlingits and Haidas further demonstrates that the Metlakatlans had no aboriginal title that Congress intended to retain or protect with the 1891 Act.[105]

> ### C. If MIC had any aboriginal rights to preserve, those rights did not survive the Court of Claims' decision in *Tlingit and Haida Indians v. United States* or ANCSA.

Based on the Court of Claims' decision in 1959 and ANCSA's passage in 1971, MIC cannot show that they had aboriginal rights.[106] Without an aboriginal right, MIC's claims lack foundation. The State failed to find a single decision, state or federal, where a court found a tribe had implied off-reservation fishing rights in the absence of an

---

[101]    21 Cong. Rec. 10092-10093.

[102]    21 Cong. Rec. 10092-10093.

[103]    21 Cong. Rec. 10092.

[104]    *Id*.

[105]    The State likely will be required in its reply brief to further address MIC's complaint's flawed reliance the *Confederated Tribes of Chehalis* decision. *Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334 (9th Cir. 1996).

[106]    *Tlinigit and Haida Indians of Alaska v. U.S.*, 147 Ct. Cl. 315, 334 (Ct. Cl. 1959); 43 U.S.C. § 1603.

aboriginal right.[107]  Therefore, if MIC has no aboriginal right, there can be no implied

off-reservation fishing right Congress could preserve.

A brief overview of aboriginal title law provides context for the Court of Claims'

decision in *Tlingit and Haida Indians v. United States* and the consequences of ANCSA.

"Aboriginal title [i.e. or rights] refers to the right of the original inhabitants of the United

States to use and occupy their aboriginal territory."[108]  "It exists at the pleasure of the

United States and may be extinguished by treaty, by the sword, ***by purchase***, by the

exercise of complete dominion adverse to the right of occupancy, or otherwise."[109] "The

tribe . . .must exercise full dominion and control over the area, such that it possesses the

right to expel intruders."[110] "Exclusivity is established when a tribe or a group shows that

it used and occupied the land to the exclusion of other Indian groups."[111]  Understanding

exclusivity and what aboriginal title actually means are key to assessing MIC's assertions

of aboriginal fishing rights in Southeast Alaska.[112]

---

[107]     The U.S. has expressly granted tribes certain usufructuary rights even if the tribe had no aboriginal rights.  *See* Treaty with the Chippewa, 10 Stat. 1109 (September 30, 1855) (providing that "such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein"); Treaty with the Chippewa, 7 Stat. 503 (May 9, 1836).  MIC does not, given the plain language of the 1891 Act, assert that Congress expressly granted them usufructuary rights to off-reservation water or lands like the Chippewa.  Neither can MIC demonstrate that those rights bar the State from enforcing the limited entry fishery statutes against the Metlakatlans.

[108]     *Confederated Tribes of Chehalis Indian Reservation*., 96 F.3d at 341.

[109]     *Id*. (emphasis added).

[110]     *Native Village of Eyak v. Blank,* 688 F.3d 619, 623 (9th Cir. 2012).

[111]     *Id*.

[112]     Amended Complaint, ¶¶ 1, 13, 16, 19, 34, 51 (using the phrase "time immemorial" to denote the existence of aboriginal rights).

On June 19, 1935, Congress authorized the Tlingits and Haidas to file suit against the U.S. Government in the Court of Claims.[113]  The Tlingits and Haidas in Southeast Alaska sought to determine the scope of their aboriginal title, and to receive compensation for the federal government's taking of their land, including the Annette Islands Reserve.[114]

In 1959, the Court of Claims found that the Tlingits and Haidas had aboriginal title to Southeast Alaska and its waters, including the Annette Islands and the waters surrounding and adjacent to them.[115] In recognizing the Tlingits' and Haidas' aboriginal title, the Court of Claims noted, "[f]or approximately 17 years after the United States acquired Alaska, the Tlingit and Haida Indians continued to use and occupy their traditional areas without molestation or restriction."[116]  However, the creation of the Annette Islands Reserve in 1891 "dealt a severe blow to any hopes the Tlingits and Haidas might have had of regaining their lands."[117] The Court of Claims found that the 1891 Act creating the Annette Islands Reserve and the 1916 Presidential Proclamation defining its marine boundary were takings of the Tlingit and Haida Indians' aboriginal title to Southeast Alaska waters and lands.[118]

---

[113]    *Tlingit and Haida Indians*, 147 Ct.Cl. at 317-18; *see also* Act of June 19, 1935, 49 Stat. 388.

[114]    *Id*.

[115]    *Id*.

[116]    *Id*. at 334.

[117]    *Id*. at 338.

[118]    *Id*.

The Tlingit and Haida Indians had exclusive use--and thus aboriginal title-- of what is now fishing districts 1 and 2; not the Metlakatlans.[119]    MIC cannot demonstrate that Metlakatlans, or Canadian Tsimshian, had aboriginal rights to fish in Southeast Alaska which Congress intended to preserve in 1891.[120]  No amendments to MIC's complaint can cure this history.

To the extent the Metlakatlans may have had or retained some aboriginal rights after the Court of Claims' decision in *Tlingit and Haida Indians*, Congress extinguished those rights in 1971 by enacting the Alaska Native Claims Settlement Act ("ANCSA"). ANCSA extinguished "[a]ll aboriginal titles, if any, and all *claims* of aboriginal title in Alaska based on use and occupancy . . . including any aboriginal hunting or fishing rights that may exist."[121]  ANCSA also extinguished "[a]ll claims against . . . the State . . .that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska."[122]  Notably, these provisions do not use the term "Natives;" thus extinguishing

---

119    In their complaint, MIC refers to the 1891 Act's language creating the Reserve for the Metlakatlans and "such other natives as may join them" and thus suggests those other Alaska natives who joined Metlakatla may also have had preserved aboriginal rights. Amended Complaint, ¶¶ 2, 16.  If those Alaska Natives were Tlingits and Haidas who had aboriginal title, their aboriginal title to Southeast Alaska land and waters were impermissibly taken by the U.S., who then paid just compensation for the taking.  *Tlingit and Haida Indians of Alaska*, 147 Ct. Cl. at 334.  Then, ANCSA extinguished any remaining claims.  43 U.S.C. § 1603.

120    Amended Complaint, ¶¶ 1, 13, 16, 19, 34, 51.

121    43 U.S.C. § 1603(b) (emphasis added).

122    *Id.* § 1603(c).

all aboriginal titles and claims of aboriginal title within Alaska.[123] ANCSA flatly

contradicts MIC's assertion of aboriginal rights in Southeast Alaska.[124]

Based on *Tlingit and Haida Indians* and ANCSA, MIC has no basis to argue that

Metlakatlans have an aboriginal right that supports the right to fish free of State

regulation in fishing districts 1 and 2.

---

[123]    *Id*. § 1602(b).

[124]    Amended Complaint, ¶¶ 1, 13, 16, 19, 34, 38, 51 (use of the phrase "time immemorial.").

**D. Metlakatlans fishing outside of the Annette Islands Reserve are subject to State regulation even if Metlakatlans had aboriginal rights.**

The State does not concede that the Metlakatlans ever had any aboriginal right or claim to the waters adjacent to the Annette Islands Reserve and comprising fishing districts 1 and 2. Assuming for the sake of argument, however, that the Metlakatlans could meet their burden of proof and demonstrate that they have some aboriginal right, they still would be subject to State regulation because those aboriginal rights have not been recognized by federal law.

States have the right to regulate Indians fishing off-reservation, subject to only limited Supremacy Clause proscriptions. In *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, the U.S. Supreme Court, mirroring the argument MIC makes here, assessed whether Klamath tribal members had the right to "hunt and fish outside the reservation boundaries . . . free of state regulation" based on implied rights in a treaty.[125] The U.S. Supreme Court held,

> [E]ven if the Tribe had expressly reserved a 'privilege of fishing and hunting' on the ceded lands, our precedents demonstrate that such an express reservation would not suffice to defeat the State's power to reasonably and evenhandedly regulate such activity.[126]

The Supreme Court has repeatedly recognized a state's right to regulate Indians fishing off-reservation and has noted only some limitation to state regulatory authority,

---

[125]   473 U.S. 753, 764 (1985).

[126]   *Id*. at 768. This suggests that even if implied off-reservation fishing rights did exist, the State would still have the right to regulate off-reservation fishing.

29

determined by the language related to the rights conveyed in the treaty, statute, or executive order.[127]

In the absence of a treaty, statute, or executive order recognizing an off-reservation fishing right, a state has complete authority to regulate Indians fishing off-reservation.  In *Organized Village of Kake v. Egan*, the U.S. Supreme Court ruled that the State's power to regulate Indians fishing off-reservation was not limited where the Organized Village of Kake failed to show that they had "fishing rights derived from federal laws."[128]  In *Metlakatla Indian Community v. Egan*, the U.S. Supreme Court ruled that because Congress created the Annette Islands Reserve and named the Secretary of the Interior as the individual responsible for regulating the reservation, the State lacked the authority to regulate fish traps used *inside* the Reserve.[129] However, the Court noted that off-reservation fishing rights not protected by a federal treaty, agreement, or statute could be regulated by the State of Alaska without any limitations.[130]

---

[127]   *Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392 (1968); *Kennedy v. Becker*, 241 U.S. at 563-64; *Winans*, 198 U.S. at 384; *Washington Commercial Passenger Fishing Vessel Assn*, 443 U.S. at 682-84; *see also Tulee*, 315 U.S. at 684 (The state had the right to regulate all off-reservation fishing rights, but because the treaty allowed the tribe to fish at all "usual and accustomed places," the state could not require the Yakimas to pay a dip net fee when they fished at their off-reservation fishing sites.).  To determine the scope of the state's authority to regulate off-reservation fishing which have been granted by federal law, courts have applied the *Sohappy* factors. *U.S. v. Sohappy*, 710 F.2d 816, 823 (9th Cir. 1985). Here, without some expressed or implied off-reservation fishing right granted to the Metlakatlans, the *Sohappy* factors do not need to be evaluated.

[128]   369 U.S. 60, 76 (1962).

[129]   369 U.S. at 58-60.

[130]   *Id.* at 56-57; *see also Tlingit and Haida Indians of Alaska v. U.S.*, 182 Ct. Cl. 130, 143 (Ct. Cl. 1968).

No federal law recognizes that Metlakatlans have off-reservation fishing rights. The 1891 Act sought to provide the Metlakatlans a place where they would not get "plundered."[131]  Subsequent legislation has not recognized a Metlakatlan off-reservation fishing right.  In 1924, Congress passed an Act regulating Alaska fisheries.[132]  The law authorized the Secretary of Commerce to adopt regulations that were not exclusive and would be of "general application" to everyone fishing in Alaska waters.[133] Similarly, in 1958 , Congress defined the State of Alaska's jurisdictional scope, which the U.S. Supreme Court determined barred "state invasion . . . of Indian property authorized by federal treaty, agreement, statute, or regulation, but only those fishing rights and privileges given by federal treaty, agreement, or statute."[134]  If Metlakatlans had off-reservation fishing rights, the 1924 or 1958 legislation would have acknowledged them and thus expressed the limitations on the state's regulatory authority.[135]

In summary, even if the Metlakatlans had some aboriginal rights in Southeast Alaska waters, those rights were never recognized by the federal government.[136]  Without federal recognition of aboriginal rights, the State retains its full authority to regulate

---

[131]     26 Stat. 1101; 21 Cong. Rec. 10092-93; *Tlingit and Haida Indians of Alaska*, 182 Ct. Cl. at 143.

[132]     Act of June 6, 1924, 43 Stat. 464.

[133]     *Id*.

[134]     *Metlakatla Indian Cmty. v. Egan*, 369 U.S. at 56.

[135]     *Id*.

[136]     369 U.S. at 58-60.

Metlakatlans commercially fishing off-reservation, including requiring Metlakatlans to obtain a limited entry permit to fish commercially in districts 1 and 2.

## IV. Conclusion

Treaties, executive orders, and statutes creating reservations cannot be interpreted "beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."[137] MIC ignores this caution.

MIC instead interprets the 1891 Act beyond its clear terms and in a manner wholly inconsistent with Congress' intent in creating the Annette Islands Reserve, *Tlingit and Haida Indians of Alaska v. United States*, and ANCSA to attempt to give Metlakatla commercial fisherman a preferential right and advantage in fishing districts 1 and 2.[138]

Congress did not intend to grant Metlakatlans off-reservation fishing rights. Despite MIC's assertions, Congress created the Reserve to "give [the Metlakatlans] some recognized footing at that place" and so they did not "live in constant terror for fear their work and labor" would be lost by "somebody who desires to plunder them."[139]

For these reasons, the face of MIC's complaint fails to state a claim for which this Court may provide relief. Their complaint should be dismissed.

DATED: October 15, 2020.

---

[137] *Skokomish Indian Tribe v. France*, 320 F.2d 205, 207 (9th Cir. 1963).

[138] *Tlingit and Haida Indians of Alaska*, 147 Ct. Cl. 315; 43 U.S.C. § 1603; 21 Cong. Rec. 10092-93; Alaska Constitution, Art. VIII,§§ 15 and 17. ("No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State."); and *May v. State*, 168 P.3d 873 (Alaska 2007)(addressing Metlakatlans commercially fishing off-reservation.).

[139] 21 Cong. Rec. 10092.

CLYDE "ED" SNIFFEN
ACTING ATTORNEY GENERAL

By:    s/Christopher F. Orman
       Christopher F. Orman
       Alaska Bar No. 1011099
       Assistant Attorney General
       Office of the Attorney General
       Natural Resources Section
       Alaska Department of Law
       PO Box 110300
       Juneau, AK 99811-0300
       *christopher.orman@alaska.gov*
       Phone: (907) 465-3600
       Facsimile: (907) 465-3019

       s/Jeffrey G. Pickett
       Assistant Attorney General
       Alaska Bar No. 9906022

       Attorneys for the State of Alaska

33