**Christopher Lundberg,** OSB No. 941084
(pro hac vice)
Email: clundberg@hk-law.com
**Joshua J. Stellmon,** OSB No. 075183
(pro hac vice)
Email: jstellmon@hk-law.com
**HAGLUND KELLEY LLP**
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

    Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| **METLAKATLA INDIAN COMMUNITY,** a Federally Recognized Indian Tribe,<br><br>    Plaintiff,<br><br>    v.<br><br>**MICHAEL J. DUNLEAVY**, Governor of the State of Alaska, **DOUG VINCENT-LANG**, Commissioner of the Alaska Department of Fish and Game, and **AMANDA PRICE**, Commissioner of the Alaska Department of Public Safety<br><br>    Defendants. | Case No.: 5:20-cv-00008-JWS<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><br>**PLAINTIFF REQUESTS ORAL ARGUMENT** |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

II.  FACTUAL BACKGROUND. .............................................................. 3

III.  LEGAL STANDARD ........................................................................ 9

IV.  ARGUMENT ................................................................................... 10

    A.  Under Well-Settled Indian Law Principles, the Metlakatla Indian Community has Stated a Claim for an Implied Right To Fish Off-Reservation ................................................................. 10

    B.  The Metlakatla Indian Community has Alleged Sufficient Facts to State a Claim for an Implied Off-Reservation Fishing Right Under the *Chehalis* Framework ................................................. 17

    C.  The Community's Claims is Not Based on Its Aboriginal Rights ............... 29

        1.  Congressionally reserved rights do not require the existence of aboriginal rights ................................................................. 30

        2.  The Community and its members had an aboriginal right to fish in the waters surrounding the Annette Islands Reserve in 1891 ....................................................................................... 31

    D.  The State's Limited Entry Program Violates the Community's Reserved Off-Reservation Fishing Rights .................................... 33

V.  CONCLUSION ................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Pac. Fisheries v. U.S.*,
240 F. 274 (9th Cir. 1917)..................................................................3 17, 18, 26

*Alaska Pacific Fisheries v. United States*,
248 U.S. 78 (1918)...............................................................................*passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................9

*Atkinson v. Haldane*,
569 P.2d 151 (Alaska 1977)..............................................................................3

*Arizona v. California*,
373 U.S. 546 (1963)...................................................................................12, 13

*B & B Hardware, Inc. v. Hargis Industries, Inc.*,
575 U.S. 138 (2015).........................................................................................32

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................9

*Cappaert v. United States*,
426 U.S. 128 (1976)...................................................................................13, 30

*Cherokee Nation v. Georgia*,
30 U.S. 1 (1831)..............................................................................................18

*Colville Confederated Tribes v. Walton*,
647 F.2d 42 (9th Cir. 1981) ................................................................*passim*

*Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*,
96 F.3d 334 (9th Cir. 1996) ................................................................*passim*

*Dep't of Game v. Puyallup Tribe*,
414 U.S. 44 (1973).........................................................................................34

*Hynes v. Grimes Packing Co.*,
337 U.S. 86.............................................................................................16, 17

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 3 of 42

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ......................................................................... 9

*McGirt v. Oklahoma*,
   _ U.S. _, 140 S.Ct. 2452 (2020) .................................................................... 9

*Michigan v. U.S.*,
   464 U.S. 1124 (1981) ...................................................................................... 31

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999) ........................................................................................ 15

*Newcal Indus. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ......................................................................... 9

*Oneida County v. Oneida Indian Nation*,
   470 U.S. 226 (1985) ........................................................................................ 15

*Parravano v. Babbitt*,
   70 F.3d 539 (9th Cir. 1995) ............................................................................ 15

*Puyallup Tribe v. Dep't of Game*,
   391 U.S. 392 (1968) ........................................................................................ 34

*Strong v. United States*,
   518 F.2d 556 (Ct. Cl. 1975) ............................................................................ 33

*Territory of Alaska v. Annette Island Packing Co*,
   289 F. 671 (9th Cir. 1923) ............................................................................... 18

*Territory v. Annette Island Packing Co.*,
   6 Alaska 583 (D. Alaska 1922), *aff'd,* 289 F. 671 (9th Cir. 1923) ....................*passim*

*Tlingit and Haida Indians of Alaska v. U.S.*,
   177 F. Supp. 452 (Ct. Cl. 1959) ...................................................................... 32

*U.S. v. State of Mich.*,
   471 F. Supp. 192 (W.D. Mich. 1979), *rev'd on other grounds,* 623 F.2d
   448 (6th Cir. 1980) ..........................................................................................*passim*

*U.S. v. State of Mich.*,
   623 F.2d 448 (6th Cir. 1980) .......................................................................... 12

*U.S. v. Oregon*,
   718 F.2d 299 (9th Cir. 1983) .......................................................................... 34

*United States v. Santa Fe Pac. R.R.*,
  314 U.S. 339 (1941) ................................................................................. 15

*United States v. Winters*,
  207 U.S. 564 (1908) ........................................................................... *passim*

*United States v. Winans*,
  198 U.S. 371 (1905) ................................................................................. 13

**Statutes**

Act of March 3, 1891, c. 561, § 15, 26 Stat. 1101 (formerly codified at 25
  U.S.C. § 495) .................................................................................... 7, 13

Alaska Stat. Ann. § 16.43.290 ...................................................................... 8

**Other Authorities**

5 AAC 39.120 ............................................................................................. 8

20 AAC 05.620 ........................................................................................... 8

21 Cong. Rec. 10092 ........................................................................... 28, 29

*A Guide to the Indian Tribes of the Pacific Northwest* 207-08 (University of
  Oklahoma Press, 3d ed. 2010) ............................................................... 23

David Treuer, *The Heartbeat of Wounded Knee* 5-6 (Riverhead Books
  2019) ..................................................................................................... 23

F. Cohen, *Handbook of Federal Indian Law* 412 (2012 ed.) ........................ 17

FRCP 12 ...................................................................................................... 9

Henry S. Wellcome, *The Story of Metlakahtla* xiv (1887) ............................ 7

Interior, *Population and Resources of Alaska* 3 (1893) ........................... 4, 29

Kent Nerburn, *Chief Joseph & the Flight of the Nez Perce* (Harper Collins
  2005) ..................................................................................................... 23

Local Civil Rule 5.1(f) ................................................................................. 1

iv

Pursuant to Local Civil Rule 5.1(f), Plaintiff Metlakatla Indian Community requests oral argument on the Defendants' Motion to Dismiss.

I.  **INTRODUCTION.**

In 1887, a band of Metlakatlans arrived on the Annette Islands with the hope of creating a new, self-sufficient community. By 1890, a growing Community of 820 members, including 103 native Alaskans, had constructed a promising cannery, which served as the core of its economic plans for the future. The Metlakatlans had been a fishing people for thousands of years, and they continued that tradition on the Annette Islands where they fished throughout the nearby waters now designated districts 1 and 2 by the State of Alaska. In 1891, Congress created the Annette Islands Reserve to encourage the Metlakatla Indian Community's (the "Community") efforts and protect their future advancement. In doing so, Congress intended to reserve the Community's right to continue its practice of fishing outside of the Reserve in waters that were (and still are) absolutely essential to the Metlaktlans' success.

Thirty-one years after Congress created the Reserve, in 1922, the District Court of Alaska held, among other things, that the Territory of Alaska could not tax fish caught in fish traps placed within the Annette Island Reserve's reservation boundaries. While that case involved tax questions, the Court made an observation that mirrors the Metlakatla Indian Community's position in this case - namely that "the right of fisheries on the reservation and adjacent waters is reserved for the benefit of the Indians resident thereon". *Territory v. Annette Island Packing Co.,* 6 Alaska 583, 631 (D. Alaska 1922),

PAGE 1 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 6 of 42

*aff'd,* 289 F. 671 (9th Cir. 1923). Conversely, the District Court's conclusion is a stark rebuttal to the Defendants' current position, who now claim that the Community has no reserved, off-reservation fishing rights. The Defendants' position displays a fundamental misunderstanding of the applicable law and circumstances surrounding the creation of the Annette Islands Reserve.

As explained in more detail below, the legal principles that guide the Court's analysis here are well established and unique to questions of federal Indian law. Those guiding legal principles require an examination of Congress' purpose in creating the reservation, the culture of the people for whom the reservation was created, and the practice of those people before, during and after the creation of the reservation. And contrary to the State's position, in questions concerning the extent of a tribe's reserved rights, ambiguity is not required — nor is explicit language. The guiding legal principles understand that the extent of a tribe's rights associated with the creation of the reservation was often unarticulated, particularly when a reservation was established through an executive order or statute. Put differently, those analytical principles acknowledge that when the United States establishes an Indian reservation, it undertakes the solemn duty to care for that tribe's well-being — and the resulting trust relationship elevates the analysis above one that is simply transactional in nature.

In the case of the Metlakatla Indian Community, long-term tribal success was paramount to the Congress' creation of the Annette Islands Reserve as the Community's

PAGE 2 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

Case 5:20-cv-00008-JWS    Document 23    Filed 11/05/20    Page 7 of 42

new and permanent home.  Given that the tribal members of the Metlakatla Indian Community derived from native peoples who all had relied heavily for thousands of years on fishing in the waters of and around Southeast Alaska for subsistence and for trade, access to enough fish was critical to fulfilling Congress' purpose.  In that regard, the guiding legal principles make abundantly clear that the Community has stated a claim for relief – namely, whether Congress, in creating the Annette Islands Reserve, necessarily reserved for the Community the right to fish in off-reservation waters that were adjacent to and surrounding the reservation.

## II.    FACTUAL BACKGROUND.

Fishing has always been the bedrock of the Metlakatlans' way of life and that remains true today.  Plaintiff's First Amended Complaint ¶ 13 ("FAC").  While most of the Community members' ancestors are Tsimshians who had emigrated from British Columbia, many tribal members descend from the tribes of other Alaskan natives, such as the Tlingit, Haida, and Tsimshian tribes.[1]  All of the Community members' ancestors

---

[1] Throughout their motion, the Defendants try to discredit the Community's claim by suggesting that because most of its original members emigrated from British Columbia, the Community is somehow less deserving of the benefit of long-standing legal principles that favor federally recognized tribes.  In so doing, the Defendants ignore that courts have already addressed that fact and determined that it has no legal significance.  *See, e.g., Alaska Pac. Fisheries,* 248 U.S. 78, 89 (1918) ("True, the Metlakathtlans were foreign born, but the action of Congress had made that immaterial here."); *Atkinson v. Haldane*, 569 P.2d 151, 156 (Alaska 1977) ("The Supreme Court thus held that the fact that the Metlakatlans were not native to the United States did not change their essential reservation status when Congress had exercised its authority to establish that reservation.").  In short, the Community's move from British Columbia makes its

PAGE 3 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

historically fished the waters of British Columbia and Southeast Alaska for subsistence and commercial purposes for thousands of years.  FAC ¶¶ 13, 14, 19.

Until the passage of the State's limited entry program in 1972, no territorial, State or federal authority ever questioned the Metlakatlans' right to fish in what are now districts 1 and 2.  In fact, quite the opposite is true.  In a 1922 tax case holding that the Territory of Alaska could not tax fish caught by Metlakatlans in fish traps located within the reservation's boundaries, both the Territory of Alaska and the Department of Interior explicitly recognized that the Community had the right to fish outside of the Reserve.  FAC ¶ 25; *Annette Island Packing Co.*, 6 Alaska at 631.  Even more notably, in that case the District Court concluded that "**the right of fisheries on the reservation and adjacent waters is reserved** for the benefit of the Indians resident thereon".  *Id.* (emphasis added).

---

situation unusual, but Congress' decision to create the Annette Islands Reserve makes it irrelevant.

The Defendants also ignore that Congress specifically intended for the Community to include "other Alaskan natives," many of whom joined the Community from its earliest days.  *See* FAC ¶ 16.  In that regard, an 1890 Census compiled just three years after the Metlakatlans moved to the Reserve listed the population of Metlakatla as 720 Foreign and 103 Native.  Robert P. Porter, Department of the Interior, *Population and Resources of Alaska* at 3 (1893), digitally available at https://live.laborstats.alaska.gov/cen/histpdfs/1890census.pdf.  Presumably, the 720 members designated as "foreign" were those that moved from British Columbia in 1887 and the 103 designated "native" were members of other Alaskan tribes, such as the Tlingit, Haida, and other Tsimshian tribes.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Consistent with that tax case, the Community alleges that before the 1970s, its members fished openly throughout the waters of what are now Alaska Department of Fish & Game Districts 1 and 2. *See* FAC ¶ 35. In that regard, the First Amended Complaint identifies no less than fifteen historic fishing grounds used by the Metlatkalans with full knowledge of the territorial, state and federal authorities in Alaska. FAC ¶ 35. The Community identified those locations from historic records, government reports, and letters. *Id.* The off-reservation fishing grounds are clustered along the eastern shore of Prince of Wales Island in what is now district 2 and the western shore of the mainland in what is now district 1. FAC, Ex. C. The Metlakatlans also traveled north to areas near Ketchikan and south to Duke Island. *Id.*

As alleged in its First Amended Complaint, while the Community's off-reservation fishing was open and known to all governmental authorities, not one of those authorities ever disavowed or attempted to limit the Metlakatlans' off-reservation fishing practice. *See, i.e.,* FAC ¶ 35 (a)-(c). For example, the United States (who controlled the fishery and waters in Southeast Alaska before Alaska' statehood) knew of and supported the Metlakatlans' off-reservation fishing. The 1896 "Report on the Salmon Fisheries of Alaska," drafted just five years after Congress created the Annette Islands Reserve, acknowledged that the Metlakatlans were fishing off-reservation and noted that they "have equal [fishing rights]" with others in Alaska waters. FAC ¶ 35(c). Three years later, in 1899, another report to the Secretary of the Treasury regarding the Alaskan

PAGE 5 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 10 of 42

fishing industry spoke highly of Metlakatla's cannery and noted that the Metlakatlan fishermen caught fish in numerous off-reservation locations. FAC ¶ 35(d). Also, a 1902 report entitled "The Salmon and Salmon Fisheries of Alaska, Report of the Alaskan Salmon Investigations of the United States Fish Commission Steamer Albatross in 1900 and 1901" identified numerous Metlakatlan fishing grounds throughout districts 1 and 2. FAC ¶ 35(c).

Fishing logs from Metlakatlan vessels show that the Community's off-reservation fishing continued unimpeded for decades. FAC ¶ 35(l). Those logs showed that the Metlakatlans fished at Cape Chacon, south of Prince of Wales Island, west of Dall Island, near Ham and Mary Islands, and around Percy Islands as late as the mid-1950s. *Id.*

Everyone in the area—and anyone who investigated the Metlakatlans' situation— would have understood from the Community's history and fishing practice that access to off-reservation fishing grounds was essential to their success. In fact, when the Community moved from Old Metlakatla, a committee selected the Annette Islands for the site of their new community largely because it provided access to excellent fisheries. FAC ¶ 14. There, Community members continued their traditional fishing practices and set up a salmon cannery to market the catch. *See* FAC ¶ 35.

Because of the Community's history and circumstances, Congress knew that the Metlaktlans sought protection of their fishing grounds—the primary resource needed by the Community—and created the Annette Islands Reserve in 1891 to provide that

PAGE 6 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 11 of 42

security.  *See, i.e.,* FAC ¶ 51; Act of March 3, 1891, c. 561, § 15, 26 Stat. 1101 (formerly codified at 25 U.S.C. § 495).  Congress knew of the Metlaktlans because of the lobbying efforts of Americans such as Henry Wellcome, a prominent philanthropist, explorer, and supporter of the Community.  Mr. Wellcome wrote a book called "The Story of Metlakahtla" to ask that the American government protect the Community and its industries.[2]  In his introduction, Mr. Wellcome explained clearly that the Metlakatlans were seeking a home with "suitable fishing and hunting grounds."  Henry S. Wellcome, *The Story of Metlakahtla* xiv (1887), *available digitally at* https://archive.org/details/storyofmetlakaht00wellrich/page/n11/mode/2up.

Also, in its 1891 Act creating the Annette Islands Reserve, Congress included an invitation for "other Alaskan natives" to join the Tsimshians emigrating from British Columbia.  Act of March 3, 1891, c. 561, § 15.  Both before and after 1891, members of the surrounding Tlingit, Haida, and Tsimshian tribes joined the Community, where they continued to fish in their historic fishing grounds.  FAC ¶¶ 2, 16.

When it created the reservation in 1891, Congress did so with an awareness that the tribal members who had emigrated from British Columbia and Alaskan natives who joined and would join the Community had all relied heavily on the fisheries of Southeast Alaska for trade and other reasons.  Notably, Congress did not diminish or limit in any

---

[2] Most historic records refer to "Metlakatla" as "Metlakahtla."  This Opposition uses the spelling from the quoted sources.

PAGE 7 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS    Document 23    Filed 11/05/20    Page 12 of 42

way that fishing right when it established the Annette Islands Reserve—nor has it taken any action to do so since 1891. Doing so would have been (and would be) economically ruinous and "inconsistent with the use of the resource by the Indians at the time." *U.S. v. State. of Mich.*, 471 F. Supp. 192, 257 (W.D. Mich. 1979), *rev'd on other grounds,* 623 F.2d 448 (6th Cir. 1980).

In contrast, in enacting the State's limited entry program and refusing to issue Metlakatlans permits for fish caught on the reservation, the State has done just that – threatened the economic existence of the Community. FAC ¶ 46-49. Under the program, the State supposedly issued the permits to those who were most dependent on the fishery based on "past participation" and "economic dependence" on the fishery. Alaska Stat. Ann. § 16.43.290; 20 AAC 05.620. However, even though the Metlakatlans have been and continue to be among the most economically dependent on the fisheries of Southeast Alaska, the State arbitrarily excluded Metlakatlan fishermen from participation. FAC ¶ 49.

Moreover, the Metlakatlans' lack of flexibility to fish off-reservation leaves the Community at a severe disadvantage compared to non-Metlakatlan fishermen. Unlike limited entry permit holders, the Metlakatlans are unable to effectively target fish. Limited-entry permit holders are able to move their fishing activities within districts during a season and between districts from year-to-year to target fish. *See* 5 AAC 39.120(a)(3)(c)(1). However, Community fishermen lack that same flexibility to respond

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

to changing fish migrations, which can shift over time due to climate change and other environmental factors. FAC ¶ 40. Further, because Community members cannot go off-reservation to target fish, the State-managed fisheries are able to intercept migratory fish that would otherwise pass through Reserve waters, unfairly denying the Community access to enough fish to support itself. FAC ¶ 41.

## III. <u>LEGAL STANDARD.</u>

When considering a motion to dismiss, the court must both "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court also must draw all reasonable inferences from the facts alleged in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043, n. 2 (9th Cir. 2008).

To defeat a motion to dismiss under FRCP 12(b)(6), a Plaintiff need not allege "specific facts beyond those necessary to state his claim and the grounds showing entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

///

///

///

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

## IV.   ARGUMENT.

### A.   Under Well-Settled Indian Law Principles, the Metlakatla Indian Community has Stated a Claim for an Implied Right to Fish Off-Reservation.

The question presented in this case is whether Congress reserved an off-reservation right to fish for the Metlakatla Indian Community.  Unique Indian law principles arising from the trust relationship between the Government and Indian tribes apply to that analysis.

Defendants' central argument that reserved rights must appear in the document creating a reservation rests on the flawed premise that "[c]ontract principles often provide the context for explaining the 'circumstances surrounding' [reservations] in determining congressional intent."   Defs.' Mot. at 13.  The Defendants' brief misses the mark because it fails to recognize that this matter is governed by well-established principles of Federal Indian law grounded in the trust relationship between Native Americans and the Federal Government.   Far from the transactional analysis under contract law, determining whether the document creating a reservation includes implied rights requires the court to look beyond the document itself to the "the circumstances surrounding their creation, and the history of the Indians for whom they were created." *Confederated Tribes of Chehalis Indian Reservation v. State of Wash.*, 96 F.3d 334, 342 (9th Cir. 1996).

In *Chehalis,* the Ninth Circuit emphatically rejected Defendants' current argument that courts cannot look beyond the scope of the document creating the reservation to

PAGE 10 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR  97201
T: (503) 225-0777 / F: (503) 225-1257

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 15 of 42

decide if an implied off-reservation fishing right exists. The Ninth Circuit reversed the District Court's finding that "off-reservation fishing rights must be expressly reserved," finding that the question was whether Congress had impliedly reserved off-reservation rights based on Congress' purpose in creating the reservation. *Id.* Notably, the Court did not look for an ambiguity. Rather, it looked at the totality of the circumstances around the creation of the reservation to determine what rights the tribe retained. *Id.* The Court considered the documents creating the Chehalis and Shoalwater Reservations, "the circumstances surrounding their creation, and the history of the Indians for whom they were created." *Id.*

The Ninth Circuit drew its framework in *Chehalis* from its prior decision in *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981), where it held that the Colville Confederated Tribes had implied reserved water rights in light of Congress' understanding and intent that the tribe would farm on its reservation in arid Eastern Washington. *Chehalis*, 96 F.3d at 342 ("[The District Court's] findings show that the court conducted the inquiry required in *Colville Confederated Tribes.*"). The *Colville Confederated Tribes* decision applied the well-known *Winters* doctrine. *See United States v. Winters,* 207 U.S. 564, 576 (1908). The Ninth Circuit summarized the doctrine as requiring courts to consider the circumstances surrounding the reservation, the history for whom the reservation was created, and the tribe's need to maintain themselves under changed circumstances to determine if an implied reserved right exists. *Colville*

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

*Confederated Tribes,* 647 F.2d at 47. Similarly, "Congress intended to deal fairly with [the Colville] by reserving waters without which their lands would be useless." *Id.* (citing *Arizona v. California*, 373 U.S. 546 (1963) as similar application of the *Winters* Doctrine).

In *Winters,* the seminal case on implied reserved rights, the Supreme Court held that implied reserved rights flow from the purpose of the reservation. *Winters,* 207 U.S. at 576-78. The Court determined that Government's purpose in creating the reservation was to give the Gros Ventre and Assiniboine bands of Indians a permanent place to live, where they would give up their prior lives as hunter-gatherers and embrace agriculture. *Id*. at 576-77. Achieving that purpose would have been impossible on the arid plains of eastern Montana without water rights. *Id*. Therefore, the U.S. Government had impliedly reserved water rights for the Indians on the Fort Belknap Reservation based on the purpose of the reservation, despite there being no reference to such rights in the agreement creating the reservation or the record of negotiations. *Id.*

The Western District of Michigan applied *Winters* in the implied off-reservation fishing context and found that the Ottawa and Chippewa had implied reserved rights to fish in Lake Michigan based on the circumstances surrounding the creation of their reservation. *U.S. v. State of Mich.,* 471 F. Supp. at 257-58.[3] The Court held that fishing

---

[3] The Sixth Circuit upheld the District Court's finding that an implied fishing right existed, but remanded to consider the permissibility of State regulations of the tribes' rights. *U.S. v. State of Mich.*, 623 F.2d 448 (6th Cir. 1980). The case then made its way back to the Sixth Circuit, 653, F.2d 277 (1981), and the Supreme Court eventually denied

PAGE 12 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

Case 5:20-cv-00008-JWS    Document 23    Filed 11/05/20    Page 17 of 42

"[r]ights are reserved by implication if they are not expressly relinquished and a contrary conclusion is inconsistent with the use of the resource by the Indians at the time of the treaty." *Id.* at 257 (citing *Winters v. United States*, 207 U.S. 564(1908); *United States v. Wheeler*, 435 U.S. 313 (1978); *Cappaert v. United States*, 426 U.S. 128 (1976); *Arizona v. California*, 373 U.S. 546 (1963); *United States v. Winans*, 198 U.S. 371, 381 (1905)). The Court looked at the circumstances surrounding the creation of the reservation and found that "the Indians were absolutely dependent upon fishing for subsistence and their livelihood" and that the United States intended for them to remain dependent on that resource. *United States v. State of Mich.,* 471 F. Supp. at 253. Given those circumstances and the trust relationship, the Court found that the Ottawa and Chippewa had an implied off-reservation fishing right.

None of the implied-rights cases discussed above involved any ambiguity in the documents creating the reservations as the Defendants wrongfully argue is necessary.[4]

---

a writ of certiorari. *Michigan v. U.S.*, 464 U.S. 1124 (1981). In fact, the Supreme Court denied writs of certiorari in each of the key cases relied upon by Plaintiff including *Chehalis Confederated Tribes, Colville Confederated Tribes,* and *U.S. v. Michigan*. The Court's consistent denial of those writs indicates that, over the course of decades, the Supreme Court believes that the lower courts are applying the *Winters* doctrine correctly.

[4] Even though no ambiguity is required, it is worth noting that the 1891 Act includes an ambiguous phrase that supports the Community's claim. In that regard, in the Act, Congress stated that the Annette Islands would be "set apart as a reservation **for the use** of the Metlakahtla Indians . . . ." Act of March 3, 1891 (emphasis added). As explained above, in creating the reservation Congress intended "to conform its action to [the Metlakatlans'] situation and needs." *Alaska Pacific Fisheries*, 248 U.S. at 89. When Congress' intention is considered in the light of the Metlakatlan's use of the off-reservation fisheries in districts 1 and 2 before and after the creation of the reservation,

PAGE 13 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 18 of 42

Rather than ambiguities, the decisions each relied on reasonable inferences drawn from the circumstances surrounding the creation of the reservations and the history of the tribe for whom they were created. *See Winters*, 207 U.S. at 576-77; *accord, Alaska Pac. Fisheries v. United States*, 248 U.S. at 89 (inferring that Congress intended to protect the Metlakatlans' fishing rights based on the Congressional purpose in creating the Annette Islands Reserve); *U.S. v. State of Mich.*, 471 F. Supp. at 257-58 (citing *Alaska Pacific Fisheries* and *Winters* for the rule that inferences should be drawn in favor of the tribe). In *Winters*, the starting point for any analysis of implied reserved rights, the Court found that the Indian law canon of construction that ambiguities must be construed in favor of tribes applied equally to inferences drawn from the document creating the reservation. 207 U.S. at 577. "On account of their [trust] relations to the government," tribes are entitled to reasonable inferences that support the reservation's purpose. *Id.* In that case, the Court inferred that Congress intended to reserve the water rights necessary for the tribes to become farmers as Congress intended, which would have been impossible without access to water. *Id.*

The holdings in *Chehalis, Winters, U.S. v. Michigan,* and *Colville* are consistent with well-settled canons of construction applicable to Indian law, which strongly favor

---

the phrase "for the use of" creates a favorable inference. That is so because, as shown by the Metlakatlans' use of the fisheries in districts 1 and 2, those fisheries were necessary to support the cannery, which in turn was inextricably linked to ensuring that the Community's use of the Annette Islands Reserve for a permanent and stable long-term home would be realized.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

finding Indian rights when the circumstances demonstrate the tribe's belief that they were provided. Like Indian law generally, "[t]hese rules of construction 'are rooted in the unique trust relationship between the United States and the Indians.'" *Chehalis*, 96 F.3d at 340 (citing *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 257, (1985)).

Under the first canon, executive orders, treaties, and statutes creating reservations are interpreted "as the Indians would have understood them and any doubtful expressions in them should be resolved in the Indians' favor." *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995) (noting that the court has "long held that when it comes to protecting tribal rights against non-federal interests, it makes no difference whether those rights derive from treaty, statute or executive order . . . ."). Second, there is a strong presumption that tribes retained the rights they possessed prior to removing to a reservation. Congressional action does not destroy tribal property or sovereign rights unless Congress' intent to do so is clear and unambiguous. *United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 346 (1941) (aboriginal property rights are not destroyed by statute unless Congress' intent to do so is "plain and unambiguous" or "clear and plain"); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999).

Notably, several of the key cases discussed above cite *Alaska Pacific Fisheries* and that the Supreme Court's analysis of the Annette Islands Reserve as a significant example of Congress creating implied reserved fishing rights, which is precisely what the Plaintiff claims here. *See U.S. v. State of Mich.,* 471 F. Supp. at 251; s*ee also Colville*

PAGE 15 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 20 of 42

*Confederated Tribes,* 647 F.2d at 47, n. 10. The *Colville Court* cited *Alaska Pacific Fisheries* for the proposition that implied rights exist if they are necessary for the tribe to fulfill Congress' intent in creating the reservation. *See Colville Confederated Tribes,* 647 F.2d at 47, n. 10. In *Alaska Pacific Fisheries*, the Supreme Court found that Congress must have included access to fish along with the Annette Islands Reserve because its purpose in creating the Reserve was "to encourage, assist and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life." 248 U.S. at 89. Like the water rights in *Winters,* achieving that goal would have been impossible without access to fish. *Id.* "Fishing was said to give value to the [Annette Islands Reserve.] 'The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location.'" *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 113(1949).

The discrete dispute in *Alaska Pacific Fisheries* was whether a non-Metlakatlan cannery could construct a fish trap within the Metlakatlans' 3,000-foot exclusive zone. In answering that limited question, the Court did not decide the full scope of the Community's rights. *Alaska Pacific Fisheries Co.,* 248 U.S. at 86-87. To answer the narrow question before it, the Court interpreted the statutory language creating the Annette Islands Reserve to include the waters directly around the Islands within the

PAGE 16 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 21 of 42

boundary of the reservation. [5] *Id.* at 89. On that basis, the Court held that the plaintiff's cannery could not deploy a fish trap within the exclusive zone. *Id.* at 89-90.

As fully explained below, although the *Alaska Pacific Fisheries* opinion did not define the scope of the Metlakatlans' fishing rights, the Court's reasoning strongly favors the existence of an implied off-reservation fishing right under the *Chehalis* and *Winters* framework. In that regard, the Ninth Circuit expressly recognized that "[t]he Metlakahtla Indians are not parties to this action, **and their rights under the reservation are not involved in this controversy**." *Alaska Pac. Fisheries v. U.S.*, 240 F. 274, 283 (9th Cir. 1917). The Metlakatlans are, of course, parties to this action, and their claim that Congress reserved an implied off-reservation right to fish is viable and well-supported by the law.

> **B. The Metlakatla Indian Community has Alleged Sufficient Facts to State a Claim for an Implied Off-Reservation Fishing Right Under the *Chehalis* Framework.**

As set forth above, the guiding Indian law principles arise from the trust relationship between the Community and the United States and lead to a strong presumption that Congress reserved the fishing rights necessary for the Community to succeed on the Annette Islands. The trust relationship between the United States and Indian tribes is "one of the cornerstones of Indian law." F. Cohen, *Handbook of Federal*

---

[5] The State baselessly cites *Hynes v. Grimes* for the proposition that the Supreme Court did not reference the Presidential Proclamation in *Alaska Pacific Fisheries* due to concerns about its legality. Defs.' Mot. at 23. Nothing in *Hynes v. Grimes* supports that analysis.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

*Indian Law* 412 (2012 ed.). The doctrine is rooted in the tribes' status as dependent

sovereign nations that gave up the full exercise of sovereignty in exchange for protection

from the United States Government. *See, e.g., Cherokee Nation v. Georgia,* 30 U.S. 1, 17

(1831). The Metlakatlans' trust relationship with the government is well-settled and the

creation of the Annette Islands Reserve must be viewed in that light. *Territory of Alaska*

*v. Annette Island Packing Co*, 289 F. 671, 674 (9th Cir. 1923), ("There can be no

question therefore but that the Metlakahtla Indians are wards of the government); *see also*

*Alaska Pac. Fisheries*, 248 U.S. at 88 (Indian reservations are "designated public

property for a recognized public purpose - that of safe-guarding and advancing a

dependent Indian people dwelling within the United States.").

     When viewed through the lens of the trust relationship, the Community's claim

presents a textbook case for an implied off-reservation fishing right under the rules

summarized in *Chehalis*. The Plaintiff's 22-page, highly detailed First Amended

Complaint lays out the history of the Community and the Annette Islands Reserve. The

following key allegations demonstrate the viability of Plaintiff's claim because they

establish that (1) the Community needed off-reservation fishing to thrive on the Annette

Islands; (2) that before, during and after the creation of the reservation the Community

used off-reservation fisheries without any objection from the Territorial, State or federal

authorities; and (3) that Congress intended to protect the Community's right to do so.

Those allegations are as follows:

PAGE 18 – **PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 23 of 42

1. Since time immemorial, the Metlakatlans' ancestors fished in the waters surrounding the Annette Islands. FAC ¶ 38.

2. Congress created the Annette Islands Reserve in 1891 following public pleas from Duncan, Wellcome, and others that it do so in order to protect the Community's advancement. *See* FAC ¶ 1, 21.

3. Congress intended to create a permanent home for the Metlakatlans where they would become a self-sufficient, thriving Community. FAC ¶ 21..

4. Congress knew that the Metlakatlans were a fishing people, that they intended to continue to rely on fishing to support themselves, and that they would need access to fish at their new settlement in order to fulfill Congress' intention that the Community would succeed on the Annette Islands. FAC ¶ 1, 22.

5. In forming a trust relationship between the United States and the Metlakatlans, Congress reserved access to fish in order to achieve its intended goal of creating a permanent home for the Community. FAC ¶ 22-23, 51.

6. From 1887 until the 1970s, the Metlakatlans continued to fish in the waters outside of the Reserve as they had always done from time immemorial. FAC ¶¶ 16, 35.

7. The Territory of Alaska, State of Alaska, and United States Government all acknowledged the Metlakatlans' right to fish outside of the exclusive zone in the years between 1891 and the establishment of the limited entry program. FAC ¶¶ 25-28, 35(c)-(f).

Plaintiff's allegations demonstrate that the Community has an implied off-reservation fishing right considering the Act creating the Annette Islands Reserve, the circumstances surrounding its creation, and the history of the Metlakatlans for whom it was created. *See Chehalis*, 96 F.3d at 342. Just like the tribes in *Colville* and *Winters* who needed water to become farmers on their reservations, the Community needed

PAGE 19 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 24 of 42

access to enough fish to run their cannery in order to live on the Annette Islands. Plaintiff's allegations clearly state a viable claim that Congress reserved the Community's access to fish outside the boundaries of the reservation based on those circumstances.  FAC ¶ 1, 22-23, 56.

Plaintiff's allegations about the Community's history of fishing off-reservation provide important contextual support for Plaintiff's claim in three ways.  *See* FAC ¶ 16, 35.  First, the Community's practice of fishing off-reservation before and after 1891 is the best evidence that the Community needed access to off-reservation fishing grounds to thrive on the Annette Islands.  Second, since "Congress intended to conform its action to [the Metlakatlans'] situation and needs[,]" those fishing practices also serve as the best evidence of what rights Congress intended to reserve for the Community to encourage its success.  *Alaska Pacific Fisheries*, 248 U.S. at 89.  Third, the fact that every governmental authority in Alaska tolerated and supported the Community's off-reservation fishing long after 1891 shows that those governmental authorities believed that Congress had reserved for the Community an off-reservation right to fish.

For example, there is no question that the United States was fully aware of the Metlakatlans' off-reservation fishing based on a 1902 report entitled "The Salmon and Salmon Fisheries of Alaska, Report of the Alaskan Salmon Investigations of the United States Fish Commission Steamer Albatross in 1900 and 1901."  *See* FAC ¶ 35(e).  In that report, Jeff Moser, a Commander in the United States Navy, described the Metlakatlans'

PAGE 20 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 25 of 42

cannery operation in detail.  Commander Moser identified numerous off-reservation fishing locations among the cannery's sources of fish, including Duke Island, Tamgas Island, Quadra Bay, and Karta bay in district 1, and Peter Johnson fishing station, Nowiskay, Old Johnson, and Kegan in district 2.  *Id.*

Another Government report issued in 1899 to the Secretary of the Treasury also shows that the Government knew of and supported the Metlakatlans' practice of fishing off-reservation.  FAC ¶ 35(d).  Not only did that report identify off-reservation fishing sites, the author also wrote positively about Community's the cannery operation, demonstrating that the Government fully supported the fishing industry on the Annette Islands and understood its importance to the Metlakatlans.  *Id.*  The 1899 report identified several fishing locations outside of the exclusive zone including Quadra Bay and Cape Fox in what is now district 1 and Karta Bay at the north end of district 2.  *Id.*

Plaintiff alleges several other contemporaneous sources to demonstrate how open and widely known the Community's fishing was, including a May 1, 1903 report from William Duncan to an agent of the U.S. Fish Commission.  FAC ¶ 35(j).  The Community was not only fishing extensively off-reservation, they were reporting it to the Government.  *Id.*  In the letter, Duncan catalogued the fishing locations for the 1901 fishing season, and, like the government report, it identifies numerous off-reservation sites within districts 1 and 2.  *Id.*

PAGE 21 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 26 of 42

Again, there is no evidence that the United States or anyone else ever questioned the Metlakatlans' authority to fish off-reservation until the 1970s. In fact, quite the opposite is true. As described above, a notable example of that awareness and support occurred in a case about the Territory of Alaska's right to tax the Metlakatlans' fishing activities in 1922. In that case, the District Court for the Territory of Alaska concluded in no uncertain terms that Congress reserved the right to fish both on and off-reservation for the Community: **"The right of fisheries on the reservation <u>and</u> adjacent waters is reserved for the benefit of the Indians resident thereon**, and, by taxing traps **on the reservation** . . . ."** *Annette Island Packing Co.,* 6 Alaska at 631 (emphasis added).

Metlakatlans continued to exercise their right to fish outside of the exclusive zone long after 1922, and, again, no one stopped them. Fishing logs from Community members in the mid-1950s show that Metlakatlans were frequently fishing outside of the Reserve, which demonstrates that the Community continued to exercise its rights for decades. FAC ¶ 35(l). As those allegations show, far from a reach for more fishing rights, Plaintiff's claim is merely an attempt to reestablish a right that everyone recognized until the 1970s.

The Government's failure to stop the Metlakatlans from fishing off-reservation creates a particularly strong inference that a reserved right exists given the difficult reality of U.S.-Native American relations in the Nineteenth Century. Far from being free to travel and fish where they wanted, the policy of the United States Government at the

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

time was to confine Native Americans to their reservations and to use force in response to violations of that policy. In 1891, when Congress created the Annette Islands Reserve, the United States was only fourteen years removed from the conclusion of a brutal guerilla war against the Nez Perce for the crime of leaving the reservation. *A Guide to the Indian Tribes of the Pacific Northwest* 207-08 (University of Oklahoma Press, 3d ed. 2010); Kent Nerburn, *Chief Joseph & the Flight of the Nez Perce* (Harper Collins 2005). More striking, Congress' 1891 creation of the Community's reservation was just three months after the Wounded Knee Massacre, where the U.S. Army's Seventh Cavalry slaughtered somewhere between 150 and 300 Lakota for fear that the ritual Ghost Dance would inspire the tribe to flee the abysmal conditions on the Standing Rock and Pine Ridge Reservations. David Treuer, *The Heartbeat of Wounded Knee* 5-6 (Riverhead Books 2019). In that bloody context, governmental authorities would not have allowed or encouraged the Metlakatalans to fish off-reservation unless they thought the Community had the reserved right to do so.

The Metlakatlans' record of off-reservation fishing and Congress' intent that the Metlakatlans would fish for their livelihood, create a much stronger case for off-reservation fishing rights than the facts in *Chehalis*. In *Chehalis,* the Ninth Circuit accepted the District Court's interpretation of the historical record, including several key

PAGE 23 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 28 of 42

statements that the tribes did not intend to leave the reservation for fishing purposes.[6]
*Chehalis*, 96 F.3d at 342-43. The Court looked to several historical statements demonstrating that the Upper Chehalis intended to settle on the reservation and "abandon their roving life" to "cultivate their lands." *Id.* at 343. Unlike the tribes in *Chehalis*, here the Community's allegations show that it had absolutely no intention of restricting its fishing activities to the reservation.

Furthermore, the Community's allegation that its implied right to access fish off-reservation was and is necessary to achieve Congress' purpose in creating the Annette Islands Reserve supports a strong inference that Congress reserved that right. The situation in *Chehalis* was entirely different.

In *Chehalis,* Congress intended for the tribes to provide for themselves by farming on the reservation, and the record contained evidence that the Chehalis Indians had no intent to leave the reservation to fish. In this case, Congress fully intended for the Metlaktatlans to depend on fishing for their community's survival on the Annette Islands Reserve. *Id.* Simply, while off-reservation fishing was not necessary to achieve the purpose of the Chehalis Reservation, access to adequate fishing ground, including off-reservation fisheries, was (and still is) critical to the Community's success on the Annette Islands Reserve. Congress simply would not have been dealing fairly with the

---

[6] The Ninth Circuit also deferred to the District Court's finding that there was no evidence in the record that the tribe understood the Shoalwater Bay Reservation to include off-reservation rights. *Chehalis*, 96 F.3d at 43.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Metlakatlans had they confined them to the Annette Islands Reserve with the intent that the Community would support itself through commercial fishing while simultaneously denying them sufficient access to fish.

In fact, Plaintiff's allegations are even stronger than the key factual findings in *U.S. v. Michigan,* where the Court **did** find an implied off-reservation fishing right even though the treaty included exclusive fishing rights for certain areas. The Western District of Michigan held that the tribes had an implied off-reservation fishing right based on the following four findings:

> [1] the Treaty of 1836 contains no language expressly relinquishing the aboriginal right of the treaty Indians to fish in the ceded waters;
>
> [2] at the time of the 1836 treaty subsistence and commercial fishing was essential to the livelihood of these Indians and for them to have relinquished fishing rights would have been tantamount to agreeing to a systematic annihilation of their culture, and perhaps of their very existence;
>
> [3] both parties to the negotiation were aware that the Indians had no way of sustaining themselves in Michigan except by fishing, and
>
> [4] the Indians did not understand the treaty to limit their right to fish, it is clear that by the Treaty of 1836 the Indians impliedly reserved a right to fish commercially and for subsistence in the ceded waters of the Great Lakes. Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

*United States v. State of Mich.,* 471 F. Supp. at 257-58 (quote divided into four points for ease of reference). Plaintiff's allegations correspond directly with the Western District of Michigan's first three findings: the 1891 Act contains no language limiting the Metlakatlans' right to fish off-reservation as they had been doing for years, commercial

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

fishing was critical to the Community's livelihood, and Congress understood that the Community needed access to fish to succeed on the Annette Islands Reserve. However, the Community's allegations far exceed the fourth finding in *Michigan*. In that regard, the Metlakatlans not only believed that they would be allowed to fish off-reservation, their use of off-reservation grounds shows that those fisheries were vital to the success of the fishing industry Congress intended for the Community to rely on, and they continued fishing off-reservation unimpeded for decades after Congress created the Reserve with the full and unequivocal support of the U.S. Government.

Furthermore, Plaintiff's claim for an implied right under *Chehalis* finds unusually relevant and strong support from the Supreme Court's findings in *Alaska Pacific Fisheries* that the Community was dependent on fishing and that Congress intended to support those efforts by creating the Annette Islands Reserve. As noted above, the Community was not a party to *Alaska Pacific Fisheries*, "and their rights under the reservation [were] not involved" in that controversy. *Alaska Pac. Fisheries v. U.S.*, 240 F. at 283. Accordingly, the Court took pains not to define the scope of the Metlakatlans' fishing rights. However, the Court nonetheless made significant factual findings and drew important inferences regarding the history and circumstances of the Community that strongly corroborate Plaintiff's allegations, as follows:

> The purpose of the Metlakahtlans in going to the islands was to establish an Indian colony which would be self-sustaining and reasonably free from the obstacles which attend the advancement of a primitive people.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

They were largely fishermen and hunters, accustomed to live from the returns of those vocations, and looked upon the islands as a suitable location for their colony, because the fishery adjacent to the shore would afford a primary means of subsistence and a promising opportunity for industrial and commercial development.

After their settlement and before the reservation was created, the Indians, under the guidance of a noted missionary . . . installed an extensive establishment where they canned salmon for the market.
The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation. They had done much for themselves and were striving to do more.

*Alaska Pac. Fisheries Co.*, 248 U.S. at 88-9.  More significantly, the Court also found that Congress clearly intended to protect the Community and reserve the resources it needed to thrive in that location:

The purpose of creating the reservation was to encourage, assist and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life.

The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location.

Evidently Congress intended to conform its action to their situation and needs.

*Id*.

The Supreme Court's findings that Congress's ultimate goal was to "encourage, assist and protect the Indians" so that they could become "self-sustaining," that Congress intended to achieve that goal by protecting the Community's fishing practices, and that fishing was central to the Community's very existence fit squarely within the *Chehalis*

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

analysis.  The allegations in Plaintiff's First Amended Complaint build on the foundation established by *Alaska Pacific Fisheries* to show that the Metlakatlans needed more than just the exclusive zone to achieve Congress' intent of a self-sustaining Community, and that everyone recognized that reality in 1891 and the decades following.

Defendants' argument that the *Alaska Pacific Fisheries* decision upholding the exclusive zone under the 1891 Act defined the sum total of the Community's fishing rights is contrary to the Metlakatlans' historic practice and is not supported by case law. *See* Defs.' Mot. at 22.  In fact, as explained by the *Michigan* court, the grant of exclusive fishing rights in specific areas for the Ottawa and Chippewa **did not** give rise to a negative inference against the tribes' claim for implied fishing rights when the government later permitted the tribes to fish off-reservation.  *United States v. State of Mich.,* 471 F. Supp. at 233-34.  That circumstance is exactly the situation in this case.

Further, despite Defendants' argument to the contrary, the Congressional record does not foreclose the Community's claim that Congress intended to reserve the Community's right to fish off-reservation and, instead, supports its viability.  According to the record, the Senate intended to set the Reserve apart as a stable home for the Metlakatans and, in an expansive rather than limiting way, indicated that its intent was to "render them all the encouragement" possible.[7]  21 Cong. Rec. 10092.  Congress also

---

[7] Congress' stated goal to provide the Metlakatlans "all the encouragement" possible strongly supports the argument that the term "use" should be interpreted to include the right to fish off-reservation as the Community did in 1891.

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR  97201
T: (503) 225-0777 / F: (503) 225-1257

sought to assure the Metlakatlans that the U.S. Government would protect their "work and labor upon" the Annette Islands, first and foremost of which was the cannery.  *Id.*  When the Congressional record is read in light of the Plaintiff's allegations, the meaning is clear:  Congress intended to defend and protect the Community's progress to that point and encourage it to continue.  The Community's historic use of fishing areas off-reservation before, during and after 1891 demonstrates that achieving Congress' goal required protection of those practices.

## C.  .The Community's Claim is Not Based on Its Aboriginal Rights.

Defendants' argument that the Community's claim "lacks foundation" without an "aboriginal right" is wrong on the law and wrong on the facts.  Congress is free to recognize reserved rights in the absence of aboriginal rights and, in any event, the Community had aboriginal rights in 1891 when Congress created the Reserve.

As a preliminary matter, Defendants ignore the fact that the Community includes many descendants of the other Alaskan natives, many of whom descend from the Tlingit and Haida tribes.  Even before Congress created the Reserve, the 1890 census noted that over 15% of the Community members were Alaska natives.  Robert P. Porter, Department of the Interior, *Population and Resources of Alaska* 3 (1893), *available digitally* at https://live.laborstats.alaska.gov/cen/histpdfs/1890census.pdf.   Given that reality, Defendants assert an illogical argument when they claim on the one hand that Tlingit and Haida tribes possessed aboriginal rights to the Annette Islands yet on the

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR  97201
T: (503) 225-0777 / F: (503) 225-1257

other hand contend the Community possessed no aboriginal rights.  *See* FAC ¶ 16; Defs.'

Mot. at 26.  Moreover, the 1891 Act does not reveal that Congress had any intention to

strip those members of their aboriginal rights.  On the contrary, Congress intended to give

the Community all the encouragement possible to succeed, which as explained above,

included the federal government's support for the Community's off-reservation fishing

practices.

### 1.  <u>Congressionally reserved rights do not require the existence of aboriginal rights</u>.

Defendants have no support for their position that Congress cannot reserve an

implied off-reservation fishing right for the Metlakatlans in the absence of an aboriginal

right.  The United States had full sovereignty over the land and fish in Southeast Alaska

in 1891, and Congress was free to reserve that property for any purpose it wished.

Federal implied reserved rights arise from Congress' purpose in creating the reservation,

not from any aboriginal right.  *See Cappaert,* 426 U.S. at 138 ("This Court has long held

that when the Federal Government withdraws its land from the public domain and

reserves it for a federal purpose, the Government, by implication, reserves appurtenant

water then unappropriated to the extent needed to accomplish the purpose of the

reservation.").  In *Cappaert,* the Court upheld the federal reservation of water for

environmental purposes without any nexus to aboriginal rights.  *Id.*

Additionally, the United States frequently created Indian reservations far from a

tribe's aboriginal home.  For example, the United States Supreme Court recently issued

PAGE 30 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR  97201
T: (503) 225-0777 / F: (503) 225-1257

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 35 of 42

its landmark opinion in *McGirt v. Oklahoma* where it decided that the Creek Reservation

is still in full force and effect absent Congressional action to the contrary.  _ U.S. _, 140

S.Ct. 2452 (2020).  There, the Court recognized that the Creek had been forced to walk

the trail of tears from their ancestral home in Georgia and Alabama to a reservation in

Oklahoma, which the government "solemnly guarantied [sic] to the Creek Indians."  *Id.*

at 2459 (quoting the "Treaty With the Creeks, Arts. I, XIV, Mar. 24, 2832, 7 Stat. 366,

368 (1832 Treaty)").  There is no logical basis to argue that the United States can create

an Indian reservation in an area where the tribal members have no aboriginal rights yet

the United States cannot create implied off-reservation rights in resources it controls.

More broadly, the Defendants' focus on aboriginal rights misses the significance

of the Metlaktlans' fishing practices before and after the 1891 Act.  Those fishing

practices are the best guidepost for what Congress intended to protect when it created the

Annette Islands Reserve to serve as the Community's permanent home.  *See, i.e.,* FAC ¶

35.  The Community's allegations show that its members were making extensive use of

off-reservation fisheries that are now located in districts 1 and 2.  As explained above,

Congress intended to protect those rights and was perfectly free to do so whether or not

the Community's use arose from an aboriginal right.

 2. **The Community and its members had an aboriginal right to fish in**
   **the waters surrounding the Annette Islands Reserve in 1891.**

Even though it is not a legal requirement, Plaintiff alleges that the Metlakatlans'

ancestors did have aboriginal rights in the waters around the Reserve.  The Metlakatlans'

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

use of the area since time immemorial was an exclusive exercise of dominion over the region sufficient to create an aboriginal right. FAC ¶¶ 16, 19.

In an effort to rebut that factual allegation, Defendants' argue that the *Tlingit and Haida Indians of Alaska v. U.S.* ("*Tlingit and Haida*") case is dispositive of whether the Metlakatlans had aboriginal rights in Southeast Alaska. 177 F. Supp. 452 (Ct. Cl. 1959). Defendants are wrong for at least three reasons.

First, as stated above, the Defendants' argument that the Community members lack any aboriginal rights ignores that many of the early members were "other Alaskan natives," including Tlingit and Haida. The Defendants' memorandum recognizes that those members had aboriginal rights in the area. Defs.' Mot. at 26. Based on the 1890 census, many of those members joined the Community prior to 1891 and continued to fish outside of what became the Reserve's boundaries. Congress expressly recognized those individuals in the 1891 Act and invited other Alaskan natives to follow. By contemplating that other Alaskan natives would become tribal members, Congress explicitly understood that the Metlakatla Indian Community was and would continue to be a coalition of Indians that historically had used the region. Because Congress did not attempt to limit the Community's use of surrounding fisheries in any way, it is clear that Congress sought to protect that historic use when it created the Annette Islands Reserve.

Second, the Community was not a part of the *Tlingit and Haida* case and, therefore, is not bound by the decision. *B & B Hardware, Inc. v. Hargis Industries, Inc.*,

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

575 U.S. 138, 148, 135 (2015). Neither claim nor issue preclusion applies in this matter because the Community was not a party to the *Tlingit and Haida* case. The Metlakatlans have every right to assert their aboriginal rights here.

Third, even if the Tlingit and Haida had aboriginal rights in the region, the allegations in the Complaint are sufficient to establish aboriginal title under the "joint and amicable" exception to the requirement that a tribe have sole control of an area to establish aboriginal title. *See U.S. v. State of Mich.*, 471 F. Supp. at 255. The Tlingit, Haida, and Tsimshian intermarried frequently, traded constantly, and had overlapping territory. The fact that so many "other Alaskan natives" voluntarily joined the Community also shows that the tribes were intertwined. The relationship between the Tlingit, Haida, and Tsimshian was "extremely close" such that members' Tsimshian ancestors had aboriginal fishing rights in the area alongside their Tlingit and Haida ancestors. *Accord Strong v. United States*, 518 F.2d 556, 561 (Ct. Cl. 1975) (tribes must be "extremely close" to hold property rights in joint and amicable possession).

### D. The State's Limited Entry Program Violates the Community's Reserved Off-Reservation Fishing Rights.

The State of Alaska's limited entry program violates the Plaintiff's reserved off-reservation fishing right for two reasons: (1) the program discriminates against the Community's members; and, (2) it is designed to protect the economic interests of Alaska's fishermen rather than to prevent the imminent extinction of a species.

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

The Defendants assert that the State has the authority to require "Metlakatlans to obtain a limited entry permit to fish commercially in districts 1 and 2." Defs.' Mot. at 32. In the hypothetical absence of a reserved, off-reservation fishing right, that argument is true as far as it goes. However, the Defendants' argument puts the cart before the horse because in this case, the Community has asserted a statutorily reserved off-reservation fishing right.

In that regard, the State does retain some limited authority to regulate the Community's off-reservation reserved fishing right – but it may do so only for conservation purposes, and the related regulations cannot be discriminatory. *Puyallup Tribe v. Dep't of Game,* 391 U.S. 392, 398 (1968). Here, the limited entry program impermissibly and arbitrarily excluded most Metlakatlans from participating given the qualifying conditions that excluded fish caught within the Community's reservation waters. FAC ¶ 49.

Furthermore, the limited entry program's economic purpose does not justify the State's regulation of the Meltakatlans' reserved off-reservation fishing right. The State may only regulate the Community's off-reservation fishing to the extent necessary to achieve valid conservation purposes. FAC ¶ 48. In the context of Indian law, conservation regulations are those designed "to forestall the imminence of extinction" of a species. *U.S. v. Oregon*, 718 F.2d 299, 305 (9th Cir. 1983); *see also, e.g., Dep't of Game v. Puyallup Tribe*, 414 U.S. 44, 49 (1973). The State of Alaska's limited entry

**HAGLUND KELLEY LLP**
200 SW Market Street, Suite 1777
Portland, OR 97201
T: (503) 225-0777 / F: (503) 225-1257

program violates the Metlakatlans' reserved rights because it is designed to protect the economic interests of Alaska's fishing industry, not to avoid imminent extinction of any of the fish species at issue.

## V.    CONCLUSION.

For the foregoing reasons, the Metlakatla Indian Community respectfully requests that this Court deny Defendants' Motion to Dismiss.

DATED this 5th day of November, 2020.

HAGLUND KELLEY LLP

By: /s/ Christopher Lundberg
       Christopher Lundberg, OSB No. 941084
       (pro hac vice)
       Email: clundberg@hk-law.com
       Joshua J. Stellmon, OSB No. 075183
       (pro hac vice)
       Email:  jstellmon@hk-law.com
       200 SW Market St., Ste. 1777
       Portland, OR 97201
       (503) 225-0777
       *Attorneys for Plaintiff*

PAGE 35 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 40 of 42

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was filed with the Clerk of the Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No.: 5:20-cv-00008-JWS who are registered CM/ECF users will be served by the CM/ECF system.

DATED November 5, 2020.

**HAGLUND KELLEY LLP**

By: /s/ Christopher Lundberg
Christopher Lundberg, OSB No. 941084
(pro hac vice)
Email: clundberg@hk-law.com
Joshua J. Stellmon, OSB No. 075183
(pro hac vice)
Email: jstellmon@hk-law.com
200 SW Market St., Ste. 1777
Portland, OR 97201
(503) 225-0777
*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR 97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 41 of 42

<u>CERTIFICATE OF COMPLIANCE WITH WORD LIMIT</u>

I certify that this brief contains 8,933 words, excluding items exempted by Local

Civil Rule 7.4(a)(4), and complies with the requirement that this brief not exceed 10,000

words.

**HAGLUND KELLEY LLP**


By: /s/ Christopher Lundberg
      Christopher Lundberg, OSB No. 941084
      (pro hac vice)
      Email: clundberg@hk-law.com
      Joshua J. Stellmon, OSB No. 075183
      (pro hac vice)
      Email:  jstellmon@hk-law.com
      200 SW Market St., Ste. 1777
      Portland, OR 97201
      (503) 225-0777
      *Attorneys for Plaintiff*

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

**HAGLUND KELLEY LLP**
**200 SW Market Street, Suite 1777**
**Portland, OR  97201**
**T: (503) 225-0777 / F: (503) 225-1257**

Case 5:20-cv-00008-JWS   Document 23   Filed 11/05/20   Page 42 of 42