IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| METLAKATLA INDIAN COMMUNITY, a Federally Recognized Indian Tribe,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. DUNLEAVY, Governor of the State of Alaska, DOUG VINCENT-LANG, Commissioner of the Alaska Department of Fish and Game, and AMANDA PRICE, Commissioner of the Alaska Department of Public Safety,<br><br>Defendants. | Case No. 5:20-cv-00008-JWS<br><br>**ORDER ON MOTION AT DOCKET 22** |

## I. MOTION PRESENTED

At docket 22, Defendants, Michael J. Dunleavy, Governor of the State of Alaska; Doug Vincent-Lang, Commissioner of the Alaska Department of Fish and Game; and Amanda Price, Commissioner of the Alaska Department of Public Safety (collectively the "State"), move to dismiss the Metlakatla Indian Community's ("MIC" or the "Community") amended complaint, which seeks declaratory and injunctive relief in relation to the State's limited entry permit program for commercial fishing in state waters.

## II. BACKGROUND

MIC is a federally recognized Indian tribe that occupies land on the Annette Islands Reserve in Southeast Alaska (the "Reserve"). MIC is unique in that it occupies the only federal Indian reservation in the State of Alaska. The Reserve was created by Congress in 1891 in order to officially authorize the settlement of a group of Tsimshian Indians, consisting of about 800 members and led by missionary priest William Duncan, that had emigrated to the Annette Islands from British Columbia a few years earlier, in 1887, on the encouragement of United States officials. The statute creating the reservation reads as follows:

> That until otherwise provided by law the body of land known as Annette Islands, situated in Alexander Archipelago in southeastern Alaska, on the north side of Dixon's entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla [sic] Indians, and those people known as Melakahtlans [sic] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior.[1]

From the time of settlement and after the 1891 creation of the Reserve, members of surrounding Alaska native tribes joined the Community. The Community, like the tribes from which their members came, relied on fishing as part of their economy and traditions, and fished waters within a day's travel of the Reserve.

---

[1] An act to repeal timber-culture laws, and for other purposes, ch. 561 § 15, 26 Stat. 1095, 1101 (March 11, 1891) (codified at 48 U.S.C. § 358 and later 25 U.S.C. § 495 (omitted)).

*Metlakatla Indian Community v. Dunleavy, et al.*　　　　　　　　　　　　　　　Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22　　　　　　　　　　　　　　　　　　　　　　　　　Page 2
Case 5:20-cv-00008-JWS　　Document 25　　Filed 02/17/21　　Page 2 of 19

On April 7, 1916, Alaska Pacific Fisheries, a non-Metlakatlan corporation, placed a fish trap "less than 2,000 feet south of a point of land designated as Cedar Point, and within 3,000 feet from the shore of the [Annette Islands] at mean low tide."[2] In response, President Woodrow Wilson issued a proclamation creating an exclusive fishing zone 3,0000 feet from the mean low tide mark around the Reserve "for the benefit of the Metlakahtlans [sic] and such other Alaskan natives as have joined them or may join them in residence on these islands, to be used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce."[3] The purpose of the proclamation was to supplement the efforts of the Secretary of the Interior in establishing a cannery operation for the Reserve.[4]

When Alaska Pacific Fisheries refused to move their fish traps, the government sued. Affirming the lower courts, the Supreme Court held that Congress intended to include the adjacent water of the island—out to 3,000 feet—for the Metlakatlans' use when it created the Reserve.[5] Thereafter, it was clear that the Reserve's boundaries included the immediate waters surrounding the islands, creating an exclusive fishing zone for the Community. Members also non-exclusively fished in off-reservation waters.

---

[2] *Alaska Pac. Fisheries v. United States*, 240 F. 274, 276–77 (9th Cir. 1917).
[3] Proclamation No. 64, 39 Stat. 1777–1778 (Apr. 28, 1916).
[4] *Id.*
[5] *Alaska Pac. Fisheries v. United States*, 248 U.S. 78 (1918); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 113–14 (1949).

*Metlakatla Indian Community v. Dunleavy, et al.*                                      Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22                                                                                   Page 3
Case 5:20-cv-00008-JWS    Document 25    Filed 02/17/21    Page 3 of 19

After statehood, the waters outside of the Reserve became state-managed fisheries. In 1973, Alaska enacted a limited entry program for commercial fishing in state waters.[6] The Limited Entry Act sought to conserve and rebuild Alaska's fishery resource and "promote . . . the economic health and stability of commercial fishing in Alaska."[7] The Act regulated and controlled who could engage in commercial fishing by requiring anyone operating commercial fishing gear to have an entry permit. There are only a limited number of entry permits for each particular fishery. After the implementation of the Act in 1973, "entry permits were issued to those who had previously held gear licenses on a grandfather rights basis subject to detailed statutory and regulatory guidelines."[8] After the initial allotment, permits could be bought and sold on the open market.

MIC alleges that the program excluded participants that could not satisfy the various criteria and strongly favored non-Community members. It alleges that its members cannot now buy into the program because the cost of purchasing a permit on the open market is prohibitive. It alleges that the enactment and implementation of the program "[a]ctually excluded most Community fishermen who were among the most dependent" on neighboring fisheries.[9] Its complaint alleges that the Limited Entry Act should not apply to its members because the MIC was granted a non-exclusive right to fish in off-reservation fisheries designated as Districts 1 and 2. Indeed, if MIC does in

---

[6] Alaska Stat. § 16.43.010.
[7] Alaska Stat. § 16.43.010(a).
[8] *State v. Ostrosky*, 667 P.2d 1184, 1188 (Alaska 1983).
[9] Docket 20 at 19, ¶ 49.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22                                          Page 4
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 4 of 19

fact possess such a non-exclusive right, the state's ability to regulate its fishing activities is limited in nature—it may regulate off-reservation fishing for conservation purposes and only in a non-discriminatory manner.[10] Whether the limited entry program is designed for conservation and implemented in a non-discriminatory manner, however, is not an issue before the Court here. Rather, the State argues that MIC does not possess any off-reservation fishing rights subject to special consideration. As such, the State argues it retains full authority to regulate commercial fishing in Districts 1 and 2, and consequently MIC's complaint must be dismissed.

## III. STANDARD OF REVIEW

Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. In reviewing such a motion, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party."[11] To be assumed true, the allegations, "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."[12] Dismissal for failure to state a claim can be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[13] "Conclusory allegations of law . . . are insufficient to defeat a motion to dismiss."[14]

---

[10] *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 398 (1968).
[11] *Vignolo v. Miller,* 120 F.3d 1075, 1077 (9th Cir. 1997).
[12] *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).
[13] *Balistreri v Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).
[14] *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 5
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 5 of 19

To avoid dismissal, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face."[15] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[16] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[17] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[18] "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."[19]

## IV. DISCUSSION

MIC's claim that the State cannot enforce its limited entry permit program as to its members who seek to commercial fish in Districts 1 and 2 rests on the assertion that MIC possesses off-reservation fishing rights in neighboring waters that its members historically have used as fishing grounds. Such rights, it argues, can be implied from Congress' reservation in 1891. It argues that Congress' reservation of land for the

---

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[16] *Id.*
[17] *Id.* (quoting *Twombly*, 550 U.S. at 556).
[18] *Id.* (quoting *Twombly*, 550 U.S. at 557).
[19] *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009); *see also Starr*, 652 F.3d at 1216.

*Metlakatla Indian Community v. Dunleavy, et al.*            Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22            Page 6
Case 5:20-cv-00008-JWS    Document 25    Filed 02/17/21    Page 6 of 19

Community necessarily included appurtenant fishing rights in off-reservation waters, without which the Community could not thrive. The argument is based on the fact that Congress knew the Community relied upon fishing when it granted the reservation, that Community members have fished the surrounding waters since their arrival in 1887, and that after the creation of the Reserve government officials acknowledged the Community's fishing practices and allowed such fishing to continue "unimpeded for decades" until the limited entry program in 1973.

MIC is not asserting that its reserved right to fish free of the State's interference stems from an aboriginal right—a right based on a group's exclusive, long, and continuous use of an area.[20] Instead, its claim rests on the premise that Congress impliedly granted it appurtenant fishing rights in 1891. Indeed, exemption from state regulation cannot be based on a showing of aboriginal use in and of itself; there must be some recognition of or basis for the right contained in a federal treaty, agreement, or statute.[21] Whether MIC possess off-reservation fishing rights under the 1891 statute

---

[20] *Native Vill. of Eyak v. Blank,* 688 F.3d 619, 622 (9th Cir. 2012). While its claim is not premised on any aboriginal right to fish, it argues that it does in fact have a basis for asserting aboriginal fishing rights in the area because many of the early members of the Community were other Alaskan natives, including Tlingit and Haida, who have been found to have aboriginal rights in the area.

[21] *See Organized Vill. of Kake v. Egan,* 369 U.S. 60, 76 (1962) (holding that a state's power to regulate fishing was not limited where the Organized Village of Kake failed to show that they had "fishing rights derived from federal laws."); *see also Wahkiakum Band of Chinook Indians v. Bateman,* 655 F.2d 176, 180 n.12 (9th Cir. 1981) ("An aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that aboriginal fishing rights were impliedly reserved to the Indians. . . . [W]e do not necessarily agree that there can be any aboriginal fishing right in the context of a tribe which no longer holds title to any lands and is not a signatory to any ratified treaty."). Furthermore, as noted by the State, the Alaska Native Claims Settlement Act, 43 U.S.C. § 1603(b)–(c), extinguished all claims premised on aboriginal title.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 7
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 7 of 19

turns on an examination of Congress' intent.[22]  To determine congressional intent with regard to rights conferred or altered in the context of Indian law the court looks at the statute or treaty itself, the surrounding circumstances, and the legislative history. "Rights arising from these statutes must be interpreted liberally" with "doubtful expressions" resolved in the tribes' favor.[23]

The 1891 statute itself says nothing with regard to fishing rights.  It simply reserves "the body of lands known as Annette Islands . . . for the use of the Metlakahtla [sic] Indians . . . and such other Alaskan natives as may join them, to be held and used by them in common" under rules and restrictions issued by the Secretary of the Interior.[24]  The only ambiguity within the statute was what Congress meant by "body of lands known as Annette Islands."  That issue was resolved in *Alaska Pacific Fisheries v. United States*,[25] where the U.S. Supreme Court determined—citing the rule that the statute should be liberally construed—that in reserving the "body of lands known as Annette Islands" Congress intended to "embrac[e] the intervening and surrounding waters as well as the upland."[26]  It held that Congress' use of the geographical name of the islands was "descriptive of the entire area comprising the islands," including the immediately adjacent waters.[27]  It consequently affirmed the

---

[22] *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586 (1977) (noting that interpretation of a statute or treaty as to the extent of rights reserved depends on congressional intent).
[23] *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995).
[24] 26 Stat. 1101.
[25] 248 U.S. 78 (1918).
[26] *Id.* at 89.
[27] *Id.*

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 8
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 8 of 19

lower court's decree that Congress reserved adjacent waters and shoreline out to 3,000 feet for the exclusive use of the Community.[28]  That is the extent of which the statute itself has been read to encompass fishing rights.

Nothing in the legislative history suggests that the 1891 reservation was meant to secure off-reservation fishing rights.  Rather, the Congressional Record associated with the creation of the Reserve indicates that Congress sought to aid Father Duncan in his efforts at forming a self-sufficient settlement in the United States for his community of "christian Indians."[29]  There is a discussion in the record about how the Metlakatlans had been disposed of their land by the bishop in British Columbia and how the Metlakatlans had lost all the fixtures they had built on the land.  There is mention of the Metlakatlans' fear that their efforts in creating a new settlement in the United States again could be lost.  The Senator advocating for the reservation stated that "[t]he proposition of the amendment is simply to allow this band of Indians to remain there under such rules and regulations as the Secretary of the Interior may impose, and give them some recognized footing at that place."[30]  He thought such action was warranted because the Community was a role model for "christian and God-fearing people."[31]  Another advocate of the reservation likewise noted the limited nature of the reservation:  "All the amendment proposes is that, until otherwise ordered by Congress, that island . . . upon which they have planted their town, shall be set apart

---

[28] *Id.* at 89–90; *Hynes v. Grimes Packing Co.,* 337 U.S. 86, 113–14 (1949).
[29] 21 Cong. Rec. 10092 (September 16, 1890).
[30] *Id.*
[31] *Id.*

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 9
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 9 of 19

for them under such rules and regulations as the Secretary of the Interior may prescribe."[32] There is mention that the Reserve would protect the islands from outside mining and timber interests, but nothing is specified about fishing interests.

The State cites language used by the government to grant off-reservation rights in various treaties predating the creation of the Reserve, and argues the failure to include similar language in the 1891 statute supports the conclusion that Congress did not consider the need to secure broad fishing rights. The Palmer/Stevens treaties are a series of treaties between the United States and various Indian tribes located in the Northwest which were entered into at least thirty years before Congress created the Reserve. In those treaties, the Indian tribes relinquished their interest in most of their respective territories in exchange for monetary payments, small parcels of land reserved for their exclusive use, and other guarantees such as protection of their right to take fish "'at all usual and accustomed grounds . . . in common with all citizens of the Territory.'"[33] As noted by the Supreme Court, the negotiations surrounding these treaties demonstrated that the government recognized the importance of fishing to the tribes and sought to protect them from the risk that non-Indian settlers might seek to monopolize their fisheries, and demonstrated that the tribes were interested in protecting their right to take fish at their usual places.[34] Given these circumstances, the term "usual and accustomed grounds" has been interpreted as granting off-

---

[32] *Id.*
[33] *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–62 (1979) (quoting 10 Stat. 1133)).
[34] *Washington*, 443 U.S. at 666–67.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 10
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 10 of 19

reservation fishing rights.[35] The government's treaty with the Colville Confederated Tribes, ratified by Congress a few months prior to the Community's reservation, contained an even more straightforward reservation of rights: "The right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged."[36] As argued by the State, these pre-dating treaties demonstrate that Congress was aware of tribes' off-reservation fishing concerns and knew how to address these issues if they had been intended to be secured as part of the reservation.

MIC stresses that the State's focus on the text of the statute and its legislative history is far too narrow. It argues that in cases where courts have found implied off-reservation rights there was no reliance on some textual ambiguity; rather, the courts look at the circumstances leading up to the creation of the reservation to see what rights, even if unstated, were necessarily retained by the tribe. Indeed, courts have rejected the argument that off-reservation rights must be grounded in text.[37] Instead, such rights can be implied based on the circumstances surrounding the creation of the reservation:

> This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.[38]

---

[35] *United States v. Winans*, 198 U.S. 371 (1905); *Puyallup Tribe*, 391 U.S. at 398.
[36] *Antoine v. Washington*, 420 U.S. 194, 196–97 (1975).
[37] *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 342 (9th Cir. 1996).
[38] *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

*Metlakatla Indian Community v. Dunleavy, et al.*   Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22   Page 11
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 11 of 19

The earliest court decision granting implied water rights was *Winters v. United States*.[39] In *Winters*, the U.S. Supreme Court found that the tribes of the Fort Belknap Indian Reservation had a right to an apportionment of off-reservation water. In so doing, the Court relied on the fact that the Belknap Indian Reservation was part of a much larger tract of land that the tribes had occupied and used, and that in consideration for their relinquishment of such land and given that the government sought to encourage agricultural activities on the reservation, there must have been an unstated reserved right to have an adequate flow of water available there.

Similarly, in *Colville Confederated Tribes v. Walton*,[40] the Ninth Circuit held that the Colville Confederal Tribes were entitled to an allotment of water sufficient to permit irrigation of reservation lands and to maintain replacement fishing grounds. It analogized the circumstances to those present in *Winters*:

> The Colville [tribes] were in a similar position when their reservation was created. As in Winters, the Indians relinquished extensive land and water holdings when the reservation was created. Some gave up valuable tracts with extensive improvements. Congress intended to deal fairly with the Indians by reserving waters without which their lands would be useless.[41]

The reserved allotment was necessary, the court found, to serve the purposes of the reservation, which were to provide for a land-based agrarian society and to preserve the tribes' access to fishing grounds.[42]

---

[39] 207 U.S. 564, 576 (1908).
[40] 647 F.2d 42 (1981).
[41] *Id.* at 46–47.
[42] *Id.* at 48.

*Metlakatla Indian Community v. Dunleavy, et al.*     Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22     Page 12
Case 5:20-cv-00008-JWS    Document 25    Filed 02/17/21    Page 12 of 19

In *United States v. Michigan*, which MIC relies on, the Western District of Michigan applied *Winters* to hold that the Bay Mills Indian Community and the Sault Ste. Marie Tribe of Chippewa Indians had implied reserved rights to fish in certain off-reservation waters of Lake Michigan.[43] The court came to this conclusion after analyzing—with what the State properly describes as "painstaking detail"[44]—the historical circumstances surrounding the creation of the reservation. It recognized the tribes' aboriginal rights that previously had been established and retained through a prior treaty, the tribes' 12,000 years of using the fisheries, and the disparate bargaining position of the parties. It concluded that government's 1836 treaty with the tribes never extinguished their aboriginal fishing rights and both sides of the negotiations understood that relinquishing such rights "would have been tantamount to agreement to a systematic annihilation of their culture, and perhaps their very existence" and that the tribes did not understand the treaty to limit their right to fish in the ceded water of the Great Lakes.[45]

These cases—finding an implied reservation of water or fishing rights—provide little guidance as to the circumstances presented here. The Metlakatlans voluntarily emigrated to the United States a few short years before the creation of the reservation. Unlike the circumstances in the cases discussed above, the Metlakatlans did not cede any territory in connection with the creation of their reservation and did not have any

---

[43] 471 F. Supp. 192 (W.D. Mich. 1979).
[44] Docket 24 at 11.
[45] 471 F. Supp at 257–58.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 13
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 13 of 19

rights to be retained. It did not have a land claim to settle with the United States and consequently did not engage in negotiations from which some additional or implied intent could be inferred or understood. As noted by the State, "the fact that Metlakatlans provided no consideration for the Annette Islands Reserve . . . serves as the initial fissure from which MIC's alleged claims of an implied off-reservation fishing right caves and crumbles."[46]

*Confederated Tribes of Chehalis Indian Reservation v. Washington*[47] is a relatively more recent example of the Ninth Circuit considering the issue of implied off-reservation rights. In that case the Shoalwater Bay Tribe and the Confederated Tribes of the Chehalis Indian Reservation separately sought a determination that they possessed off-reservation fishing rights within the Chehalis and other nearby river systems. The court explained that a tribes' continuous exercise of its right to fish an area—that is, an aboriginal right—does not confer a present right to fish off-reservation because extinguishment of aboriginal title to land also extinguishes any corresponding use and occupancy rights, unless those rights expressly or impliedly have been reserved in a ratified treaty, statute, or executive order.[48] The court turned to the executive orders creating the tribes' respective reservations to consider whether the orders contained implied reservations of fishing rights. Citing *Colville*, the court noted that it must identify the purposes meant to be served by the creation of the reservations and

---

[46] Docket 24 at p. 14.
[47] 96 F.3d 334 (9th Cir. 1996).
[48] *Id.* at 341–42.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 14
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 14 of 19

the rights associated therewith. It recognized that "the specific purposes of executive-order reservations were often unarticulated" and therefore identifying such purposes required examining the circumstances surrounding the reservation's creation and the history of the tribe for whom the reservations were created.[49] As to the Chehalis tribes and their reservation, the Ninth Circuit upheld the lower court's finding that the executive order creating their reservation did not impliedly retain or confer off-reservation fishing rights despite its acknowledgement that these tribes were historically dependent on fish. The Ninth Circuit cited with approval the lower court's finding that the executive order creating the reservation was not based upon an agreement between the government and the tribes and that the tribes did not believe they were obtaining any treaty rights.[50] It also cited predating government correspondence to conclude that the primary purpose of the reservation was to provide the tribes farmland. Letters also confirmed that the government believed the tribes' fishing needs could be fulfilled at the fishing grounds contained within the reservation, suggesting the executive order did not intend to reach off-reservation rights.[51] As for the Shoalwater Bay tribe and their reservation, the Ninth Circuit upheld the lower court's determination that there was no executive intent to confer off-reservation fishing rights. The fact that the reservation lands were chosen because they were

---

[49] *Id.* at 342.
[50] *Id.*
[51] *Id.* at 342–43.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 15
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 15 of 19

proximate to fishing resources was not sufficient in and of itself to support an implied off-reservation fishing right.[52]

The circumstances here are more in line with those in *Chehalis*. Like the reservations in that case, the one granted to the Community was not based upon treaty negotiations or any other agreement. The congressional record, which provides insight into the purpose of the reservation, much like the government correspondence surrounding the executive orders did in *Chehalis*, indicates that the purpose was a land grant with a missionary-type purpose. Congress sought to provide the Metlakatlans a secure place to live and to encourage the establishment of a self-sufficient, Christian community that other Alaska natives would emulate.[53] As was the case in *Chehalis*, the fact that the Metlakatlans are fish-reliant people and the fact that the Annette Islands are proximate to fishing grounds are not sufficient grounds from which to find special implied off-reservation fishing rights.

MIC points to *Alaska Pacific Fisheries* to support its assertion that Congress did in fact intend to protect the Community's broad access to fishing grounds, and that the Court must consider the Community's "need to maintain [itself] under changed circumstances."[54] As noted above, in that case the Supreme Court held that when Congress reserved "the body of lands known as Annette Islands" it meant to include

---

[52] *Id.* at 343.
[53] 21 Cong. Rec. 10092.
[54] *Colville Confederated Tribes*, 647 F.2d at 47 (citing *Alaska Pacific Fisheries* for the proposition that courts must consider what the Indians for whom the reservation was created needs to maintain itself).

the "intervening and surrounding waters."[55] It based its broad interpretation of the geographical name on the fact that "the purpose of creating the reservation was to encourage, assist and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life."[56] Including the adjacent fishing grounds helped realize that purpose. It also noted that the Metlakatlans themselves understood the reservation to include the immediately adjacent waters as part of the islands. MIC points out that the Metlakatlans were not party to the case and therefore the Court had no occasion to define the extent of its right to access fisheries, but that the Court's reasoning strongly favors the existence of an implied off-reservation fishing right. That is, it argues that Congress' goal of encouraging a self-sufficient community necessarily means that they intended to protect the Community's fishing practices in general—the statute must have impliedly granted non-exclusive rights to nearby fishing grounds because they are necessary to support the Community, particularly in the face of changed and depleted fishing grounds in the Reserve.

The Court disagrees that Congress' goal of encouraging a self-sufficient settlement means that Congress intended to grant the Community extended fishing rights in the area or otherwise understood that such rights necessarily would be appurtenant to the reservation itself. As discussed above, implied off-reservation

---

[55] 248 U.S. at 89.
[56] Id.

*Metlakatla Indian Community v. Dunleavy, et al.*  Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22  Page 17
Case 5:20-cv-00008-JWS   Document 25   Filed 02/17/21   Page 17 of 19

fishing rights have been found based on circumstances involving more than just a tribe's historical reliance on fishing and an intent to encourage self-sufficiency. Unlike the other implied off-reservation water or fishing rights cases discussed above, the Metlakatlans voluntarily emigrated to the United States a few short years before the creation of the reservation; they were not forcefully relocated and had no land claim to settle with the United States. They did not engage in negotiations from which some additional or implied intent could be inferred or understood. The *Alaska Pacific Fisheries* case decided what Congress meant to include as part of the "the lands known as the Annette Islands." The reasoning used to construe the Reserve's boundaries liberally does not extend to provide the Community with a federally recognized right to fisheries within proximity of the Reserve as needed to secure an adequate supply of fish. Such a right simply cannot be implied from the language of the 1891 statute, the congressional record associated with its passage, and the history of the Community's relocation to the Annette Islands.

MIC also argues that the right to fish off-reservation must have been impliedly granted because its practice of fishing outside of the Reserve from the 1890s through the mid-1970s was widely known, acknowledged, and accepted. It asserts that "[t]he Government's failure to stop the Metlakatlans from fishing off-reservation creates a particularly strong inference that a reserved right exists."[57] This Court, however, agrees with the State's position that the failure of the federal government to regulate

---

[57] Docket 23 at 27.

*Metlakatla Indian Community v. Dunleavy, et al.* Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22 Page 18
Case 5:20-cv-00008-JWS Document 25 Filed 02/17/21 Page 18 of 19

or limit the Metlakatlans off-reservation fishing was not due to some recognized right granted to the Community in 1891, but rather due to the minimal regulation of the area's fisheries in general.[58]

## V. CONCLUSION

Based on the preceding discussion, the State's motion to dismiss at docket 22 is GRANTED.

IT IS SO ORDERED this 17th day of February, 2021, at Anchorage, Alaska.

                                                         */s/ John W. Sedwick*
                                                         JOHN W. SEDWICK
                                          Senior United States District Judge

---

[58] *See* Docket 24 at 15–16, which the Court references and adopts herein. *See* John H. Clark, Andrew McGregor, Robert D. Mecum, Paul Krasnowski and Amy M. Carroll, *The Commercial Salmon Fishery in Alaska*, Alaska Fishery Research Bulletin (ADF&G), Vol. 12 no.1, 2006, at 1–3, *available at* http://www.adfg.alaska.gov/fedaidpdfs/AFRB.12.1.001-146.pdf (accessed on Feb. 15, 2021).

*Metlakatla Indian Community v. Dunleavy, et al.*      Case No. 5:20-cv-00008-JWS
Order on Motion at Docket 22      Page 19
Case 5:20-cv-00008-JWS    Document 25    Filed 02/17/21    Page 19 of 19