TREG TAYLOR
ATTORNEY GENERAL

Christopher F. Orman (Alaska Bar No. 1011099)
Assistant Attorney General
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-3019
Email: *christopher.orman@alaska.gov*

Attorney for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| METLAKATLA INDIAN COMMUNITY, a Federally Recognized Indian Tribe, | |
| Plaintiff, | |
| v. | Case No.: 5:20-cv-00008-SLG |
| MICHAEL J. DUNLEAVY, Governor of the State of Alaska, DOUG VINCENT-LANG, Commissioner of the Alaska Department of Fish and Game, and JAMES E. COCKRELL, Commissioner of the Alaska Department of Public Safety, | **MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This is a case about aboriginal rights.[1] As the U.S. Supreme Court has said, aboriginal rights are rights established by a tribe proving they actually, exclusively, and continuously fished in a certain location since "time immemorial."[2]

Here, the Metlakatla Indian Community (MIC) must prove that the Metlakatlans—Tsimshian members of a Christian community named Metlakatla that emigrated to the Territory of Alaska from Canada in 1887—have fished in the waters now identified as fishing districts 1 and 2[3] since "time immemorial."[4]

MIC's case has several flaws.

The Alaska Native Claims Settlement Act (ANCSA) broadly extinguished all aboriginal rights in Alaska and barred any aboriginal rights litigation.[5] Congress included no exemptions.[6] ANCSA ends this case.

Even if ANCSA does not apply, MIC has the burden of proving that in 1891 the Metlakatlans had actual, exclusive, and continuous use of the historic waters of fishing

---

[1]     *Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034, 1046 (9th Cir. 2023).

[2]     *Johnson v. M'Intosh*, 21 U.S. 543, 549-550 (1823); *Northwestern Bands of Shoshone Indians v. U.S.*, 324 U.S. 335, 338 – 339 (1945); *Tee-Hit-Ton Indians v. U.S.*, 348 U.S. 272, 277 (1955).

[3]     "Fishing districts 1 and 2" is defined in Alaska Department of Fish and Game regulations.  5 AAC 33.200(a) – (b); *see also* State of Alaska – Salmon and Shellfish Statistical Area Maps, Map 5 (April 2022).

[4]     *Metlakatla Indian Community*, 58 F.4th at 1046.

[5]     43 U.S.C. § 1603(c).

[6]     *Id*.

districts 1 and 2 since time immemorial. As their complaint shows, MIC can never prove the Metlakatlan emigrants held aboriginal rights in those waters in 1891.[7]

The Court of Claims found the Tlingit and Haida Indians held aboriginal fishing rights in Southeast Alaska, and those rights were taken by several legislative acts like the creation of the Annette Islands Reserve.[8] The Tlingit and Haida Indians received just compensation for those takings.[9]

That takings litigation is important for a few reasons. It highlights the significant factual deficiencies of MIC's aboriginal rights case. It also bars MIC from attempting to confuse the scope of this Court's aboriginal rights inquiry. This Court has been asked to determine the aboriginal rights held by the Tsimshian emigrants in 1891; not the aboriginal rights held by MIC members of Tlingit and Haida descent.[10] However, due to *res judicata*, ANCSA and successor-in-interest case law, MIC cannot rely on those Tlingit and Haida aboriginal rights to avoid summary judgment.

## SUMMARY JUDGMENT STANDARD

Under Federal Rules of Civil Procedure, Rule 56, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[7]     *Id.*

[8]     *See MIC v. Dunleavy*, Case No. 5:20-cv-00008-SLG, Second Amended Complaint, ¶ 15 (May 12, 2023); and *Tlingit and Haida Indians of Alaska v. U.S.*, 177 F.Supp. 452, 467-468 (Ct. Cl. 1959).

[9]     *Tlingit and Haida Indians of Alaska v. U.S.*, 389 F.2d. 778 (Ct. Cl. 1968).

[10]     *Metlakatla Indian Community*, 58 F.4th at 1046.

the movant is entitled to judgment as a matter of law." Summary judgment is appropriate here.

**STATEMENT OF THE CASE**

## I. Explaining the use of Tsimshian, Metlakatlans, and Metlakatla Indian Community in this brief.

In an aboriginal rights case, a court must decide whether a specific tribe actually, continuously, and exclusively fished in a specific location since time immemorial.[11] This yields two questions. First, what is the specific tribe for purposes of this Court's aboriginal rights inquiry? Second, how should these various terms be used?

The Ninth Circuit answered the first question by remanding for this Court to determine whether Tsimshian that were living on the Annette Islands when Congress created the reservation in 1891 had aboriginal rights in the historic waters of fishing districts 1 and 2.[12] The specific tribe, then, is the emigrant Tsimshian in 1891; i.e., the Metlakatlans as Congress used the term in 1891.[13]

The second question requires outlining the distinctions between MIC, Metlakatla community, and the Tsimshian.

---

[11] *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1046.

[12] *Metlakatla Indian Community*, 58 F.4th at 1046.

[13] An act to repeal timber-culture laws, and for other purposes, 26 Stat. 1095, 1101 § 15 (March 3, 1891) (Congress differentiated Metlakatlans from Alaska Natives).

Tsimshian is a historic tribal designation like Tlingit or Aleut or Athabascan of the Canadian pacific northwest;[14] the name meaning "people inside the Skeena River."[15]

The Metlakatla community arose on the Annette Islands in 1887. Metlakatla was a religious community founded by Father Duncan in British Columbia in the 1860s.[16] Metlakatla was comprised of Metlakatlans: Tsimshian who joined Metlakatla.[17] Not all Tsimshian were Metlakatlan, because not all Tsimshian joined Metlakatla.[18] When these Metlakatlans emigrated to the Territory of Alaska in 1887, they started the Metlakatla community.[19] Alaska Natives joined the Metlakatla community.[20]

---

[14]    *Id*.

[15]    The Skeena River is in British Columbia; emptying near Prince Rupert. Britannica, "Skeena River," available at: https://www.britannica.com/place/Skeena-River (accessed on August 15, 2023).

[16]    *Id*.

[17]    Hosmer, Brian, American Indians in the Marketplace, p. 199 – 200 (Univ. of Kansas 1999). Obviously, the Metlakatlans themselves, who began as a religious/political body in the 1860s, cannot claim that in 1891 they had been fishing in a location since "time immemorial," as thirty years is not "time immemorial." The Ninth Circuit referred to the Metlakatlans' Tsimshian ancestors' aboriginal rights and the historical record recited by the Ninth Circuit was of the Tsimshian. *Metlakatla Indian Community*, 58 F.4th at 1037-1039, 1046.

[18]    There are still Tsimshian living in Canada. *See* Lax Kw'alaams Band, "History," available at: https://laxkwalaams.ca/history/ (accessed on August 15, 2023).

[19]    Technically, the community was named Metlakatla. But the Defendants have used Metlakatla community in an effort to avoid the confusing distinguishing titles of "old" Metlakatla and "new" Metlakatla.

[20]    Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 3100, H.R. 7039, and H.R. 7432 – To Provide for the Settlement of Certain Land Claims of Laska Natives, and for Other Purposes," Serial No. 92-10, pp. 307 – 309, 328, 395 (U.S. Gov. 1971) (see statement by MIC attorney S. Bobo Dean that in 1968, 22 percent of the MIC membership was Alaska Native).

Lastly, the Metlakatla Indian Community (MIC) – a successor-in-interest to the Metlakatla community – is a governmental body, which incorporated under the Indian Reorganization Act in 1944 and became a federally recognized tribe in 1993.[21] MIC's modern tribal membership includes ancestors of the Metlakatlans that emigrated to Alaska as well as ancestors of Alaska Natives.[22]

In this case, the terms Metlakatla Indian Community (MIC), Metlakatla, Metlakatlan, and Tsimshian have often been used interchangeably to confusing effect.[23] To avoid that problem, in this motion, the terms Tsimshian, Metlakatlans, Metlakatla community, and MIC are used consistent with the above. This should help spotlight the central issue before this Court: whether the Tsimshian emigrants'–the Metlakatlans— aboriginal fishing rights in 1891 included fishing districts 1 and 2.

## II. Historical background

Because this is an aboriginal rights case, the history of Father Duncan, the Tsimshian, the Metlakatlans, the Tlingit and Haida takings litigation, and ANCSA all play an important part.

---

[21] *U.S. v. State of Or.*, 29 F.3d 481, 485 (9th Cir. 1994); U.S. Dept. of the Interior, Constitution and By-Laws of the Metlakatla Indian Community Annette Islands Reserve Alaska (August 23, 1944); and Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 538 Fed. Reg. 54,364, 54,364, 1993 WL 420646 (Oct. 21, 1993).

[22] *Supra* note 22.

[23] *See* Amended Complaint; and *Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034.

That history shows that while the Metlakatlans, the emigrant Tsimshian, in 1891 may have held aboriginal rights in British Columbia, they never held such rights in the historic waters of fishing districts 1 and 2.

## A. In 1862, Father Duncan forms a religious community in British Columbia he names Metlakatla; a community comprised of Tsimshian who historically fished in the freshwater streams near Prince Rupert.

Prior to moving to the Annette Islands, Tsimshian lived in concentrated groups in British Columbia.[24] The Tsimshian were a "mainland coastal people" that fished in freshwater streams and not the open ocean.[25] They lived in "a single winter village, moving in the spring to fishing villages on the lower Nass and in the summers to fishing camps on other rivers."[26] Their camps were situated as far north as what is now known as Finlayson Island and as far south as what is now known as Price Island.[27]

William Duncan, an Anglican missionary, arrived in British Columbia in 1858.[28] In 1862, he formed "the settlement, known as Metlakahtlan [sic], in British Columbia."[29]

---

[24]  Halpin, M. M., and M. Seguin. Tsimshian Peoples: Southern Tsimshian, Coast Tsimshian, Nishga, and Gitksan in Wayne Suttles (ed.), Northwest Coast, 267-284, Washington: Smithsonian Institution (1990).

[25]  Josephson, Karla, Alaska and the Law of the Sea, "Use of the Sea by Alaska Natives – A Historical Perspective," p. 28 (Univ. of Alaska 1974).

[26]  Halpin and Seguin, at p. 281.

[27]  *Id.*

[28]  *Id.*

[29]  *Id.*

Tsimshian joined this community and were named Metlakatlans, after Duncan's settlement.[30]

Because Duncan encountered general resistance to his community and religious practices, he began to consider where to relocate Metlakatla.[31]

> **B.** **The formation of "new" Metlakatla: in 1887 Father Duncan relocates Metlakatla to the Annette Islands located in the southeast of the Territory of Alaska where Community members faced resistance for fishing in Tlingit and Haida waters.**

Starting in the 1870s, Duncan began communicating with the United States about relocating Metlakatla to the Territory of Alaska.[32]

By this time, Duncan had already identified the Annette Islands—located in the Southeastern portion of the Territory of Alaska near Ketchikan on Revillagigedo Island and the site of a Tlingit fishing village – as suitable for "New Metlakatla."[33]

In 1887, Duncan visited Washington D.C, where he "hoped to purchase the [Annette] island" from the United States.[34] However, "[Duncan] was advised that, in as

---

[30]     *Id*.

[31]     *Id*.; *see also* Neylan, Susan, "Choose Your Flag," New Histories for Old: Changing Perspectives on Canada's Native Pasts, p. 211 (UBC Press 2007).

[32]     18 U.S. Op. Atty. Gen. 557, 1877 WL 4593 (February 28, 1877).

[33]     Hosmer, Brian, American Indians in the Marketplace, p. 199 – 200, 205 (Univ. of Kansas 1999). In 1891, Congress was under the belief that no Alaska natives used the Annette Islands. 21 Cong. Rec. 10092, Testimony of Sen. Dawes (Sept. 16, 1890). Tingle, George, "Report on the Salmon Fisheries in Alaska, 1896, p. 69 (Washington Government Printing Ofc. 1897).

[34]     Hosmer, p. 199 – 200.

much as no land laws had been enacted for Alaska it was best that the colony go, not as a group, but as individuals, to Alaska and obtain 'squatters rights.'"[35]

Duncan agreed. In 1887, Duncan and approximately 800 Metlakatlans emigrated to the Annette Islands in the Territory of Alaska.[36]

Census data shows that there were no Tsimshian residing in the southeast of the Territory of Alaska prior to the relocation of the Metlakatlans in 1887.[37]

After arriving, the Metlakatlans began to develop the Annette Islands; clearing trees and land, building homes, building a timber mill, and building a cannery.[38] The cannery was owned by the Metlakatla Industrial Company; a company "almost entirely [owned] by Father Duncan."[39] They also fished in "several small streams on Annette Island, Prince of Wales Island, and other locations along the southern Alaska panhandle."[40]

---

[35]    Alaska Natives and the Land, p. 759 (1968).

[36]    Hosmer, p. 199 – 200.

[37]    Rogers, George W., Alaska in Transition: The Southeast Region, p. 181, 183, 203, 209 (John Hopkins Press 1960)

[38]    Tingle, George, Report on the Salmon Fisheries in Alaska, 1896, at p. 8 (Wash. Gov. Printing Ofc. 1897).

[39]    *Id*. at 69.

[40]    Hosmer, p. 205

*MIC v. Dunleavy, et al.*                                  Civil Action No.:  5:20-cv-00008-SLG
Motion for Summary Judgment                                              Page 9 of 41

The Metlakatlans' fishing in Southeast Alaska "soured relations with neighboring Tlingit communities [who] apparently resented both the incursion of new fishermen and the presence of foreigners on Annette Island."[41]

### C.   Four years after arriving in the Territory of Alaska, Congress creates the Annette Islands Reserve.

After living on the Annette Islands for four years under "squatters rights," Congress in 1891 set aside the Tlingit Indians' and Haida Indians' aboriginal lands, waters, and fisheries to create the Annette Islands Reserve.[42] In creating the Annette Islands Reserve, Congress believed no one wanted or used the Annette Islands.[43]

The creation of the Annette Islands Reserve increased tensions between the Metlakatlans and Alaska Natives. Duncan conceded that some [Alaska Natives] lived 'in fear of coming to us thinking that if they do so they will forfeit their rights in other places where they have been used to fish and hunt."[44]

---

[41]    Hosmer, p. 205.  This undermines any future assertions that the Metlakatlans held "joint aboriginal title" with the Tlingit and Haida Indians.  *See U.S. v. Pueblo of San Ildefonso*, 206 Ct.Cl. 649 (Ct. Cl. 1975).

[42]    An act to repeal timber-culture laws, and for other purposes, 26 Stat. 1095, 1101 § 15 (March 3, 1891).

[43]    21 Cong. Rec. 10092, Testimony of Sen. Dawes (Sept. 16, 1890) (" . . . that island, which is good for nothing. . . Nobody wants [the island] now.")

[44]    Hosmer, p. 205.

Duncan's comments were not unfounded. Tlingits that joined the Metlakatla community were required to give up their individual "fishing stations" to the Metlakatla community.[45]

### D. President Wilson grants the Metlakatla community an exclusive fishery in 1916, something few Alaska tribes would ever obtain.[46]

In 1916, President Wilson issued a presidential proclamation granting the Metlakatla community an exclusive fishery.[47]

The exclusive fishery comprised the waters 3,000 feet from the Annette Islands' uplands; waters that were later determined to be the Tlingit and Haida Indians' aboriginal fisheries.[48] Litigants challenged the President's authority to expand the reservation beyond the uplands, and the United States Supreme Court, without mentioning the presidential proclamation, concluded that the geographic term "the body of lands known as Annette Islands," was ambiguous and so meant to include not only the uplands but "embracing the intervening and surrounding waters as well as the uplands."[49] Because

---

[45] Hosmer, p. 205 ("[A] native Metlakatlan delegation visited Saxman and Ketchikan in 1902, warning Tlingits 'against taking any step for settling on [the Annette Islands]' in ways other than the 'legitimate door of entrance' which was of course, 'joining our community, and obeying our rules of living.'").

[46] In their Amended Complaint, MIC refers to the "Exclusive Zone." *See eg.* ¶ 38k. MIC appears to be referring to its exclusive fishery and not the exclusive economic zone. *See*, NOAA, "What is the EEZ?", available at: https://oceanservice.noaa.gov/facts/eez.html (accessed on September 5, 2023).

[47] 39 Stat. 1777.

[48] Price, Robert, The Great Father in Alaska, p. 99 – 100 (First Street Press 1990); *citing* Memorandum of March 16, 1934 from Paul E. Gordon to John Collier.

[49] *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78 (1918).

*MIC v. Dunleavy, et al.*  Civil Action No.: 5:20-cv-00008-SLG
Motion for Summary Judgment  Page 11 of 41

they had this exclusive fishery, the Metlakatla community's commercial fishery and Duncan's cannery prospered.[50]

**E.** **After arriving on the Annette Islands in 1887, Metlakatlans who fished in the Territory of Alaska's waters were subject to the same laws as all other commercial fishermen.**

From 1887 until statehood, the Territory of Alaska's fisheries were relatively unregulated.[51] However, any laws Congress passed applied uniformly to everyone commercial fishing in the Territory of Alaska. Metlakatla community members that fished outside their exclusive fishery were not exempt from those commercial fishing laws.[52]

For example, on June 9, 1896, Congress passed "An act to provide for the protection of the salmon fisheries in Alaska."[53] The 1896 Act barred the use of "dams, barricades, fish wheels" or other devices that prevented "the ascent of salmon to their spawning ground" to catch salmon.[54] The Act also included season closures and limited

---

[50] *Territory of Alaska v. Annette Island Packing Co.*, 6 Alaska 585 (D. Alaska 1922).

[51] John H. Clark, Andrew McGregor, Robert D. Mecum, Paul Krasnowski and Amy Carroll, "The Commercial Salmon Fishery in Alaska," Alaska Fishery Research Bulletin 12(1):1-146, pp. 1-3 (ADF&G 2006); available at: http://www.adfg.alaska.gov/fedaidpdfs/AFRB.12.1.001-146.pdf (accessed on August 28, 2023).

[52] Act of July 1, 1870, 16. Stat. 180 (exempting Alaska Natives to allow them to hunt for food, clothing, and boat manufacture); Act of June 7, 1902, 32 Stat. 327 (exempting Alaska Natives from restrictions on taking game animals); and Alaska Game Commission Act of 1925, 43 Stat. 739.

[53] Moser, Jefferson F., The Salmon and Salmon Fisheries in Alaska: Bulletin of the United States Fish Commission for 1898, pp. 38 (Washington: GPO 1899).

[54] *Id*.

the date and times people could fish.[55] Although most commercial fishermen disregarded the law, Duncan admitted that Metlakatlan fishermen followed it; presumably knowing they did not hold an off-reservation fishing right or any legal exemption.[56]

This also meant Metlakatlan fishermen, like all commercial fishermen, benefited from the Territory of Alaska's minimal regulations.[57] From 1906 to 1924, forty-two bills were introduced in Congress to increase regulations of the Territory of Alaska's fisheries.[58] None passed.[59]

By 1929, Congress' light management of the southeast Territory's fisheries caused them to decline.[60]

**F.      In 1959, the Court of Claims finds the Tlingit and Haida Indians held aboriginal fishing rights in Southeast Alaska in 1884; thus, clarifying that when the Metlakatlans emigrated to the Annette Islands, they were fishing in Tlingit and Haida waters.**

Because they had an exclusive fishery, the Metlakatla community was not as affected by the salmon fisheries' downturn in the late 1920s.[61]

---

[55]      *Id.*

[56]      Report on the Salmon Fisheries in Alaska, 1896 at pp. 57 and 70.

[57]      The Commercial Salmon Fishery in Alaska, pp. 1-3.

[58]      *Id.* at p. 2.

[59]      *Id.*

[60]      *Id.*

[61]      The Great Father in Alaska, p. 99 – 100; *citing* Memorandum of March 16, 1934 from Paul E. Gordon to John Collier.

Seeking similar economic success, Alaska tribes requested their own exclusive fisheries and reservations.[62] However, very few were granted.[63]

The Tlingit Indians and the Haida Indians took a different approach. They argued that they held an aboriginal right to Southeast Alaska's fisheries, and that starting in 1884, those aboriginal rights were taken from them.[64] In particular, they asserted the creation of the Annette Islands Reserve (including exclusive use of waters around the uplands) were takings of their aboriginal rights.[65]

In 1935, Congress passed legislation authorizing the Tlingit and Haida Indians to sue the United States for these alleged takings.[66]

---

[62]  The Great Father in Alaska, p. 106 – 133 (noting the failed attempts to create exclusive fisheries under the Alaska Indian Reorganization Act.).

[63]  *Id*.

[64]  *Id*.

[65]  *Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct.Cl. 315, 338 (1959) ("The reservation, known thereafter as the Metlakahtla [sic] Indian reservation, was administered by the Secretary of the Interior and became very prosperous. It was probably the success of this reservation which prompted the Tlingits and Haidas to ask that they be given a reservation where they could develop their own fishing, mining and timber industries unmolested by the white settlers and used under the protection of the Government.").

[66]  Act of June 19, 1935, 49 Stat. 388.

And in 1959,[67] the Court of Claims found that the Tlingit and Haida Indians held aboriginal rights to the lands and waters within Southeast Alaska.[68] The Court of Claims determined that when Congress created the Annette Islands Reserve in 1891 and when President Wilson issued his presidential proclamation in 1916 creating an exclusive fishery, both were takings from the Tlingit and Haida Indians.[69] The Court of Claims held that the Tlingit and Haida Indians used these lands, waters, and fisheries to the exclusion of all other tribes.[70]

From 1959 to 1968, the Tlingit and Haida Indians litigated their just compensation for these takings. In 1968, the Court of Claims granted a final compensation award of $7.2 million for the various takings.[71] In their final award, the Court of Claims granted no damages for their fisheries being taken; determining that the Tlingit and Haida Indians'

---

[67]    It is unclear how long the Tlingit and Haida litigation was pending before the Court of Claims. Based on Alaska Statehood hearings, the Tlingit and Haida had filed claims under the 1935 Act prior to 1954. Hearings before the Committee on interior and Insular Affairs, U.S. Senate, S. 50, January 20 – February 24, 1945, p. 206 – 208 (U.S. Gov. Printing Ofc. 1954). This would suggest the Court of Claims had the case for at least five years.

[68]    *Tlingit and Haida Indians of Alaska,* 177 F.Supp. at 467-468.

[69]    *Id.*

[70]    *Id*.

[71]    *Id*. at 791. Note, after this litigation, it was determined that Tlingit and Haida Indians had not been compensated for an additional 2.6 million acres taken from them, which would be addressed in ANCSA.  Arnold, Robert, Alaska Natives and the Land, p. 543 (October 1968).

Case 5:20-cv-00008-SLG   Document 42   Filed 09/11/23   Page 15 of 41

fishing rights held no direct value because fish are migratory and cannot be appropriately valued.[72]

      **G.**    **In 1971, Congress passes ANCSA, which extinguished all aboriginal rights and claims based on aboriginal rights in Alaska; granting no exemptions for any tribes or organizations.**

Wanting to avoid additional aboriginal rights litigation—a strong possibility given over 90 Alaska tribes had filed aboriginal rights petitions with BIA—negotiations began in earnest to settle all aboriginal land claims and end all aboriginal claims litigation in Alaska.[73]

From 1968 to 1971, legislators, the Alaska Federation of Natives (AFN) Alaska Tribes, and the State of Alaska negotiated the settlement of all aboriginal claims – land claims as well as fishing and hunting claims – in Alaska.

MIC was active in the ANCSA negotiations, in particular to ensure that they retained the Annette Islands Reserve.[74]

However, in early drafts of ANCSA, Congress struggled with how to address MIC members; best exemplified in H.R. 13142.

---

[72]    *Id*. at 790.

[73]    Alaska Natives and the Land, p. 445-446.  The Tlingit and Haida takings litigation is included in ANCSA. 43 U.S.C. § 1615(c).

[74]    Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 3100, H.R. 7039, and H.R. 7432 – To Provide for the Settlement of Certain Land Claims of Laska Natives, and for Other Purposes," Serial No. 92-10, pp. 307 – 309, 328, 395 (U.S. Gov. 1971) (*see* Statement by Solomon Guthrie, mayor of Metlakatla, and statement by Metlakatla's attorney S. Bobo Dean).

Case 5:20-cv-00008-SLG   Document 42   Filed 09/11/23   Page 16 of 41

H.R. 13142 first abolished all aboriginal claims of "natives" in exchange for money and land.[75] However, Congress defined "native" to exclude Tsimshian Indians, because it believed all MIC members were Tsmishian and that no Tsmishian were Native Alaskan.[76] Congress thought this definition of "Native" would comprehensively eliminate all aboriginal claims while also addressing MIC membership.[77]

But H.R. 13142 presented two problems as it related to MIC: first, not all Tsimshian Indians were from British Columbia, as there were some that had lived in Southeast Alaska;[78] second, not all MIC members were Tsimshian.[79] Legislators were

---

[75]     Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 13142 and H.R. 10193 – Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes," Serial No. 91-8, pp. 20, 123 (U.S. Gov. Printing 1969).

[76]     Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 13142 and H.R. 10193 – Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes," Serial No. 91-8, p. 4 (U.S. Gov. Printing 1969).

[77]     Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 13142 and H.R. 10193 – Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes," Serial No. 91-8, pp. 20, 123 (U.S. Gov. Printing 1969) ("We also feel that the Field Study report intended to exclude all Tsimshian Indians, not simply those living in Metlakatla.").

[78]     *Id*.

[79]     Alaska Native Land Claims, Hearings before Committee on Interior and Insular Affairs United States Senate, S. 2906 and S. 1964, S. 2690, and S. 2020, February 8, 9, and 10, 1968, p. 415 (statement of S. Bobo Dean) (U.S. Gov. Printing 1968); Alaska Native Land Claims, Hearings before the Committee on Interior and Insular Affairs, U.S. Senate, S. 1830, August 7 and 8, 1969, p. 109 (statement of Solomon Guthrie) (U.S. Gov. Ofc. 1969).

reminded that when Congress created the AIR in 1891, it was a home for both Metlakatlans who arrived from Canada as well as Alaska Natives that would join.[80] MIC's attorney Dean Bobo and acting mayor of Metlakatla Solomon Guthrie confirmed that MIC membership also included Alaska natives such as Tlingit Indians and Haida Indians.[81] Legislators also heard testimony that some Tsimshian were not MIC members and were even Alaska native.[82]

Accordingly, extinguishing aboriginal claims of "natives" only, and defining "natives" to exclude Tsmishians would not be broad enough to extinguish all aboriginal rights in Alaska.[83]

During Congressional negotiations, both Attorney Bobo and Mayor Guthrie explained that MIC wanted to retain the AIR as well as their exclusive fishery. The Community's exclusive fishery was so prosperous that Mr. Guthrie believed, if given the choice between land and money settlements and retaining their exclusive fishery, the former option would not be as "good [of] a deal."[84]

Still, Mr. Guthrie and Mr. Bobo also requested Congress provide MIC members a portion of any ANCSA settlement; that such funding would aid the Metlakatla

---

[80]     *Id.*

[81]     *Id.*

[82]     *Id.*

[83]     *Id.*

[84]     *Id.*

community.[85] In requesting such funding, Mr. Guthrie and Mr. Bobo never suggested that Metlakatlans held off-reservation fishing rights or aboriginal rights in Alaska that warranted compensation.[86]

The final draft of ANCSA fixed H.R. 13142's errors by comprehensively settling and extinguishing all aboriginal claims. Unlike section 3 of H.R. 13142, which extinguished only aboriginal claims of "natives," and defined "natives" too narrowly, ANCSA's three extinguishment clauses did not hinge the extinguishment on the phrase "native" and did not exempt MIC members.[87] Instead, the three clauses extinguished any and all aboriginal claims based on land and water conveyances, extinguished any aboriginal claims based on occupancy and use, and extinguished any litigation and claims against the State and Federal government based on aboriginal rights.[88]

In addition to extinguishing all aboriginal claims throughout the entire State (including any claims of MIC members), the ANCSA negotiations and final legislation shows Congress comprehensively considered the Tsmishian, the Metlakatlans, and MIC in general. It allowed Tsimshian who were not MIC members, and thus were not authorized to use the Annette Island Reserve's exclusive fishery or reside on the Annette Islands, to be eligible for land and money settlement.[89] It prohibited MIC members,

---

[85]     *Id*.

[86]     *Id*.

[87]     85 Stat. at 710.

[88]     43 U.S.C. § 1603.

[89]     43 U.S.C. § 1602(b) (definition of native).

regardless of whether they were Tsmishian or not, from being eligible for any additional money or land settlement under ANCSA; determining that retaining their 82,000 square foot reservation and exclusive fishery were significant holdings given village corporations were receiving only 69,120 acres and no exclusive fisheries.[90]

Throughout these negotiations, Congress never suggested that MIC members held a unique fishing right that meant they would be treated differently from Alaska Native fishermen.[91]

The State agreed to ANCSA's terms and paid more than half of the $962.5 million settlement.[92] All aboriginal rights in Alaska were extinguished.[93] All claims based on aboriginal rights were extinguished.[94] All litigation based on aboriginal rights was barred.[95] No one held aboriginal rights to Alaska's fisheries.

With ANCSA, Congress cleared the way for the State to freely manage its fisheries, to protect and preserve its salmon fisheries, and to treat all commercial fishermen the same.

---

[90]     43 U.S.C. §§ 1602, 1611, 1618.

[91]     *See Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255 (Alaska 1980) (providing an extremely thorough history pertaining to the Limited Entry Act.).

[92]     *Yellen v. Confederated Tribes of Chehalis Reservation*, 141 S.Ct. 2434, 2439 (2021).

[93]     43 U.S.C. § 1603

[94]     *Id.*

[95]     *Id.*

### H. In the 1970s the State of Alaska passes a constitutional measure and adopts the limited entry program, which treats all commercial fishermen the same.

The mismanagement of salmon in the 1920s ultimately led to the Alaska Statehood Act and ANCSA, which allowed the State to effectively manage its fisheries under a sustained yield principle.[96] The State of Alaska would also amend its Constitution to bar any exclusive fisheries or exclusive rights.[97] The State's limited entry permit program was then adopted to ensure the State's fisheries would not be depleted like they were under federal management.[98]

Under the limited entry permit program, MIC members were treated the same as other commercial fishermen, and thus in the 1970s they too were awarded limited entry permits.[99] MIC members sold or lost those permits over time.[100]

Therefore, after almost 140 years of being subject to the same fishing laws as all other commercial fishermen, which includes fifty years of being subject to the limited entry program, MIC now asserts its members hold an implied off-reservation fishing

---

[96]    Ernest Gruening, The State of Alaska 400-05 (1968).

[97]    Alaska Constitution, Article VIII, § 15.

[98]    *Scudero v. State*, 496 P.3d 381, 386 – 388 (Alaska 2021).

[99]    Metlakatla: Holdings of Limited Entry Permits, Sablefish Quota Shares, and  Halibut Quota Shares through 1997 and Data on Fishery Gross Earnings, CFEC Report-98-SPMEtlakat-N (AK CFEC 1998); *see also* Dinneford, Elaine, "Changes in Holdings of Permanent Limited Entry Permits in Metlakatla, Alaska; 1975-1991," CFEC Report-92-12 (AK CFEC 1992).

[100]    *Id*. If Metlakatlans fished off-reservation as much as they assert, they would have been awarded permits assuming they applied. *See* 20 AAC 05.610.

right, that the State's limited entry program infringes on that right, and that its members can commercially fish in Southeast Alaska without a limited entry permit.

## III.   Procedural history

On August 7, 2020, MIC filed a complaint for relief.

On October 15, 2020, the State moved to dismiss. This Court granted the State's motion and dismissed MIC's complaint based on its interpretation of the 1891 Act.[101] The district court held that MIC's allegations were insufficient: that the Metlakatlans' historical reliance on fishing and that Congress in creating the reservation to encourage self-sufficiency did not establish an implied off-reservation fishing right.[102]

MIC appealed this Court's decision to the Ninth Circuit.

On January 31, 2023, the Ninth Circuit reversed this Court's decision granting the State's Rule 12(b)(6) motion to dismiss.[103] The Ninth Circuit determined that when Congress created the Annette Islands Reserve, it did not extinguish the Metlakatlans' aboriginal rights, with Metlakatlans being defined as "descendants of the Tsimshian people."[104] It concluded that Congress, in passing the 1891 Act, "confirmed" the Community's aboriginal rights.[105] The Ninth Circuit concluded the Act reserved

---

[101]   *Metlakatla Indian Community v. Dunleavy*, 2021 WL 960648 (Feb. 17, 2021), *reversed by* 58 F.4th 1034 (9th Cir. 2023).

[102]   *Id.*

[103]   *Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034, 1046 (9th Cir. 2023).

[104]   *Id*. at 1044; *emphasis added*.

[105]   *Id.* at 1046.

"for the Metlakatlan Indian Community an implied right to non-exclusive off-reservation fishing in the areas where they have fished since time immemorial and where they continued to fish in 1891 when their reservation was established."[106]

The Ninth Circuit then remanded to this Court to determine whether the Metlakatlans' aboriginal fishing rights in 1891 included fishing districts 1 and 2.[107]

On May 12, 2023, MIC amended its complaint to align with the Ninth Circuit's aboriginal rights focused ruling by alleging that "When Congress created the Annette Islands Reserve . . . it reserved the right of the Metlakatlans to . . . off-reservation fishing in the areas where they have fished since time immemorial."[108] Absent a few generalizations, MIC's complaint includes no specific factual assertions that the Metlakatlans that emigrated to Alaska had "actual, exclusive, and continuous use" of fishing districts 1 and 2 prior to 1891.[109]

The Defendants now move for summary judgment.

## ARGUMENT

To successfully assert an implied off-reservation fishing right, MIC must prove that the Metlakatlans in 1891 held aboriginal fishing rights in fishing districts 1 and 2. Due to ANCSA's extinguishment clause, their failure to plead any facts that Metlakatlans held aboriginal rights in fishing districts 1 and 2, and the Tlingit and Haida takings

---

[106]     *Id*. at 1048.

[107]     *Id*.

[108]     Second Amended Complaint, ¶ 57; *emphasis added*.

[109]     *Id*. in general.

litigation, MIC can never prove its aboriginal rights case. For these reasons,

the Defendants' motion for summary judgment should be granted.

## I.  ANCSA extinguished all claims and barred any litigation based on aboriginal rights and did not exempt any tribe, group, or political body from that extinguishment clause.

ANCSA bars this litigation. "ANCSA had one overriding purpose: to clear title

through Congressional action."[110] To accomplish this purpose, Congress included Section

4 to broadly extinguish all aboriginal rights and all claims based on aboriginal rights in

Alaska.[111] This included the extinguishment of "[a]boriginal fishing and hunting rights

[because they were] precisely the kind of rights Congress wished to extinguish."[112]

To ensure a full and complete extinguishment of all aboriginal rights in Alaska, Congress

did not simply extinguish all aboriginal rights, but also extinguished any and all claims

based on aboriginal rights.[113] Section 4(c) of ANCSA states,

> <u>All claims against</u> the United States, <u>the State</u>, and all other persons that are <u>based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska</u>, or that are based on any statute or treaty of the United States relating to Native use and occupancy, or that are based on the laws of any other nation, including any such claims that are pending before any Federal or state court or the Indian Claims Commission, <u>are hereby extinguished</u>.[114]

---

[110]  *Cape Fox Corp. v. U.S.*, 4 Cl. Ct. 223, 232 (Ct. Claims 1983).

[111]  43 U.S.C. § 1603.

[112]  *People of Village of Gambell v. Clark*, 746 F.2d at 576; *see also* 746 F.2d at 578 ("The Alaska Federation of Natives further clarified . . . in a supplemental statement . . . that the settlement should extend to all claims founded upon aboriginal title or use and occupancy of lands, including claims relative to fishing rights.")

[113]  43 U.S.C. § 1603.

[114]  43 U.S.C. § 1603(c); *emphasis added*.

Under this section, Congress wanted to address "those claims which threatened to interfere" with ANCSA's policy of extinguishing aboriginal rights.[115] Section 4(c) broadly and clearly barred any aboriginal rights litigation in Alaska.[116]

Section 4(c) of ANCSA does not exempt MIC, Metlakatlans, or Tsimshian.[117] Congress considered a bill that extinguished only "native" aboriginal claims, and rejected it.[118] "Native," is defined as "a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlaktla [sic] Indian Community)."[119] Instead, Congress extinguished all aboriginal rights and claims based on aboriginal rights and did so as broadly as possible by ensuring the extinguishment did not rely on the term "Native."[120] This prevented any suggestion that some aboriginal rights litigation could survive ANCSA.[121] If Congress intended to

---

[115]  *Aleut Community of St. Paul Island v. U.S.*, 480 F.2d 831, 833 (Ct. Cl. 1973).

[116]  *See Aleut Community of St. Paul Island v. U.S.*, 480 F.2d 831, 833 (Ct. Cl. 1973); *Monroe v. California Yearly Meeting of Friends Church*, 564 F.2d 304 (9th Cir. 1977); and *Inupiat Community of Arctic Slope v. U.S.*, 680 F.2d 122 (Ct. Cl. 1982).

[117]  *See* 43 U.S.C. § 1603 (none of the three extinguishment clauses include any exemptions, and in fact none of them even use the phrase "native."

[118]  Alaska Native Land Claims, Hearings Before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs – House of Representatives, "H.R. 13142 and H.R. 10193 – Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes," Serial No. 91-8, pp. 20, 123 (U.S. Gov. Printing 1969).

[119]  43 U.S.C. § 1601(b).

[120]  Congress did use the term "Native" later in 43 U.S.C. 1603(c), in the phrase "or treaty of the United States relation to Native use and occupancy." Congress use of "Native" here only further supports this argument.

[121]  43 U.S.C. § 1603.

Case 5:20-cv-00008-SLG   Document 42   Filed 09/11/23   Page 25 of 41

authorize litigation pertaining to aboriginal rights in Alaska by the Metlakatlans, Tsimshian, or MIC members, Congress could have expressed that intention. It did not.

Because section 4 of ANCSA is unambiguous, the Indian canon does not apply.[122] "The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress."[123] Indeed, the Ninth Circuit has squarely rejected applying that canon to Section 4 of ANCSA because Section 4 must be "construed 'broadly' to extinguish all claims and litigation, and this takes precedence over generalized rules of construction."[124]

ANCSA ends this litigation. Congress did not broadly extinguish aboriginal rights and bar litigation based on aboriginal rights in 1971, only for them to be squarely litigated in Southeast Alaska in 2023. The State did not pay $500 million of a $962.5 million settlement to have aboriginal rights litigation revived in 2023. Nothing in Section 4(c) of ANCSA can be construed as exempting MIC, Tsimshian, or Metlakatlans from Congress' plain and broad extinguishment. Section 4(c) was included in ANCSA to

---

[122]    *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (When statutory language is "plain and unambiguous" it should be applied "according to its terms."); *U.S. v. Atlantic Richfield Co.*, 612 F.2d 1132, 1138-1139 (9th Cir. 1980).

[123]    *South Carolina v. Catawba Indian* Tribe, 476 U.S. 498, 506 (1986).

[124]    *U.S. v. Atlantic Richfield Co.*, 612 F.2d 1132, 1138-1139 (9th Cir. 1980). The Ninth Circuit has also questioned the Indian canon's applicability given the context of ANCSA's passage. *Id.* at 1139.

prevent precisely the type of litigation MIC brings here; litigation that ultimately

undermines the State's ability to uniformly manage its fisheries.

## II. In their complaint, MIC failed to plead any facts that the Metlakatlans in 1891 had exclusive use of fishing districts 1 and 2 that can give rise to the requisite aboriginal right for their implied off-reservation fishing right claim.

Even if this Court determines that ANCSA does not end this litigation, summary

judgment is still appropriate. The Ninth Circuit adopted the reserved rights doctrine,

which means MIC must prove that when Congress passed the 1891 Act, the Metlakatlans

actually, continuously, and exclusively fished in fishing districts 1 and 2 since time

immemorial. As explained below, they can never meet that showing.

### A. The Ninth Circuit adopted the reserved rights doctrine, which means MIC has the burden of proving that the emigrant Metlakatlans in 1891 actually, exclusively, and continuously fished in fishing districts 1 and 2 since time immemorial.

The Ninth Circuit on appeal clarified that an implied off-reservation fishing right

requires the tribe to prove it had aboriginal rights (i.e., "actual, exclusive and continuous

use" of the fishery in question since "time immemorial."). In its conclusion, the Ninth

Circuit held that the 1891 Act reserved off-reservation fishing "in the areas where

[MIC had] fished since time immemorial and where they continued to fish in 1891 when

their reservation was established."[125] Remember, aboriginal rights are often referred to as

---

[125]     *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1048. The Court's inquiry is the rights that "vest[ed] on the date the reservation was created." *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46 (9th Cir. 1981).

rights held since "time immemorial."[126] In rejecting the State's argument that MIC's claim failed because Metlakatlans "ha[ve] no aboriginal rights to preserve," the Ninth Circuit stated that "Metlakatlans and their Tsimshian ancestors asserted and exercised a right to fish in these waters since time immemorial," and the 1891 Act "confirmed the continued existence of this right."[127] In rejecting the State's argument that *Winters* applies only to off-reservation *water* rights to ensure adequate water *within* the reservation,[128] the Ninth Circuit cited with approval a case from the Western District of Michigan applying the "reserved rights" doctrine to off-reservation fishing rights.[129]

The conceptual framework for interpreting a "reserved right" in the context of an off-reservation fishing right is that a "grant or cession in the treaty" is "not made from the United States to the Indians."[130] Rather, "the Indians were the grantors of a vast area they

---

[126]     *Johnson v. M'Intosh*, 21 U.S. 543, 549-550 (1823); *Northwestern Bands of Shoshone Indians v. U.S.*, 324 U.S. 335, 338 – 339 (1945); *Tee-Hit-Ton Indians v. U.S.*, 348 U.S. 272, 277 (1955); and *Oneida Indian Nation of N.Y. State v. Oneida County, New York*, 414 U.S. 661, 664 (1974).

[127]     *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1046 (bracket omitted).

[128]     *See Arizona v. Navajo Nation*, 14 18043 S. Ct. (2023) ("Under this Court's longstanding reserved water rights doctrine, sometimes referred to as the *Winters* doctrine, the Federal Government's reservation of land for an Indian tribe also implicitly reserves the right to use needed water from various sources—such as groundwater, rivers, streams, lakes, and springs—that arise on, border, cross, underlie, or are encompassed within the reservation." (citations omitted)).

[129]     *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1044 (citing *United States v. Michigan*, 471 F. Supp. 192, 253, 258 (W.D. Mich. 1979), *aff'd*, 653 F.2d 277).

[130]     471 F. Supp. at 254; *see also* Cohen's Federal Indian Law, §§ 18.02 – 18.03[1] (Lexis Nexus 2012); *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1166-1167 (9th Cir. 2017); and *U.S. v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983).

owned aboriginally and the United States was the grantee."[131] "The Indians' claim to reserved fishing rights [therefore] depends upon their having possessed such [aboriginal] rights at the time of the cessation."[132] The Michigan district court in *U.S. v. Michigan* used the *Winters* doctrine to buttress its conclusion that the treaty did not extinguish aboriginal rights because doing so "would have been tantamount to agreeing to a systemic annihilation of their culture, and perhaps of their very existence."[133] Therefore, the aboriginal rights the tribe held when the treaty or act was passed defines the scope of the implied off-reservation fishing right the tribe holds under the "reserved rights" doctrine.

Consistent with the above, no court has found a tribe holds an implied off-reservation fishing right absent ever holding an aboriginal right to the fishery and water in question.[134] The Ninth Circuit did not do so either.[135] The Ninth Circuit also did not purport to create new law or suggest it was expanding the *Winters* doctrine to ignore whether the tribe held an aboriginal right in the areas in question when Congress created the reservation.[136] Instead, the Ninth Circuit clearly applied the "reserved rights doctrine."[137]

---

[131]    471 F. Supp. at 254.

[132]    471 F. Supp. at 255.

[133]    *Id.* at 247-48.

[134]    *See* Cohen's Handbook of Federal Indian Law § 18.04.

[135]    *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1044.

[136]    *Id.* at 1044 – 1045; 1046.

[137]    *Id.* at 1043.

Therefore, MIC's litigation hinges on proving the Metlakatlans that emigrated to the Territory of Alaska held an aboriginal right in fishing districts 1 and 2 when Congress created the Annette Islands Reserve in 1891. To prove the existence of an aboriginal right MIC has "the burden of proving [the Metlakatlans had] actual, exclusive, and continuous use and occupancy" in fishing districts 1 and 2 since time as of 1891.[138] For the reasons provided below, MIC cannot meet that burden.

**B.     As their complaint shows, MIC cannot prove that the emigrant Metlakatlans in 1891 actually, exclusively, and continuously fished in fishing districts 1 and 2 since time immemorial.**

In their complaint, MIC has failed to plead any facts that the Metlakatlans held an aboriginal right in fishing districts 1 and 2; that there are no facts that they exclusively used fishing districts 1 and 2 prior to Congress creating the Annette Islands Reserve in 1891.

On appeal, the Ninth Circuit determined that when Congress created the Annette Islands Reserve in 1891, it reserved for the Metlakatlans the aboriginal fishing rights it enjoyed since time immemorial.[139] The Ninth Circuit remanded for this Court to

---

[138]     *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012); *Johnson v. M'Intosh*, 21 U.S. 543, 549-550 (1823); *Northwestern Bands of Shoshone Indians v. U.S.*, 324 U.S. 335, 338 – 339 (1945) (using the phrases "immemorial title" and "immemorial occupancy" to discuss aboriginal rights); *Tee-Hit-Ton Indians v. U.S.*, 348 U.S. 272, 277 (1955); *Oneida Indian Nation of N.Y. State v. Oneida County, New York*, 414 U.S. 661, 664 (1974).

[139]     *Id.*

determine whether the Metlakatlans' historic fishing grounds—the situs of their aboriginal rights—included fishing districts 1 and 2.[140]

To prove the presence of an aboriginal right, "[a tribe has] the burden of proving actual, exclusive, and continuous use and occupancy for a really long time of the claimed area."[141] A tribe's complaint based on aboriginal rights must allege the tribe fished in a certain location, they fished in that location to the exclusion of all other tribes, and had fished in that location since time immemorial.[142] For exclusivity, the tribe must allege they "exercised control over [the claimed area] and over other Indians who may have ventured therein."[143] "Actual and continuous use" requires the tribe to allege they "continued to use" the area in question for "hundreds of years . . . for traditional purposes."[144] A tribe may have successfully pled actual and continuous use, but if the tribe fails to plead exclusivity, the claim fails.[145]

Here, MIC's complaint includes no facts alleging they had "exclusive control" over fishing districts 1 and 2. Their complaint contains only two general assertions of the Metlakatlans fishing in the Territory of Alaska's waters prior to 1891:

1. While the Tsimshian maintained a central village, their fishermen migrated with the fish runs, establishing temporary fishing villages along the coast and rivers of British Columbia, and engaged in frequent trading voyages to the

---

[140]    *Id.*

[141]    *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012).

[142]    *See U.S. v. State of Mich.*, 471 F.Supp. 192 (W.D. Mich. 1979).

[143]    *Pueblo of Jemez v. U.S.*, 790 F.3d 1143, 1166 (10th Cir. 2015).

[144]    *Pueblo of Jemez*, 790 F.3d at 1166.

[145]    *Id.*

villages of other Alaskan Native tribes, such as the Tlingit and Haida tribes. From these locations and during these excursions, the Tsimshian fished throughout the waters of Southeast Alaska, including as far north as 50 miles from what is now Annette Islands Reserve.[146]

2. The ancestors of the Metlakatlans, which includes the Tsimshian people and 'such other Alaskan natives as may join them' fished throughout Southeastern Alaska from time immemorial.[147]

At best, these allegations suggest the Metlakatlans may have "wandered over" these southeast waters and used the fisheries of the Tlingit and Haida tribes during their "excursions."[148] But they cannot be read to suggest the Metlakatlans "used and occupied [fishing districts 1 and 2] to the exclusion of other Indian groups."[149]

The minimal facts presented in their complaint, taken as true, would fail to prove that the Metlakatlans[150] exclusively fished in fishing districts 1 and 2 when Congress created the Annette Islands Reserve in 1891. The absence of facts is for a good reason: the Court of Claims in 1959 determined the Tlingit and Haida Indians, not the Tsimshian

---

[146]    Second Amended Complaint, ¶ 13.

[147]    *Id*. at. ¶ 15.

[148]    *Pueblo of Jemez*, 790 F.3d at 1166.

[149]    *Pueblo of Jemez*, 790 F.3d at 1166; *emphasis added*. *See also Zuni Tribe of New Mexico v. U.S.*, 12 Cl.Ct. 607, 608 (Ct. Cl. 1987) (a tribe can prove exclusive use if there is evidence that other tribes used those lands that was "either temporary and under agreement with the [Tribe] or was of specific short duration and the result of raid or other hostile intrusion.").

[150]    *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1046 ("Metlakatlans and their Tsimshian ancestors asserted and exercised a right to fish in these waters since time immemorial.").

or Metlakatlans, held aboriginal rights to these waters.[151] This presents a factual obstacle they can never sidestep.

## III. MIC cannot rely on aboriginal rights of individual members of Tlingit or Haida descent to assert MIC has aboriginal rights in fishing districts 1 and 2.

The Ninth Circuit requested this Court determine if the Metlakatlans, defined as Tsimshian ancestors, held aboriginal rights in fishing districts 1 and 2 when Congress created the Annette Islands Reserve in 1891.[152] The Ninth Circuit did not suggest this Court's inquiry included the aboriginal rights held by MIC members of Tlingit and Haida descent.[153]  Such an inquiry also conflates the historic tribe with the modern tribal organization.

However, there are three legal reasons why MIC cannot rely on Tlingit and Haida Indians' aboriginal rights: (1) *res judicata*; (2) ANCSA extinguished all aboriginal rights in Alaska, including those held by all Tlingit and Haida Indians; and (3) MIC is not a successor-in-interest to those aboriginal claims.

### A. *Res judicata* bars MIC members of Tlingit and Haida descent from relying on the Court of Claims' decision in the Tlingit and Haida takings litigation.

*Res judicata* bars Tlingit and Haida members from asserting they hold aboriginal rights in fishing districts 1 and 2 that yields an off-reservation fishing right. The Court of

---

[151]    *Tlingit and Haida Indians of Alaska v. U.S.*, 177 F.Supp. 452, 467-468 (Ct.Cl. 1959).

[152]    *Metlakatla Indian Community v. Dunleavy*, 58 F.4th at 1045, 1046.

[153]    *Id*.

Claims determined the Tlingit and Haida Indians held aboriginal fishing rights to Southeast Alaska's fisheries and that certain conduct and acts after 1884 extinguished those rights.[154] The Tlingit and Haida Indians were compensated for those takings.[155]

"Under *res judicata* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."[156] "To establish that a claim is barred by res judicata a party must show: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action."[157] All four elements bar MIC members of Tlingit or Haida descent from asserting they hold an aboriginal right in fishing districts 1 and 2.

First, the Tlingit and Haida takings litigation reached a final judgment. The Tlingit and Haida Indians were found to have had aboriginal claims that Congress extinguished.[158] Those claims were settled in 1968.[159] The Tlingit and Haida Indians were compensated for the determined value of those takings both in the takings litigation and

---

[154]     *Id.*

[155]     *Tlingit and Haida Indians of Alaska v. U.S.*, 389 F.2d 778 (Ct. Cl. 1968); 43 U.S.C. § 1615(c).

[156]     *Yankton Sioux Tribe v. U.S. Dept. of Health and Human Services*, 533 F.3d 634, 639 (8th Cir. 2008).

[157]     *Id.*

[158]     Act of June 19, 1935, 49 Stat. 388; *Tlingit and Haida Indians of Alaska*, 177 F.Supp. at 467-468; and *Tlingit and Haida Indians of Alaska*, 389 F.2d 778.

[159]     *Tlingit and Haida Indians of Alaska*, 389 F.2d 778.

then in ANCSA.[160] A compensation award, no matter the amount, constitutes a final judgment.[161]

Second, the Tlingit and Haida aboriginal rights litigation was based on proper jurisdiction. In 1935, Congress passed a law granting the Tlingit and Haida Indians jurisdiction to sue the United States related to takings of state land.[162] Congress directed the Court of Claims to hear the case.[163] The Court of Claims heard the case.[164] Therefore, jurisdiction was proper.

Third, the litigation applied to all Tlingit and Haida Indians.[165] Congress afforded a right to sue and compensation to be paid to "all persons of Tlingit or Haida blood, living in or belonging to any local community of these tribes" in Southeast Alaska.[166] There is no evidence that Tlingit and Haida Indian members of MIC were excluded from these rolls. Therefore, any Tlingit and Haida Indian members of MIC were in "privity" with the Court of Claims' decisions.

Fourth, and lastly, the Court of Claims was asked to determine who held aboriginal fishing rights in Southeast Alaska, effectively the same legal question now being presented to this Court. The Court of Claims held that the creation of the Annette

---

[160]    *Id.*; 43 U.S.C. § 1615(c).

[161]    *Id.*

[162]    Act of June 19, 1935, 49 Stat. 388.

[163]    *Id.*

[164]    *Id.*

[165]    *Id.*

[166]    Act of June 19, 1935, 49 Stat. 388.

Islands Reserve and the 1916 presidential proclamation granting the Metlakatlans an exclusive fishery were both takings:

> In conclusion, we hold that the plaintiffs have established their use and occupancy, i.e., Indian title, of the lands and waters in southeastern Alaska . . . that they were using and occupying that land according to their native manner of use and occupancy in 1867 when the United States acquired Alaska from Russia; that following the purchase of Alaska in 1867 these Indians continued to exclusively use and occupy the same areas <u>of land and water</u> as previously, and that such use and occupancy was not interfered with by the United States or its citizens until 1884; <u>that beginning in 1884 and continuing thereafter, these Indians lost most of their land in southeastern Alaska through the Government's failure and refusal to protect the rights of the Indians in such lands and waters, through the administration of its laws and through the provisions of the laws themselves; that a large area of land and water in southeastern Alaska was actually taken without compensation and without the consent of the Indians, through Presidential proclamations issued pursuant to law, and through reservation of part of the land for Canadian Indians under the Act of March 3, 1891 [i.e. the Act that created the Annette Islands Reserve.].</u>[167]

The Court also held that, "The most valuable asset lost to these Indians was <u>their fishing rights in the area they once used and occupied to the exclusion of all others</u>."[168]

This aboriginal fishing right was taken from the Tlingit and Haida Indians because the United States allowed groups like the Metlakatlans to freely fish in Southeast Alaska and Congress created the Annette Islands Reserve.[169]

---

[167] *Tlingit and Haida Indians of Alaska*, 147 Ct.Cl. at 341.

[168] *Id.; emphasis added.*

[169] *See People of Village of Gambell v. Clark*, 746 F.2d 572, 574 (9th Cir. 1984).

The Tlingit and Haida Indians received just compensation[170] for their aboriginal

rights being taken from them; with payments received under this litigation as well as

ANCSA.[171] It is incongruous to suggest that the Tlingit and Haida Indians successfully

litigated the takings of their aboriginal rights – some of those takings directly tied to the

Annette Islands Reserve – but that those rights now provide the basis for MIC's off-

reservation fishing right. That is the very definition of *res judicata*.

**B.      ANCSA extinguished all Alaska Natives' aboriginal rights.**

As explained in this briefing, ANCSA extinguished all aboriginal rights in

Alaska.[172] Today, MIC's ancestors are not solely Tsimshian immigrants from Canada;

Alaska Natives have also joined the Community.[173] Congress' extinguishment of

aboriginal rights was broad and included all Alaska Natives' aboriginal rights.[174]

MIC cannot revive those extinguished aboriginal rights in this litigation.

**C.      MIC is not a successor-in-interest to the Tlingit Indians and Haida Indians' aboriginal rights.**

A successor-in-interest is a "political successor . . . to the Indians" who were

signatories to a treaty or a party to prior litigation.[175] To be a "successor-in-interest," a

---

[170]     The Court of Claims determined the value was zero, and that there was no "compensation" to award. *Tlingit and Haida Indians of Alaska*, 389 F.2d 778.

[171]     *Tlingit and Haida Indians of Alaska*, 389 F.2d 778; and 43 U.S.C. § 1615(c).

[172]     *Supra* Argument, Section I.

[173]     Amended Complaint, ¶ 17.

[174]     *Id*.

[175]     *U.S. v. State of Mich*., 471 F.Supp. 192, 218 (W.D. Mich. 1979); *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 413 (3rd Cir. 2006).

modern federally recognized tribe will present facts that they are bringing the litigation as a political successor to claims held by the historic tribe or by individual descendants of that historic tribe.[176]

The Ninth Circuit determined that MIC was a successor-in-interest to the emigrant Tsimshian in 1891.[177] The Ninth Circuit remanded to this Court to determine the scope of the aboriginal rights held by the emigrant Metlakatlans in 1891.[178] The Court defined those Metlakatlans as "Tsimshian ancestors."[179] The Ninth Circuit never asserted that MIC's claims were tied to Tlingit and Haida Indians' aboriginal claims or Alaska Natives' aboriginal claims simply because they had joined the community before or after 1891.[180]

The Ninth Circuit properly limited this Court's aboriginal rights review to the emigrant Tsimshian because Central Council of Tlingit and Haida Indian Tribes of Alaska (CCTHITA), not MIC, is the political successor-in-interest to any aboriginal rights held by Tlingit and Haida Indian members. The Court of Claims takings litigation was brought by the Tlingit and Haida Indian tribes.[181] In 1965, Congress recognized that CCTHITA was the modern tribe that could assert those aboriginal rights and was entitled

---

[176]    *Delaware Nation*, 446 F.3d at 413.

[177]    58 F.4th at 1038, 1045.

[178]    *Id*.

[179]    *Id*. at 1046.

[180]    *Id.*

[181]    147 Ct.Cl. 315.

Case 5:20-cv-00008-SLG   Document 42   Filed 09/11/23   Page 38 of 41

to the just compensation award that would be issued in 1968.[182] MIC is not a successor-in-interest to those rights.

Consistent with the Ninth Circuit's reasoning and the 1965 legislation, MIC's complaint lacks facts asserting it is a successor-in-interest to the Court of Claims' decision.[183] Importantly, MIC's complaint also fails to explain how those aboriginal rights potentially held by individual descendants of Tlingit and Haida members apply to all MIC members, including members that joined after 1891.[184] This successor-in-interest issue reinforces that the Ninth Circuit properly limited this Court's aboriginal rights review to the rights held by the emigrant Tsimshian in 1891.

## CONCLUSION

This Court may ask, "how could the Ninth Circuit find the Metlakatlans held an implied off-reservation fishing right when Congress passed the 1891 Act, but there is no implied off-reservation fishing right in Southeast Alaska?" The answer is simple: before emigrating, the Metlakatlans held an aboriginal right in Canada.[185] Ignoring jurisdictional headaches for a moment, that means Congress reserved Canadian aboriginal rights, but there were no rights reserved in the historical waters of fishing districts 1 and 2.[186]

---

[182]     *See* Act to amend the Act of June 19, 1935 relating to the Tlingit and Haida Indians, 79 Stat. 543 (August 19, 1965); and 88 Fed. Reg. 4636 (January 12, 2023) (CCTHITA is a federally recognized tribe).

[183]     Amended complaint; *generally*.

[184]     *Id*.

[185]     *Id.* at 1037 – 1038, 1046.

[186]     *Id*.

For the reasons provided above, the state's motion for summary judgment should be granted.

Lastly, the defendants want to highlight one more legal issue. As the Alaska Supreme Court determined in *Scudero v. State*, even if MIC members hold an off-reservation fishing right, the State of Alaska's Limited Entry Program was instituted for a conservation purpose.[187] The Alaska Supreme Court determined the state has the authority to require MIC members to hold a valid limited entry permit to commercially fish in fishing districts 1 and 2.[188] If this Court were to grant the relief MIC has requested, it would create a state and federal court split. Therefore, if it any time in this litigation this Court finds MIC members hold an off-reservation fishing right, the State requests this Court complete a thorough analysis of the *SoHappy* factors.

DATED: September 11, 2023.

TREG TAYLOR
ATTORNEY GENERAL

By:     */s/ Christopher F. Orman*
        Christopher F. Orman
        Assistant Attorney General
        Alaska Bar No. 1011099
        Email: christopher.orman@alaska.gov
        *Attorney for the Defendants*

---

[187]    469 P.3d 381, 388 – 389 (Alaska 2021) (finding that even if MIC members held an off-reservation fishing right, they could be regulated when they fished in state waters.).

[188]    *Id.*

*MIC v. Dunleavy, et al.*                      Civil Action No.:  5:20-cv-00008-SLG
Motion for Summary Judgment                    Page 40 of 41

**CERTIFICATE OF WORD COUNT**

Consistent with Local Civil Rule 7.4, I certify that this document complies with the court-ordered word count limit because it contains 9856 words.

*/s/ Christopher F. Orman*
Christopher F. Orman
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2023, I electronically filed the foregoing by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Christopher F. Orman*
Christopher F. Orman
Assistant Attorney General