TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

DARON TATE CARREIRO, Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Indian Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 202-305-1117; Fax: 202-305-0275
Email: daron.carreiro@usdoj.gov

*Attorneys for the United States*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

METLAKATLA INDIAN COMMUNITY,
a federally recognized Indian Tribe,

      Plaintiff,

  v.

MICHAEL J. DUNLEAVY, Governor of
the State of Alaska, et al.,

      Defendants.

Case No. 5:20-cv-00008-SLG

### *AMICUS CURIAE* BRIEF OF THE UNITED STATES
### IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This action arises out of a dispute over the federally reserved fishing rights of the Metlakatla Indian Community (the "Community"). The Community established itself on the Annette Islands in Alaska in 1887. And in 1891, Congress passed a statute, 26 Stat. 1095, 1101 (the "1891 Act"), establishing the Annette Islands Reserve as a Reservation for the Community. Congress's intent in doing so was to establish a permanent, self-sustaining homeland for the Community. The Supreme Court has long recognized the homeland purposes of the Community's Reservation, including the Community's implied, federally reserved fishing rights established by the 1891 Act. Moreover, as recently recognized by the Ninth Circuit Court of Appeals, Congress intended, and the Community understood, that the 1891 Act would reserve non-exclusive fishing rights in off-reservation waters where Community members have traditionally fished. *Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034 (9th Cir. 2023).

The Community filed the current suit to obtain a declaration of its federally reserved, non-exclusive right to fish in those areas free from unreasonable interference by the State of Alaska, and to enjoin the State from exercising jurisdiction over the Community and its members inconsistent with the Community's reserved fishing rights. Dkt. 40. The Ninth Circuit recently ruled in the Community's favor, confirming the Community's reserved fishing rights, and rejecting the State of Alaska's arguments that: (1) the 1891 Act did not reserve off-Reservation fishing rights for the Community; and (2) the Community needed to demonstrate aboriginal fishing rights in order to have a

reserved fishing rights claim and the Alaska Native Claims Settlement Act ("ANCSA") extinguished such aboriginal rights. Following its opinion, the Ninth Circuit issued a mandate and a narrow remand for specific factual findings about the geographic scope of the Community's traditional off-reservation fishing grounds.

On remand, the State filed a motion for summary judgment alleging that: (1) the Community must first prove all the legal elements of an aboriginal fishing rights claim in order to establish a reserved rights claim; and (2) ANCSA extinguished all claims and barred any litigation based on aboriginal rights. Dkt. 42. The Community cross-moved for summary judgment on these issues. Dkt. 46.

This Court should grant the Community's Motion for Summary Judgment and deny the State's Motion. First, the State's Motion merely repeats arguments already rejected by the Ninth Circuit; the law-of-the-case doctrine and the rule of mandate bar the State from relitigating them here. Second, the State's aboriginal rights argument—that the Community must prove the legal elements of an *aboriginal* right in order to establish its *reserved* right—misconstrues the nature of the reserved rights at issue and is wrong as a matter of law. Contrary to the State's arguments, the Community's reserved fishing rights arise from the 1891 Act and the establishment of its Reservation and thus are not premised on aboriginal rights, so the Community need not prove the legal elements of an aboriginal right. Finally, ANCSA does not apply to this case; indeed, Congress expressly excluded the Community from the application of ANCSA. Ultimately, the Community is not asserting an aboriginal right to fish in the waters at issue; rather, its claim seeks to

protect and enforce a federally reserved right arising from the 1891 Act.

## BACKGROUND

### I. The Metlakatla Indian Community.

The Community moved to the Annette Islands in 1887, where "Metlakatlans continued to fish throughout the waters of Southeast Alaska." *Metlakatla*, 58 F.4th 1038. The 1891 Act "set [the Annette Islands] apart as a reservation" for the Community. 26 Stat. at 1101. Congress's intent in doing so was to establish a permanent, "self-sustaining" homeland for the Community. *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 88 (1918). Given the Community's historic, cultural, and economic reliance on fishing, Congress also impliedly reserved fishing rights for the Community as part of its Reservation. *Id.* Since first moving to the Annette Islands, the Community fished predominately within a day's travel of the current Reservation. Dkt. 40 at 8; *see also Metlakatla*, 58 F.4th at 1037 ("Historical sources indicate that they fished as far north as 50 miles from the Annette Islands in what is now the State of Alaska."). Indeed, "[the Metlakatlans] specifically selected the Annette Islands because of their fishing potential." *Id.* at 1038. "When Congress passed the 1891 Act establishing the Metlakatlans' reservation, it did so with the expectation that the Metlakatlans would continue to support themselves by fishing." *Id.* at 1044 (citing *Alaska Pac. Fisheries*, 248 U.S. at 89). The Community shared this understanding. *Id.* ("When Metlakatlans moved to the islands in the late 1880s . . . they did so with the understanding that they would be able to support themselves by fishing, as they had always done."). Both Congress and the Community

contemplated that the Community would continue to fish in its off-reservation fishing grounds, and Congress impliedly reserved the use of these fishing areas upon the establishment of the Community's Reservation in 1891. *Id.* at 1045.

## II.    Procedural background.

The Community filed the current suit to obtain a declaration that Congress's reservation of the Annette Islands Reserve included the federally reserved, non-exclusive right to fish in certain off-reservation areas free from unreasonable interference by the State of Alaska and to enjoin the State from asserting jurisdiction over the Community and its members inconsistent with the Community's reserved fishing rights. Dkt. 40. This Court initially dismissed the Community's suit, holding that the Community did not possess an implied right under the 1891 Act to fish in off-reservation waters. The Community appealed this decision, arguing that the District Court misapplied the legal framework for evaluating a claim of implied rights by ignoring the relevant Indian canons of construction and failing to properly consider the purposes for which the Reservation was created. The Community pointed to the circumstances surrounding the creation of the Community's reservation, including the Community's historical off-reservation fishing activities, as evidence of Congress's intent to reserve fishing rights needed to fulfill the purposes of the Reservation. The Community also argued that the District Court erred in relying upon *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334 (9th Cir. 1996), in support of dismissal of the case, because the facts underlying the Community's claim "create a far stronger case for off-reservation fishing rights" than did

the facts in *Chehalis*. Brief of Plaintiff-Appellant at 47, Metlakatla Indian Community v. Dunleavy, 58 F.4th 1034 (9th Cir. 2023) (No. 21-35185), 2021 WL 2483755. The State, on the other hand, argued that the 1891 Act did not reserve off-Reservation fishing rights for the Community. Specifically, the State argued that the Community could not maintain a reserved fishing rights claim because it lacked aboriginal fishing rights, and/or because ANCSA extinguished any aboriginal fishing rights claims.

The Ninth Circuit ruled in the Community's favor, reversing the decision of the lower court, and holding that the 1891 Act reserved for the Community and its members a non-exclusive right to fish in the off-reservation waters where they have traditionally fished. 58 F.4th 1034. In doing so, the Ninth Circuit rejected the State's arguments to the contrary, including the need for aboriginal rights as a legal predicate for the Community's reserved rights claims. *Id.* at 1046. The Ninth Circuit also held that "Alaska's limited entry program, as currently administered, is incompatible with the Metlakatlans' off-reservation fishing rights." *Id.* at 1047. The Ninth Circuit remanded the case to this Court "to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2." *Id.* at 1045. The Ninth Circuit issued its mandate on February 8, 2023. Dkt. 34.

Following the Ninth Circuit's opinion and issuance of the mandate, the State filed a motion for summary judgment, reasserting arguments rejected by the Ninth Circuit, including: (1) that the Community must first prove all the legal elements of an aboriginal fishing rights claim in order to establish a reserved rights claim; and (2) that ANCSA

extinguished all aboriginal claims and therefore bars the Community's current claims. Dkt. 42. The Community cross-moved for summary judgment on these issues. Dkt. 46.

## ARGUMENT

### I. The State's arguments are barred by the law-of-the-case doctrine and the rule of mandate.

The State's current summary judgment arguments merely repeat what the State previously argued at length in earlier stages of this case, including on appeal. The Ninth Circuit considered and rejected these arguments. The law-of-the-case doctrine and the rule of mandate bar the State from relitigating them here.

"The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs." *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000). "Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case." *Id.* "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" *Id.* (quoting *Liberty Mut. Ins. Co. v. EEOC,* 691 F.2d 438, 441 (9th Cir.1982)). "[W]here an issue has been decided by a higher court . . . the lower court is precluded from reconsidering the issue and abuses its discretion in doing so except in [] limited circumstances . . . ." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018).

The "rule of mandate" is a related principle that requires a lower court to execute the terms of an appellate court mandate and precludes the lower court from considering matters previously decided and foreclosed by the mandate. *United States v. Kellington*,

217 F.3d 1084, 1092 (9th Cir. 2000) (citing *Herrington v. County of Sonoma,* 12 F.3d 901, 904 (9th Cir. 1993)). The Ninth Circuit has described the rule of mandate as "broader than the law of the case doctrine." *Herrington*, 12 F.3d at 904. Following the issuance of the mandate, this Court's role is to consult the Ninth Circuit's opinion to determine what was intended by the mandate. *Kellington*, 217 F.3d at 1093 (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895)). And, contrary to the State's Motion, the Court may not issue an order after remand which is "counter to the spirit of the circuit court's decision." *Id.* (quoting *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1404 (9th Cir. 1993)); *see also Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) (post-mandate conduct of lower court must be consistent with "either the spirit or express terms" of the mandate). Both the law-of-the-case doctrine and the rule of mandate apply not only to express rulings, but also to legal issues *impliedly* decided by courts of appeal. *Lummi*, 235 F.3d at 452; *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986).

The State's current summary judgment arguments were previously argued before this Court and before the Ninth Circuit on appeal:

- The Community "has no aboriginal fishing rights . . . and if they did, ANCSA extinguished them." State's Memorandum in Support of Motion to Dismiss, Metlakatla Indian Community v. Dunleavy, Case No. 5:20-cv-00008-JWS (D. Alaska Oct. 15, 2020), 2020 WL 8025586.

- "To the extent the Metlakatlans may have had or retained some aboriginal rights . . . Congress extinguished those rights in 1971 by enacting [ANCSA]." *Id.*

- "ANCSA flatly contradicts [the Community's] assertion of aboriginal rights in Southeast Alaska." *Id.*

- "[The Community] cannot show that they had aboriginal rights. Without an aboriginal right, [the Community's] claims lack foundation." *Id.* (footnotes omitted).

- "[I]f [the Community] has no aboriginal right, there can be no implied off-reservation fishing right Congress could preserve." *Id.* (footnotes omitted).

- "With no aboriginal fishing rights, [the Community] lacks the legal foundation to claim an off-reservation fishing right." State's Reply in Support of Motion to Dismiss, Metlakatla Indian Community v. Dunleavy, Case No. 5:20-cv-00008-JWS (D. Alaska Nov. 19, 2020), 2020 WL 8025590.

- "[The Community's] aboriginal fishing rights claims are barred under [ANCSA]." *Id.*

- "Metlakatlans lack aboriginal fishing rights and thus lack the necessary foundation for a successful implied off-reservation fishing right claim." *Id.*

- "Without aboriginal fishing rights, [the Community] lacks the mandatory foundation for proving its claim of implied off-reservation fishing rights." *Id.*

- "ANCSA broadly extinguished all aboriginal rights in Alaska, which then bars [the Community's] current aboriginal fishing right claims. *Id.*

- "Without aboriginal rights, [the Community] has then failed to state a claim upon which the relief . . . can be granted." *Id.*

- "ANCSA and the *Tlingit and Haida Indians of Alaska* decision extinguished any alleged Metlakatlan aboriginal fishing rights and without such rights they cannot successfully assert a claim of implied off-reservation fishing rights." *Id.*

- "The Metlakatlans . . . lacked any aboriginal fishing claims that Congress could statutorily recognize." Brief of Appellees at 17, Metlakatla Indian Community v. Dunleavy, 58 F.4th 1034 (9th Cir. 2023) (No. 21-35185), 2021 WL 3636038.

- "That the Metlakatlans had no aboriginal claims to preserve . . . affirms the absence of any implied off-reservation fishing right." *Id.* at 26.

*Metlakatla Indian Community v. Dunleavy, et al.*
Case No. 5:20-cv-00008-SLG                    8

- "[I]mplied off-reservation fishing rights exist only where . . . a tribe had aboriginal fishing rights . . . ." *Id.*

- "If a tribe lacks aboriginal fishing rights, there would be no off-reservation fishing rights for Congress to preserve." *Id.* at 27.

- "The Metlakatlans . . . had no aboriginal claims. The Metlakatlans therefore had no aboriginal fishing rights to retain . . . ." *Id.*

- "Congress . . . in any event extinguished all aboriginal claims when it passed the Alaska Native Claims Settlement Act." *Id.* at 28 n.90

The Ninth Circuit acknowledged the State's arguments: "Alaska argues that the Community is foreclosed from claiming an implied right to off-reservation fishing because Metlakatlans 'had no aboriginal claims to preserve.'" *Metlakatla*, 58 F.4th at 1046. The Ninth Circuit nonetheless confirmed the Community's federally reserved fishing right based on the 1891 Act and the establishment of the Community's Reservation: "the 1891 Act grants to the Community and its members a non-exclusive right to fish in the off-reservation waters where they have traditionally fished." *Id.* at 1037. By holding that the Community holds federally reserved fishing rights pursuant to the 1891 Act, the Ninth Circuit necessarily rejected the State's contrary arguments about the need for aboriginal title. The Ninth Circuit opinion, in confirming the 1891 Act as the source of the Community's reserved rights, at the very least constitutes an implied rejection of all the State's current summary judgment arguments. *Lummi*, 235 F.3d at 452 (law-of-the-case doctrine applies to issues "decided . . . by necessary implication"); *Nguyen*, 792 F.2d at 502 (rule of mandate applies to matters "expressly or impliedly disposed of on appeal").

In ruling that the Community holds federally reserved fishing rights by virtue of the 1891 Act and the establishment of the Community's Reservation (contrary to the State's arguments about the need to demonstrate aboriginal title and ANCSA's abrogation of those rights), the Ninth Circuit issued a mandate and a narrow remand for specific factual findings: "we remand to the district court to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2." *Metlakatla*, 58 F.4th at 1045. Relitigating the State's arguments regarding aboriginal title and ANSCA—and now potentially ruling that aboriginal title is a necessary predicate for the Community's reserved rights claims under the 1891 Act, or that ANCSCA bars the Community's reserved fishing rights claims—would override the Ninth Circuit's holding, violating the law of the case as well as the terms of the mandate. At the very least it would violate the "spirit of the circuit court's decision." *Kellington*, 217 F.3d at 1093. As a result, the State's summary judgment arguments are barred by the Ninth Circuit's ruling, the law-of-the-case doctrine, and the rule of mandate.

## II. The State's aboriginal rights argument misconstrues the nature of reserved rights and the law governing implied rights.

Even if the State's aboriginal title and ANCSA arguments were not barred by the law-of-the-case doctrine and the rule of mandate, they fail as a matter of law. Case law has long distinguished between "reserved rights" and "aboriginal rights." *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 338-39 (1945) (distinguishing aboriginal rights and reserved rights); *Mille Lacs Band of Chippewa Indians v.*

*Metlakatla Indian Community v. Dunleavy, et al.*
Case No. 5:20-cv-00008-SLG                    10

*Minnesota*, 124 F.3d 904, 919 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999) (distinguishing reserved hunting and fishing rights from those based upon aboriginal title); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 351 (7th Cir. 1983) ("Supreme Court precedent relating to Indians' rights has drawn a distinction between 'aboriginal title' and 'treaty-reserved title.'"); *Miami Tribe of Oklahoma v. United States*, 175 F. Supp. 926, 936-37 (Ct. Cl. 1959) (describing the difference between aboriginal title, arising from occupancy, and reserved or recognized title, arising from or recognized by treaty or statute).

Pursuant to the Indian reserved rights doctrine, the establishment of an Indian reservation impliedly reserves tribal hunting, fishing, and other rights necessary to fulfill the homeland purposes of the reservation. Such rights can arise based on a treaty, statute, or other law regardless of whether a tribe possessed aboriginal rights in the area. The law regarding aboriginal rights is different; these rights arise from a tribe's ancestral occupation and use of an area. Such rights may require a showing of "actual, exclusive, and continuous use and occupancy for a long time of the claimed area," but unlike reserved rights they "don't depend on a treaty or an act of Congress for their existence." *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012). Aboriginal rights may form the basis of a reserved rights claim, but they are not necessary for doing so. In other words, reserved rights, which the Ninth Circuit ruled that the Community holds, may arise upon the federal establishment of a reservation regardless of whether they also

satisfy all the requirements for an aboriginal rights claim.[1]

Here, the Community's claim is based solely upon federally reserved rights arising out of the 1891 Act and the establishment of its Reservation. These reserved rights have long been recognized. The State's aboriginal rights argument—that the Community must also prove the legal elements of an aboriginal right to establish its reserved right claims—misconstrues the nature of reserved rights and the law governing implied rights. Contrary to the State's arguments, the Community need not prove the legal elements of an aboriginal right to establish its reserved right claims.

> ### A. It has long been established that the Community has reserved fishing rights under federal law based upon the 1891 Act and the establishment of its Reservation.

The establishment of an Indian reservation reserves tribal hunting and fishing rights needed to serve the homeland purposes of the reservation. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 405-07 (1968); *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 44-48 (9th Cir. 1981). This is true even when the relevant documents establishing the reservation are otherwise silent about such tribal hunting and fishing rights. *Menominee*, 391 U.S. at 405-06 (holding that an 1854 Treaty, establishing a new Menominee Reservation "for a

---

[1] In *Winters v. United States*, for example, the Supreme Court addressed whether an 1888 agreement setting aside the Fort Belknap Reservation "as and for a permanent home" for the several tribes impliedly reserved water necessary to fulfill the purposes of the reservation. 207 U.S. 564, 565, 575 (1908). The Supreme Court did not consider or even mention aboriginal rights; as *Winters* and subsequent reserved rights cases make clear, the nature and scope of reserved rights may be, and often are, a function of the tribes' and Congress's intent and the purposes of the reservation.

home, to be held as Indian lands are held," and saying nothing about hunting and fishing rights, nevertheless established a reserved "right to fish and to hunt"); *Parravano*, 70 F.3d at 546 (holding that executive orders establishing reservations "for Indian purposes," and saying nothing about hunting or fishing rights, impliedly reserved such rights); *Walton*, 647 F.2d at 47-48 (holding that an 1872 Executive Order creating the Colville Reservation—which stated only that land was to be "set apart as a reservation for said Indians"—impliedly reserved fishing rights, including access to fishing sites and water for the development and maintenance of new fishing grounds to replace sites destroyed by dams on the Columbia River).

In these cases, courts identify the purposes of a reservation by looking to the historical record and the circumstances surrounding its creation, as well as to the traditional practices and understandings of the tribes at the time. *Walton*, 647 F.2d at 48 ("[P]reservation of the tribe's access to fishing grounds was one purpose for the creation of the Colville Reservation. Under the circumstances, we find an implied reservation of water . . . for the development and maintenance of replacement fishing grounds."); *Menominee*, 391 U.S. at 406 ("The essence of the Treaty of Wolf River was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing."); *Parravano*, 70 F.3d at 546 (In construing executive orders establishing the Hoopa Valley and Yurok reservations "for Indian purposes," "[w]e have never encountered difficulty in inferring that the Tribes' traditional salmon fishing was necessarily included in one of those 'purposes.'").

Moreover, the "general purpose" of establishing an Indian reservation, which is "to provide a home for the Indians, is a broad one and must be liberally construed." *Walton*, 647 F.2d at 47.

Here, the Supreme Court has already held that the purposes of the Metlakatla Reservation were determined by "the circumstances in which the reservation was created," "the location and character of the islands," "the situation and needs of the Indians," and the fact that Metlakatlans were "largely fishermen and hunters" who would depend on the islands as their permanent home. *Alaska Pac. Fisheries*, 248 U.S. at 88. Since first moving to the Annette Islands in 1887, the Community fished predominately within a day's travel of the current Reservation. Dkt. 40 at 8; *see also Metlakatla*, 58 F.4th at 1037 ("Historical sources indicate that they fished as far north as 50 miles from the Annette Islands in what is now the State of Alaska."). Indeed, "[the Metlakatlans] specifically selected the Annette Islands because of their fishing potential." *Id.* at 1038. "When Congress passed the 1891 Act establishing the Metlakatlans' reservation, it did so with the expectation that the Metlakatlans would continue to support themselves by fishing." *Id.* at 1044 (citing *Alaska Pac. Fisheries*, 248 U.S. at 89). The Community shared this understanding. *Id.* ("When Metlakatlans moved to the islands in the late 1880s . . . they did so with the understanding that they would be able to support themselves by fishing, as they had always done."). Both Congress and the Community contemplated that the Community would continue to fish within its off-reservation fishing grounds, and impliedly reserved these fishing areas upon the establishment of the Community's

Reservation in 1891. *Id.* at 1045.

## B. The Community does not need to demonstrate an aboriginal fishing right in order to establish a reserved rights claim.

The Community does not have to prove the legal elements of aboriginal title to establish these reserved right claims. Cases like *Menominee*, *Parravano*, and *Walton* recognize tribal reserved hunting and fishing rights—based entirely on the establishment of a federal reservation and the implied rights accompanying those reservations—without any analysis of whether those tribes established the legal elements also necessary to prove aboriginal fishing rights.

To be sure, reserved rights may be based upon aboriginal practices in some instances, and as a result may carry with them added legal benefits for a particular tribe. For example, in the reserved water rights context, where such rights often vest "on the date of the reservation" and are "superior to the rights of future appropriators," *Cappaert v. United States*, 426 U.S. 128, 138 (1976), a reserved rights claim based upon a recognized aboriginal right may instead include a "time immemorial" priority date as opposed to a "date of reservation" priority date for water rights in prior appropriation systems. *Hawkins v. Bernhardt*, 436 F. Supp. 3d 241, 250 (D.D.C. 2020), *aff'd sub nom. Hawkins v. Haaland*, 991 F.3d 216 (D.C. Cir. 2021). In the case of the recently completed Yakima River adjudication, for example, the Yakama Nation has an 1855 "date of reservation" priority date for certain reserved rights based solely upon its 1855 Treaty and the establishment of its reservation, and a "time immemorial" priority date for reserved rights based upon tribal aboriginal fishing practices recognized by the treaty. *In*

*Metlakatla Indian Community v. Dunleavy, et al.*
Case No. 5:20-cv-00008-SLG          15

*re Yakima River Drainage Basin*, 498 P.3d 911, 929-30 (Wash. 2021); *In re Yakima River Drainage Basin*, 296 P.3d 835, 840 (Wash. 2013). But the absence of an aboriginal right in no way undermines the existence of federally reserved rights.

The State relies almost exclusively on case law analyzing aboriginal rights (including, in some instances, where such rights were subsequently confirmed by treaty, statute, or executive order). Dkt. 42 at 28-32 (citing *United States v. Michigan*, 471 F. Supp. 192 (W.D. Mich. 1979), *Native Village of Eyak*, 688 F.3d 619, and *Pueblo of Jemez v. United States*, 790 F.3d 1143 (10th Cir. 2015)). But these cases do not stand for the proposition that a federal reservation, or federally reserved rights, *must* stem from aboriginal rights, or that the legal elements of an aboriginal rights claim are prerequisites to the existence of federal reservations or federally reserved rights. Reserved rights may be established and may exist independently, just as aboriginal rights may continue to exist independent of reserved rights. *See, e.g.*, *Native Village of Eyak*, 688 F.3d at 622 (recognizing that "[a]boriginal rights don't depend on a treaty or an act of Congress for their existence").

The State's failure to cite *Chehalis* in its opening brief is telling. There, the Ninth Circuit considered whether tribes had off-reservation fishing rights based *either* upon an aboriginal rights theory *or* upon federally reserved rights arising from the establishment of their reservations. 96 F.3d at 341-43. In that case, the Ninth Circuit first addressed tribal aboriginal fishing rights claims, holding that an executive order extinguished such rights. *Id.* at 341-42. That would have ended the case if the Ninth Circuit in *Chehalis* had

agreed with the State of Alaska's arguments here that aboriginal rights are a precondition for the existence or exercise of reserved rights. However, *Chehalis* proceeded to decide—separately from the consideration of aboriginal rights—whether the establishment of the Shoalwater Bay and Chehalis Indian Reservations impliedly reserved off-reservation fishing rights for those tribes. The Ninth Circuit did not require aboriginal rights as a prerequisite to determining whether the tribes had reserved fishing rights. Instead, in examining the reserved rights claim, the Ninth Circuit considered the purposes of the reservations, the circumstances surrounding their creation, the tribes' histories, and the understandings of the tribes and Congress at the time. *Id.* at 342-43. The Ninth Circuit eventually upheld the district court's determinations that neither the tribes nor the United States intended or believed that such reservations secured any off-reservation fishing rights.[2] In other words, although the Ninth Circuit ruled against the tribes' reserved rights claims in *Chehalis*, it did so by employing the reserved rights test examining whether the tribes and United States intended to reserve off-reservation fishing rights as part of the homeland purposes of their reservations, without analyzing the "actual, exclusive, and

---

[2] This finding in *Chehalis* is substantially different from the Community's case, in which both Congress and the Community intended for the Community to continue fishing in the off-reservation waters where they have traditionally fished, and impliedly reserved these fishing rights upon the establishment of the Community's Reservation in 1891. *Metlakatla*, 58 F.4th at 1045. The *Chehalis* case is also different in two other important respects: (1) the Ninth Circuit ruled that the Indian canons of construction, which require courts to construe treaties, statutes, and executive orders liberally in favor of tribes, were inapplicable given the competing claims of another tribe in that particular case; and (2) the Ninth Circuit was reviewing the district court's finding under a "highly deferential clear error standard." *Chehalis*, 96 F.3d at 343.

continuous use and occupancy" elements of an aboriginal rights claim.

The State's reliance (Dkt. 50 at 6-7) on *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, Case No. 13-cv-883, 2015 WL 13309103 (C.D. Cal. Mar. 24, 2015), further undercuts the State's aboriginal rights theory. There, the Tribe and the United States asserted a federally reserved water right in the aquifer beneath the Tribe's reservation, with a time immemorial priority date based upon the Tribe's aboriginal water uses. The district court rejected the Tribe's aboriginal rights claim. *Id.* at **8-9. It held that an 1851 Act of Congress extinguished the Tribe's aboriginal rights when the Tribe failed to file aboriginal claims within the two-year window purportedly required by the 1851 Act. *Id.* at **9-10.[3] However, the existence of this aboriginal right was irrelevant for determining—separately—whether the Tribe had federally reserved rights by virtue of the establishment of its reservation in 1876. *Id.* at **5, 8. That is, even though the court held that the Tribe's aboriginal rights had been extinguished, the court proceeded to uphold the Tribe's reserved rights claims pursuant to an entirely different analysis, which the Ninth Circuit affirmed. *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262 (9th Cir. 2017). Contrary to the State of Alaska's arguments in this case, the Tribe in *Agua Caliente* had reserved rights solely based upon the establishment of its reservation, without the need for or reference to the legal standard for aboriginal rights, and even if the Tribe's aboriginal rights had been extinguished by Congress.

---

[3] The United States does not concede the correctness of the district court's ruling on this point and reserves all rights about the effect of the 1851 Act on tribal rights and title.

## III.   ANCSA does not apply to this case.

The State's argument that "ANCSA bars this litigation" (Dkt. 42 at 24) also lacks merit. ANCSA does not apply to this case. The State cites Section 4(c) of ANCSA, which extinguishes "[a]ll claims against the United States, the State, and all other persons that are based on claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska." 43 U.S.C. § 1603(c). However, as demonstrated above, the Community does not assert and has no need to assert an aboriginal right to fish in the waters at issue; rather, its claim seeks to protect and enforce a federally reserved right arising from 1891 Act which. The Community expressly acknowledges that its claim does not implicate aboriginal rights. Dkt. 46 at 8, 18. And its claim in no way "threaten[s] to interfere with ANCSA's policy of extinguishing aboriginal rights." Dkt. 42 at 25. Indeed, as this Court has already recognized:

> [The Community] is not asserting that its reserved right to fish free of the State's interference stems from an aboriginal right—a right based on a group's exclusive, long, continuous use of an area. Instead, its claim rests on the premise that Congress impliedly granted it appurtenant fishing rights in 1891. . . . Whether [the Community] possess[es] off-reservation fishing rights under the 1891 statute turns on an examination of Congress' intent.

*Metlakatla Indian Community v. Dunleavy*, Case No. 5:20-cv-00008-JWS, 2021 WL 960648, at *3 (D. Alaska Feb. 17, 2021) (citations omitted). Section 4(c) of ANCSA has no bearing on the Community's claimed right, which was impliedly reserved by the 1891 Act and not from an underlying, non-statutory claim to an aboriginal practice.

The State's ANCSA argument is further undercut by the fact that the Community elected not to participate in ANCSA settlement proceedings and instead chose to maintain

its reservation status. ANCSA revoked all reservations in Alaska, except for the Community's Reservation, and precluded enrolled Community members from receiving any benefit under ANCSA. *See* 43 U.S.C. § 1618(a) (revoking all reservations in Alaska except "the Annette Island Reserve established by the Act of March 3, 1891," and providing that "no person enrolled in the Metlakatla Indian community of the Annette Island Reserve shall be eligible for benefits under this Act"). The fact that ANCSA specifically excludes the Reservation evinces Congress's intent to preserve the status of the Reservation and any federally reserved rights the Community enjoyed pre-ANCSA. Here, the establishment of the Reservation carried with it an implied federally reserved right to non-exclusive fishing in certain waters. This right was one of the rights attached to the Reservation based on the 1891 Act and preserved in ANCSA by virtue of the exceptions in Section 1618(a).

## CONCLUSION

For the foregoing reasons, this Court should grant the Community's Motion for Summary Judgment and deny the State's Motion.

DATED:  January 12, 2024                 Respectfully submitted,

                                         TODD KIM
                                         Assistant Attorney General
                                         United States Department of Justice
                                         Environment and Natural Resources Division

                                         /s/ Daron Tate Carreiro
OF COUNSEL:                              DARON TATE CARREIRO, Trial Attorney
SAMUEL E. ENNIS                          United States Department of Justice
Assistant Solicitor                      Environment and Natural Resources Division
CONNIE K. BRIGGS                         Indian Resources Section
Attorney-Advisor                         999 18th Street, South Terrace, Suite 370
Office of the Solicitor                  Denver, CO 80202
Division of Indian Affairs               Telephone: 202-305-1117; Fax: 202-305-0275
U.S. Department of the Interior          Email: daron.carreiro@usdoj.gov


# CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, the foregoing document was

electronically transmitted to the Clerk of the Court using the CM/ECF filing system,

which will transmit a Notice of Electronic Filing to counsel of record.


                                         /s/ Daron Tate Carreiro
                                         Daron Tate Carreiro, Trial Attorney


*Metlakatla Indian Community v. Dunleavy, et al.*
Case No. 5:20-cv-00008-SLG          21