TREG TAYLOR
ATTORNEY GENERAL

Christopher F. Orman (Alaska Bar No. 1011099)
Assistant Attorney General
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-3019
Email: *christopher.orman@alaska.gov*

Attorney for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| METLAKATLA INDIAN COMMUNITY, a Federally Recognized Indian Tribe, | |
| Plaintiff, | |
| v. | Case No.: 5:20-cv-00008-SLG |
| MICHAEL J. DUNLEAVY, Governor of the State of Alaska, DOUG VINCENT-LANG, Commissioner of the Alaska Department of Fish and Game, and JAMES E. COCKRELL, Commissioner of the Alaska Department of Public Safety, | **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*MIC v. Dunleavy, et al.*                              Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 1 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 1 of 43

# TABLE OF CONTENTS

I. Issues Presented and Brief Answers ................................................................. 7

II. Statement of Facts ...................................................................................... 8

    A. The Metlakatla community in British Columbia traditionally fished in the Nass and Skeena Rivers. ................................................................ 8

    B. From 1862 to the 1880s, Metlakatlans' traditions develop, with a focus on religion and generating income for the community. ................................. 10

    C. In 1887, the Metlakatlans emigrate from British Columbia to the United States and settle on the Annette Islands. ...................................................... 11

    D. After relocating to the Annette Islands, Metlakatlans return to fish the Nass and Skeena Rivers and there is little evidence the Metlakatlans had a tradition of fishing in Southeast Alaska's waters ........................................ 13

    E. Four years after the Metlakatlans immigrated to the Annette Islands, Congress creates the Annette Islands Reserve for the Metlakatla community ................................................................................................... 16

    F. The Metlakatla community's traditional fishing grounds were the Annette Islands' freshwater and close to shore marine fisheries and the Nass and Skeena Rivers in British Columbia ............................................................ 18

III. Argument ................................................................................................... 19

    A. The "usual and accustomed fishing location" case law should guide this Court's fact finding ..................................................................................... 20

        1. "Traditional fishing grounds" and "usual and accustomed fishing locations" should be read synonymously ........................................ 21

        2. By using the phrase "non-exclusive" fishing right, the Ninth Circuit and the Community further confirmed that the usual and accustomed fishing right cases set the standard ................................................... 23

        3. This Court should not apply a lower standard to an implied off-reservation fishing right than courts use to evaluate an expressed off-reservation fishing right ................................................................. 24

    B. "Fish," as to the Metlakatlans' "traditional fishing grounds," is salmon .... 25

    C. Because commercial fishing under a limited entry permit is only allowed in the marine fisheries of fishing districts 1 and 2—as under Alaska law freshwater streams are closed to commercial fishing—any evidence about historic salmon harvests from freshwater streams is irrelevant ................. 29

*MIC v. Dunleavy, et al.*                     Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment         Page 2 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 2 of 43

D.  The Metlakatlans' did not traditionally fish for salmon in the marine waters of what is now identified by the State as fishing districts 1 and 2 ..............31

E.  Occasional and incidental fishing in Southeast Alaska's deeper marine fisheries for salmon and halibut by Metlakatlans and Tsimshian during trading voyages does not provide sufficient evidence of regular and frequent use establishing a "traditional fishing location, station, or ground." ....................................................................................................................39

IV. In this litigation, the Community asserts a prioritized fishing right stemming from the 1891 Act, while the federal government's policy at the time of the 1891 Act was to treat all commercial fishermen fishing in Southeast Alaska's marine fisheries equally. ...................................................................................................41

V.  Conclusion ...........................................................................................................42

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                         Page 3 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 3 of 43

## TABLE OF AUTHORITIES

### Cases

*Alaska Pacific Fisheries Co. v. U.S.*,

248 U.S. 78 (1918) ..................................................................................... 26

*Haaland v. Brackeen*,

599 U.S. 255 (2023) ................................................................................... 41

Indian Immigration,

1877 WL 4593 (U.S. Attorney General February 28, 1877). ................... 9, 10

*Lax Kw'alaams Indian Band v. Canada*,

2008 BSCS 447 (BCSC 2008) ................................................................... 32

*Makah Indian Tribe v. Quileute Indian Tribe*,

873 F.3d 1157 (9th Cir. 2017) .......................................................... 20, 24, 30

*Metlakatla Indian Community v. Dunleavy*,

58 F.4th 1034 (9th Cir. 2023) .......................................................... 20, 21, 25

*Swinomish Indian Tribal Community v. Lummi Nation*,

80 F.4th 1056 (9th Cir. 2023) ..................................................................... 38

*U.S. v. Confederated Tribes of Colville Indian Rsrv.*,

606 F.3d 698, (9th Cir. 2010) ..................................................................... 22

U.*S. v. Lummi Indian Tribe*,

841 F.2d 317 (9th Cir. 1988) ................................................................. 31, 38

*U.S. v. Mich.*,

471 F.Supp. 192 (W.D. Mich. 1979) ......................................................... 18

*U.S. v. State of Wash.*,

384 F.Supp. 312 (W.D. Wash. 1974) ..................................................... 23, 30

*U.S. v. State of Wash.*,

459 F.Supp. 1020 (W.D. Wash. 1978) ................................................... 22, 31

*U.S. v. State of Wash.*,

626 F.Supp. 1405 (W.D. Wash. 1985) ................................................... 22, 30

*MIC v. Dunleavy, et al.*                     Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                Page 4 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 4 of 43

*U.S. v. State of Washington,*

    129 F.Supp.3d 1069 (W.D. Wash. 2015)....................................................20

*U.S. v. Wash.,*

    157 F.3d 630 (9th Cir. 1998)..........................................................24, 41

*U.S. v. Wash.,*

    193 F.Supp.3d 1190 (W.D. Wash. 2016)..................................................31

*U.S. v. Washington,*

    853 F.3d 946 (9th Cir. 2017)...............................................................21

*U.S. v. Winans,*

    198 U.S. 371 (1905)..........................................................................21

*Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe,*

    66 F.4th 766 (9th Cir. 2023)..........................................5, 18, 31, 37

*Upper Skagit Indian Tribe v. Washington,*

    590 F.3d 1020 (9th Cir. 2010).......................................................19, 31

*Upper Skagit Tribe v. State of Washington,*

    576 F.3d 920 (9th Cir. 2009)...............................................................20

*Wash. V. Wash. State Commercial Passenger Fishing Vessel Ass'n,*

    443 U.S. 658, (1979). ..................................................................19, 23

## Statutes

An act to repeal timber-culture laws, and for other purposes, 26 Stat. 1095-1103, sec. 15
    (March 3, 1891)..........................................................................15, 26

## Other Authorities

"Salmon and Shellfish Fisheries, Districts, Sections and Statistical Areas," Chart 5 –
    Region 1, Southeast Alaska (ADF&G March 2025); .....................................33

21 Cong. Rec. 10092 (Sept. 16, 1890) .......................................................15, 25

Brian Hosmer, American Indians in the Marketplace: Persistence and Innovation Among
    the Menominees and Metlakatlans 1870-1920 (Univ. of Kansas 1999)........................16

Cohen's Handbook of Federal Indian Law (2012 ed.)...............................................19, 30

Steve Langdon, From Communal Property to Common Property to Limited Entry:
    Historical Ironies in the Management of Southeast Alaska Salmon, A Sea of Small

*MIC v. Dunleavy, et al.*          Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment          Page 5 of 43

Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 5 of 43

Boats: Customary Law of the Sea and Territoriality in the World of Inshore Fishing
(Cambridge Mass: Cultural Survival Inc. 1990) ................................................ 13, 35, 36

Thomas Thorton, Being and Place (Univ. of WA 2008) .................................................. 13

**Regulations**

20 AAC 05.1940 - .1952 ....................................................................................................... 29

5 AAC 28.150 ................................................................................................................. 28, 29

5 AAC 29.150 ................................................................................................................. 28, 29

5 AAC 33.350 ................................................................................................................. 28, 29

5 AAC 39.290 ...................................................................................................................... 29

*MIC v. Dunleavy, et al.*                                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                                     Page 6 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 6 of 43

# I. Issues Presented and Brief Answers

(1) What legal standards should the Court apply when it evaluates whether the Metlakatla Indian Community (the Community) has met its burden of proof that certain freshwater or marine fisheries comprise the Metlakatlans' "traditional off-reservation fishing grounds?"; and

(2) Can the Community meet its burden of proof that the Metlakatlans' "traditional off-reservation fishing grounds" included the marine waters of fishing districts 1 and 2? ECF Doc. 70, p. 27.

As to the first question, this Court should use the standards from the "usual and accustomed fishing location" cases.[1] The geographic scope of the Metlakatlans' implied off-reservation fishing right is the Metlakatlans' usual and accustomed fishing grounds when Congress created their reservation in 1891. This requires the Community to prove that its members regularly and frequently fished in the marine waters comprising fishing districts 1 and 2 prior to Congress' creation of the Annette Islands Reserve in 1891.

The answer to the second question is "no." The Community asserts a right to commercially fish for salmon in the marine fisheries – the deep waters – of fishing districts 1 and 2 without a limited entry permit for the economic self-sufficiency of the reservation. But the Metlakatlans' "traditional fishing grounds" for economic purposes were the Nass and Skeena Rivers, the Annette Island's freshwater streams, and the marine waters up to 3,000 feet from the Annette Islands' uplands.[2] These were the fisheries that

---

[1] *E.g. Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766 (9th Cir. 2023).

[2] Dr. Anthony Gulig, "A Historical Analysis of the Traditional Fisheries of the Metlakatla Indian Community," (January 30, 2025); attached as Exhibit A (cited as Gulig Report).

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 7 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 7 of 43

supported Metlakatla's cannery. There is no evidence that prior to 1891 the Community's members, or even their familial ancestors, fished regularly and frequently in the marine fisheries that comprise fishing districts 1 and 2. And any fishing in those marine fisheries was under federal law where all commercial fishermen were treated the same.

## II. Statement of Facts[3]

### A. The Metlakatla community in British Columbia traditionally fished in the Nass and Skeena Rivers.

It is not entirely clear precisely which clans and ethnographic tribes inhabited Southeast Alaska 4,000 years ago. There is some evidence to suggest that in 1500 B.C., Tsimshian ancestors inhabited the most southern regions of Southeast Alaska.[4] However, by the 1700s, it is undisputed the Tsimshian had abandoned those lands and their claims when they relocated to British Columbia.[5] This relocation led to the development of the Coastal Tsimshian.[6]

---

[3] This brief mentions several geographic locations, including islands, streams, and waters. The State's Exhibit G includes three maps: (1) a historic map from 1890; (2) a map showing the various clans within Southeast Alaska and Northern British Columbia; and (3) the 2025 map showing Alaska fishing districts 1 and 2 for salmon management purposes.

[4] Dr. Steven Langdon, "Metlakatla Pioneers Ancestral Marine Resource Use in Southeast Alaska Prior to 1887," p. 26 (January 2025); attached as Exhibit B (cited as Langdon Report).

[5] *Id*.

[6] *Id*.

*MIC v. Dunleavy, et al.*                                      Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 8 of 43
            Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 8 of 43

The Coastal Tsimshian would comprise the initial Metlakatla community.[7]  They were traders[8] that harvested salmon and oolichan [i.e., hooligan] from the Nass and Skeena Rivers.[9]

Meanwhile, the Tlingit and Haida have "since time immemorial" asserted control over all of Southeast Alaska's lands and waters.[10]  This is consistent with the Court of Claims' findings that the Tlingit and Haida exercised control over Southeast Alaska's lands and waters, including the Annette Islands, on which lay a Tlingit village.[11]

In the early 1800s, trade and western expansion brought changes.[12]  The Coastal Tsimshian, who had always been traders, were now fiscally immersed in modern trading with the Hudson's Bay Company.[13]

---

[7] Gulig Report, p. 8, 14 – 37.  The word Tsimshian translates to "people of Skeena River." John R. Swanton, The Indian Tribes of North America, p. 606 (Smithsonian Institution Press 1952).

[8] Langdon Report, p. 15-16; Gulig Report, p. 19-21.

[9] Gulig Report, p. 14-17.

[10] *Id*. at p. 26 ("Accounts indicate a movement from earliest presence on the upper Stikine River downriver to the mouth where occupation was established. . . Based on geological evidence of glacier activity in the upper Skeena River valley, it is estimated that the period of ancestral origins described in the adawk [i.e. Native oral history] occurred approximately 3500 bp [i.e. which converts to 1500 B.C.]").

[11] *See Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct.Cl. 315, 338, 340 (Ct.Cl. 1959) ("The major part of the lands aboriginally used and occupied by the Tlingit and Haida Indians in southeastern Alaska was actually taken from them by the United States . . . The land so taken was, first, some 86,740 acres comprising the Annette Islands in the southern part of Tlingit territory taken as a reservation for the Tsimshian (Metlakahtla [sic]) Indians pursuant to the Act of March 3, 1891.").

[12] *Id.* at p. 21-22.

[13] *Id.*

*MIC v. Dunleavy, et al.*                              Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 9 of 43
          Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 9 of 43

In 1857, William Duncan, a missionary from England, arrived in Fort Simpson, British Columbia where he met the Coastal Tsimshian.[14] Duncan's plan was to convert the Coastal Tsimshian to Christianity.[15]

In 1862, Duncan and his congregation of Coastal Tsimshian established the Metlakatla community in British Columbia at "the site of an earlier Tsimshian village."[16] This Christian community comprised Tsimshian and Haida members from Fort Simpson – a fort near the Nass and Skeena Rivers – in British Columbia.[17] Duncan's community grew during the smallpox outbreak.[18]

Despite relocating to Metlakatla in British Columbia, the members still returned to Fort Simpson in British Columbia and fished the Nass and Skeena Rivers.[19]

B. From 1862 to the 1880s, Metlakatlans' traditions develop, with a focus on religion and generating income for the community.

For the Metlakatlans, "[t]heir economic world was changing, and they made conscious choices to incorporate that change into their world and territory."[20] But, because Metlakatla was somewhat isolated, Duncan was able "to shape the community

---

[14] *Id.* at p. 22.

[15] *Id.* at p. 25 ("Duncan sought a venue that would allow his mission to flourish by segregating his growing Christian community from the distractions of the trading post.").

[16] *Id.* at p. 25-28.

[17] Gulig Report, p. 25-28

[18] *Id.* at p. 27-28.

[19] *Id.* at p. 28.

[20] *Id.* at p. 20.

*MIC v. Dunleavy, et al.*                Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                Page 10 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 10 of 43

into a utopian settlement he hoped would benefit his Indigenous charges and serve as a model for other missions."[21]

Because of this, the Metlakatla community focused on industrial enterprises that would yield strong fiscal returns throughout British Columbia.[22]  To that end, the community built a cannery, a church, and large houses.[23]

C.  In 1887, the Metlakatlans emigrate from British Columbia to the United States and settle on the Annette Islands**.**

By the 1870s, the British Columbia government entered its era of Indian termination.[24]  This included "settling" Indian rights throughout the British Columbia coast.[25]  The British Columbia government rejected—and even apparently ignored—Duncan's requests to settle these disputes so that the Metlakatla community could continue to live in British Columbia.[26]

Because of this, the Metlakatlans – led by William Duncan – began considering immigrating to Alaska.[27]  Duncan sought approval from the President for the community

---

[21] *Id*. at p. 28.

[22] *Id.* at p. 20, 30

[23] *Id.* at p. 28.

[24] Gulig Report, p. 30.

[25] *Id*.

[26] *Id.* at p. 31.

[27] *Id.* at p. 31 – 32.  Indian Immigration, 1877 WL 4593 (U.S. Attorney General February 28, 1877).

*MIC v. Dunleavy, et al.*                                           Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                      Page 11 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 11 of 43

immigrate to Alaska. President Grant's Attorney General responded that there was no law prohibiting their immigration, but their ability to acquire these lands would be difficult.[28]

In the spring of 1887, Duncan went to Washington D.C. to gain further approval for the Metlakatlans to immigrate to the United States.[29] Duncan believed that if the community moved to Alaska, the United States would protect the community's investments – such as in a new mill and cannery – and thus the community would economically prosper.[30] Duncan received that approval from President Cleveland and his staff.[31]

Duncan sent a telegram to Metlakatla.[32] Immediately, a group of Metlakatlans scouted several locations to immigrate to, such as areas on Prince of Wales Island.[33] They ultimately choose the Annette Islands.[34] And in 1887 approximately 800 Metlakatlans emigrated from British Columbia to the Annette Islands that summer.[35]

Days after the Metlakatlans' arrival, members of Tlingit and Haida tribes contacted the community on the Annette Islands.[36] The record does not indicate the Tlingit asked

---

[28] Indian Immigration, 1877 WL 4593.

[29] Gulig Report, p. 32.

[30] Gulig Report, p. 31-32.

[31] *Id.*

[32] *Id.*

[33] *Id.* at p. 32-33.

[34] *Id.* at p. 32.

[35] *Id.* at p. 36-37.

[36] *Id.* at p. 37.

*MIC v. Dunleavy, et al.*                           Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                  Page 12 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 12 of 43

Duncan or the other Metlakatlans to leave.[37]  The Haidas offered deer for sale, but there is no evidence they asked Duncan or the other Metlakatlans to leave.[38]  Because the Tlingit and Haida had aboriginal control of these lands, their contact suggests an implicit authorization that the Metlakatlans could remain on the islands.[39]

D.  After relocating to the Annette Islands, Metlakatlans return to fish the Nass and Skeena Rivers and there is little evidence the Metlakatlans had a tradition of fishing in Southeast Alaska's waters**.**

After immigrating to Alaska, the Metlakatlans built a mill and a cannery.[40]  Both the mill and cannery were funded by outside investors secured by Duncan.[41]

The Metlakatlans continued to spend their summers fishing the Nass and Skeena Rivers, which were their traditional fishing grounds.[42]

Returning to the Nass and Skeena Rivers to fish was also a recognition that the Tlingit and Haida held rights to Southeast Alaska's streams.[43] Rights to fish those streams were based on clan and familial ties.[44] As the Community's expert Dr. Langdon has explained, "In general, property rights accrued to the social organizational level that a given resource could adequately support, but the house group and clan were by far the

---

[37] *Id.*

[38] *Id*.

[39] Gulig Report, p. 36 – 37.

[40] Gulig Report, p. 42.

[41] *Id.* at p. 44.

[42] *Id.* at p. 50.

[43] *Id.*

[44] *Id.* at p. 47-48 (regarding the Haida and stream ownership.).

*MIC v. Dunleavy, et al.*                              Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 13 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 13 of 43

most typical levels."[45]   Those outside of the family or clan could fish those sites, but only with the approval of the families or clans that held the rights to those waters; a verbal, revocable license.[46]  "Control over natural resource territories, which clans or house groups held, was normally exercised by the eldest male.  This role usually has been seen as one of "custodian or trustee of the hunting and fishing territories of his clan."[47] To the extent the trustee of a Tlingit or Haida clan gave a revocable license to a Metlakatlan to fish, there is no indication that such license was a bestowal of a right for the entire 800 person community to fish.

The only evidence that the Community provided regarding a fishing right that a Metlakatlan family held was in Kegan Creek, and the right belonged to a family, not the Community as a whole. George "Kegan" Williams was a Tlingit was joined the Metlakatla Community[48]  Williams' family held rights to fishing stations on Kegan

---

[45] Steve Langdon, From Communal Property to Common Property to Limited Entry: Historical Ironies in the Management of Southeast Alaska Salmon, A Sea of Small Boats: Customary Law of the Sea and Territoriality in the World of Inshore Fishing, p. 309 (Cambridge Mass: Cultural Survival Inc. 1990).

[46] Thomas Thorton, Being and Place, p. 154 (Univ. of WA 2008) ("These streams, under their own administration, for centuries have belonged to certain families or clans. . . . No Indians would fish in a stream not their own except by invitation, and they cannot understand how those of a higher civilization should be – as they regard it less honorable."); and p. 136 ("Although Tlingits exercised a high degree of territorial control over key production sites, access, even to non-matrikin, was typically extended *if permission was sought*.").

[47] Langdon, "Communal Property," p. 310.

[48] Dr. Steven Langdon, "Plaintiff Rebuttal Report Prepared by Dr. Steven Langdon to A Historical Analysis of the Traditional Fisheries of the Metlakatla Indian Community by Dr. A.G. Gulig," p. 9-13 (March 31, 2025); attached as Exhibit C (cited as Langdon Rebuttal).

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                        Page 14 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 14 of 43

Creek, on Prince of Wales Island.[49]  Importantly, Dr. Langdon, the Community's expert, does not suggest that Williams' familial fishing property rights transferred to the Metlakatlan community at a whole.[50]  In other words, the fact that Williams, who had fishing rights joined the Metlakatla Community does not mean his family's rights "conveyed" to the Metlakatla Community.[51]  Rather, Williams' family had rights to these fishing stations, so when he left the Metlakatla Community, he retained his the rights to Kegan Creek.

Federal reports from the 1890s and 1900s show that salmon from Kegan Creek, Old Johnson Stream, Peter Johnson Stream, and Nowiskay Stream—streams on Prince of Wales island—were "supplied to" the Metlakatla cannery.[52] None of these reports suggest that the Metlakatlans actively fished in these four freshwater fisheries.[53] This is consistent with Metlakatlans being traders and engaging in the ever developing modern economy.

In fact, Duncan's letters from 1887 to 1914, which the Community's experts Dr. Langdon and Mr. Boxley did not review, show that the Metlakatlans did not commercially fish in most of the waters identified in those federal reports. Duncan lodged complaints about Metlakatlans not having access to Southeast Alaska's fisheries.[54]  He

---

[49] *Id.*

[50] Langdon Rebuttal, p. 9-13.

[51] *Id.*, Langdon Dep. 122:2-125:8, (May 9, 2025); attached as Exhibit D.

[52] Langdon Rebuttal p. 9 – 13.

[53] *Id.*

[54] Gulig Report, p. 52-55.

*MIC v. Dunleavy, et al.*                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 15 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 15 of 43

also asserted that the freshwater fisheries for salmon should be a common fishery.[55]  He informed federal officials about Metlakatlans facing violence in parts of Southeast Alaska when they tried to fish in certain streams.[56]  To ensure the cannery was successful – and a return on an investment made by Duncan's Oregon connections – Duncan leased fishing stations and purchased fish from Tlingit and Haida fishermen.[57]

E. Four years after the Metlakatlans immigrated to the Annette Islands, Congress creates the Annette Islands Reserve for the Metlakatla community.

Four years after the Metlakatlans arrived in Southeast Alaska, Congress created the Annette Islands Reserve.[58] Congress did not use any ethnographic delineations like Tsimshian, Haida, or Tlingit.[59]  Instead Congress stated the Annette Islands would be:

> . . . set apart as a reservation for the use of the Metlakahtla [sic] Indians, and those people known as Metlakahtlans [sic] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them.[60]

Congress understood that Metlakatla was a Christian community and the reserve would be for *that Christian community*.[61]  With this language, Congress recognized that

---

[55] *Id.* at p. 55.

[56] *Id.* at p. 52-55.

[57] *Id.* at p. 51, 55-59.

[58] *Id.* at p. 43-44.

[59] An act to repeal timber-culture laws, and for other purposes, 26 Stat. 1095-1103, sec. 15 (March 3, 1891)

[60] *Id.*

[61] 21 Cong. Rec. 10092 (Sept. 16, 1890) (recognizing the Metlakatlans as "Christian indians.").

*MIC v. Dunleavy, et al.*                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 16 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 16 of 43

Metlakatlans included not just "Metlakatla Indians" or Alaska Natives who joined, but also Duncan and other non-Indians who were part of the Christian community.[62]

Because of this, Metlakatlan has been described as a "layer" that "overlayed" someone's ethnographic delineation as a Tsimshian, Tlingit, or Haida.[63] To become a Metlakatlan meant joining and committing to Duncan's religious community. Those who joined were "required . . . to commit to a fifteen-point pledge and was not intended to be trivial or symbolic. Joining the community required *commitment and change*."[64] This meant Metlakatlans "distinguished them[selves] from their neighbors, native and nonnative, if not by ethnicity then certainly by their attachment to their missionary and community."[65]

Their unique political and religious "overlay" meant the Metlakatlans developed their own fishing traditions; traditions that were not directly tied to a family, clan, or ethnographic group.[66]

---

[62] Census Data, PAC, Duncan Papers, M-2329, Miscellaneous, Entry Books, 1890-1895; attached as Exhibit E.

[63] Brian Hosmer, American Indians in the Marketplace: Persistence and Innovation Among the Menominees and Metlakatlans 1870-1920, p. 180 (Univ. of Kansas 1999).

[64] Gulig Report, p. 41, fn. 79; *emphasis added*.

[65] Hosmer, p. 180.

[66] Hosmer, p. 180; *see also* Gulig Report, p. 41, fn. 79.

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 17 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 17 of 43

F. The Metlakatla community's traditional fishing grounds were the Annette Islands' freshwater and close to shore marine fisheries and the Nass and Skeena Rivers in British Columbia.

From 1860 through the 1890s, only eight percent of the Metlakatlans commercially fished.[67] Evidence shows that Metlakatlans that fished did so in the waters they had a familial and traditional connection with: the Nass and Skeena Rivers in British Columbia that they continued to travel to into the 1900s.[68] Duncan's letters show that he did not believe the Metlakatlans held *any* fishing rights in Southeast Alaska.[69] The few Metlakatlans who infrequently fished outside of the Annette Islands – in the freshwater streams of the Prince of Wales Islands or Kah Shakes Cove -- did so either with a lease or with the permission of the Tlingit and Haida.[70]

Evidence shows that the Metlakatlans also fished in the freshwater streams of the Annette Islands and the marine fisheries very close to the Annette Islands.[71] It is not surprising that the 1916 Presidential Proclamation confirmed the geographic scope of the Metlakatlans' fishing rights in Alaska and protected the Annette Islands' streams and

---

[67] Gulig Report, p. 61 (stating "[t]he percentage of Metlakatlan fishermen providing catch for the cannery roughly approximates the number of venues supplying the Metlakatlan operation.").

[68] *Id.* at p. 69 ("Travel to their traditional fishing territory and stations on the Nass and Skeena Rivers was important for Metlakatlans well into the twentieth century.").

[69] Gulig Report, p. 52-55.

[70] *Id.* at p. 68-70.

[71] *Id.* at p. 72-74, 84 (John Smith quotation). The Metlakatlans fished here under implicit authorization from the Tlingit and Haida. Gulig Report, p. 27 (about the Tlingit meeting with the Metlakatlans after arriving on the Annette Islands in 1887).

*MIC v. Dunleavy, et al.*                                                    Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 18 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 18 of 43

close-in marine fisheries to ensure that salmon harvests would not be exploited to the detriment of the Metlakatla community.[72]

## III.    Argument

"Summary judgment is appropriate where there is no genuine issue as to any material fact and (where) the moving party is entitled to judgment as a matter of law."[73] "The burden of establishing there is no genuine issue of material fact lies with the moving party."[74] Once the moving party has met its burden, the burden shifts to the opposing party to present "specific facts showing that such contradiction is possible."[75]

There are no material facts in dispute. The evidence shows that the Metlakatlans did not traditionally fish – for salmon or any other species of fish – in the marine fisheries that comprise fishing districts 1 and 2.  At trial, the Community cannot present any facts that establish frequent and regular fishing in those marine waters.

The Ninth Circuit concluded that the Community has a non-exclusive right to fish in areas where the Community had "traditionally fished" in 1891, and directed this Court to determine the scope of that right. [cite] First, the Court must determine what "traditionally fished" means. Then, the Court must determine whether the evidence satisfies this standard.

---

[72] *Id.* at p. 67.

[73] *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950-951 (9th Cir. 1978); Federal Rules of Civil Procedure, Rule 56.

[74] *Id*. at 951.

[75] *Id.*

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                           Page 19 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 19 of 43

**A.** The "usual and accustomed fishing location" case law should guide this Court's fact finding**.**

There are only two "types" of off-reservation fishing rights cases.[76] First, is the novel holding in *U.S. v. Michigan*, where the scope of an off-reservation fishing right is a tribe's non-extinguished aboriginal rights.[77] Second, are the usual and accustomed fishing rights cases, which interpret the Palmer Stevens' treaties' expressed language that the Tribes retained the right to fish at all "usual and accustomed fishing locations."[78] This Court has rejected the State's *U.S. v. Michigan* arguments. ECF Doc. 70, p. 21. Given the language used by the Ninth Circuit in its decision here – in particular the phrase "traditional fishing locations"— the usual and accustomed fishing grounds cases provide this Court with the standard by which to evaluate the evidence.[79] If this Court does not adopt and apply the "usual and accustomed fishing location" case law, it will be creating new law and applying a less stringent standard for an implied off-reservation fishing right than courts apply when evaluating an expressed off-reservation fishing right.[80]

---

[76] Cohen's Handbook of Federal Indian Law, §§18.04, 18.04[e], 18.07[2] (2012 ed.).

[77] *U.S. v. Mich*., 471 F.Supp. 192 (W.D. Mich. 1979)

[78] E.g. *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766 (9th Cir. 2023).

[79] The State does not waive its right to argue on appeal or rehearing from the panel decision that the 1891 Act provides no off-reservation fishing rights. The State is simply arguing that within the panel's decision, and rejection that aboriginal rights are relevant, this is the only other standard.

[80] If the Court creates further new law, the State requests that this Court: (1) provide clear direction on the law it will use, the standards that will be applied, and how it will review

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                        Page 20 of 43
Case 5:20-cv-00008-SLG        Document 95-1        Filed 06/30/25        Page 20 of 43

### 1. "Traditional fishing grounds" and "usual and accustomed fishing locations" should be read synonymously.

A "usual and accustomed fishing location" is

> [a] fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters.[81]

A "traditional fishing ground" is the same in that it is the "locations where [they] . . . customarily fished from time to time at and before treaty times."[82]

For this reason, courts have used "traditional fishing" and "usual and accustomed fishing" interchangeably. In *Washington v. Washington State Commercial Passenger Vessel Association*, the U.S Supreme Court reviewed "the character of [the] treaty right to take fish" at all "usual and accustomed fishing grounds."[83] In its analysis, the U.S. Supreme Court used "traditional fishing areas" as a synonym for "usual and accustomed fishing grounds."[84] In *U.S. v. State of Washington*, the trial court considered where the Quileute Indian Tribe had "traditionally fished" for halibut to determine the scope of the

---

the evidence; and (2) citations to the case law that supports the new standards the Court has adopted.

[81] *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022 (9th Cir. 2010).

[82] *Id*. "Time immemorial" gets effectively subsumed into this inquiry through the showing of "regular" and "frequent" use.

[83] *Wash. V. Wash. State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 662 (1979).

[84] *Id*. at 670.

*MIC v. Dunleavy, et al.*  Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment  Page 21 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 21 of 43

Tribe's "usual and accustomed fishing locations" for halibut.[85]  Lastly, the Ninth Circuit in *Upper Skagit Tribe v. State of Washington* reviewed Judge Boldt's decision and found while it did not "list all of the *usual and accustomed fishing locations* of the Suquamish" that some fisheries were "part of the Suquamish *traditional fishing grounds*."[86]

The Ninth Circuit's decision confirmed the connection between "traditional fishing grounds" and "usual and accustomed fishing locations" as it pertains to the geographic scope of the Community's off-reservation fishing right.[87]  The Court used the term "traditional" seven times: "the Metlakatlans fished in their traditional off-reservation waters;"[88] "where Community members have traditionally fished;"[89] "Metlakatlans traditional fishing grounds;"[90] "off-reservation fishing in the traditional fishing grounds;" and "we remand to the district court to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska Districts 1 and 2."[91]  The Court then cited to *U.S. v. Washington* three times, even directly citing to the following, "[T]he Tribes' right of access to their *usual and*

---

[85] *U.S. v. State of Washington,* 129 F.Supp.3d 1069, 1109, 1117 (W.D. Wash. 2015); *see also Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1163, 1164 (9th Cir. 2017) (The Ninth Circuit uses "traditional fishing" and "usual and accustomed fishing locations" interchangeably.).

[86] *Upper Skagit Tribe v. State of Washington,* 576 F.3d 920, 929 (9th Cir. 2009); *withdrawn and superseded on rehearing*.

[87] *Metlakatla Indian Community v. Dunleavy*, 58 F.4th 1034 (9th Cir. 2023).

[88] *Id.* at 1036.

[89] *Id.* at 1037.

[90] *Id.* at 1040.

[91] *Metlakatla Indian Community*, 58 F.4th at 1045.

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 22 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 22 of 43

*accustomed fishing places*."[92]  The Ninth Circuit confirmed that "traditional fishing grounds" and "usual and accustomed fishing grounds" are synonyms.

> **2.  By using the phrase "non-exclusive" fishing right, the Ninth Circuit and the Community further confirmed that the usual and accustomed fishing right cases set the standard.**

The phrase "non-exclusive" used by the Community and the Ninth Circuit stems from the usual and accustomed fishing right cases.  The Ninth Circuit held "that the 1891 Act grants to the Community and its members a non-exclusive right to fish on the off-reservation waters where they have traditionally fished."[93]  The Ninth Circuit used the phrase "non-exclusive right" at least six times.[94] The Community's May 2023 complaint uses the term "non-exclusive" at least eleven times and in the following way: "non-exclusive right to fish," "non-exclusive historical fishing areas," "non-exclusive off-reservation fishing," and "non-exclusive fishing grounds" ECF Doc. No. 40, ¶¶ 1, 8, 9, 33, 57, 59, and 60.

"Non-exclusive" is a phrase used in the "usual and accustomed" cases. In *U.S. v. Winans*, the Court recognized that the Tribe had the exclusive right to fish within its reservation and a "not exclusive" right to fish off-reservation at all usual and accustomed locations.[95]  Similarly in *U.S. v. Confederated Tribes of Colville Indian Reservation*, the

---

[92] *Id.* at 1044. Notably, Judge Fletcher inaccurately quoted the Ninth Circuit's decision in *U.S. v. Washington,* 853 F.3d 946 (9th Cir. 2017).

[93] *Metlakatla Indian Community*, 58 F.4th at 1037.

[94] *Id.*

[95] *U.S. v. Winans*, 198 U.S. 371, 381-382 (1905).

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 23 of 43
Case 5:20-cv-00008-SLG      Document 95-1      Filed 06/30/25      Page 23 of 43

Court differentiated "[t]he exclusive right of taking fish in all the streams, where running through or bordering said reservation" from the "non-exclusive [off-reservation] fishing right" tied to the Tribe's usual and accustomed fishing locations.[96]  In 1978, the Washington trial court in *U.S. v. Washington* explained it had to determine if the Treaty of Neah Bay secured "to the Makah Tribe non-exclusive fishing rights in those portions of the fishing grounds described in Findings of Fact No. 346."[97] Seven years later, the trial court in *U.S. v. Washington* had to determine Stillaguamish Tribe's "non-exclusive usual and accustomed fishing area[s]."[98]

By using the phrase "non-exclusive right," the Ninth Circuit and the Community confirmed that the usual and accustomed fishing rights case law applies.

### 3. This Court should not apply a lower standard to an implied off-reservation fishing right than courts use to evaluate an expressed off-reservation fishing right.

If this Court creates a novel standard by which to judge the evidence, it risks applying an easier standard of proof to the Community's implied off-reservation fishing right case than a court would apply in a Palmer Stevens treaty case involving an expressed off-reservation fishing right.  With the Palmer Stevens treaties, Congress exercised its plenary authority and *expressly* included language granting the Tribe the

---

[96] *U.S. v. Confederated Tribes of Colville Indian Rsrv.*, 606 F.3d 698, 711-712 (9th Cir. 2010).

[97] *U.S. v. State of Wash.*, 459 F.Supp. 1020, 1048 (W.D. Wash. 1978), *U.S. v. State of Wash.*, 626 F.Supp. 1405, 1468 (W.D. Wash. 1985).

[98] 626 F.Supp. 1405, 1482 (W.D. Wash. 1985).

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 24 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 24 of 43

continued right to fish at all "usual and accustomed fishing" locations.[99]  Here, the Court

is reviewing a judicial construct: an expansion of the *Winters* Doctrine and an implied

off-reservation fishing right.  Congress did not expressly exercise its plenary authority.

There were no negotiations with the Metlakatlans.  Congress did not include language

expressly confirming the Metlakatlans' right to fish anywhere.[100]

Therefore, at the very least, the usual and accustomed fishing location framework

applies.  For that, we start by considering the "fish" at issue.

**B.**  "Fish," as to the Metlakatlans' "traditional fishing grounds," is salmon**.**

In the phrase "traditional fishing grounds," the word "fish" raises a threshold

question: what species of fish did the Tribe traditionally fish for?  Based on the Ninth

Circuit's decision and the Community's complaint, the Court's inquiry should focus on

salmon that the Community wants to commercially harvest without a limited entry

permit.

In most usual and accustomed fishing grounds cases, Tribes assert Congress

preserved the right to fish for certain species of fish at their "traditional fishing

---

[99] *U.S. v. State of Wash.*, 384 F.Supp. 312 (W.D. Wash. 1974); *Wash. V. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).

[100] To be clear, the State asserts that the standard of proof to prove an implied off-reservation fishing right should be greater than that needed to prove an expressed off-reservation fishing right.  This is why non-extinguished aboriginal rights controlled this case, and that *U.S. v. Michigan* applied.  The State has not waived its right or ability to assert that a higher evidentiary standard should apply.

*MIC v. Dunleavy, et al.*                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 25 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 25 of 43

grounds."[101]  But the question then is what species of fish did Congress preserve the right to harvest from those locations.  To answer that question, courts review the treaty negotiations and circumstances surrounding the creation of the reservation.[102]

Because the 1891 Act creating the Annette Islands Reserve is unique and contains no evidence that Congress considered granting off-reservation fishing rights much less off-reservation fishing rights to a particular type of fish, the above case law cannot be readily applied.  There were no negotiations between the Metlakatlans and Congress about fishing, much less a species of fish.[103]  Congress never used the word fish or fishing in the 1891 Act.[104]  During hearings on the 1891 Act, Congress never mentioned fishing or any species of fish.[105]

Instead, this Court must rely on the Ninth Circuit's decision interpreting the 1891 Act, the U.S. Supreme Court's holding in *Alaska Pacific Fisheries*, the Community's complaint, and the Community's expert reports to determine what species of fish the Community wants to harvest from its alleged "traditional fishing grounds."

---

[101] *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157 (9th Cir. 2017); *U.S. v. Wash.*, 157 F.3d 630 (9th Cir. 1998) (where the Tribe asserted a usual and accustomed right to take shellfish.).

[102] *Id.*

[103] 21 Cong. Rec. 10092 (Sept. 16, 1890).

[104] *Id.*; *see also* An act to repeal timber-culture laws, and for other purposes, 26 Stat. 1095-1103, sec. 15 (March 3, 1891

[105] *Id.*

*MIC v. Dunleavy, et al.*                                   Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 26 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 26 of 43

Using the *Winters* doctrine, the Ninth Circuit drew a connection between water for agricultural survival and fish for economic survival.  In doing so, the Ninth Circuit discussed only salmon.[106]  The Court mentions salmon approximately eighteen times.[107]  It never mentions halibut or any other species of fish.  The Ninth Circuit cites to federal reports, which cataloged commercial salmon harvests in Southeast Alaska in the 1890s and 1900s.[108]  The Ninth Circuit reasoned that Congress—if it had considered the issue— would have intended for the Tribe to support itself and to "pursue *the commercial fishery that had provided, and continued to provide, essential economic support for the Community*."[109]  The reservation's cannery, and the salmon being supplied to the cannery, were that "essential economic support."[110]  To the Ninth Circuit, the Metlakatlans' economic survival was tied to off-reservation commercial salmon harvests.

Historical accounts that the Ninth Circuit relied on confirm that after arriving in Alaska, salmon was the Metlakatlans' economic focus. Duncan entered agreements with Tlingit and Haida? to ensure a supply of salmon for the Metlakatla cannery.[111]  The 1916 presidential proclamation to establish an exclusive fishery for the Metlakatlans focused on barring fish traps set up by a California corporation in the waters immediately adjacent

---

[106] *Metlakatla Indian Community*, 58 F.4th 1034.

[107] *Id*.

[108] *Metlakatla Indian Community*, 58 F.4th 1034

[109] *Id*. at 1045; *emphasis added*.

[110] *Id*.

[111] Gulig Report, p. 52-55.

*MIC v. Dunleavy, et al.*                                  Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 27 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 27 of 43

to the islands shores to protect the Metlakatla cannery's salmon supply.[112] In *Alaska Pacific Fisheries Co. v. U.S.*, the U.S. Supreme Court noted the significant amount of salmon the Metlakatla cannery "lost" due to the California company's fish traps being impermissibly placed near the Annette Islands.[113] History tells us that salmon drove Metlakatla's economy and the recognition of its fishing right.[114]

In their more recent complaint, the Community confirms the above, by asserting its members hold an off-reservation right to commercially salmon fish in fishing districts 1 and 2 without a limited entry permit. Salmon and salmon fishing is used thirty-one times in their complaint. ECF Doc. 40, ¶¶ 20, 23 (stating that "the Natives Inheritance is Salmon Fishing."), 28, 30, 37, 38b, 38c, 38e, 41, 43 ("The Community's salmon fisheries are *their most important and main economic resource*."), 44. The Community alleges that "the [salmon] catch was *too small to make a profit* in 2016-2018." ECF Doc. 40, p. 3. Consistent with Metlakatla's economic history and the Ninth Circuit's decision, commercial salmon harvests are the focus in the Community's complaint.

To conclude, this Court's "traditional fishing grounds" inquiry should focus on waters where the Metlakatlans harvested *salmon*. The Community is then required to

---

[112] *Id*. at p. 67-68, 75-77.

[113] *Alaska Pacific Fisheries Co. v. U.S.*, 248 U.S. 78, 87 (1918) ("The fish trap was erected in 1916 without the consent of the Indians or the Secretary of the Interior. It is a formidable structure . . . intended to catch about 600,000 salmon in a single season.").

[114] There is nothing in Dr. Langdon's report or rebuttal report that suggest halibut, herring, shellfish, or oolichan were being processed at the Metlakatla cannery. Gulig Report, generally; Langdon Report, generally.

*MIC v. Dunleavy, et al.*                                    Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                        Page 28 of 43
Case 5:20-cv-00008-SLG        Document 95-1        Filed 06/30/25        Page 28 of 43

present evidence that the Metlakatlans traditionally fished for salmon in fishing districts 1 and 2.

> **C.** Because commercial fishing under a limited entry permit is only allowed in the marine fisheries of fishing districts 1 and 2—as under Alaska law freshwater streams are closed to commercial fishing—any evidence about historic salmon harvests from freshwater streams is irrelevant.

Historic harvests from freshwater streams, which are closed to commercial fishing, is irrelevant because they do not prove a tradition of fishing in the marine waters that are open to commercial salmon fishing in fishing districts 1 and 2.

The Community asserts the right to commercially fish in the marine waters of fishing districts 1 and 2 without a limited entry permit. ECF Doc. 40, ¶¶ 20 – 44, 52, 59, Prayer for Relief ¶ (2). Fishing districts 1 and 2 are marine fisheries managed by the Alaska Department of Fish and Game (ADF&G) and the Commercial Fisheries Entry Commission (CFEC) for commercial salmon fishing.[115] A fishermen that holds a limited entry permit can commercially fish with certain gear for salmon within fishing districts 1 and/or 2.[116] This means that the Community wants its commercial fishermen to be able to, for example, use purse seines, long lines, and gill nets when they fish for salmon in

---

[115] 5 AAC 29.150 (Salmon troll fishery closures); 5 AAC 33.350 (Closed waters); 5 AAC 28.150 (Closed waters in Eastern Gulf of Alaska Area).

[116] The limited entry permit program manages commercial fishing, not subsistence fishing.

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 29 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 29 of 43

Southeast Alaska's marine fisheries without a limited entry permit.[117]  ECF Doc. 40, ¶¶ 41-55.

Consistent with State law, the Community does not allege the right to commercially fish in freshwater streams.  Under State regulations, freshwater streams (as well as within 500 yards of a salmon stream) in Southeast Alaska are closed to *all* commercial fishing even for those who hold a limited entry permit.[118]  Some of the salmon harvested from the freshwater streams were provided salmon to the Metlakatla cannery; though there is no direct evidence that the Metlakatlans actually harvested salmon from those streams.[119]  Even if the Community could prove that the Metlakatlans traditionally fished in those freshwater streams–including on beaches within 500 yards of those streams–a limited entry permit would not allow Community members to commercially harvest salmon from those freshwater fisheries.[120]

This further narrows the geographic scope of this Court's traditional fishing grounds inquiry.  The Community's case is about salmon harvests from the *offshore*

---

[117] *E.g.* 20 AAC 05.1940 - .1952.  Such fishing methods are not shore-based or stream-based, but in fact occur in the deeper waters of fishing districts 1 and 2's marine fisheries.

[118] In his rebuttal report, Dr. Langdon recognized that freshwater streams are closed to commercial fishing.  Langdon Report, p. 14 ("It is notable that Alaska's limited entry program tracks this policy, stating that commercial salmon fishing is closed (1) within the fresh water of streams and rivers of Alaska; (2) within 500 yards of the fresh water of a stream that is a salmon stream; and (3) over the beds or channels of fresh water of streams and rivers of Alaska during all stages of the tide.").

[119] 5 AAC 29.150 (Salmon troll fishery closures); 5 AAC 33.350 (Closed waters); 5 AAC 28.150 (Closed waters in Eastern Gulf of Alaska Area); 5 AAC 39.290 (Closed waters).

[120] *Id*.  The Community does not challenge the State regulations closing those fisheries to commercial fishing. ECF Doc. 40, ¶¶ 41-55.

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                          Page 30 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 30 of 43

*marine fisheries* of fishing districts 1 and 2 for salmon prior to 1891. These are the waters where commercial fishermen can use gill nets, purse seines, and long lines to commercially fish for salmon under a limited entry permit. The Community must present evidence that its members had a tradition of regular and frequent salmon harvests *in those deeper water marine fisheries*–the waters in fishing districts 1 and 2 open to commercial fishing—at the time that Congress created the Annette Island Reserve.

> **D.** The Metlakatlans' did not traditionally fish for salmon in the marine waters of what is now identified by the State as fishing districts 1 and 2.

"'Usual and accustomed' applies to 'every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then-usual habitat of the tribe, and whether or not other tribes then also fished in the same waters. [ A] usual and accustomed fishing site need not be located in the territory ceded by the tribe, although the burden of proving that a certain place is a usual and accustomed area falls on Indians claiming rights under the treaties."[121] "The determination of any area as a usual and accustomed fishing ground or station of a particular tribe must consider all of the factors relevant to (1) use of that area as a usual or regular fishing area, (2) any treaty-time exercise or recognition of *paramount or preemptive fisheries control* (primary right control) by a particular tribe, and (3) the petitioning tribe's (or its predecessors') regular and frequent treaty-time use of that area

---

[121] Cohen's Handbook of Federal Indian Law, p. 1297 – 1298.

*MIC v. Dunleavy, et al.*                                      Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                                Page 31 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 31 of 43

*for fishing purposes*."[122] The Tribe must present clear evidence of *regular and frequent fishing* in a location to qualify as a usual and accustomed fishing ground.[123]

Importantly, this Court is considering the Tribe's usual and accustomed fishing grounds *at the time Congress created the reservation*. What constitutes usual and accustomed fishing ground can change over time. They can end or be abandoned. For example, Dr. Langdon asserts that the Tsimshian in 1500 B.C. inhabited lower portions of what is now Southeast Alaska.[124] They had traditions they presumably developed while living in that area.[125] But when the Tsimshian migrated, they abandoned any fishing in Southeast Alaska.[126] This is distinguishable from when Metlakatlans emigrated to the Annette Islands in 1887, because they kept returning to British Columbia to fish. There is no evidence that they kept returning to Southeast Alaska after they moved to British Columbia in 1700. (This is assuming the accuracy of Tsimshian ancestry in Southeast Alaska.) This means that while usual and accustomed locations may have existed in 1500 B.C., if they end in 1700 A.D., they are not the usual and accustomed locations *at the time* Congress created the reservation in 1891. Because of this, courts are discerning the

---

[122] *U.S. v. State of Wash*, 626 F.Supp. 1405, 1531 (W.D. Wash. 1985); *citing U.S. v. Wash*., 384 F.Supp. at 332, 459 F.Supp. at 1059.

[123] *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1161 (9th Cir. 2017).

[124] Langdon Report, p. 26.

[125] *Id*.; Gulig Report, p. 22-23.

[126] Gulig Report, p. 22-23.

*MIC v. Dunleavy, et al.*                              Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 32 of 43
        Case 5:20-cv-00008-SLG       Document 95-1       Filed 06/30/25       Page 32 of 43

Tribe's "usual and accustomed fishing grounds" at the time the reservation was created.[127]

To successfully prove a traditional fishing ground, Tribes must provide sufficient evidence of regular and frequent fishing in certain specific geographic locations. For example, a court could find a tribe failed to present adequate evidence that they traditionally fished in the middle portion of a river, but did present enough evidence of traditional fishing at that same river's mouth.[128] While locations need? not be entirely precise, the tribe must present sufficient evidence of regular and frequent fishing for certain species of fish in the locations they assert to hold a right in.[129]

Foreshadowing their case's factual flaws, the Community's complaint rejects traditional place names and locations. Instead it uses the description of "fishing districts 1

---

[127] *U.S. v. Lummi Indian Tribe*, 841 F.2d 317, 318 (9th Cir. 1988) ("The Tulalips initiated this action for a determination that their usual and accustomed grounds *at the time of the treaty* included waters not included in the provisional adjudication.").

[128] *See e.g. U.S. v. Wash*, 459 F.Supp. 1020, 1038 (W.D. Wash. 1978) (the Tribe's case area was "Grays Harbor and its watershed, including the Humptulips River."); *Upper Skagit Indian Tribe v. Wash.*, 590 F.3d 1020 (9th Cir. 2010) (the Upper Skagit Indian Tribe "filed a Request for Determination that Saratoga Passage and Skagit Bay on the eastern side of Whidbey Island are not within the Suquamish Tribe's U&A") ; *U.S. v. Wash.*, 193 F.Supp.3d 1190 (W.D. Wash. 2016); and *Upper Skagit Indian Tribe v. Sauk-Siuattle Indian Tribe*, 66 F.4th 766, 769 (9th Cir. 2023) (that the Tribe's usual and accustomed fishing places were the "Sauk River, Cascade River, Suiattle River, and the following creeks which are tributary to the Suiattle River—Big Creek, Tenas Creek, Buck Creek, Lime Creek, Sulphur Creek. . .."); Lummi Indian Tribe, 841 F.2d at 318 ("The waters at issue are 1) Point Roberts, Birch Bay and adjacent waters; 2) waters of the San Juan Islands and the straits on either side of the San Juan Islands (Haro and Rosario; and 3) waters off the west coast of Whidbey Island.").

[129] *Id.*

*MIC v. Dunleavy, et al.*        Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment    Page 33 of 43
Case 5:20-cv-00008-SLG   Document 95-1   Filed 06/30/25   Page 33 of 43

and 2" to define the scope of their members' alleged off-reservation fishing right. Tribes asserting an off-reservation fishing right ground that right in a traditional geographical descriptor: a river, stream, creek, or bay.[130] This is logical because a Tribe's traditional rights would be tied to traditional places and thus traditional geography.[131] In contrast, the Community relies on a description of Southeast Alaska's waters that the State uses to manage commercial salmon harvests.[132] It shows a historical anachronism as well as a legal disconnect. In a case about "traditional fishing grounds," the Community should be citing to specific sounds, rivers, streams, or creeks where they exercised that right, not a generality like the State of Alaska's regulatory delineation "fishing districts 1 and 2."[133]

The Community's expert reports lean further into these generalities. There are generalities about locations, generalities about members, and generalities about dates. It is a report marked by an absence of scholarly specificity. Dr. Langdon's 41-page report[134]

---

[130] *Id.*

[131] *Id.*

[132] "Salmon and Shellfish Fisheries, Districts, Sections and Statistical Areas," Chart 5 – Region 1, Southeast Alaska (ADF&G March 2025); available at: https://www.adfg.alaska.gov/static/fishing/PDFs/commercial/maps/chart05_salm_shell_all.pdf (accessed on May 26, 2025).

[133] It also confirms that this is a case about commercial fishing.

[134] Dr. Langdon's approach of drawing conclusions based on broad inferences was heavily criticized by the Supreme Court of British Columbia. *Lax Kw'alaams Indian Band v. Canada*, 2008 BSCS 447 (BCSC 2008) ("I also have a concern that Dr. Langdon was prepared to reach broad based and far reaching conclusions on the strength of three or four oral narratives which I analyze in section IX. C."); available at: https://www.canlii.org/en/bc/bcsc/doc/2008/2008bcsc447/2008bcsc447.html (accessed on May 26, 2025).

*MIC v. Dunleavy, et al.*  Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment  Page 34 of 43
Case 5:20-cv-00008-SLG  Document 95-1  Filed 06/30/25  Page 34 of 43

includes nothing specific about the Community's fishing practices, locations, or even the Metlakatlans (i.e., the community that Tlingit, Haida, and Tsimshian joined and developed their own traditions).[135] There is nothing about salmon harvests from the marine fisheries of fishing districts 1 and 2.[136] The strongest indictment of Dr. Langdon report is that in a case about the geographic scope of a Tribe's "traditional off-reservation fishing rights," he uses the word "traditional" 2 times and mentions "salmon" 6 times.[137] Instead, he lists of village sites of Native peoples?, but provides no evidence that inhabitants of those villages later became Metlakatlans, much less that they traditionally fished in fishing districts 1 and 2.[138] He provides no dates or years for his discussions, often jumping between discussions and accounts with a date range from 1500 B.C. to 1887.[139] This yields a report that never provides any facts of locations the Metlakatlans' traditionally fished when Congress created the reservation.[140]

---

[135] Langdon Report, generally.

[136] Langdon Report, p. 20 – 26.

[137] *Id*.

[138] *E.g.* Langdon Report, p. 26.

[139] *Id*.

[140] Langdon Report, p.12-16 (discussing historic fishing techniques, then more modern techniques and failing to provide dates and when these changes were occurring); p. 21-26 (discussing village sites and using the phrase "proto-Tsimshian" but failing to provide dates when these changes occurred or even discussing when the Tsimshian vacated those village sites due to Tlingit and Haida presence). The only date given by Dr. Langdon is 3500bp –or 1500 BC – and clearly the location and use of resources by Tribes—i.e. their traditions—can change from 1500 BC to 1800 A.D. Langdon Report, p. 26; *see also* Gulig Report, generally (how Tribes uses of resources change over time).

*MIC v. Dunleavy, et al.*                     Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                     Page 35 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 35 of 43

More importantly, Dr. Langdon fails to provide any evidence of Tsimshian families that joined Metlakatla and those families holding fishing rights in Southeast Alaska's marine fisheries. Dr. Langdon has explained that fishing stations *in freshwater streams* were owned by families, clans and moieties.[141] Therefore, in this litigation the Community must show—at a minimum—a connection between families that joined Metlakatla and where those families traditionally fished.[142] But in his report, Dr. Langdon fails to identify families that joined Metlakatla and where those families traditionally fished.[143] The problem? This is a case about the Metlakatlans' traditional fishing grounds, not where those who can be ethnographically described as Tsimshian and that never joined Metlakatla fished. In failing to ground his research to families who joined Metlakatla, this Court would be wrongly determining the fishing rights of an ethnographic group – like the Tsimshian – and not the rights held by the families who actually joined Metlakatla. That would convert a case about the Metlakatlans' traditional fishing grounds into a case adjudicating the Tsimshian's traditional fishing grounds; which would entirely erase Congress' expressed language in the 1891 Act.

In his rebuttal report, Dr. Langdon finally uses census data to identify *a single member of the Community* (who was Tlingit, not Tsimshian) who held rights to certain Prince of Wales streams. Dr. Langdon spends considerable time discussing George

---

[141] Langdon, From Communal Property to Common Property to Limited Entry at p. 309

[142] *Id.*

[143] *Id.*

"Kegan" Williams, a Tlingit who joined Metlakatla and held fishing rights on Kegan Creek on Prince of Wales Island.[144] As previously explained, those waters are closed to commercial salmon fishing and thus are largely irrelevant to the Court's inquiry here about the open marine waters of fishing districts 1 and 2.[145] Regardless, the fishing rights were held by the Williams family.[146] There is no suggestion that other Metlakatlans fished those waters.[147] If that Tlingit member left the Community those fishing rights went with him.[148] That the fishing rights of individuals that joined the Community were *never* held and exercised by the Metlakatla community at large means that those streams were not traditional fishing grounds of the Metlakatlans. Instead, they were the traditional fishing grounds of that family and clan and remained with that family and clan.[149]

 Mr. Boxley's seven-page expert report – devoid of any citations – is similarly deficient.[150] Mr. Boxley's report relies on the following premise: place names are an indication that Metlakatlans fished at those locations.[151] It is a report that relies on

---

[144] Langdon Rebuttal, p. 3, 9

[145] Langdon Rebuttal, p. 14.

[146] Steve Langdon, From Communal Property to Common Property to Limited Entry: Historical Ironies in the Management of Southeast Alaska Salmon, A Sea of Small Boats: Customary Law of the Sea and Territoriality in the World of Inshore Fishing, p. 309 (Cambridge Mass: Cultural Survival Inc. 1990).

[147] Langdon Rebuttal, generally.

[148] *Id*.

[149] This confirms that Metlakatla was a political unit and not an ethnographic delineation.

[150] David R. Boxley (No date given); attached as Exhibit G (cited as Boxley Report).

[151] *Id*.

*MIC v. Dunleavy, et al.*    Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment    Page 37 of 43
Case 5:20-cv-00008-SLG   Document 95-1   Filed 06/30/25   Page 37 of 43

generalities and assumptions. Like Dr. Langdon, Mr. Boxley provides no specific fishing

locations or species of fish that the Metlakatlans harvested. There are no years listed. The

specific marine fisheries that are discussed in the Community's complaint are never

mentioned.[152]

Worse, both reports never cite to any of William Duncan's letters. They almost

entirely ignore Duncan. It is a blind spot that this Court cannot overlook.[153] This is a

case about the Metlakatlans. Duncan helped found Metlakatla in British Columbia.

Duncan secured the immigration to Alaska. Duncan obtained funds to build the cannery

and the mill. Duncan entered contracts with non-Metlakatlans to obtain fish to make the

cannery profitable. Duncan's letters from 1862 to 1891 provide the best evidence about

the Metlakatlans' traditions.[154] If Duncan believed the Metlakatlans held such traditional

fishing rights, then he would have asserted that his members held those rights.[155] Duncan

had asserted that the Metlakatlans had aboriginal rights to the lands and waters in British

Columbia.[156] This shows he had no problem asserting members rights for Community's

long term benefit.[157] Duncan did not make such claims after the Metlakatlans arrived in

---

[152] *Id.*

[153] It suggests a dangerous game of trying to erase the Metlakatla history and replace it with Tsimshian history.

[154] Langdon Rebuttal, p. 11-12; Gulig Report, p. 42-43, 48, 50-51.

[155] *Id.*; *generally*.

[156] Gulig Report, p. 31.

[157] Gulig Report, p. 31.

*MIC v. Dunleavy, et al.*                             Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 38 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 38 of 43

Southeast Alaska.[158]  Given Duncan's motivation for the cannery to be profitable, he

certainly would have told federal officials –likely told anyone – that his members held

certain fishing rights and they were not being recognized in Southeast Alaska.  He did

not, and that evidence cannot simply be ignored.

The Community lacks any evidence showing that the Metlakatlans' traditional

fishing grounds included the marine fisheries of fishing districts 1 and 2.

> **E.** Occasional and incidental fishing in Southeast Alaska's deeper marine
> fisheries for salmon and halibut by Metlakatlans and Tsimshian during
> trading voyages does not provide sufficient evidence of regular and
> frequent use establishing a "traditional fishing location, station, or
> ground."[159]

At best, Dr. Langdon's reports and Dr. Boxley's report suggest occasional and

incidental subsistence fishing by the Tsimshian and Metlakatlans during their trading

voyages throughout Southeast Alaska.[160]  However, occasional and incidental fishing in a

general area is insufficient evidence of regular and frequent use under the "usual and

accustomed" case law.

"Occasional and incidental [fishing] was not considered to make the marine waters

traveled thereon the usual and accustomed [referred to as U&A] fishing grounds of the

transiting Indians."[161] "Mere travel through a set of waters was . . . not sufficient to

---

[158] Gulig Report, generally.

[159] The Court of Claims held that federal management that started in 1884, including the
federal open access policy, constituted a taking from the Tlingit and Haida.  *Tlingit and
Haida Indians of Alaska*, 147 Ct.Cl. at 338.

[160] Langdon Report, *generally*; Boxley report, *generally*.

[161] *Upper Skagit Indian Tribe*, 66 F.4th at 774.

*MIC v. Dunleavy, et al.*                                           Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                              Page 39 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 39 of 43

render a body of water a "usual and accustomed" fishing place for the traveling tribe. Although "[m]arine waters were ... used as thoroughfares for travel by Indians *who trolled en route*," this sort of "occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians."[162]

As traders, the Tsimshian and the Metlakatlans travelled throughout Southeast Alaska.[163] According to Dr. Langdon, during the "mere travel" of their trading voyages, the Tsimshian "trolled en route" for subsistence purposes.[164] As Judge Boldt acknowledged, subsistence fishing during "mere travel" is insufficient evidence to find certain waters were a Tribe's usual and accustomed fishing locations. And occasional *subsistence* fishing certainly does not support traditional *commercial* fishing. The Community's evidence of trolling during "mere travel" in fishing districts 1 and 2 does not establish those marine waters were the Metlakatlans' "traditional fishing locations."

---

[162] *Swinomish Indian Tribal Community v. Lummi Nation*, 80 F.4th 1056, 1066 (9th Cir. 2023); *see also United States v. Lummi Indian Tribe*, 841 F.2d 317, 320 (9th Cir. 1988); *emphasis added*.

[163] Gulig Report, p. 25, 68-69; Langdon Report, p. 26-31.

[164] Langdon Report, p. 34-35 (implying that during these trading voyages, the Tsimshian were sustaining themselves on the area's marine resources).

*MIC v. Dunleavy, et al.*                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                    Page 40 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 40 of 43

**IV. In this litigation, the Community asserts a prioritized fishing right stemming from the 1891 Act, while the federal government's policy at the time of the 1891 Act was to treat all commercial fishermen fishing in Southeast Alaska's marine fisheries equally.**

The Community has provided insufficient evidence to show that it traditionally fished in the deep marine waters of fishing districts 1 and 2. These are the waters that modern Community members assert a right to commercially fish for salmon without a limited entry permit. Importantly, since the 1880s, all commercial fishermen who fished in these marine waters were subject to the same laws and no commercial fishermen held a superior right or interest over other commercial fishermen.

In his rebuttal report, Dr. Langdon explains that starting in the 1880s, the federal government adopted a policy that Alaska's marine fisheries—the waters the Community asserts a right to fish without a limited entry permit—were managed to ensure *a fair fishery for all commercial fishermen*.[165] The Metlakatlans were not exempt from this policy.[166] Indeed, Dr. Langdon confirms that the Metlakatlans—if they did fish in the area—would have been required to comply with the federal fisheries laws like all other commercial fishermen.[167] That means that *if* the Metlakatlans had a fishing tradition in those marine waters—and there is insufficient evidence that they did—it was that they were treated the same as all other commercial fishermen, subject to the same rules as all

---

[165] Langdon Rebuttal, p. 14-15.

[166] *Id.*

[167] *Id.*

*MIC v. Dunleavy, et al.*　　　　　　　　　　Civil Action No.: 5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment　　　　Page 41 of 43
Case 5:20-cv-00008-SLG　　Document 95-1　　Filed 06/30/25　　Page 41 of 43

other fishermen.[168]  If the Metlakatlans held a traditional fishing ground in Southeast

Alaska's marine fisheries, it was a tradition that they be treated the same.[169]

But if the Community is successful in this litigation, Metlakatlans for the first time

in 140 years would be treated differently when they fish in these marine waters. The

Community filed this litigation asserting its members should not be required to hold a

limited entry permit when they commercially fish in fishing districts 1 and 2.  ECF Doc.

40, ¶ 52.  This would grant the Metlakatlans an advantage over all commercial fishermen

when they harvest salmon in fishing districts 1 and 2—including an advantage over

Tlingit and Haida members who held aboriginal rights in these very waters.[170] This would

break from the tradition that has existed, according to Dr. Langdon, since the 1880s.

## V.     Conclusion

The Community cannot meet its burden of proof to show that the *Metlakatlans* –

the community and those who joined that community – traditionally fished for salmon

throughout the marine fisheries that comprise fishing districts 1 and 2. ECF Doc. 70, p.

27.  The Community's experts provide no evidence that the Metlakatlans fished for

salmon – or even halibut – with *frequency and regularity* in the marine waters and

fisheries that comprise commercial fishing districts 1 and 2.  The Community's evidence

rests on areas having Tsimshian place names and trolling for subsistence purposes during

---

[168] *Id.*

[169] *Id.*

[170] *Tlingit and Haida Indians of Alaska v. U.S.*, 147 Ct.Cl. at 340.

*MIC v. Dunleavy, et al.*                                    Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                              Page 42 of 43
Case 5:20-cv-00008-SLG     Document 95-1     Filed 06/30/25     Page 42 of 43

trading voyages.  None of this evidence shows that the Metlakatlans regularly and frequently harvested salmon from the marine fisheries of fishing districts 1 and 2.

Nothing in the State's memorandum departs from what the Metlakatlans have openly acknowledged prior to this litigation.  John Smith, former Metlakatlan city manager said, "we—from our past experience, we know that all these years we've lived pretty well *off this island.  Our men don't have to beg anybody to fish any place.*"[171]  It is the Annette Islands' freshwater streams and the marine fisheries 3,000 feet from the Annette Islands uplands that are the Metlakatlans traditional fishing locations.  Those are the waters where the Metlakatlans fished, ceremonially or otherwise.  Their fishing rights end there. To go further would be overstepping Congress' plenary authority over Indian affairs.[172]

DATED: June 30, 2025.

TREG TAYLOR
ATTORNEY GENERAL

By:     /s/ Christopher F. Orman
        Christopher F. Orman
        Assistant Attorney General
        Alaska Bar No. 1011099
        Email: christopher.orman@alaska.gov
        *Attorney for the Defendants*

---

[171] Gulig Report, p. 84; *emphasis added*.

[172] *Haaland v. Brackeen*, 599 U.S. 255, 273 (2023); *U.S. v. State of Wash.*, 157 F.3d 630, 651 (9th Cir. 1998) ("In reaching its decision, the Court may not rewrite the Treaties.").

*MIC v. Dunleavy, et al.*                            Civil Action No.:  5:20-cv-00008-SLG
Brief in Support of Motion for Summary Judgment                     Page 43 of 43
Case 5:20-cv-00008-SLG    Document 95-1    Filed 06/30/25    Page 43 of 43