Richard D. Monkman
rdm@sonosky.net
Nathaniel H. Amdur-Clark
nathaniel@sonosky.net
Noah I. Star
noah@sonosky.net
Sonosky, Chambers, Sachse,
  Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, Alaska 99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| METLAKATLA INDIAN COMMUNITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 5:20-cv-00008-SLG |
| MICHAEL J. DUNLEAVY, et al., | ) ) ) | |
| Defendant. | ) ) | |

## MOTION TO DISMISS
**[Civil Rules 19, 12(b)(1) and 12(b)(7)]**

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................... 1

II.     THE TLINGIT, THE HAIDA, AND THE METLAKATLANS ..................... 3

III.    APPLICABLE STANDARDS ........................................... 5

IV.     BACKGROUND ......................................................... 7

V.      ARGUMENT ............................................................ 13

        A.  The Tribes are Required Parties to this Action. .............................. 14

        B.  The Tribes Cannot be Joined in this Matter due to Sovereign Immunity. ...... 25

        C.  In "Equity and Good Conscience" This Action Cannot Proceed in the Tribes'
            Absence ...................................................... 28

        D.  Dismissal Under Rule 12(b)(1) and 12(b)(7) is Required. ............................. 30

VI.     CONCLUSION ........................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Bell*, 711 F.2d 161, 171 n. 42 (D.C.Cir.1983) ..................................................... 31

*Alaska Logistics, LLC v. Newtok Village Council*, 357 F. Supp. 3d 916, 923 (D. Alaska 2019) ......................................................................................................................... 6, 7, 33

*Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 87 (1918) ............................ 10

*Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) ........................................................... 26

*Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022-25 (9th Cir. 2002) 1, 16, 19, 32

*Annette Islands Reservation v. Egan*, 369 U.S. 45, 48 (1962) .......................................... 10

*Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d, 1232, 1237 (D. Alaska 2019) ..................................................................................................................... 7

*Behrens v. Donnelly*, 236 F.R.D. 509, 512 (D. Hawaii 2006) ............................................ 6

*Canoe Pass Packing Co. v. United States*, 270 F. 533, 535 (9th Cir. 1921) ..................... 17

*Chilkat Indian Vill. v. Johnson*, 870 F.2d 1469, 1475 (9th Cir. 1989) ............................. 23

*Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943) ........................... 34

*Citizen Potawatomi Nation v. Salazar*, 624 F.Supp.2d 103, 114 (D.D.C. 2009) ............. 32

*Comenout v. Whitener*, 2015 WL 917631 at *4 (W.D. Wash. 2015) ................................. 31

*Confederated Tribes of the Chehalis Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir.1991) .................................................................................................... 22, 23, 31

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ................................................................................................... 21, 23, 31

*Diné Citizens*, 932 F.3d at 857 ......................................................................................... 32

*Duro v. Reina*, 495 U.S. 676, 685–86, 694 (1990) ........................................................... 20

*Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) ....................................................................................................... 32

*Friends of Amador County v. Salazar*, 554 Fed. Appx. 562, 564 (9th Cir. 2014) ........ 1, 32

*Jamul Action Committee v. Simermeyer*, 974 F.3d 984, 989 (9th Cir. 2020) ............. 29, 31

*John v. Baker*, 982 P.2d 738 (Alaska 1999) ...................................................................... 20

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas, et al., v. Babbit*, 43 F.3d 1491, 1496 (D.C. Cir. 1995).................................................................................... 31, 33

*Klamath Irrigation*, 48 F.4th at 943 ........................................................................... 6, 27

*Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir. 1990) .................................. 25

*McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960)..................................................... 6

*Metlakatla Indian Community v. Dunleavy*, 736 F.Supp.3d 741, 751 (D. Alaska 2024) .. 7, 17

*Metlakatla Indian Community v. Egan*, 369 U.S. 45, 48 (1962)........................................ 5

*Miller v. Wright*, 705 F.3d 919, 927-28 (9th Cir. 2013)..................................................... 7

*Milligan v. Anderson*, 522 F.2d 1202, 1203-04 (10th Cir. 1975)...................................... 1

*Northern Arapahoe Tribe v. Harnsberger*, 660 F. Supp. 2d 1264, 1280 (D. Wyo. 2009) 31

*Okla. Tax Comm'n v. Potawatomi Tribe*, 498 U.S. 505, 509 (1991) ............................... 30

*P. E. Harris & Co v. Mullaney*, 87 F. Supp. 248, 253 (D. Alaska 1949)......................... 17

*Pistor v Garcia*, 791 F.3d 1104, 1110 (9th Cir. 2015) .............................................. 6, 7, 33

*Pit River Home and Agr. Co-Op. Ass'n v. U.S.,* 30 F.3d at 1101.................................... 22

*Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072, 1117 (S.D. Cal. 2008) ... 15

*Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1460 (9th Cir.1994) ................. 22, 24, 31

*Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)........................................... 7

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ............................. 6

*Santa Clara Pueblo v. Martinez,* 436 U. S. 49, 58 (1978) .............................................. 30

*Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992).................................... 16

iv

*Sisseton–Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, North Dakota and South Dakota v. United States*, 90 F.3d 351 (9th Cir.1996) ............................................. 15

*Skokomish Indian Tribe v. Goldmark*, 994 F. Supp. 2d at 1187–90 ................................. 19

*Stacy v. Colvin*, 825 F.3d 563, 568 (9th Cir. 2016) .............................................................. 7

*State of Alaska v. Newland*, Case No. 3:23-cv-00007-SLG, 2024 WL 3178000, *appeal pending sub nom State of Alaska v. Central Council of Tlingit & Haida Indian Tribes of Alaska, et al.*, Case No. 24-5285 (appeal filed Aug. 26, 2024) ................................. 27

*Territory of Alaska v. Annette Island Packing Co.*, 6 Alaska 585 (1922) ..................... 9, 10

*Thlinget Packing Co. v. Harris & Co.*, 5 Alaska 471 (1916) ............................................ 17

*Tlingit & Haida Indians of Alaska v. U.S.*, 177 F.Supp. 452, 457-58 (Ct. Cl. 1959) .... 2, 4, 11, 13

*U.S. v. Zapeda*, 792 F.3d 1103, 1114 (9th Cir. 2015) ........................................................ 1

*United States v. Alaska Pac. Fisheries*, 5 Alaska 484, 486–87 (D. Alaska 1916) ............ 10

*United States v. Testan*, 424 U.S. 392, 399 (1976) .......................................................... 30

*United States v. Winans*, 198 U.S. 371, 381–82, 25 S. Ct. 662, 664, 49 L. Ed. 1089 (1905) ............................................................................................................................. 34

*White v. Univ. of California*, 765 F.3d 1010, 1028 (9th Cir. 2014) (collecting cases)32, 33

**FEDERAL STATUTES**

26 Stat. 1095, 1101 ............................................................................................................ 5

48 U.S.C.A. § 358 .............................................................................................................. 5

**FEDERAL RULES AND REGULATIONS**

25 C.F.R. § 83.2(b) ........................................................................................................... 28

89 Fed. Reg. 99899, 99902, 99903 .............................................................................. 1, 28

Civil Rule 19(b) ......................................................................................................... 3, 17, 33

Fed. R. Civ. P. 12(b)(7) ................................................................................................... 1, 6

Fed. R. Civ. P. 12(h)(3) ................................................................................. 6, 32

**OTHER AUTHORITIES**

Alaska Tribal Recognition Act, AS 01.15.100, SLA 2022, ch. 42, sec. 2 (2022) .............. 1

Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and
  Procedure: Civil 3d. § 1359 at 68 (2004) ....................................................... 6

Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 3.02[3], at 134–35 (Nell Jessup
  Newton ed., 2012) ........................................................................... 29

*Tlingit and Haida Indians of Alaska*, 177 F.Supp. at 468-69 (map showing Tlingit and
  Haida territory in Southeastern Alaska) ................................................. 12, 19

Tlingit and Haida Status Clarification Act, Pub. L. No. 103-454, Title II, 108 Stat. 4792. 1

*Wright, Miller & Kane*, § 1617, at 257 ............................................................. 32

vi

# I. INTRODUCTION

The Central Council of Tlingit & Haida Indians of Alaska ("Tlingit & Haida"), together with the Organized Village of Saxman, the Organized Village of Kasaan, the Craig Tribal Association, the Petersburg Indian Association, and the Wrangell Cooperative Association ("the Tribes")[1] appear specially[2] to move that this matter be dismissed for lack of subject matter jurisdiction pursuant to Civil Rules 19, 12(b)(1), and 12(b)(7).[3] The Tribes are necessary parties to this action and cannot be joined due to sovereign immunity absent consent, which they do not give.

The Tribes move to dismiss at this juncture because the Court's mandate on remand from the Ninth Circuit involves a determination of what traditional fishing rights, if any, the Metlakatla Indian Community has in Alaska Commercial Fisheries Entry Commission Fishing Districts 1 and 2. This task inescapably requires a determination of traditional Tlingit and Haida fishing rights in those Districts. Those rights are among the

---

[1] Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 99899, 99902, 99903 (Dec. 11, 2024) (federally recognized tribe list); *see*, *U.S. v. Zapeda*, 792 F.3d 1103, 1114 (9th Cir. 2015); Alaska Tribal Recognition Act, AS 01.15.100, SLA 2022, ch. 42, sec. 2 (2022); Section 8 of the Act of June 19, 1935 (49 Stat. 388), as am. Act of August 19, 1965 (79 Stat. 543); Tlingit and Haida Status Clarification Act, Pub. L. No. 103-454, Title II, 108 Stat. 4792.

[2] The Tribes do not consent to the Court's jurisdiction. Non-parties that do not consent to jurisdiction may specially appear to seek dismissal pursuant to Rule 19. *See Friends of Amador County v. Salazar*, 554 Fed. Appx. 562, 564 (9th Cir. 2014); *Milligan v. Anderson*, 522 F.2d 1202, 1203-04 (10th Cir. 1975).

[3] Fed. R. Civ. P. 12(b)(7); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022-25 (9th Cir. 2002).

most important cultural and economic property—*at.óow*—of the Tribes' clans.[4]   The Metlakatla Indian Community ("the Metlakatlans") has no legitimate claim to these ancient property rights.  Yet, by this action the Metlakatlans seek to misappropriate the Tribes' rights in order to obtain current economic advantage.

Tlingit and Haida clans have fished Districts 1 and 2 "since time immemorial" and have continuously defended their traditional fishing rights to the exclusion of all others, including against the Metlakatlans.[5]  The clans' traditional rights' extend to the locations at issue in this matter.[6]  Their rights were never given to the Metlakatlans by the Tlingit and Haida clans when the Tsimshians arrived in 1887.[7]  Nor were clan fishing rights transferred to the Metlakatla Indian Community as a whole when individual Tlingits or Haidas joined the Community or married Community members.[8]

A holding that the Metlakatlans have even "non-exclusive" traditional fishing rights in Districts 1 and 2 would significantly damage and diminish the Tlingit and Haida clans' *at.óow* and would interfere with the Tribes' sovereign rights to regulate property

---

[4] Nora Marks Dauenhauer & Richard Dauenhauer, *Haa Shuká, Our Ancestors: Tlingit Oral Narratives* at 25 (1987) ("Dauenhauer") ("The single most important concept in the entire book is at.óow. The word means, literally, 'an owned or purchase things.' The concepts of 'thing,' 'owned,' and 'purchased' are all equally important.").

[5] *Tlingit & Haida Indians of Alaska v. U.S.*, 177 F.Supp. 452, 457-58 (Ct. Cl. 1959).

[6] *Id.*, 177 F.Supp. at 455; Ramos Decl. ¶ 13; Monteith Decl. ¶¶ 18-43; Dundas Decl. ¶¶ 6-23.

[7] Buchanan Decl. ¶¶15-20; Jackson Decl. ¶¶ 24-27.

[8] Jackson Decl. ¶¶ 24-27.

issues among Tribal citizens and to manage relations with other tribes. It would diminish the contemporary rights of the Tribes' citizens to fish their traditional areas in Districts 1 and 2 on an equal footing with other Alaska permit holders. This matter cannot, "in equity and good conscience," proceed without the Tribes' participation.[9]

The Tribes believe strongly that questions of traditional fishing rights and other traditional property rights should be decided by and among the tribes involved, not by a federal court. Therefore, the Tribes move to dismiss.

## II. THE TLINGIT, THE HAIDA, AND THE METLAKATLANS

The Tlingit have been in Lingít Aaní (Tlingit territory, now known as Southeast Alaska) for over 11,000 years—millennia before European explorers and traders arrived during the 1700s.[10] Lingít Aaní includes the mainland, islands, and all inland and ocean waters from Yakutat to below Ketchikan, including the Annette Islands.[11]

The Haida have been in the Haida Gwaii at least 12,500 years. The Alaskan Haida, known as the K'ayk'aanii or Kaigani, came to Prince of Wales Island and the southern

---

[9] Civil Rule 19(b); Jackson Decl. ¶ 28 ("It is impossible to decide any question of traditional rights in Southeast Alaska without the involvement of the Tlingit and Haida clans who hold the traditional fishing rights. We must have a seat at the table to protect our traditional rights and to ensure that the many peoples of Southeast Alaska understand, recognize, and respect our traditional law and customs.").

[10] James Decl. ¶ 3, 6.

[11] Monteith Decl. ¶¶ 9-53; *Haa Aaní Our Land: Tlingit and Haida Land Rights and Use*, Walter R. Goldschmidt and Theodore H. Haas (U. Washington Press, 1998), pg. 4 ("Goldschmidt"); Decl. Joel Buchanan ¶ 6-7.

Motion to Dismiss                                                                                Page 3 of 32
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

reaches of Southeast Alaska before European contact.[12]  The Kaigani Haida hold fishing rights in several areas at issue in this matter, acquired pursuant to Tlingit and Haida traditional law.[13]  The area held by the Kaigani Haida is called X̲aadas Tlagáa (Haida country).  Tlingit and Haida clans have well-defined, long-standing, valuable, and exclusive traditional rights to fish in certain areas and at specific salmon streams and other locations throughout Lingít Aaní and X̲aadas Tlagáa.[14]

The Metlakatlans, by contrast, are primarily descendants of Canadian Tsimshians who emigrated to the Annette Islands only in 1881.[15]  While their ancestors traded in the Lingít Aaní and X̲aadas Tlagáa, Metlakatlan Tsimshians do not and have never held traditional fishing rights in those areas.  They did not hold such rights in "time immemorial"; they did not hold such rights in 1881; and they do not have any claim on such rights today.  The traditional fishing rights they assert here are important cultural property that belong exclusively to the Tlingit and Haida clans.[16]

---

[12] Cook Decl. at ¶ 5; *see generally*, *Haida Gwaii Human History and Environment from the Time of the Loon to the Time of the Iron People* 128 (Daryl W. Fedje & Rolf W. Mathewes eds., 2005).

[13] Jones Decl. ¶ 6-25; Cook Decl. ¶ 5-10.

[14] *Tlingit & Haida Indians of Alaska*, 177 F.Supp. at 455.

[15] *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 48 (1962); 26 Stat. 1095, 1101, 48 U.S.C.A. § 358.

[16] Jones Decl. ¶ 13; Dundas Decl. ¶¶ 6-23; Cook Decl. ¶¶ 8-10; Monteith Decl. ¶¶ 16-18; Rowan Decl. ¶¶ 5-7; James Decl. ¶ 6-8; Rosita K̲aaháni Worl, *Tlingit At.óow: Tangible and Intangible Property* at 61, 187-188, 192, 195, 196-197 (1998) (unpublished Ph.D. dissertation, Harvard University) ("Worl"); Wallace M. Olson, *The Tlingit: An Introduction to Their Culture & History* at 34 (Heritage Research, 3d Ed. 1997) ("Olson")

# III.   APPLICABLE STANDARDS

1.   <u>Civil Rule 19</u> provides that when a "required party" cannot be joined to an action (whether due to tribal sovereign immunity or other reasons), dismissal of the entire action is mandated for "failure to join a [required] party under Rule 19."[17]  Rule 19 "sets forth a three-step inquiry": (1) whether the absent party is "required," (2) if so, "whether joinder of that party is feasible," and (3) if joinder of the absent party is infeasible, "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."[18]  To determine whether joinder is required, the court may consider evidence outside the pleadings.[19]

---

("The Tlingit had strict laws of ownership. Each lineage or house owned physical things such as stories, legends, ceremonies, and exclusive rights to fish as certain streams …"); George Thorton Emmons, *The Tlingit Indians* at 46-47   (U. Wash. Press, 1991) ("Emmons") ("The clan was the unit of social organization, and its property was held in common. Its territory, however, was to a large degree divided among the individual families or household [lineages], as an inalienable right, which they could not dispose of and which was inherited in the direct maternal line. These possessions consisted particularly of the fishing streams, since salmon consisted their main food.").

[17] Fed. R. Civ. P. 12(b)(7).

[18] *Maverick Gaming LLC v. United States*, 123 F.4th 960, 972 (9th Cir. 2024), citing and quoting, *Klamath Irrigation*, 48 F.4th at 943.

[19] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960); *Behrens v. Donnelly*, 236 F.R.D. 509, 512 (D. Hawaii 2006) (citing Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure: Civil 3d. § 1359 at 68 (2004)).

2.    Civil Rule 12(b)(1) is "a proper vehicle for invoking [tribal] sovereign immunity from suit."[20] When tribal sovereign immunity is raised in a 12(b)(1) motion, "'the party asserting subject matter jurisdiction has the burden of proving its existence,' *i.e.* that immunity does not bar the suit."[21] On a "factual" Rule 12(b)(1) motion, such as this motion, "'[n]o presumptive truthfulness attaches to [a] plaintiff's allegations,'" and a "district court may 'hear evidence regarding jurisdiction' and 'resolv[e] factual disputes where necessary.'"[22]

3.    The Rule of Mandate applies to remands from the Ninth Circuit. This "provides that any district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it. The district court may, however, decide anything not foreclosed by the mandate."[23]

Here, the mandate directs this Court to decide the geographic locations of the Metlakatlans' "traditional fishing grounds," if any, in Districts 1 and 2,[24] as "the 1891 Act

---

[20] *Alaska Logistics, LLC v. Newtok Village Council*, 357 F. Supp. 3d 916, 923 (D. Alaska 2019); *Pistor v Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[21] *Alaska Logistics*, 357 F.Supp.3d at 935 (quoting, *Miller v. Wright*, 705 F.3d 919, 927-28 (9th Cir. 2013)).

[22] *Pistor v Garcia*, 791 F.3d at 1110 (quoting *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)); *Barron v. Alaska Native Tribal Health Consortium*, 373 F. Supp. 3d, 1232, 1237 (D. Alaska 2019).

[23] *Stacy v. Colvin*, 825 F.3d 563, 568 (9th Cir. 2016) (internal quotations omitted).

[24] *Metlakatla Indian Community v. Dunleavy*, 736 F.Supp.3d 741, 752 (D. Alaska 2024).

reserves for the Metlakatla Indian Community an implied right to non-exclusive off-reservation fishing in the areas *where they have fished since time immemorial and where they continued to fish in 1891* when their reservation was established."[25]  This implied right applies only to Metlakatlans "who had 'emigrated from British Columbia to Alaska' [in 1887], and, up to that point, 'such other Alaskan natives as may [have] join[ed] them.'"[26]  But the Metlakatlans did not fish "*since time immemorial and . . . continu[e] to fish in 1891*" on Annette Island, or in the adjacent waters and fishing grounds, or elsewhere in Lingít Aaní and X̲aadas Tlagáa.[27]

## IV.    BACKGROUND

In 1862, a group of Canadian Tsimshians abandoned their traditional villages and traditional rights to join a lay Anglican pastor, known as Reverend William Duncan, in a "Christian community."  Their decision to be "under [Reverend] Duncan's leadership constituted a complete break with their past on the part of all the participants. They had to pledge themselves to forego all heathen rights and put themselves completely at Duncan's disposal."[28]  At Duncan's direction, these Tsimshians began a "commercial fishing enterprise" and other businesses at Metlakatla, British Columbia.[29]

---

[25] 58 F.4th at 1048 (emphasis added).

[26] Docket 70, at 20, quoting, 58 F.4th at 1038 (quoting 1891 Act) (emphasis added).

[27] Buchanan Decl. ¶ 18; Monteith Decl. ¶ 16-52; Rowan Decl. ¶ 5-12; Dundas Decl. ¶¶6-23.

[28] Aurel Krause, *The Tlingit Indians*, (Univ. Wash. Press, 1956) ("Krause"), at 226.

[29] 58 F.4th at 1037.

In 1887, facing Canadian pressure on their land, "a group of five Metlakatlans traveled to the Territory of Alaska in search of a new home."[30]  The group "chose" the Annette Islands "because the fishery adjacent to the shore would afford a primary means of subsistence and a promising opportunity for industrial and commercial development."[31] Shortly afterwards, Duncan and "some 800 to 1,200 Metlakahtla or Tsimpsean Indians emigrated from British Columbia and settled on one of these islands."[32]  The Metlakatlans did not engage in a traditional fishery at their new location; they moved onto Annette Island and established modern commercial enterprises.[33]  Within a few years, the Metlakatlans "built a church, homes, and the commercial plant, including a store, a lumber mill, and a salmon cannery.[34]  In short, "the Metlakatlans successfully picked up and relocated, hardly missing a beat."[35]

The Metlakatlans' emigration was "not only acquiesced in but encouraged by executive and administrative officers of the United States, and subsequently [was]

---

[30] *Id*.; Buchanan Decl. ¶¶ 9-10.

[31] *Id*. at 1048.

[32] *Territory of Alaska v. Annette Island Packing Co*., 6 Alaska 585 (1922).

[33] Ex. B. at 173 (describes "new enterprises" on Annette Island, including "[t]he cannery, the sawmill, [and] trading through . . . the sailing ship that they had.").

[34] Brian C. Hosmer, *American Indians in the Marketplace: Persistence and Innovation Among the Menominees and Metlakatlans*, 1870-1920, at 200 (1999) ("Hosmer").

[35] *Id*. at 204.

sanctioned by Congress."[36]  In 1916, to bolster the Metlakatlans' enterprises, President Wilson created a 3,000-foot exclusive fishing zone for the Metlakatlans around the islands.[37]  Litigation ensued for decades concerning the Metlakatlans' fishing rights and use of fish traps, otherwise illegal in Alaska.[38]

Remarkably, Tlingit and Haida ownership and use of the Annette Islands fisheries and salmon streams in surrounding areas was not recognized in President Wilson's proclamation, in the related Congressional enactments, or in the litigation.  The apparent governmental view at the time was that the Annette Islands were simply vacant space, free for the taking by Canadian emigrants:

> The [Annette] islands are in the interior of the Alexander Archipelago and separated from other islands by well-known bodies of water. *Before the Metlakahtla settlement they were wild and uninhabited.*[39]

But the Annette Islands were neither wild nor "uninhabited."  They are in the Lingít Aaní, squarely in the traditional territory of the Saanya Ḵwáan and the Taant'a Ḵwáan,

---

[36] *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 87 (1918); 58 F.4th at 1038-39, citing, 15 of the Act of March 3, 1891, c. 561, 26 Stat. 1101 (Comp. St. 1916, § 5096a) (establishing Annette Islands Reserve)..

[37] 58 F.4th at 1039-40 (quoting Presidential Proclamation No. 1332, 39 Stat. 1777–78 (Apr. 28, 1916)).

[38] 58 F.4th at 1039-41, citing *United States v. Alaska Pac. Fisheries*, 5 Alaska 484, 486–87 (D. Alaska 1916); *Territory v. Annette Island Packing Co*., 6 Alaska 585 (D. Alaska 1922), *aff'd*, 289 F. 671 (9th Cir. 1923), *cert. denied*, 263 U.S. 708 (1923); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 48 (1962).

[39] *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 88 (1918).

and adjacent to the territory of the Kaigani Haida.[40]  The fishing streams on Annette Island

and elsewhere in Districts 1 and 2—the sites at issue here—were property of Taant'a

Ḵwáan clans, Saanya Ḵwáan clans, and Kaigani Haida clans.[41]  Indeed, when the first

Metlakatlans arrived on Annette Island, they were met on the beach at Táakw.áani, a

Tlingit winter village, by the Taant'a Ḵwáan.[42]

In creating the Annette Island Reserve and later an exclusive fishing zone for the

Metlakatlans, the United States entirely ignored the clans' property rights.  The Court of

Claims accurately described this as an "outright taking[] by the United States of Tlingit

and Haida land or property rights":

> The major part of the lands aboriginally used and occupied by the
> Tlingit and Haida Indians in southeastern Alaska was actually taken
> from them by the United States without the payment of any
> compensation therefor.  The land so taken was, first, some 86,740

---

[40] Tlingit "Ḵwáan" are sometimes described as "tribes," although the analogy is not exact.
Clans are descended from a common matrilineal ancestor and are a fundamental social
group in Tlingit culture.  Sealaska Heritage Foundation, https://sealaskaheritage.org/wp-content/uploads/2024/04/SHI-Alaska-Education-Social-Studies-Grade-6-Unit-7_Clans-and-Moieties.pdf (last visited 6/28/2025) ("Southeast Alaska is divided into regions called
kwáans, in which both the Eagle and Raven clans live. The clans living in a kwáan own
the land and share the natural resources of the region."); National Park Service, "The
Tlingit," https://www.nps.gov/sitk/learn/historyculture/the-tlingit.htm (last visited
6/28/2025) ("Each Tlingit clan had exclusive fishing areas; infringement by others was
grounds for war or retribution. "); 7 *Tlingit & Haida Indians of Alaska v. U.S.*, 177 F.Supp.
452, 457-58 (Ct. Cl. 1959); Hope, A., "Traditional Tlingit Country," U. Alaska,
http://www.ankn.uaf.edu/ancr/southeast/tlingitmap/tlingitmap.pdf (last visited 6/28/2025)
(map showing Ḵwáan territories and clans); Jackson Decl ¶¶ 4-6; Monteith Decl. ¶¶ 9,15;
Jones Decl. ¶¶ 3-25; Cook Decl. ¶¶ 5-6, 9.

[41] Jackson Decl. ¶ 7; Jones Decl. ¶¶ 3-25; Cook Decl. ¶¶ 5-10.

[42] Buchanan Decl. ¶¶ 9-12.

acres comprising the Annette Islands in the southern part of Tlingit territory taken as a reservation for the Tsimshian (Metlakahtla) Indians pursuant to the Act of March 3, 1891 [. . .].

The most valuable asset lost to these Indians was their fishing rights in the area they once used and occupied to the exclusion of all others.[43]

The Court of Claims found that the Tlingit and Haida "were using and occupying [Lingít Aaní and X̱aadas Tlagáa] according to their native manner of use and occupancy in 1867 when the United States acquired Alaska from Russia; that *following the purchase of Alaska in 1867 these Indians continued to exclusively use and occupy the same areas of land and water as previously, and that such use and occupancy was not interfered with by the United States or its citizens until 1884* [when Congress passed the Organic Act of Alaska, 23 Stat. 24, *and*] *through reservation of part of the land for Canadian Indians under the Act of March 3, 1891*."[44]

The Metlakatlans did not hold fishing rights "since time immemorial" on Annette Island, nor elsewhere District 1 and 2, nor anywhere else in the Lingít Aaní and X̱aadas Tlagáa before 1891.[45] To the contrary, Tlingit clans have held exclusive rights to the fishing sites at issue here for over 10,000 years—"since time immemorial"—and the Haida clans held exclusive rights to their sites far predating the Metlakatlans' arrival. Both Tlingit and Haida clans continuously defended their rights to their fishing sites to

---

[43] *Tlingit and Haida Indians of Alaska*, 177 F.Supp. at 468-69.

[44] *Id*. at 468.

[45] Buchanan Decl. ¶¶ 12, 18; Dundas Decl. 10-23; Jackson Decl. ¶ 7.

Motion to Dismiss                                                                 Page 11 of 32
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

the exclusion of all others.[46]  Those fishing rights, whether on or off the Annette Islands, were not given by the Taant'a Ḵwáan clans, Saanya Ḵwáan clans, or Kaigani Haida clans to the Metlakatlans when they arrived in 1887.[47]

Indeed, the Metlakatlans did not exist as an entity until their emigration to Annette Island.  The Metlakatlans' expert opined that, in ancient times, ancestral Tsimshians migrated through Southeast Alaska to British Columbia and may at times have had "permanent" villages along the way.[48]  But, their expert testified at deposition, the Metlakatla Indian Community *itself* did not exist before 1887 "when [the Metlakatlans] occupied [Annette Island] and began construction of their domiciles and businesses and enterprises . . . that's when the community begins."[49]  The expert further admitted that "[w]e have no historically documented record" of traditional fishing activities by the Metlakatlans after their emigration to Annette Island.[50]

The Circuit's remand opinion states, in dicta, that "federal agencies and federal officials documented Metlakatlans fishing up to 50 miles from the reservation" in Southeast Alaska—presumably within Districts 1 and 2.  But, with respect, these federal

---

[46] *Tlingit & Haida Indians*, 177 F.Supp. at 457-58; Worl, at 20 ("The Tlingit… maintained absolute control over their Southeast Alaska homeland.").

[47] Buchanan Decl. ¶¶ 16-20; Jackson Decl. ¶¶ 26-28; Jones Decl ¶¶ 27-30.

[48] Ex. A. at 20–26.

[49] Ex. B. at 33

[50] *Id.* at 33, 115.

reports are dated *after* 1891—*after* the Reserve was established—and do not show fisheries from "time immemorial" until 1891. It is questionable whether these reports even prove Metlakatlans were fishing outside the Reserve after 1891, rather than buying fish from Tlingit and Haida fishermen.[51]

Further, again in dicta, the opinion cites Hosmer for the proposition that "[a]fter moving to the Annette Islands, the Metlakatlans continued to fish throughout the waters of Southeast Alaska."[52] But Hosmer states it differently: after arrival, the Metlakatlans "*continued to ply the waters of the Skeena and the Nass* [in British Columbia], returning to stations long claimed by [Tsimshian clans]." Hosmer further confirms that Metlakatlan attempts to fish outside the Annette Islands Reserve in Lingít Aaní and X̱aadas Tlagáa were met by unremitting Tlingit and Haida hostility.[53]

## V.    ARGUMENT

Rule 19 "sets forth a three-step inquiry": (1) whether the absent party is "required," (2) if so, "whether joinder of that party is feasible," and (3) if joinder of the absent party is infeasible, "whether, in equity and good conscience, the action should proceed among

---

[51] 58 F.4th at 1039 (reports from 1897, 1899, 1900 and 1902); *but see*, Ex. C. at 11; Ex. D at 11.

[52] *Id*. at 1038 (emphasis added) (citing Hosmer at 200-201).

[53] Hosmer, at 202-204 (emphasis added); *accord*, Ex. C. at 10-12; Ex. D. at 11; Special Agent George R. Tingle, *Reports on the Salmon Fisheries of Alaska*, at 21-22 (Treasury Dep't, Government Printing Office 1897).

the existing parties or should be dismissed." To determine whether joinder is required, the court may consider evidence outside the pleadings.

The Tribes easily meet this standard. They are required parties; joinder is not feasible without their consent, which they do not give; and in "equity and good conscience" this action should be dismissed under Civil Rules 19, 12(b)(1), and 12(b)(7). The Tribes bring this motion directly and in *parens patriae* on behalf of their tribal citizens.[54]

## A. The Tribes are Required Parties to this Action.

The Court must first determine whether the Tribes are "required part[ies]" under Rule 19(a). A "required party" is one who "in that person's absence, the court cannot accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A), or who "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest…." Fed. R. Civ. P. 19(a)(1)(B)(i).[55]

---

[54] Tribes can bring suit in a *parens patriae* capacity. *Sisseton–Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, North Dakota and South Dakota v. United States*, 90 F.3d 351 (9th Cir.1996); *Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072, 1117 (S.D. Cal. 2008).

[55] *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002) ("It is the party's claim of a protectible interest that makes its presence necessary."); *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992) ("Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party.").

The remand here, as defined by the Ninth Circuit's mandate, requires determining the scope of "traditional fishing rights" in Districts 1 and 2, which are entirely within Lingít Aaní and X̱aadas Tlagáa. Any determination that the Metlakatlans had a right to fish at the Tribes' traditional sites would be contrary to *káa k̲ududziteeyi yoo x̲'atánk* ("words one lives by," Tlingit traditional law[56]). The Tribes have important interests in defending their exclusive traditional fishing rights; in protecting Tlingit and Haida sovereign authority regarding their clans' *at.óow*; and in preventing adverse impacts to their citizens' fish harvests at these locations.[57] A decision "in [the Tribes'] absence" would "impair or impede" the Tribes' ability to protect those interests.[58]

### 1. The Tribes have important cultural and property interests in the subject of this action.

The mandate on remand is to determine what "'the [Metlakatlans] would have understood'" to be their traditional fishing grounds that they have fished since "time immemorial" and where they "continu[ed]" to fish in 1891.[59] The answer to that question unavoidably impacts the Tribes' rights. As Taant'a K̲wáan Teik̲weidí clan leader Richard Jackson states, "[t]o once again disregard our laws and customs and create 'traditional'

---

[56] Worl, at 18.

[57] Jackson Decl. ¶¶ 34-35; Buchanan Decl. ¶¶ 23-24; Jones Decl. ¶¶ 30, 36; Monteith Decl. ¶ 53.

[58] Civil Rule 19(b).

[59] 736 F. Supp. 3d at 752 (quoting 58 F.4th at 1042) (citations omitted).

fishing rights for Metlakatla Indian Community will harm our people, our culture, and our sovereignty. Our *at.óow* is who we are."[60]

Fishing rights, methods, and sites have been property interests cognizable in federal court since Alaska became a territory.[61] The Tribes' clans have held fishing rights under traditional law for much longer—since time immemorial.[62] For example, the Taant'a Ḵwáan Teiḵweidí and Gaanaxádi clans and the Saanya Ḵwáan Neix.ádi clan claim traditional fishing rights to the waters of Kegan Cove, Nowiskay Cove, Port Johnson, and Moira Sound.[63] Tlingit and Haida clans tightly controlled who could access their fishing streams throughout the area since time immemorial.[64] Others who wished to fish at those

---

[60] Jackson Decl. ¶ 41.

[61] The Metlakatlans concede as much. Docket 40 at 4; *Thlinget Packing Co. v. Harris & Co.*, 5 Alaska 471 (1916); *Canoe Pass Packing Co. v. United States*, 270 F. 533, 535 (9th Cir. 1921); *P. E. Harris & Co v. Mullaney*, 87 F. Supp. 248, 253 (D. Alaska 1949).

[62] Worl, at 35 ("[T]he clan was the basic property-holding unit, and individuals within a clan held property rights because they were members of a clan."); Monteith Decl. ¶¶ 7-52; Jones Decl. ¶ 13; Jackson Decl. ¶¶ 15-27; Buchanan Decl. ¶¶ 13-25; Douville Decl. ¶¶ 4-7; Dundas Decl. ¶¶ 6-23; Moser, *The Salmon and Salmon Fisheries of Alaska: Report of the Operations of the United States Fish Commission Steamer Albatross for the Year Ending June 30, 1898*, at 43 (GPO, 1899) ("Moser"); Kutchin, *Report on the Salmon Fisheries of Alaska 1898*, at 22-23 (GPO 1899); Olson, at 56-57; Emmons, at 31;.

[63] Monteith Decl. ¶¶ 28-31; Dundas Decl. ¶ 12

[64] Jackson Decl. ¶¶ 3-11; Monteith Decl. ¶¶ 7-17; Ramos Decl. ¶¶ 5-13; Dundas Decl. ¶¶ 6-23; Olson at 37; Thomas F. Thornton, *Being and Place Among the Tlingit*, at 136 (2008) ("Although Tlingit exercised a high degree of territorial control over key production sites, access, even to non-matrikin, was typically extended *if permission was sought*."); Worl, at 20 ("The Tlingit… maintained absolute control over their Southeast Alaska homeland"); Langdon, *Traditional Knowledge and Harvesting of Salmon by Huna and Hinyaa Lingít* 92 FIS Final Report 02-104 (Anchorage: US Department of Interior, Fish and Wildlife Service) (2006) ("If an owner's property right to a stream or location was violated by

places were expected to get permission from the clan,[65] and permission sometimes required payments.[66] All Indians who fished in Southeast Alaska in 1891, including the Metlakatlans, understood traditional law and abided by it to avoid the consequences of a violation.[67]

If Metlakatlans fished at traditional Tlingit and Haida locations in 1891 or earlier, they did so either by permission or without any right.[68] A decision that the Metlakatlans may fish in Districts 1 and 2 based on "traditional rights" the Metlakatlans never held would deeply and significantly prejudice the Tribes.[69] This result would be a direct and substantial affront to the Tribes' cultural rights, a diminishment of the Tlingit and Haida

---

intrusion or unsolicited use, the owners had recourse to violence to protect their property. Such retaliation was widely recognized as legitimate in Tlingit society.") (internal citations omitted)); Olson at 34 ("If people wished to fish in a certain stream or pick berries in a specific place, they had to get the permission of the local lineage or house spokesman to do so."); Dauenhauer at 25.

[65] Hosmer, *supra*.; Monteith Decl. ¶¶ 6, 18-52 (explaining Tlingit and Haida clan control over fishing sites named in complaint); Ramos Decl. ¶ 6-7; Olson, at 37; Jones Decl. ¶¶ 25-29; Jackson Decl. ¶¶ 22-27; Buchanan Decl. ¶¶ 13-25; ; Williams Decl. ¶¶ 16-20; Ramos Decl. ¶ 6; Douville Decl. ¶ 4; R.L. Olson, at 37; Moser, at 43; Thornton at 136.

[66] Moser at 43, 88; Ramos Decl. ¶ 12; Douville Decl. ¶ 4.

[67] Jones Decl. ¶¶ 27-30; Jackson Decl. ¶¶ 14-26; Buchanan Decl. ¶¶ 15-24.

[68] *Tlingit & Haida Indians*, 177 F. Supp. at 456; Jackson Decl. ¶ 7; Cook Decl. ¶ 12; Monteith Decl. ¶ 17; James Decl. ¶ 8; Jones Decl. ¶¶ 23-28; Buchanan Decl. ¶¶ 15-21; Williams Decl. ¶¶ 15-21; Ex. B. at 61, 125, 146-148.

[69] *Am. Greyhound Racing, Inc.*, 305 F.3d at 1025; *Skokomish Indian Tribe*, 994 F. Supp. 2d at 1187–90; Buchanan Decl. ¶23-24; Dundas ¶ 24.

clans' property rights in their *at.óow*,[70] and an irreparable injury to the Tribes' ancient customs, traditions, and clan property rights.[71]  These rules are still followed today by the Tribes' citizens, as they have been for millennia, and have deep meaning to the Tlingit and Haida.[72]

### 2. The Tribes have important sovereignty interests in regulating *at.óow* among their members and with other Tribes.

The Tribes have a separate and vitally important interest in protecting tribal sovereignty.  Tribal sovereignty entails the power to control "internal relations, and to preserve their own unique customs and social order."[73]  The Tribes have the sovereign right and the obligation to protect their traditional law and customs and to regulate actions by Tribal citizens and other Indians concerning *at.óow*.[74]

Traditional laws regarding clan ownership of and control over *at.óow*, including fishing rights, are fundamental aspects of Tlingit and Haida cultures.  The Tribes' have not

---

[70] Jackson Decl. ¶¶ 23, 34-35; Monteith Decl. ¶¶ 11-14, 53, 52; Jones Decl. ¶ 30; Dundas Decl. ¶ 24; Worl, at 65 ("While clans have lost their original land base, they continue to hold special regard for their traditional lands and have been active in protecting the clan's sacred sites.").

[71] Jones Decl. ¶ 36; Monteith Decl. ¶¶ 11-14, 53; Buchanan Decl. ¶¶ 23-24.

[72] Rowan Decl. ¶¶ 10-11; Worl at 229.

[73] *Duro v. Reina*, 495 U.S. 676, 685–86, 693 (1990); *John v. Baker*, 982 P.2d 738, 761 (Alaska 1999).

[74] Jackson Decl. ¶¶ 9-10, 23 ("At.óow is part of our traditions and culture and is fundamental to our identities as Tlingit people.  At.óow is clan owned property, both tangible and intangible property.  At.óow includes fishing grounds, places on land, names, crests, stories, spirits, art designs, songs and objects—all are at.óow."); Buchanan Decl. ¶¶ 23-24; Dundas Decl. ¶ 24.

relinquished their sovereign powers and responsibility to govern intra-tribal and inter-tribal matters concerning *at.óow*.[75] "Asserting traditional claims to the fishing locations [of the Tribes' clans] is a grave offense. It goes against every tradition and custom we have. What Metlakatla Indian Community is now asking the Court to do is a grave affront to our people."[76] The Metlakatlans "know[] now what they knew then [on arrival]—that their Community members cannot fish on the fishing grounds of the Tlingit and Haida clans as a matter of right."[77]

The Metlakatlans' claims also directly interfere with the Tribes' rights to govern internal matters.[78] This interest is critical here, where the Metlakatlans argue that *as a community* they are entitled to assert the traditional clan rights of the few individual Tlingit and Haidas who joined the Tsimshian emigrants at the Community's founding.[79] Even if the Metlakatlans could identify any such individuals who had clan rights to fish, those individuals' rights would not apply to the Community as a whole, nor do those rights necessarily belong to those individuals' descendants.

---

[75] *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002); Worl, at 7 ("Tlingit property law is based on a communal or group orientation, rather than a system of private and individual ownership rights paramount under American law.") and 8 ("Legal transactions involving Tlingit clan property… transpire within the context of ceremonial activities and through the recitation of oral histories").

[76] Buchanan Decl. ¶¶ 22-23.

[77] Buchanan Decl. ¶ 20.

[78] Cook Decl. ¶¶ 8-12; Douville Decl. ¶ 8.

[79] Docket 40 at 16.

First, clan members have no individual property rights in *at.óow*. They only have use rights, and then within defined bounds.[80]  Second, an individual's right to use *at.óow* is based on clan membership and does not transfer from one generation to another in any manner similar to western concepts of inheritance.[81]  Imputing an individual's clan rights to an entire group of Tsimshian emigrants simply is not allowed under traditional law. Tlingits who joined the Metlakatla Indian Community did not and could not transfer their clan's *at.óow* to the Community as a whole.[82]

The Ninth Circuit has repeatedly held that a tribe's interest in governing its people and territory constitutes a legally protected interest.[83]  In *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, the Quinault Nation possessed a "legal interest in the litigation" when plaintiffs sought "a complete rejection of the [Tribe's] current status as

---

[80] Worl at 187 ("Ownership of clan-owned property under Tlingit law is determined by membership in a social unit, a clan, whereby the whole group owns property together rather than one or several members of the unit."), 188 ("Tlingit law does not recognize individual rights to clan property, nor descendible rights or the transfer of estates to lineal descendants."); Ramos Decl. ¶ 5-7, 10-12; Buchanan Decl. ¶ 20.

[81] Worl, at 45-46 and 195 ("Descendible ownership or transference of property rights between generations is absent within the Tlingit legal system."), 197 ("Ultimately, a clan holds the property—tangible and intangible—it received from its ancestors on behalf of its future generations."); Emmons, at 31 (1991); Monteith, *Tongass, The Prolific Name, The Forgotten Tribe: An Ethnohistory of Taantakwaan Tongass People*, at 46-47 (1998); Goldschmidt and Haas, at 12.

[82] *Id*. Whether any individuals in the Metlakatla Indian Community assert *bona fide* clan rights to use the fishing sites at issue is unknown to the Tribes.

[83] *Pit River Home and Agr. Co-Op. Ass'n v. U.S.,* 30 F.3d at 1101; *Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1460 (9th Cir.1994) .

the exclusive governing authority of the[ir] reservation."[84]  In *Kescoli v. Babbit*, the Court found the Navajo Nation's and Hopi Tribe's sovereignty was a protected legal interest, determining they were required parties as the litigation attempted to "disrupt their ability to govern themselves."[85]  These "sovereign interests" are sufficient "claims . . . which may be impaired in the [Tribes'] absence."[86]

The Tribes here have the same sovereign interests in recognizing and enforcing traditional rules concerning property ownership among the Tribal citizens.[87]  Demanding respect for traditional protocols surrounding clan property, whether the *at.óow* are salmon fishing streams or other resources like berry patches and halibut banks, is a sovereign right of the Tribes.[88]  This litigation usurps the Tribes' sovereign authority over these traditional protocols and over the traditional fishing rights held by their clans.[89]  Continuing this action in the Tribes' absence jeopardizes both the Tribes' "property interests and [the Tribes'] governing authority over those interests."[90]

---

[84] *Confederated Tribes of the Chehalis Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) (amended opinion).

[85] *Kescoli v. Babbitt*, 101 F.3d 1304, 1312 (9th Cir. 1996).

[86] *Dawavendewa*, 276 F.3d at 1157.

[87] *Chilkat Indian Vill. v. Johnson*, 870 F.2d 1469, 1475 (9th Cir. 1989); Cook Decl. ¶ 10.

[88] Buchanan Decl. ¶¶ 22-23; Monteith Decl. ¶¶ 10-12, 52; Jones Decl. ¶¶ 30-41; Dundas Decl. ¶ 24.

[89] Monteith Decl. ¶¶ 8-18; Buchanan Decl. ¶¶ 22-23; Jackson Decl. ¶¶ 33-34.

[90] *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 140 (9th Cir. 1994).

### 3. The Tribes have important current economic interests in the subject of this matter.

Last, and also importantly, the Tribes' interests in this matter extend to current economic injury as well. If the relief requested is granted, there will be more fishermen competing for dwindling salmon resources[91] at the clans' fishing streams, affecting Tribal citizens' commercial and subsistence opportunities. Any "implied" right to do so would allow the Metlakatlans to fish without a State of Alaska limited entry permit or, for that matter, any regulation whatsoever.[92] The Metlakatlans could set fish traps at the mouths of the most productive salmon streams throughout Districts 1 and 2, and fish without regard to State closures or federal subsistence priorities.

The Tribes, on the other hand, are limited by State law on commercial fishing access to those areas, even though the traditional rights to those areas are held by their

---

[91] Oliva Rose, *Southeast Alaska Single-Fish Limits for King Salmon*, (April 4, 2025), https://www.kfsk.org/2025/04/04/southeast-alaska-sport-fishery-sees-single-fish-limits-for-king-salmon/ (last visited 6/28/2025).

[92] Jackson Decl. ¶¶ 35-36 ("In addition, I fear that if Metlakatla Indian Community fishes without limited entry permits in Districts 1 and 2, our region will see fishing at unsustainable levels. This will jeopardize the fishery resources, including salmon, halibut, eulachon, and other fish, that Taant'a K̲wáan people have fished for generations and time immemorial"); Williams Decl. ¶ 14 ("I am concerned that the Community will use fish traps or other poor management practices at our traditional sites, free of any State regulation. That would harm the fish populations and cause harm to our fishing at those salmon streams, where we have fished for untold generations."); Jones Decl. ¶¶ 39-40; Douville Decl. ¶ 7-8.

clans and respected by Tribal citizens.[93] Both traditional tribal fishing practices and the

State's limited entry system provide safeguards to maintain healthy escapement and to

protect future fisheries.[94] Those safeguards would be lost if the Metlakatlans are given

free rein to exploit the Tribes' traditional fishing sites.

Where multiple tribes have "claims for allocation of a limited resource," the Ninth

Circuit holds that tribes do not "share compatible interests," and that the competing claims

are "more analogous to request by a beneficiary to allocate a common fund."[95] *Skokomish*

*Indian Tribe v. Goldmark* recognized that "all tribes with hunting and gathering rights in

the subject territory have a vital, legally-protected interest in how the [the treaty in that

case] is interpreted and enforced."[96] The Sixth Circuit reached a similar determination In

*Keweenaw Bay Indian Community v. State*, where competing claims to fishing rights in

Lake Superior made the Red Cliff and Bad River Bands necessary parties to Keweenaw

Bay's reserved treaty rights action against the State of Michigan.[97] Similarly, the Tribes

---

[93] An award of traditional fishing rights to the Metlakatlans may also affect the Tribes' civil and criminal jurisdiction under federal law. *Cf.* U.S. Dep't of the Interior, Opinion M-37079, Partial Withdrawal of Solicitor's Opinion M-36975 (Feb. 1, 2024), https://www.doi.gov/sites/default/files/documents/2024-02/m37079-partial-wd-m36975-and-clarification-trbl-jurisdiction-over-ak-native-allotments-2124.pdf (under "Suspension Review," U.S. Dep't of the Interior, M-Opinion Review Memo. (Feb. 28, 2025)).

[94] Ex. B. at 70-72.

[95] *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir. 1990).

[96] 994 F. Supp. 2d 1168, 1187–88 (W.D. Wash. 2014) (citing *Makah*).

[97] 11 F.3d 1341, 1347-48 (6th Cir. 1993).

have important interests in the scope of any Metlakatlan off-reservation fishing rights and equally important interests in ensuring that Tribal citizens' economic rights are not diminished by the Metlakatlans' claims.

Last, as part of the Rule 19(a) "required party" impairment analysis, courts acknowledge that "[a]s a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit,"[98] often framing this question as "whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments; whether the party is capable of and willing to make such arguments; and whether the absent party would offer any necessary element to the proceedings that the present parties would neglect."[99]

The "present parties" to the matter cannot be relied upon to represent the Tribes' interests. The Metlakatlans most assuredly will not—their interests in this matter are diametrically opposed to the Tribes' interests. Nor can the Tribes rely on the State of Alaska "to undoubtedly make all of the [Tribe's] arguments."[100] The State of Alaska has consistently opposed tribal interests in a wide range of matters, including very recently

---

[98] *Maverick*, 123 F.4th at 973 (quoting *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013)).

[99] *Diné Citizens*, 932 F.3d at 852-54.

[100] *Id.*, 932 F.3d at 852; *Klamath Irrigation*, 48 F.4th at 945.

before this Court.[101]  As far as the Tribes knows, neither party has made any effort to inform this Court or the Ninth Circuit about the Tribes' interests, let alone attempted to advance the Tribes' interests in this matter.

The Tribes submit that they meet the Civil Rule 19(a)(1)(B)(i) standard fully. Resolving this action in the Tribes' absence would inescapably "impair or impede" the Tribes' ability to protect their vitally important property, cultural, and economic interests discussed above.

**B.      The Tribes Cannot be Joined in this Matter due to Sovereign Immunity.**

Once the Court determines that the Tribes are required parties under Rule 19(a), the next step is "to determine if joinder [of the required party] is infeasible" under Rule 19(b).  Joinder is infeasible due to the Tribes' sovereign immunity.

Tlingit & Haida is the largest federally recognized tribe in Alaska, with more than 38,000 tribal citizens throughout all of Southeast Alaska and elsewhere.[102]  Tlingit & Haida's mission is to "perpetuate and preserve our traditions to ensure that future generations inherit their rightful heritage as Tlingit and Haida people."[103]

---

[101] *E.g.*, *State of Alaska v. Newland*, Case No. 3:23-cv-00007-SLG, 2024 WL 3178000, *appeal pending sub nom State of Alaska v. Central Council of Tlingit & Haida Indian Tribes of Alaska, et al*., Case No. 24-5285 (appeal filed Aug. 26, 2024).

[102] "Who We Are," https://tlingitandhaida.gov/; and https://tlingitandhaida.gov/wp-content/uploads/TribalEnrollmentReport.pdf  (last visited 6/28/2025).

[103] "Tlingit & Haida Today," https://tlingitandhaida.gov/about-us/history/ (last visited 6/28/2025).

The Organized Village of Saxman is a federally recognized tribe for the Tlingit villages of Cape Fox and Tongass, the Sanyaa Ḵwáan and Taant'a Ḵwáan people.[104]  The Sanyaa Ḵwáan and Taant'a Ḵwáan traditional territories include the Annette Islands and fishing sites throughout District 1 and 2.[105]

The Organized Village of Kasaan and the Craig Tribal Association are federally recognized tribes, located on Prince of Wales Island, within Districts 1 and 2.[106]  Kasaan is a village of the Kaigani Haida and has traditional fishing sites that are at issue in this matter.

The Petersburg Indian Association is a federally recognized tribe of the Séet Ká Kwa'án, with its tribal headquarters on Mitkof Island.[107]  The Wrangell Cooperative Association—also known as Ḵaachx̱ana.áak'w, the People of the Bitter Water—is a federally recognized tribe of the Shtax'héen Ḵwáan, located in Wrangell, at the mouth of the Stikine River.[108]  Both Tribes have tribal citizens who fish in Districts 1 and 2 and have clan relationships, including clan membership, with traditional fishing rights to the sites at issue in this matter.

---

[104] Ex. E, Organized Village of Saxman, Resolution # 205-06-278, June 6, 2025; https://saxmantribe.org/ (last visited 6/28/2025).

[105] Decl. Buchanan at ¶ 7; Decl. Monteith at ¶¶ 15-53; Decl. Jackson at ¶¶ 7, 26-27.

[106] Organized Village of Kasaan, https://www.kasaan.org/ (last visited 6/28/2025); Craig Tribal Association, http://www.craigtribe.org/ (last visited 6/28/2025).

[107] https://piatribal.org/  (last visited 6/28/2025).

[108] https://www.wcatribe.org/ (last visited 6/28/2025).

The Tribes are all on the Department of the Interior's list of federally recognized tribes[109] and "entitled to the immunities and privileges available to other federally recognized tribes."[110] Those include sovereign immunity from unconsented suit: "Indian tribes have long been recognized as possessing the common law immunity from suit traditionally enjoyed by sovereign powers."[111] Accordingly, "[s]uits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation."[112] A "waiver of sovereign immunity 'cannot be implied, but must be unequivocally expressed.'"[113]

The Tribes have not waived their sovereign immunity; Congress has not abrogated their sovereign immunity; and the Tribes cannot be joined in this matter without their consent. The Tribes do not consent as they believe, with the greatest respect to the Court, that traditional fishing rights issues should be resolved between the affected tribes and not by a federal court.

---

[109] 89 Fed. Reg. at 99902-99903.

[110] 25 C.F.R. § 83.2(b); *Jamul Action Committee*, 974 F.3d at 989 (9th Cir. 2020); Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 3.02[3], at 134–35 (Nell Jessup Newton ed., 2012).

[111] *Santa Clara Pueblo v. Martinez,* 436 U. S. 49, 58 (1978).

[112] *Okla. Tax Comm'n v. Potawatomi Tribe*, 498 U.S. 505, 509 (1991).

[113] *Santa Clara Pueblo,* 436 U.S. at 58 (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)).

## C.  In "Equity and Good Conscience" This Action Cannot Proceed in the Tribes' Absence

When the Court determines an absent party is required under Rule 19(a) but cannot be joined, the last step is to determine under Rule 19(b) "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." There are four factors to this analysis: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum.[114]

This weighing "almost always favors dismissal when a tribe cannot be joined due to tribal sovereign immunity."[115]  Although the Rule 19(b) factors still must be considered, in that circumstance, the court's "discretion in balancing the equities . . . is to a great degree circumscribed, and the scale is already heavily tipped in favor of dismissal."[116]  There "is very little room for balancing of other factors" set out in Rule 19(b) where a necessary party is immune from suit, because immunity is viewed as one of those interests "compelling by themselves."[117]

---

[114] *Dawavendewa*, 276 F.3d at 1161.

[115] *Jamul Action Comm. v. Simermeyer*, 974 F.3d at 998.

[116] *Id*.; *Comenout v. Whitener*, 2015 WL 917631 at *4 (W.D. Wash. 2015); *Northern Arapahoe Tribe v. Harnsberger*, 660 F. Supp. 2d 1264, 1278-79 (D. Wyo. 2009); *Quileute Indian Tribe v. Babbitt*, 18 F.3d at 1460; *Chehalis*, 928 F.2d at 1499.

[117] *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas, et al., v. Babbit*, 43 F.3d 1491, 1496 (D.C. Cir. 1995) (citations omitted); *Adams v. Bell*, 711 F.2d 161, 171 n. 42

"If the absent parties are Indian tribes invested with sovereign immunity," the Ninth Circuit observes, "virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy is available."[118] Indeed, there is a "'wall of circuit authority' requiring dismissal when a Native American tribe cannot be joined due to its assertion of tribal sovereign immunity."[119] The Circuit acknowledges that plaintiffs may be left with no adequate remedy upon dismissal for non-joinder, "[b]ut this result is a common consequence of sovereign immunity, and [the Tribe's] interest in maintaining [its] sovereign immunity outweighs the [plaintiffs'] interest in litigating their claims."[120] Simply put, "the weighty competing interest of preserving tribal sovereign immunity is paramount."[121]

The Tribes' sovereign immunity is dispositive of this issue. Moreover, even if immunity was not dispositive, each of the four factors identified in *Dawavendewa* weigh in favor of dismissal: (1) the Tribes would be gravely prejudiced if the suit proceeds

---

(D.C. Cir. 1983) (en banc), cert. denied, 465 U.S. 1021 (1984); *Wright, Miller & Kane*, § 1617, at 257; *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989).

[118] *Diné Citizens*, 932 F.3d at 857 (quoting *White v. Univ. of California*, 765 F.3d 1010, 1028 (9th Cir. 2014) (collecting cases)).

[119] *Maverick*, 123 F.4th at 971.

[120] *White*, 765 F.3d at 1028; *Greyhound Racing*, 305 F.3d at 1025; *Friends of Amador County*, 554 Fed. Appx. at 566.

[121] *Citizen Potawatomi Nation v. Salazar*, 624 F.Supp.2d 103, 114 (D.D.C. 2009), quoting *Kickapoo*, 43 F.3d at 1496–97.

without them; (2) relief cannot be shaped to lessen prejudice, as Metlakatlans seek to create "non-exclusive implied traditional rights" to fish in locations where they have no traditional rights at all; (3) no adequate remedy can be awarded without the Tribes' participation; and (4) there is no alternate forum but, as noted above, "this result is a common consequence of sovereign immunity."[122]

### D. Dismissal Under Rule 12(b)(1) and 12(b)(7) is Required.

Federal Rule of Civil Procedure 12(b)(1) is "a proper vehicle for invoking [tribal] sovereign immunity from suit." [123]  When a "required party" is dismissed or cannot be joined to an action, dismissal of the entire action is equally mandated under Rule 12(b)(7) for "failure to join a [required] party under Rule 19."  The Tribes are "required part[ies] that cannot be joined in the litigation, and because this suit cannot proceed in equity and good conscience in the Tribe's absence," dismissal is warranted. [124]

## VI.    CONCLUSION

The Metlakatla Indian Community asserts implied rights to fish at locations that exclusively belong to the Tlingit clans of the Lingít Aaní and the Kaigani Haida clans of

---

[122] *White*, 765 F.3d at 1028.

[123] *Pistor v Garcia*, 791 F.3d 1104, 1110 (9th Cir. 2015). *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  When tribal sovereign immunity is raised in a 12(b)(1) motion, "'the party asserting subject matter jurisdiction has the burden of proving its existence,' *i.e.* that immunity does not bar the suit." *Alaska Logistics, LLC v. Newtok Village Council*, 357 F. Supp. 3d 916, 923 (D. Alaska 2019).

[124] *Maverick*, 123 F.4th at 965.

Xaadas Tlagáa.  The Metlakatlans claim rights they never had to the detriment of the Tribes' important traditional cultural, sovereign, and economic interests.[125]  "[A]s a practical matter" proceeding in the Tribes' absence would "impair or impede" the Tribes' ability to protect those interests.   The Tribes cannot be joined due to tribal sovereign immunity.  A judgment entered in their absence would prejudice the Tribes and thus, "in equity and good conscience," this matter should be dismissed.  Civil Rule 19(b).

DATED this 30th day of June, 2025, at Juneau, Alaska.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By:   */s/ Richard D. Monkman*
Richard D. Monkman
Alaska Bar No. 8011101
Nathaniel H. Amdur-Clark
Alaska Bar No. 1411111
Noah I. Star
Alaska Bar No. 2111128

*Attorneys for Plaintiff*

---

[125] "Reserved rights," similar to the "implied rights" at issue here, cannot "be re-written or expanded" to remedy an "injustice" or to achieve a goal outside the clear terms of the reserving treaty or statute.  *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *United States v. Winans*, 198 U.S. 371, 381–82, 25 S. Ct. 662, 664, 49 L. Ed. 1089 (1905) (emphasis added).

Motion to Dismiss                                                                                     Page 31 of 32
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

## Certificate of Service

I certify that on June 30, 2025, a copy of the foregoing document was served via ECF on:

Christopher F. Orman
christopher.orman@alaska.gov

Jeffrey G. Pickett
jeff.pickett@alaska.gov

Daron Carreiro
daron.carreiro@usdoj.gov

Christopher Thomas Griffith
cgriffith@hk-law.com

Christopher G. Lundberg
clundberg@hk-law.com

Joshua James Stellmon
jstellmon@hk-law.com

*/s/ Richard D. Monkman*
Richard D. Monkman