Excerpts of Rosita Ḵaaháni Worl, *Tlingit At.óow: Tangible and Intangible Property* (1998) (unpublished Ph.D. dissertation, Harvard University)

**Table of Contents**

**Abstract**
**Acknowledgments**
**Tlingit Language Glossary**

**Introduction and Methodology**
- Fact Checking
- Case Study Approach

**Chapter 1: Tlingit Social Organization and Property**
- Tlingit Social Organization
- Moiety
- Clan
- Houses
- Geographic Units
- Clan Children and Grandchildren
- *Sháade Nákx'i* (Clan Leaders)
- Responsibilities of *Sháade Nákx'i* (Clan Leaders)
- Validation of a *Sháade Háni* (Clan Leader) and Transference of Office
- Changes in Tlingit Society
- Land
- Closing Thoughts

**Chapter 2: Spiritual and Ceremonial Dimensions of *At.óowu***
- Tlingit Spirituality
- The Tlingit *Íxt'* (Shaman)
- *At.óow*
- Crests
- The Commissioning of *Át.óow*
- Ceremonial Uses of *Át.óowu* in Practice

**Chapter 3: Clans and Crests**
- Oral Traditions and Clan Migrations
- *Ch'áak'* (Eagle) Clans
- The Case of *Wooshdaxk'i Tlaa*
- *Yéil* (Raven) Clans
- Shared Crests
- Crests
- Dualistic Systems
- The *Kaagwaantaan* and their Crests
- *Kaagwaantaan Gooch* (Wolf) Crest
- Custodianship of *Gooch Át.óowu*

**Chapter 4: Dispute Settlement Case Studies**
- Case Study 1: The *Kiks.ádi* and *L'uknax̱.ádi*: Competing Claims to the *Xíxch'* (Frog) Crest
    - The *Kiks.ádi*'s Claim to the *Xíxch'* (Frog) Crest
    - The *L'uknax̱.ádi* Claim to the *Xíxch'* (Frog) Crest

- The Conflict Over the Use of the *Xíxch'* Crest
- *L'uknax̱.ádi*and *Kiks.ádi* Histories of Sleeping Man Crest
- The *Kiks.ádi* Take the *L'uknax̱.ádi* Sleeping Man Crest
- The *L'uknax̱.ádi* Repossess the Sleeping Man Legend Pole
- Placing the Sleeping Man Legend Pole with the Sitka National Historical Park

- Case Study 2: The Naval Bombardment of Angoon
- Case Study 3: The *Wooshkeetaan* Screen
- Case Study 4: The *G̱aanax̱teidí Yáay Hít* (Whale House) Case
- New Legal Issues

**Chapter 5: Principles of Tlingit Property Law and the Dispute Settlement Process**

- Tlingit Property Law and Dispute Resolution
- Clan Objects
- Clans as Collective Property Holders
- Possessory Rights of a Clan *Hít* (House)
- Usufruct Rights of Clan Children and Grandchildren
- Authority of *Sháade Háni* (Clan Leader) and *Hít s'aatí* (Keeper of the House)
- Validation of Property Rights and Trustees in *Ḵu.éex* (Potlatch Ceremony)
- Alienation of Property
- Intangible Property
- Dispute Settlement Processes
  - Informal Dispute Settlement Processes
  - Supernatural Sanctions as Dispute Process
  - Formal Dispute Settlement Processes
  - The Peace Ceremony Settlement Process
  - Western Legal System and Tribal Courts

**Conclusion: The Convergence of Communal and Individual Property**

- Alaska Native Claims Settlement Act (ANCSA) and Property

**Afterword: Reflection**

**Appendix A:  Clan Crest Register**

**Endnotes**

**Bibliography**

the publication of Bronislaw Malinowski's *Crime and Custom in Savage Society* in 1926.[6] Although Lewis Henry Morgan described communal property among the Haudenosaunee (Iroquios) in 1877, anthropologists did not begin writing about customary law, legal systems, and property ownership until the 1920s, long after the period of early-contact in Southeast Alaska occurred (Malinowki 1926; Lowie 1928). Even if 'civilized' societies accepted the idea that 'tribal' societies possessed legal systems, the theory of social evolution that justified taking land from Natives remained prevalent.[7] The Tlingit suffered the consequences of Western beliefs in the superiority of 'civilized' people over 'savages' (as outlined in social evolutionary theory) because it formed the basis of Western social and legal policies governing the colonialist's relationship with the Tlingit. Historical precedent then seemed to justify the Western belief that the natural order gave them the right to claim property without negotiation. Despite the rejection of Tlingit law by Euro-Americans, it became increasingly clear that the Tlingit had a system of law that differed from American law in several key areas.[8]

Tlingit property law is based on a communal or group orientation, rather than a system of private and individual ownership rights paramount under American law (see Conclusion for full discussion of this point). Under Tlingit law, a single or individual member cannot alienate most property because the Tlingit regard it as communally owned, while American law extends unrestrained alienability rights to the individual as a private property holder.[9] In addition, Tlingit legal constructs treat both tangible and intangible property as real and concrete property. Euro-American law, on the other hand, defines intangible or 'intellectual' property as the creative products of artists and inventors, in which a complex set of laws—patent, trademark, and copyright laws—protect ownership rights. These laws differ significantly from property laws

relating to material objects (real and personal property) derived from English common law.[10]

In Tlingit society, clans own all significant *at.óowu* and it is not considered private property. Therefore, Tlingit transference of property rights between generations is unlike that of American society or Western law. The concept of inheritance is absent in traditional Tlingit law. Instead, Tlingit law recognizes that membership in a social unit is the basis of ownership of clan property. Children acquire the rights to property as a result of their membership in a clan rather than through inheritance. For example, I share in the ownership of *Shangukeidí* clan *at.óowu* because I am a member of the *Shangukeidí* clan. I did not 'inherit' this right to ownership of clan property.[11] Furthermore, Tlingit ownership 'title' results from a process of validating claims of ownership and clan membership that occurs in a ceremonial context and is not recorded by a formal, bureaucratized governmental entity. Legal transactions involving Tlingit clan property, including the claims of property ownership, assignment of title, transfer of office, and the resolution of property disputes and conflicts, transpire within the context of ceremonial activities and through the recitation of oral histories. Additionally, some of these transactions are recorded symbolically on ceremonial objects and clothing, which this book presents in case studies and images. While such rituals incorporate supernatural dimensions, the processes are nonetheless legal transactions. While Tlingit traditional laws are not codified into written statutes, the traditional body of knowledge called 'law' is generally understood among those who continue to live in Southeast Alaska and remain active in the traditional and ceremonial life of Tlingit society.

Tlingit contemporary reality, rich and complex, demands that the Tlingit live within two legal systems. As both Indigenous people and American citizens, Tlingit accept the concept of

community as a whole) and non-Tlingit economic and political entities—or, more specifically, with an American business enterprise and the United States government.

Following Hoebel's directive, I have taken the findings from my research and analysis together with the case studies to formulate the basic propositions, or "jural postulates," defining Tlingit property law.[30] The basic legal principles, particularly those pertaining to communal or clan ownership of property, became immediately apparent, just as they were to the early visitors to the coast of Southeast Alaska, which is reflected in the ethnographic and historical accounts of conflicts between Europeans and the Tlingit and between Americans and the Tlingit. As I have stressed, early observers to the Southeast coast of Alaska could not deny that the Tlingit had a well-defined body of law. The closest translation for "law" is *káa k̲ududziteeyi yoo x̲'atánk* *(*words one lives by). The Tlingit themselves, or at least the *sháade nák̲x'i* and those who continue to adhere to the traditional ways, are the first to expound in considerable detail on the legal principles of clan ownership. This study, initially submitted in 1998 as my dissertation at Harvard, attempts to outline the principles that govern Tlingit jurisprudence relating to property ownership.

canoes, Tsimshian carvings, and slaves, which the Tlingit both imported and exported.[35] With the bounty from their homeland and goods obtained from neighboring tribes, they developed an unparalleled rich and socially complex culture rarely found among hunting and gathering societies.

The Tlingit, whose population prior to contact numbered approximately ten thousand,[36] maintained absolute control over their Southeast Alaska homeland. Their territory stretched along a narrow strip of coastal mainland and included the adjacent islands from Portland Canal in British Columbia northward to six hundred miles beyond Yakutat to the Copper River Delta.[37] The Stikine, Taku, Chilkat, and Alsek riverways provided them access through the otherwise impenetrable steep and rugged coastal range into the interior, where a smaller group of Inland Tlingit established themselves among the Athabascan groups. The Tlingit were expanding their northwestern frontier across the Gulf of Alaska when they encountered the Russians in the late 1700s, who were extending their sea otter enterprise eastward along the Gulf of Alaska to the southeast region.[38] At this same time, Haida communities were moving southward in to portions of Tlingit territory. [FIGURE: MAP B]

The warm Japanese Current, also known as the Kuroshio Current, brought moderate temperatures and heavy precipitation to Southeast Alaska. The climate nourished an environment rich in natural resources. Dense stands of rain forests of spruce, hemlock, and yellow and red cedar covered all but the peaks of the mountains. The thick underbrush provided berries, plants, and roots used for food and medicine. Devil's Club (*Oplopanax horridus*), known to Tlingit as *s'áxt',* is a thorny, bushy plant used as a medicinal drug and for spiritual healing and protection. The sea provided their greatest riches, teeming with five species of salmon, halibut, herring,

In the early twentieth century, the clan was the basic property-holding unit, and individuals within a clan held property rights because they were members of a clan. Property in this sense was tangible *at.óow* (crest objects, regalia, totem poles, shamanic paraphernalia, etc.), as well as intangible property (crests, songs, stories, names, etc.). Prior to the imposition of American jurisdiction and the expropriation of Native land, clans exercised symbolic ownership of land and territory they guarded, which included fishing and harvesting areas, trails, and sacred sites. They demarcated their territories with property marks. They owned hunting and fishing equipment, canoes and other utilitarian items, and rights to trade. They claimed trading routes and the exclusive rights to trade with the Athabascans, as well as ceremonial objects, crests, names, songs, stories, and shamanic paraphernalia. It was only after the extinction of aboriginal title to lands in Alaska by the United States in 1971 through the Alaska Native Claims Settlement Act (ANCSA) that the clans reluctantly acknowledged they could no longer protect their legal claims of ownership to the land and their hunting and fishing areas. But clans continue to claim symbolic ownership of their former lands, and this traditional relationship is still acknowledged among the Tlingit. The clans continue to maintain ownership of clan houses, ceremonial objects, as well as intangible and intellectual property.

Houses

The *hít* (house) was both a social and a residential unit, the membership of which did not coincide at all times in history. The term *hít* refers to both a physical structure and a matrilineage association with a house. The *hít* is a subunit of a clan, much like a subsidiary of a parent corporation, and is identified by a formal name, such as *Kawdliyaayi Hít* (House Lowered from the Sun) or *Yéil Hít* (Raven House). Although clan houses are still found in some villages, they

their father's and paternal grandfather's clan. Highly esteemed, clan children and paternal grandchildren can exert tremendous influence on their father and paternal grandfather. Either a father or a father's father may ceremonially present or acknowledge the child and grandchild during ceremonies. This value and practice are supported by myth and is thought to have begun with *Yéil* and the creation of the universe. *Yéil* was born as a human, dearly loved by his father's father. *Yéil* cried incessantly for the sun, moon, and stars until his paternal grandfather relented and gave them to him.

During ceremonies, clan songs are dedicated to clan children, and these children come forward and dance for their father's patrilineal clan while the songs are performed. The children acknowledge the honor accorded them and donate either gifts or cash to show their respect, pride, and love for their father and his clan.

A father or a father's father may grant special 'use,' but not ownership, rights of certain clan *at.óowu* to the child or grandchild of a clan. He may extend to the child or grandchild the right to use his clan crest or regalia. According to one oral account, the father of a well-known and respected warrior among the Tlingit and Russians, *K'alyaan* (a *Kiks.ádi* of the *Yéil* moiety), requested that his son wear his Eagle war helmet into battle with the Russians during the Battle of Sitka in 1804. And in the *Xeitl* (Thunderbird) case, to be reviewed later, a grandson residing in another community asked his grandfather if he could use the *Xeitl* crest of the *Shangukeidí*. Such use rights are granted to clan crests, regalia, and songs. Use rights, like ownership rights in Tlingit society, end with the death of the child or grandchild.[76]

A recipient of a use right cannot transfer it to someone else, since only a paternal parent

or grandparent can grant it. Nor does the use right allow a child to claim ownership or assert rights over his/her father's clan property upon the death of his/her father (or grandfather). Since the father was a member of another clan, his clan owns the property. A child or grandchild has full ownership rights only to the property held by his/her own mother's clan.

*Sháade Nákx'i* (Clan Leaders)

The Tlingit *aanyádi* (noble person or aristocrat) constituted the social category most often associated with rank in the general ethnographic literature of Northwest Coast societies. The *aanyádi* was identified by birth status, wealth, and by the number and scale of ceremonies that they sponsored during their lifetime. Significant factors determining rank also included personal character and accomplishments, such status individuals could achieve through their deeds; similarly, a dishonorable person or an individual who did not fulfill their duties and responsibilities to their clan could lose their status. The *aanyádi* had access to wealth primarily through slave labor, but did not own land, which remained clan property, nor could they accumulate the necessary wealth to sponsor a ceremony independent of their clan members. During the ceremonies, the *aanyádi* distributed the greatest amount of accumulated food and goods (wealth), but his/her clan members contributed directly to him/her to increase the amount the clan was able to distribute. In reciprocal ceremonies, the *aanyádi* received the greater amount of goods, which they in turn shared with their house and clan. While recognized as a person of wealth and high status, members of the *aanyádi*'s clan vitally helped the *aanyádi* to achieve and maintain this position.

The ranking system is most evident in the role of *sháade nák̲x'i* (clan leaders) who are

Clan collections formally held by a single trustee often transferred to two or more individuals. On other occasions, the patterns reversed and clan collections formally dispersed among several houses consolidated under a single house and trustee. Research has not been conducted that fully analyzes these changes. It is apparent, however, that today clan houses no longer function as social and economic units. Clan members moved into nuclear family dwellings and sometimes away from their traditional communities. Likewise, clan collections transferred, separated, or consolidated into various holdings. Some individuals retained objects in their possession as clan property under American law. Others illegally claimed clan objects as their own individual property, while others who adopted new religious beliefs destroyed or sold clan objects.

New patterns have emerged today. Sometimes, a clan separates or divides the office of the *sháade háni* among two or three individual offices. Some *sháade nák̲x'i* appoint a trustee when they move away from their home communities. In this case, the *sháade nák̲x'i* often retain their position, but another appointed clansperson cares for clan property that remains in the village in his absence.

Land

The Tlingit acknowledge that autonomous Tlingit kin groups claimed all the land and waters within their territorial boundaries of Southeast Alaska. They, however, have never held land collectively under a centralized government. This situation changed when the United States government settled their land claims and transferred portions of their aboriginal assets to newly-created regional and community organizations, first in 1968 and then in 1971. The earliest incidence of political unification occurred in the early 1800s, when several clans united to

retain ownership of tangible and intangible ceremonial property. While clans have lost their original land base, they continue to hold special regard for their traditional lands and have been active in protecting the clan's sacred sites.

While the Tlingit have reconstituted themselves at the village and regional level to deal with the political and economic changes confronting them, they also demonstrate resilience in maintaining their dual moiety organization. The restrictions against exogamous marriage have relaxed over time, but the Tlingit continue to assume the moiety and clan membership of their mother. Like the Xavante and Central Brazilian societies, which maintained their dual organization in the face of social and cultural change, the traditional Tlingit social organization persists.[121] The dualistic structure that has long dominated their lives remains the underlying basis of their ideologies and ceremonial practices to ensure social and spiritual balance.

Mr. M. Johnson had violated the tribe's 1976 Ordinance. It also noted that

> This court is convinced that as a matter of tribal law the artifacts must be returned to Klukwan. . . . Accordingly, this court hereby makes it clear that plaintiff Chilkat Indian Village, in consultation with the Ganexteidi [*G̲aanax̲teidí*], has ultimate authority to enforce its ordinance, effect the return of the artifacts to Klukwan, and otherwise exercise all necessary custodial responsibility in overseeing the care and future custodial arrangements of the Whale House artifacts.[338]

The *Yáay Hít* case raised a number of questions both under American and Tlingit law. The legal issues under American law pertained to sovereignty and jurisdictional issues. The legal questions pertaining to Tlingit law in this case involved the authority of a house leader to dispose of clan property without the consent of his clan. Two lineal descendants also claimed Tlingit property under Western inheritance law, and one of the *Yáay Hít* defendants included the estate of a deceased defendant.

*Hít s'aatí*, Mr. Clarence Hotch, ordered the sale of the *Yáay Hít* collection with the support of his sister, Mrs. M. Hotch Sparks. As a tenant of Tlingit property law, as was made explicit in this case, an individual or caretaker cannot independently dispose of such property. Mr. C. Hotch also directed his nephew to remove the clan treasures from the *Yáay Hít* and transport them to Haines to be sold. While maternal uncles have great authority over their nephews, and nephews are taught to honor their uncles, these values do not include violating basic tenets of Tlingit law. Ownership of clan-owned property under Tlingit law is determined by membership in a social unit, a clan, whereby the whole group owns property together rather than one or several members of the unit. No one member can be deprived of property rights, and the action to alienate property from the clan would be constrained should one or more protest. Although thirteen members supported the sale of the *Yáay Hít* objects, several other members of

the *G̱aanax̱teidí* clan expressed their opposition, and thus the sale could not be legitimately made.

The issue of whether a *hít* or clan owns property has been repeatedly raised through numerous examples. In the case with the *Yáay Hít*, leaders and caretakers of the *Yáay Hít* were drawn from the *Yáay*, *Yéil*, and *Shaanáx̱ Hítx'*. The *Yáay Hít* property also moved between the *Yáay Hít* and *Yéil Hít*. The defendants themselves represented at least two different houses. It is also historically clear that the *G̱aanax̱teidí*, as a clan, contributed to the construction of the *Yáay Hít*, and the *G̱aanax̱teidí* ceremoniously validated their ownership of the *Yáay Hít* objects and crests as a single body. There is no indication that members of the *Yáay Hít* acted independently from the *G̱aanax̱teidí* clan or that they conceived of themselves as an autonomous clan.

Both Louis Shotridge and Mrs. E. DeHaven Johnson attempted to claim the *Yáay Hít* objects as lineal descendants of former house leaders. Both claims violated Tlingit property law despite the fact that Mrs. E. DeHaven Johnson could prove she was a descendant of an individual who took the lead in rebuilding the *Yáay Hít* and that she herself was a member of the *Yáay Hít*. Tlingit law does not recognize individual rights to clan property, nor descendible rights or the transfer of estates to lineal descendants.

New Legal Issues

When the tribal government codified the village vote to preserve clan objects within the village and adopted an Artifacts Ordinance on May 12, 1976, it raised new legal issues. The action of the tribal council and ordinance are significant in several respects. Paramount is the fact that the tribal government, a non-Indigenous institution, acted in the arena of traditional Tlingit

The legal principles surrounding *at.óow* are multiple and complex. A clan object can possess two, and sometimes three, proprietary interests, including ownership, use, and the equivalent of Western law indemnification rights. Ownership of *at.óow* may, under special circumstances, be separated between two clans as was seen in the case of the *Wooshkeetaan* Screen (addressed in Chapter Four).

Anthropologists and observers who have studied Tlingit culture uniformly concur that the Tlingit have a complex form of property ownership. Aurel Krause writes,

> The Tlingit has a well developed sense of ownership. He not only has his own clothes, weapons, and utensils, he also has his own hunting grounds, his own trade trails which no one else may use without his permission or without paying damages.[343]

Walter R. Goldschmidt and Theodore H. Haas, who liken Tlingit organization and law to Western corporate institutions and law, support this when they write:

> [T]he Tlingit had well defined conceptions of property and legal rights to territory. The clan or house group is an economic unit in Tlingit society, which, like a corporation in western society, controls the use of certain land and other valued properties.[344,345]

While these laws were not codified, the rules and conduct governing Tlingit behavior and legal expectations towards property were nevertheless well established throughout the society and acknowledged by neighboring tribes.

In the case studies discussed in Chapter Four, the dispute settlement process applied only in those instances involving two clans. Tlingit law was enforced whether the conflict was between two clans within the same moiety or clans from opposite sides. This principle is significant because the settlement process did not apply to internal affairs of one clan, but applied to clans even if within the same moiety. The dualism that dominates Tlingit society and

*K'alyaan*'s *tákl*, which carried the name *Kaalshax'kayee*,[353] took on special significance to the *Kiks.ádi* when it became clan property through its association with the death of the woman killed by the Russians and *K'alyaan*'s efforts to avenge her death; in addition, its subsequent presentations during several *ku.éex'* (memorial ceremony) presumably included the distribution of great sums of money and validation of clan ownership, and its value as a named *at.óow* increased with each presentation and distribution of money.[354,355]

Clans as Collective Property Holders

Traditionally in Tlingit society, the clan was the basic unit that held property, and it remains the main group that holds clan ceremonial property today. Ownership resides within the clan as a unit rather than with specific individuals; all its members own clan objects at once and by none of its members individually. This principle remains in force, and individual clan members have no private property interests in objects validated as clan property in ceremonial activities (despite the assertions represented in the case studies presented in Chapter Four).

In Tlingit society, ownership of clan property is acquired through membership within a clan, meaning an individual's right to share, own, or use clan property is a matter of birth into a clan. An infant has all the attendant power (or, inherent right) to use and own clan property as an Elder does. And the clan child does not acquire this prerogative through inheritance of an estate from his or her parents. Descendible ownership or transference of property rights between generations is absent within the Tlingit legal system.

The principle of clan ownership has limitations when clans are dispersed through two or more communities. The nature of the property also conveys varying property interests among

localized clans. Clans, irrespective of location, collectively and equally own intangible property, such as crests, stories, songs, and names. The entire clan also owns ceremonial property, properly called *at.óow* (as discussed in Chapter Three). This collective ownership, based on clan membership, exists no matter where one lives, and the clan expects members to render support to a localized clan when it commissions and validates new clan objects as clan property. However, the Tlingit presume the localized clan to have a greater interest in property it commissions and constructs, evidenced in the presumption that such property should remain in the community of the localized clan.[356] Further, utilitarian property and land held by localized clans are both treated differently than crests and ceremonial property. For example, clan-owned utilitarian property and land within a *kwaan* is protected and members of the same clan but from other communities must acquire permission of the localized clan to use their equipment and to hunt and fish on their land and in their waters.

Felix Cohen, a former Department of Interior solicitor from the mid-1940s and recognized expert on Native American law, studied forms of Indigenous communal ownership. In Cohen's monumental work, *Handbook of Federal Indian Law* (1942), he discusses communal ownership and cites the opinion rendered by the Supreme Court in the case of *Journeycake v. Cherokee Nation and the United States* that defined communal property:

> The distinctive characteristic of communal property is that every member of the community is an owner of it as such. He does not take as heir, or purchaser, or grantee. If he dies his right of property does not descend; if he removes from the community it expires; if he wishes to dispose of it he has nothing which he can convey; and yet he has a right of property in the land as perfect as that of any other persons; and his children after him will enjoy all that he enjoyed, not as heirs but as communal owners.[357]

Communal law as defined by the US Supreme Court in the above case described the principles

Case 5:20-cv-00008-SLG Document 108-1 Filed 07/09/25 Page 17 of 19

found in Tlingit property law. No conveyance of property is permissible unless all members of the tribe or clan agree. Individual clan members have no individual property interest in ceremonial objects, and they cannot devise, sell, or transfer them. Under this form of unitary ownership, members of a clan cannot deprive other members of their interests should they not consent to the alienation of clan property.

The principle of the loss of property interests and rights if one removes from the community, as noted in the case of *Journeycake v. Cherokee Nation and the United States,* is not well developed in Tlingit law.[358] In the Tlingit system, this idea of a 'loss of property' does not occur with respect to individuals, and applies only in those instances in which a) a sub-unit of a clan leaves its parent clan, and b) where the sub-unit establishes itself as a separate clan and the parent clan acquires new property to which the offshoot has no interests or rights. This concept is particularly evident in rights associated with crests and intangible property. As mentioned in Chapter Three, the offshoot clan maintains an interest in crests acquired prior to its departure, but no interest/claim in new crests acquired by the parent clan after its departure. The loss of rights associated with removal from the community was implied in the *Wooshkeetaan* case (see case study 3 in Chapter Four) when the defendants argued that individual members lost ownership rights because they were absent or failed to fulfill their responsibilities to the aged caretaker.

Ultimately, a clan holds the property—tangible and intangible—it received from its ancestors on behalf of its future generations. This legal precept intertwines with the religious and cultural values of *at.óow, haa shagóon,* and *haa shuká* (commonly interpreted as our ancestors'). These values acknowledge that spirits of ancestors remain with and within clan objects and that the use and display of the ceremonial objects between the moieties maintains social and spiritual

with other goods worth an additional several thousands of dollars. Money and blankets have replaced slaves and furs as the riches distributed at the *ku.éex'*, in part to validate the ownership of clan property and appointment of new *sháade nákx'i* (clan leaders) at these memorial events.

Walter R. Goldschmidt and Theodore H. Haas further describe the transformation and the elements that persisted within the clan, property ownership, and laws:

> As a result of nearly eighty years of American administration and close contact with white miners, traders, missionaries, school teachers, canners and government officials, the old legal system of the Tlingit and Haida has been greatly altered. Yet there remains a surprising continuity in their customs, attitudes and patterns of behavior where these were not in direct conflict with Christian ethics and American law. Slavery, the potlatch as a legal expression, old shamanistic rites, the secret societies, are no longer found. The sanctity of the clan and the identification of the individual with the clan of his mother, the recognition of ancient clan rights to land and old status system based upon such ownership and the status of earlier clans; the rules against intermarriage within clans—all these are still poignant in the lives of the natives of southeastern portion of Alaska.[407]

Although Goldschmidt and Haas acknowledge the persistence of property ownership and Tlingit laws, they err in their assertion that "the potlatch as a legal expression" did not survive. Significant in their observations was the increasing individualization of nuclear family households in place of the large communal houses and the growing prominence of the village organization, both evident in 1946. The establishment of municipal and tribal governments and later, in the more recent historic period, the organization of village corporations under the Alaska Native Claims Settlement Act of 1971 (ANCSA) and their receipt of twenty-three thousand acres of land formerly owned by clans, further strengthened the movement away from a strict clan-based society and toward a village organization.

This shift to nuclear homes coincided with the disappearance of clan houses occupied by extended families. As a result, the process of transferring and consolidating clan property into one