Richard D. Monkman
rdm@sonosky.net
Nathaniel H. Amdur-Clark
nathaniel@sonosky.net
Noah I. Star
noah@sonosky.net
Sonosky, Chambers, Sachse,
    Miller & Monkman, LLP
302 Gold St., Suite 201
Juneau, Alaska 99801
Telephone: (907) 586-5880
Facsimile: (907) 586-5883

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| METLAKATLA INDIAN COMMUNITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 5:20-cv-00008-SLG |
| MICHAEL J. DUNLEAVY, et al., | ) ) | |
| Defendant. | ) ) ) | |

## REPLY IN SUPPORT OF MOTION TO DISMISS

### I.     INTRODUCTION

The Ninth Circuit determined that the 1891 Act establishing the Annette Islands Reserve gave the Metlakatla Indian Community "an implied right to non-exclusive off-reservation fishing in [their] *traditional fishing grounds* for personal consumption and

ceremonial purposes, as well as for commercial purposes."[1]  The question for this Court on remand is "to determine whether the Community's *traditional off-reservation fishing grounds* included the waters within Alaska's Districts 1 and 2,"[2] with those "traditional fishing grounds" defined as "*where they have fished since time immemorial and where they continued to fish in 1891* when their reservation was established."[3]

The Metlakatlans are primarily descendants of Canadian Tsimshian Indians who "pledge[d] themselves to forgo all heathen rights" when they joined Reverend Duncan's "Christian community" in the late 1800s.[4]  They later emigrated to Alaska, where Congress established the Annette Island Reserve for their settlement. In opposing the Tribes' motion at bar, the Metlakatlans' expert asserts that in ancient times Tsimshian ancestors migrated through Southeast Alaska, had two villages "located near Cape Fox, … from which Tsimshian people migrated into what is now British Columbia," "and would have traditionally fished in the adjacent waters."[5]  The Metlakatlans also proffer declarations asserting that *after* the Annette Islands Reserve was established in 1891, and continuing

---

[1] *Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034,  1045 (9th Cir. 2023) (emphasis added).

[2] *Metlakatla Indian Cmty. v. Dunleavy*, 736 F.Supp.3d 741, 747 (D. Alaska 2024) (emphasis added).

[3] *Id*. at 747 (citing Dkt. 40 at 20-21 (2d Am. Compl)), 752 (citing *Metlakatla*, 58 F.4th at 1045, 1048).

[4] Aurel Krause, *The Tlingit Indians* at 226 (Univ. Wash. Press, 1956).

[5] Dkt. 119, Dr. Stephen J. Langdon Decl., Dkt. 119, Decl., ¶¶ 52, 63.

until 1973, when Alaska's Limited Entry Permit program was put in place, Metlakatlan commercial fishermen fished "all over Southeast Alaska," from Yakutat to Ketchikan, using modern gear and modern fishing boats, without "permission from anyone, including any Tlingit or Haida."[6]

There is an unbridgeable gap between the ancient migration theories of the Metlakatlans' expert and the 1891 establishment of the Annette Islands Reserve. When the Reserve was established, it was by an uncompensated taking of Tlingit and Haida land and waters by the United States, settled by a group of Canadian emigrants who never lived there before.[7] For literally thousands of years between the Tsimshians' ancestral migrations and the Reserve's establishment—the "continuous" period at issue on remand here—Tlingit and Haida clans indisputably held, and resolutely defended against all intruders, their traditional fishing grounds in Districts 1 and 2.[8]

The Metlakatlans argue that the Tribes' aboriginal title to fishing rights "based on use and occupancy" were extinguished by ANCSA section 4 in 1971.[9] That, of course, is 80 years *after* the Reserve was established and *after* the period at issue here. And regardless, Tlingit and Haida *culture* was certainly not "extinguished" by ANCSA, and is

---

[6] *E.g.*, Albert Smith Decl., Dkt. 117, at ¶¶ 18-19.

[7] *Tlingit and Haida Indians of Alaska v. United States*, 177 F.Supp. 452, 468-69 (Ct. Cl. 1959).

[8] Joel Buchanan Decl., Dkt. 97, ¶¶ 7, 12, 18; Irene Dundas Decl., Dkt. 100, ¶¶ 10-23; Richard Jackson Decl., Dkt. 105, ¶¶ 7-11.

[9] *See* 43 U.S.C. § 1603, Pub. L 92-203, § 4, 85 Stat. 689 (Dec. 18, 1971).

Reply in Support of Motion to Dismiss                                    Page 3 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG     Document 123     Filed 08/04/25     Page 3 of 21

vibrant and thriving today. Here, the Tribes' claim injury to their clans' cultural property—their *at.óow*. The traditional fishing sites at issue are the Tribes' clans' heritage, are their history, and are one of the defining links with untold generations of their ancestors. By asserting "traditional fishing rights" at the clans' traditional fishing sites, the Metlakatlans infringe on the clans' *at.óow* for their own commercial purposes.

As with claims relating to personal property, the existence and significance of the Tribes' *at.óow* "does not depend on a showing of aboriginal title. Accordingly, such claims are not covered by [ANCSA] section 4(c)."[10] The Tribes' declarants establish that clan ownership and clan rights to use traditional fishing grounds are existing, important, cultural property of the Tribes and their citizens, and have never inured to the Metlakatla Indian Community as a whole.[11] If the Metlakatlans are as inextricably intertwined with Tlingit and Haida culture as they claim, they would admit this forthrightly.

---

[10] *United States v. Atlantic Richfield Co*., 435 F.Supp. 1009, 1025 n.53 (D. Alaska 1977); *cf*., *Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 816 (10th Cir. 1999).

[11] Dundas Decl., Dkt. 100, ¶¶ 8-24; Professor Daniel Monteith Decl., Dkt. 103, ¶¶ 8-53; Buchanan Decl., Dkt. 97, ¶¶ 7-9, 12-13, 20-23; Jackson Decl., Dkt. 105, ¶¶ 22-42; Williams Decl., Dkt. 107, ¶¶ 170-21.

Reply in Support of Motion to Dismiss                                        Page 4 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG     Document 123     Filed 08/04/25     Page 4 of 21

## II.    ARGUMENT

### A.    The Tribes Have Raised Non-Frivolous, Substantive Claims of Legally Protected Interests.

The Metlakatlans dispute the merits of the Tribes' claims under Rule 19(a)(1)(B)(i). But Rule 19 "forecloses" analysis of the merits of a nonfrivolous, substantive claim.[12] Under Rule 19, "the finding that a party is necessary to the action *is predicated only on that party having a claim to an interest*."[13]   In other words, Rule 19 is implicated when a party "make[s] known their interests and legal theories," [14] which the Tribes have amply done here.  The Metlakatlans' opposition on the merits of the Tribes' "interests and legal theories" is not relevant to whether the Tribes are required parties.[15]  This "foreclosure" of a merits analysis is especially crucial when the absent required party is entitled to sovereign immunity, as the Tribes are here.[16]

---

[12] *Shermoen v. United States*, 982 F.2d 1312, 1317-18 (9th Cir. 1992) ("Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party."); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024-25 (9th Cir. 2002) ("It is the party's claim of a protectible interest that makes its presence necessary.").

[13] *Shermoen*, 982 F.2d at 1318.

[14] *Id.* (quoting *Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986)).

[15] *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 868–69, (2008); *Shermoen*, 982 F.2d at 1317.

[16] *Republic of Philippines*, 553 U.S. at 868-69; *Cassidy v. United States*, 875 F. Supp. 1438, 1444-45 (E.D. Wash. 1994). ("It is clear that the Tribes have at least a claim to a legally cognizable interest in this case . . . . Further, . . . the Tribes here have a protected interest in preserving their own sovereignty, with the concomitant right not to have their legal duties adjudged without consent.").

Reply in Support of Motion to Dismiss                                                    Page 5 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

### 1. The Tribes have raised a substantial claim of important cultural property interests in this action.

The Tribes' traditional fishing rights are *at.óow*, important cultural property interests belonging to the Tribes' clans. The Metlakatlans admit as much, stating that "the scope of [the Community's] already-existing implied, off-reservation fishing right is established by the time immemorial fishing practices of its Tlingit, Haida and Tsimshian ancestors in the area . . ."[17] That is precisely why the Tribes are required parties to this matter.[18]

The "intangible aspects of culture, including [tribal] songs, stories, and knowledge, and the tangible aspects of culture (*e.g.*, land and resources) . . . are necessary for the continued survival of [the Tribes as] Indian nations."[19] The Tribes are required parties because they must be able to "assert[] control over the intangible aspects of their culture," here, their clans' *at.óow*, as an inherent aspect of tribal sovereignty.[20] The Metlakatlans

---

[17] Opp., Dkt. 112, at 10. The Metlakatlans' framing of the issue misstates the standard on remand, which is that they must show their asserted "implied, off-reservation fishing rights" were in existence and exercised *continuously* from "time immemorial" until 1891. *Metlakatla*, 58 F.4th at 1045, 1048.

[18] *See* Wallace Coffey & Rebecca Tsosie, *Rethinking the Tribal Sovereignty Doctrine: Cultural Sovereignty and the Collective Future of Indian Nations*, 12 Stan. L. and Pol. Rev. 191, 203-204 (2001), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1401586 ("Coffey & Tsosie"); Ramos Decl., Dkt. 104, ¶¶ 5-6; Monteith Decl., Dkt. 103, ¶¶ 7-8.

[19] Coffey & Tsosie at 203.

[20] *Id.*; *see generally* Angela R. Riley, *The Ascension of Indigenous Cultural Property Law*, 121 Mich. L. Rev. 75, 93 (2022) https://repository.law.umich.edu/mlr/vol121/iss1/3 ("Riley").

cannot credibly contest that the Tribes have this cultural property interest, as they assert an

identical cultural property interest when arguing their reserved rights arise from their own

*adawk*.  Indeed, their expert goes as far to say that Tsimshian *adawk* "deserves the same

level of respect" as the Tribes' *at.óow*.[21]

Other tribes have sought and received legal protection for their cultural interests in

myriad contexts, both in Alaska and Outside.[22]  In *Chilkat Indian Village v. Johnson*, for

example, Chilkat Indian Village  sought to enforce its own laws regulating the use and

conveyance of tribal cultural property.[23]  The Ninth Circuit deemed the Tribe's interest in

enforcing its sovereign laws to be a claim cognizable under federal law.[24]  Similarly, in

---

[21] *See* Langdon Decl., Dkt. 119, ¶ 50. The Metlakatlans' treatment of the Tribes' *at.óow* and the Tsimshian's *adawk* equally admits that the Tribes' claims are valid and that the Tribes are required parties to this action.

[22] Coffey & Tsosie at 203; Riley at 77-78 ("Over the last decade, Native people have actively fought to defend their cultural property. The Navajo Nation sued Urban Outfitters to stop the sale of 'Navajo panties,' the Quileute Tribe sought to enjoin Nordstrom's marketing of 'Quileute Chokers,' and the descendants of Tasunke Witko battled to end production of 'Crazy Horse Malt Liquor.' And today, Indigenous Peoples are fighting to preserve sacred ceremonies and religious practices at places like Standing Rock, Oak Flat, and Bear's Ears. Though the claims range from 'lands to brands,' these conflicts are connected by a common thread: they are all contemporary examples of Indigenous Peoples' efforts to protect their cultural property." (internal citations omitted)).

[23] 870 F.2d 1469, 1475 (9th Cir. 1989).

[24] *Id.*  The Ninth Circuit separately determined the Tribe's cultural property itself was a property interest under tribal law, but that it lacked jurisdiction to adjudicate a tribal property conversion claim.  *Id.* at 1472-73. Here, the Tribes do not bring a tribal law conversion claim.  Instead, the Tribes explain and defend their clans' ownership of traditional fishing grounds in Districts 1 and 2 since time immemorial and continuously until (at least) the time of the 1891 Act.  *Cf., Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).  The Metlakatlans' claim to those rights directly infringes on the

Reply in Support of Motion to Dismiss                                        Page 7 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG     Document 123     Filed 08/04/25     Page 7 of 21

*Bear Lodge Multiple Use Ass'n v. Babbitt*, the Tenth Circuit recognized the Cheyenne River Sioux Tribe's cultural interest in Devils Tower was a basis for intervention before the district court. Devils Tower is "a sacred site of special religious and cultural significance," a place that the Tribes had "historically occupied . . . dating back before Wyoming was established as a territory or Devils Tower became a National Monument," a cultural interest which the Tribe claimed was "vital to the health of [the Tribal] nation and to [the Tribe's] self-determination as a Tribe."[25]

The Tribes' claim here follows those cases. The Tribes face cultural injury from the Metlakatlans claiming the *right* to the Tribes' *at.óow* without the Tribes' consent and without regard for the Tribes' traditional protocols.[26] Simply put, the Metlakatlans are infringing on the Tribes' historical and cultural assets, the clans' *at.óow*, to achieve their goals in this action. As the many Tribal declarants emphasize,[27] the Tribes' determination

---

Tribes' historical and cultural property, the Tlingit and Haida clans' *at.óow*. The Metlakatlans' description of tribal jurisdiction "over fee land" in Alaska after *Chilkat Indian Village*, Opp., Dkt. 112, at 27, is not relevant to the Tribes' rights to protect the cultural property interests in their clans' *at.óow*.

[25] *Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 816-817 & n.3 (10th Cir. 1999); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805, 808-09 (9th Cir. 1999) (determining that the U.S. Forest Service had failed to properly account for the Muckleshoot Indian Tribe's traditional and ancestral transportation corridor, under the National Historic Preservation Act).

[26] Buchanan Decl., Dkt. 97, ¶¶ 19-22; Jackson Decl., Dkt. 105, ¶¶ 33-34, 41-42; Dundas Decl., Dkt. 100, ¶ 24. Monteith Decl., Dkt. 103, ¶ 53.

[27] *See supra* note 27.

Reply in Support of Motion to Dismiss                                         Page 8 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

to protect their clans' *at.óow* is a key to "ensuring [their] cultural survival."[28]  The Tribes'

cultural interests would "be affected as a practical matter by [a] judgment" that denies or

diminishes the clans' *at.óow*.[29]

The cultural rules for using the clans' traditional fishing grounds are still followed

today by Tribal citizens throughout Southeast Alaska.[30]  More importantly for the task at

hand, those rules were in place from time immemorial until (and long past) 1891 and the

early 20th century when, according to the Metlakatlans' declarations, they first began

fishing outside the Reserve.[31]  For the Court to adjudicate without the Tribes' participation

what "'the [Metlakatlans] would have understood'" to be the "traditional fishing grounds"

where they were entitled to fish since "time immemorial" and where they "continu[ed]" to

fish in 1891[32] would be inequitable and unjust.[33]

---

[28] Coffey & Tsosie at 204.

[29] *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002).

[30] Buchanan Decl., Dkt. 97, ¶¶ 19-22; Jonathan Rowan Jr. Decl., Dkt. 106, ¶¶ 10-12; Jackson Decl., Dkt. 105, ¶ 33; Rosita Ḵaaháni Worl, Tlingit At.óow: Tangible and Intangible Property (1998) (unpublished Ph.D. dissertation, Harvard University), Dkt. 108-1, at 229.

[31] *E.g.*, Dkt. 117, Smith Decl., ¶ 19 ("After I got my seine boat . . . the fishing on the Reserve got worse and worse.  But I and the others who didn't have a limited entry permit couldn't leave the Reserve to go where the fish were, *which is how my grandfather and the rest of the fleet had fished since 1891*.").

[32] Dkt. 70, 736 F. Supp. 3d at 752 (quoting 58 F.4th at 1042) (citations omitted).

[33] Jackson Decl., Dkt. 105, ¶¶ 23-26, 34-35; Monteith Decl., Dkt. 103, ¶¶ 11-14, 53; Jones Decl., Dkt. 102, ¶ 30, 37-41; Dundas Decl., Dkt. 100, ¶ 24; Worl, Dkt. 108-1, at 65.

As the Court can easily see from the declarations filed by the parties, there are substantial disputes of fact between the Metlakatlans and the Tribes on the scope, nature, history, locations, and extent of the traditional fishing rights at issue in this matter. In "equity and good conscience," the "scope of [the] Tlingit, Haida and Tsimshian" traditional fishing rights in this matter cannot be determined without the participation of the affected Tlingit and Haida Tribes.[34]

### 2. The Tribes have raised a substantial claim of important sovereign interests in this action.

The Tribes further have a substantial interest in maintaining their sovereign authority to enforce, regulate, and protect their clans' *at.óow*. It bears repeating that Metlakatla's opposition concerns the merits and scope of the Tribes' sovereign authority, not whether the Tribes have raised a valid claim to have that authority.[35]

First, contrary to the Metlakatlans' assertion, the Tribes indisputably have and retain non-territorial sovereignty over their citizens. "Congress intended ANCSA to free Alaska

---

[34] Fed. R. Civ. P. 19(b). The Metlakatlans argue federal supremacy elevates their reserved rights over the Tribes' *at.óow*. This argument effectively admits that the Tribes have valid claims under Rule 19 and Rule 24, if it is applied. *Cf.*, *Shermoen*, 982 F.2d at 1318 ("Thus, the joinder rule is to be applied so as to preserve the right of parties 'to make known their interests and legal theories.' In this case, the absent tribes have an interest in preserving their own sovereign immunity, with its concomitant 'right not to have [their] legal duties judicially determined without consent.' The district court was therefore correct in concluding that the tribes were necessary parties.") (internal citations omitted)).

[35] *Shermoen*, 982 F.2d at 1318.

Natives from the dictates of 'lengthy wardship or trusteeship,' not to handicap tribes by divesting them of their sovereign powers"[36]:

> The federal decisions discussing the relationship between Indian country and tribal sovereignty indicate that the nature of tribal sovereignty stems from two intertwined sources: tribal membership and tribal land. The United States Supreme Court has recognized the dual nature of Indian sovereignty for more than a century and a half; the Court has explained that, under federal law, 'Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory' Tribes not only enjoy the authority to exercise control within the boundaries of their lands, but they also possess the inherent 'power of regulating their internal and social relations.'[37]

Second, the Metlakatlans try to bootstrap their claims to "traditional fishing rights" in Lingít Aaní and X̱aadas Tlagáa based on the Tlingit and Haida "ancestral roots" of some Community members.[38] It is, of course, correct that over the last 11,000 years there have been innumerable interactions between the Tlingit, Haida, and Tsimshian peoples, as the Metlakatlans repeatedly assert.[39] But "ancestral roots" do not determine whether any particular individual is entitled to exercise traditional clan rights to any particular fishing ground, nor does any individual's "ancestral" right transfer over *ipso facto* to the entire Metlakatla Indian Community.[40]

---

[36] *John v. Baker*, 982 P.2d 738, 753 (Alaska 1999).

[37] *Id.* at 754-55 (internal citations omitted).

[38] Opp., Dkt. 112, at 15.

[39] *Id.*

[40] *See* Dundas Decl., Dkt. 100, ¶ 22; Worl, Dkt. 108-1 at 45-46, 195, 197; George Thorton Emmons, *The Tlingit Indians* at 31 (U. Wash. Press, 1991); Monteith, *Tongass, The Prolific*

The Metlakatlans cannot have it both ways.  If their "traditional fishing rights" derive from Tlingit and Haida clan members, the Tribes have the inherent sovereignty to regulate the scope of those rights.  The Tribes have a sovereign interest "to prescribe and enforce rules of conduct for [their] own members," through their "retained sovereignty . . . to control their own internal relations, and to preserve their own unique customs and social order."[41]  The Tribes' sovereignty was never divested, certainly not by ANCSA, and does not depend on Indian country status.

Third, the Metlakatlans incorrectly suggest that the Tribes' sovereign interests are not legally protected interests for Rule 19 purposes.  This argument is incorrect as a matter of law.  The Ninth Circuit has repeatedly recognized that a tribe's sovereign power is a legally protected interest.[42]

_____

*Name, The Forgotten Tribe: An Ethnohistory of Taantakwaan Tongass People*, at 46-47 (1998); Walter R. Goldschmidt and Theodore H. Haas, *Haa Aaní Our Land: Tlingit and Haida Land Rights and Use*, at 12 (U. Washington Press, 1998).  Clan rights descend matrilineally; are owned collectively by the clans, not by individuals; and are not inheritable or transferable in the Western sense. Worl, *supra*.

[41] *Duro v. Reina*, 495 U.S. 676, 685–86 (1990).

[42] *E.g., Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ("In addition, a judgment rendered in the Nation's absence will impair its sovereign capacity to negotiate contracts and, in general, to govern the Navajo reservation."); *Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991) ("Second, the Quinault Nation undoubtedly has a legal interest in the litigation. Plaintiffs seek a complete rejection of the Quinault Nation's current status as the exclusive governing authority of the reservation.").

Reply in Support of Motion to Dismiss                                           Page 12 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG     Document 123     Filed 08/04/25     Page 12 of 21

### 3.  The Tribes have raised a substantial claim of significant economic interest in this action.

The Metlakatlans assert the Tribes lack a legally protected economic interest in the health of District 1 and 2 fisheries, and their lawyers make broad, non-binding statements about how the Metlakatlans "will fish in a responsible and sustainable manner and, consistent with Federal law, [and] will follow the State's opening, closing, gear and location regulations governing the fisheries."[43]  Their lawyers' arguments do not appear in the complaint; are inconsistent with the Metlakatlans requested relief, which requests a broad and unfettered right to fish throughout the region; and are not evidence.[44]

If all the Metlakatlans seek is participation in the Southeast Alaska limited entry fisheries, there is nothing stopping them from purchasing permits.  But their declarations indicate otherwise.  The Metlakatlan declarants candidly yearn for the apparently halcyon days "start[ing] in the mid-1920s" and continuing until limited entry was implemented in 1972, a period when unregulated "Metlakatlan fishermen would always go to where the fish were" from one end of Southeast Alaska to the other.[45]

---

[43] Opp., Dkt. 112, at 21.

[44] *See* Opp., Dkt. 112, at 31-32.  It is an oft repeated maxim (and jury instruction) that "arguments are not evidence." *Butler v. State of Alaska*, 2024 WL 4783616, at *1 (Alaska Ct. App. Nov. 13, 2024).

[45] D. Hayward-King Decl., Dkt. 113, ¶ 9; F. McGilton Decl., Dkt. 115,  ¶¶ 2, 4, 6; S.H. Guthrie Decl., Dkt. 116, ¶¶ 4-6, 8; A. Smith Decl., Dkt. 117, ¶ 18; D. Marsden Decl., Dkt. 118, ¶ 5  ("This was before limited entry, around the 1930s and 1940s.  [The Metlakatla fishermen] would fish all over Southeast Alaska in places like areas in Anan, Point Eton, Cordova Bay, Behm Canal, Excursion Inlet, Inian Islands around Icy Straits, near Craig, including Noyes Island, Dall Island, Security Cove, Gooseneck, Roller Bay, Haystack,

Reply in Support of Motion to Dismiss                                                Page 13 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG     Document 123     Filed 08/04/25     Page 13 of 21

The Metlakatlans' Second Amended Complaint seeks to exempt the Community from the Limited Entry Act entirely, and identifies *fourteen specific fishing locations* that are traditional fishing grounds of the Tribes' clans in Southeast Alaska where the Metlakatlans intend to fish without limited entry permits.[46]  The Metlakatlans seek an unregulated opportunity to exploit the clans' traditional fishing grounds and a broad, equally unregulated right to fish throughout what they call "marine areas" in Southeast Alaska[47] because they no longer have a sustainable salmon harvest on the Reserve or within their exclusive 3,000 foot buffer zone.[48]

As the Tribes' declarations establish, their clan members continue to fish at the fourteen targeted traditional fishing sites today, as they have for thousands of years.[49]  If the requested relief is granted, the Metlakatlans will be free to intercept fish bound for those

---

Cape Chacon area, Ruth Bay, and other areas in [the] south end of Southeast like Boca de Quadra and Smeton Bay.  The best fishing in the early part of the season started up north, around Icy Straits. [T]he Metlakatlan seiners would start up [in Icy Straits, northern Southeast] in late June and work their way down, not returning to fish our island until the 7th of August.  The Annette Island Packing Company (AIPC) would send tenders to take [the] Metlakatlan fishermen's fish wherever the fleet was fishing, even up as far north as in [the] Juneau area.").

[46] Monteith Decl., Dkt. 103, ¶¶ 8-53; Dundas Decl., Dkt. 100, ¶¶ 10-24; Buchanan Decl., ¶¶ 12-26; Second Amended Complaint, Dkt. 40, ¶¶ 55 & pages  20-21 (seeking exemption from Limited Entry Act); *id.* at ¶ 41, 60 & pages 29-30 (Exhibit 3 and Key).  The complaint targets fifteen sites; one on which in Canada.

[47] *See* Second Amended Complaint, Dkt. 40, at ¶¶ 44, 55.

[48] Opp., Dkt. 112, at 18; Second Amended Complaint, Dkt. 40, at ¶ 44.

[49] *E.g.*, Monteith Decl., Dkt. 103, ¶¶ 8-53; Dundas Decl., Dkt. 100, ¶¶ 10-24; Buchanan Decl., ¶¶ 12-26; Jackson Decl., Dkt. 105, ¶¶ 23-42.

fishing grounds and, for that matter, the Metlakatlans will be able to fish in those grounds directly, without restriction.[50]

The Tribes' citizens, by contrast, are subject to the Limited Entry Act, the principal management tool used by the State of Alaska to conserve fisheries resources.[51] Competing claims to allocate a limited fisheries resource are legally protected interests under Ninth Circuit law, as "any share that goes to" the Metlakatlans will be taken from the Tribes and their citizens.[52]

---

[50] Jackson Decl., Dkt. 105, ¶¶ 35-36 ("In addition, I fear that if Metlakatla Indian Community fishes without limited entry permits in Districts 1 and 2, our region will see fishing at unsustainable levels. This will jeopardize the fishery resources, including salmon, halibut, eulachon, and other fish, that Taant'a Ḵwáan people have fished for generations and time immemorial"); Williams Decl., Dkt. 107, ¶ 14 ("I am concerned that the Community will use fish traps or other poor management practices at our traditional sites, free of any State regulation. That would harm the fish populations and cause harm to our fishing at those salmon streams, where we have fished for untold generations."); Jones Decl., Dkt. 102, ¶¶ 39-40; Douville Decl., Dkt. 99, ¶ 7-8.

[51] *Scudero v. State*, 496 P.3d 381, 389 (Alaska 2021) ("We have repeatedly recognized the [Limited Entry] Act's intertwined purposes of conserving fisheries resources and maintaining a healthy fishing industry."); *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1263-64 (Alaska 1988) (explaining Commercial Fisheries Entry Commission limiting number of boats in fishery because of low level of fish as "in accord with the purposes of the Limited Entry Act").

[52] *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir. 1990) (describing competing legal claims to fishery resource as zero sum and legally protected interests); *Skokomish Indian Tribe v. Goldmark* 994 F. Supp. 2d 1168, 1187–88 (W.D. Wash. 2014) (citing *Makah*).

## B.    The Tribes' Motion to Dismiss is Timely and Proper.

The Metlakatlans' procedural arguments confuse and conflate the Tribes' special appearance to seek dismissal of this case under Rules 12(b)(1) and 19 with intervention under Rule 24.

Here, the Tribes followed the well-established Rule 19 practice for asserting a jurisdictional bar when a required party cannot be joined because of Tribal sovereign immunity.[53] The Tribes appeared specially to contest jurisdiction; established that they are required parties under Rule 19; and moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[54]  *Spangler*, cited by the Metlakatlans, is easily distinguishable.[55] *Spangler* is a standard Rule 24 intervention case and did not involve a jurisdictional issue; did not involve a required party under Rule 19; and did not involve a tribe as a required

---

[53] *See, e.g.*, *Friends of Amador County v. Salazar*, 554 F. App'x 562, 564 (9th Cir. 2014) ("The Tribe made a special appearance to file a motion to dismiss based on the Appellants' failure and inability to join the Tribe as a required and indispensable party under Rule 19. The district court granted the motion and denied the Appellants' motion to vacate the judgment of dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm both rulings."); *Alto v. Black*, 738 F.3d 1111, 1118 (9th Cir. 2013) (following the same process); see also, *Holl v. Avery*, No. 3:24-CV-00273-JLR, 2025 WL 1785887, at *4–5 (D. Alaska June 27, 2025) (dismissing for inability to join federally recognized Tribe as a party under Rule 19 after that Tribe "appear[ed] in [that] matter for the limited purpose of moving to dismiss this action for lack of subject matter jurisdiction due to the Tribe's sovereign immunity, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to join an indispensable party pursuant to Rules 12(b)(7) and 19.").

[54] Mot. to Dismiss, Dkt. 96, at 1.

[55] *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1328-29 (9th Cir. 1977) (cited in Opp., Dkt. 112, at 27)

Reply in Support of Motion to Dismiss                          Page 16 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

party that could not be joined due to sovereign immunity.[56] It simply makes no logical or practical sense to require a tribe to file a Rule 24 motion *to join an action* in order to assert that the action must be dismissed because *they cannot be joined*. The *Amador County*, *Alto v. Black*, and *Holl* process is the proper route.

To the extent the Court finds it necessary to consider Rule 24, the Tribes easily meet the intervention requirements. A court must grant intervention as a matter of right when a proposed intervenor "(i) timely moves to intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties."[57] Although the proposed intervenor "bears the burden of establishing these elements," the Ninth Circuit has "repeatedly instructed that "the requirements for intervention are [to be] broadly interpreted in favor of intervention."[58] The analysis is "guided primarily by practical considerations, not technical distinctions."[59] Here, the case has only now reached

---

[56] *Id.*

[57] *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022) (quoting *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020)).

[58] *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016) (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004)); *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (this "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002))

[59] *W. Watersheds Project*, 22 F.4th at 835 (quoting *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011)). There is no set point in the litigation when a motion to intervene becomes untimely; rather, courts "consider the totality of

the stage in which issues relating to the Tribes clans' interests have come into focus. In practical terms, intervention by the Tribes at this stage, if were required, would be appropriate and not prejudicial.[60]

This stands in stark contrast to the cases the Metlakatlans proffer, which involved intervention after twenty years of litigation and after a consent decree had been issued[61] and intervention seeking "redress of an issue not before the Court, and … to relitigate an issue that the Court already decided."[62] *Alisal Water Corporation*, another of the Metlakatlans' cases, supports the Tribes' position, noting that "[p]rior cases suggest that a party's interest in a specific phase of a proceeding may support intervention at that particular stage of the lawsuit."[63]

The Tribes are not attempting to relitigate the Ninth Circuit's decision that the Metlakatlans' complaint stated a claim for relief.[64] It was not until the Ninth Circuit's mandate and this Court's Order implementing that mandate that it became clear the Metlakatlans' asserted "traditional fishing rights" in Districts 1 and 2 are based on their

---

circumstances." *Id.* at 835-36 (quoting in part *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854(9th Cir. 2016).

[60] *See also* Mot. to Dismiss, Dkt. 96, at 28-29.

[61] *United States v. State of Oregon*, 913 F.2d 576, 588 (9th Cir. 1990).

[62] *United States v. State of Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996).

[63] *United States v. Alisal Water Corp.*, 370 F.3d 915, 922 (9th Cir. 2004).

[64] Opp., Dkt. 112, at 31 (citing *Metlakatla*, 58 F. 4th at 1048).

Reply in Support of Motion to Dismiss                                                    Page 18 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG      Document 123      Filed 08/04/25      Page 18 of 21

proposed infringement of the Tribes' clans' *at.óow*.[65]   The Tribes did not "sit on their hands"[66] but instead, once it became clear that they needed to take action, alerted the court that it does not have jurisdiction to undertake the "factual inquiry"[67] now at issue in the absence of the Tribes.

The other Rule 24 factors are easily met.  As explained above, the Tribes have a "significantly protectable interest related to the subject of the action" and that interest "may be impaired by the disposition of the action."  The Tribes will certainly not be adequately represented by the State.[68]  Accordingly, all four factors indicate that the Tribes are eligible to intervene under Rule 24(a).

In sum, the Metlakatlans' arguments regarding intervention and timeliness are immaterial to the jurisdictional questions presented.[69]  Jurisdictional issues,  including the inability to join a required party, "may be raised at any time" and, indeed, courts have a duty to consider them *sua sponte*.[70]

---

[65]  Dkt. 70, *Metlakatla*, 736 F.Supp.3d 741.

[66] Opp., Dkt. 112, at 29.

[67] Dkt. 70, *Metlakatla*, 736 F.Supp.3d 741, 755.

[68] *See* Dkt.96, Mot. to Dismiss, at 24-25.

[69] Opp., Dkt. 112, at 27-32.

[70] *Wilkins v. United States*, 598 U.S. 152, 157 (2023) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).

Reply in Support of Motion to Dismiss                                      Page 19 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

## III.   CONCLUSION

For the reasons stated above and in their opening memorandum and declarations, the Central Council of Tlingit and Haida Indians, the Craig Tribal Association, the Organized Village of Kassan, the Organized Village of Saxman, the Petersburg Indian Association, and the Wrangell Cooperative Association respectfully request that this matter be dismissed.  With the greatest respect to the Court, the Tribes firmly believe that issues relating to the scope and ownership of traditional fishing rights should be decided by and among the affected Tribes, not by the federal judiciary.

DATED August 4, 2025, at Juneau, Alaska.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By: _/s/ Richard D. Monkman_
     Richard D. Monkman
     Alaska Bar No. 8011101
     Nathaniel H. Amdur-Clark
     Alaska Bar No. 1411111
     Noah I. Star
     Alaska Bar No. 2111128

     *Attorneys for Central Council of the*
     *Tlingit & Haida Indian Tribes of Alaska,*
     *Craig Tribal Association, Organized*
     *Village of Kassan, Organized Village of*
     *Saxman, Petersburg Indian Association,*
     *and Wrangell Cooperative Association*

Reply in Support of Motion to Dismiss            Page 20 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG

Case 5:20-cv-00008-SLG    Document 123    Filed 08/04/25    Page 20 of 21

**Certificate of Service**

I certify that on August 4, 2025, a copy of the foregoing document was served via ECF on:

Christopher F. Orman
christopher.orman@alaska.gov

Jeffrey G. Pickett
jeff.pickett@alaska.gov

Daron Carreiro
daron.carreiro@usdoj.gov

Christopher Thomas Griffith
cgriffith@hk-law.com

Joshua James Stellmon
jstellmon@hk-law.com

Christopher G. Lundberg
clundberg@hk-law.com

*/s/ Richard D. Monkman*
Richard D. Monkman

Reply in Support of Motion to Dismiss                                    Page 21 of 21
*Metlakatla Indian Community, v. Dunleavy, et al.,* Case No. 5:20-cv-00008-SLG