# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

METLAKATLA INDIAN COMMUNITY,

        Plaintiff,

        v.

MICHAEL J. DUNLEAVY, *et al.*,

        Defendants.

Case No. 5:20-cv-00008-SLG

## ORDER OF CLARIFICATION

At oral argument on March 13, 2026, in Juneau, Alaska, the Court denied Defendants'[1] Motion for Summary Judgment at Docket 95; denied Plaintiff Metlakatla Indian Community's ("Metlakatla" or "the Community") Cross-Motion for Summary Judgment at Docket 139; and denied Plaintiff's Motion to Exclude the Testimony of Anthony Gulig at Docket 136.[2] This order is intended to clarify the basis for the Court's rulings in preparation for trial.

## BACKGROUND

The Court assumes familiarity with the facts, which are provided in more detail in the Court's prior orders.[3] On September 8, 2022, the Ninth Circuit published its

---

[1] Defendants are Michael J. Dunleavy, Governor of Alaska; Doug Vincent-Lang, Commissioner of the Alaska Department of Fish and Game; and James E. Cockrell, Commissioner of the Alaska Department of Public Safety (collectively, "Defendants"). Docket 40 (2d Am. Compl.) at ¶¶ 4-6.

[2] Docket 149.

[3] *See* Docket 70; Docket 129.

initial opinion.[4]  On January 31, 2023, that opinion was replaced by an amended opinion.[5]  In the amended opinion, the Ninth Circuit held that the trial court had erred in granting Defendants' motion to dismiss, and "that the 1891 Act preserved for the Community and its members an implied right to non-exclusive off-reservation fishing in the traditional fishing grounds for personal consumption and ceremonial purposes, as well as for commercial purposes."[6]

The 1891 Act provides:

> That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be . . . set apart as a reservation for the use of the Metlakahtla [sic] Indians, and those people known as Metlakahtlans [sic] who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and

---

[4] *Metlakatla Indian Cmty. v. Dunleavy*, 48 F.4th 963 (9th Cir. 2022) [hereinafter *Initial Opinion*], *opinion amended and superseded on denial of reh'g*, 58 F.4th 1034 (9th Cir. 2023) [hereinafter *Amended Opinion*].

[5] The amended opinion made two substantive changes to the initial opinion.  First, the initial opinion was amended to reflect that the procedural posture of the case on appeal was from an order granting a motion to dismiss.  *Compare Initial Opinion*, 48 F.4th at 973 ("We expect that it will be unnecessary in this case to determine the precise geographic contours of the Community's traditional off-reservation fishing, for the only fishing at issue is within Alaska's Districts 1 and 2. Their [*sic*] appears to be no dispute that the traditional fishing grounds of Metlakatlans have always included the waters within those two Districts."), *with Amended Opinion*, 58 F.4th at 1045 ("Because this case comes to us on appeal from a ruling on a Rule 12(b)(6) motion, we remand to the district court to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2.").

Second, in the "Arguments Made by Alaska" sub-section of the Discussion section, the amended opinion deleted one sentence. *Compare Initial Opinion*, 48 F.4th at 976 ("Further, the Senate's understanding of the religious beliefs of Community members tells us nothing about the means by which Congress expected them to support themselves. Congress could not have believed that Christian prayer would replace fishing as their means of subsistence."), *with Amended Opinion*, 58 F.4th at 1047 ("Further, the Senate's understanding of the religious beliefs of Community members tells us nothing about the means by which Congress expected them to support themselves.").

[6] *Amended Opinion*, 58 F.4th at 1045, 1048.

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 2 of 31

subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior.[7]

The Ninth Circuit remanded the case to the district court to make factual findings about the geographic scope of the Community's traditional off-reservation fishing grounds: "Because this case comes to us on appeal from a ruling on a Rule 12(b)(6) motion, we remand to the district court to allow further proceedings to determine whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2."[8]

On June 7, 2024, the Court denied Defendants' motion for summary judgment and granted summary judgment in part for Metlakatla—specifically, on its request for the Court to declare that Congress reserved for the Metlakatlans "the non-exclusive right to fish in the areas where they have fished since time immemorial and where they continued to fish in 1891 when their reservation was established, free from unreasonable interference by the defendants, and that such right has not been revoked or diminished[.]"[9]  The Court set for trial the issue of "whether the Community's traditional off-reservation fishing grounds included the waters within Alaska's Districts 1 and 2."[10]  The Court further found that "genuine issues remain[ed]

---

[7] Act of Mar. 3, 1891, ch. 561, § 15, 26 Stat. 1095, 1101.

[8] *Amended Opinion*, 58 F.4th at 1045.

[9] Docket 70 at 24-25 (quoting Docket 40 at 21).

[10] Docket 70 at 25 (quoting *Amended Opinion*, 58 F.4th at 1045).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 3 of 31
Case 5:20-cv-00008-SLG   Document 151   Filed 07/20/26   Page 3 of 31

as to what aspects of the State's limited entry program are incompatible with the Community's off-reservation fishing rights."[11]

On November 10, 2025, the Court denied a Motion to Dismiss for Lack of Jurisdiction filed by several Southeast Alaska tribes.[12] In that order, the Court stated that in this case, "[t]he Court is not determining aboriginal rights to fish in Southeast Alaska; nor is this Court determining the scope of the Tribes' traditional fishing rights in those waters or whether those rights were exclusive or nonexclusive."[13]

## DISCUSSION

### I.    Scope of the Remand

When this case was on appeal at the Ninth Circuit, Metlakatla's First Amended Complaint ("FAC") was the operative complaint.[14] The FAC used the phrase "time immemorial" nine times, all in connection with the length of time the Metlakatlans had fished in Alaska's Districts 1 and 2.[15] The Ninth Circuit used the phrase "time

---

[11] Docket 70 at 26-27.

[12] Docket 129. The Southeast Alaska tribes included the Central Council of Tlingit and Haida Indians of Alaska, the Organized Village of Saxman, the Organized Village of Kasaan, the Craig Tribal Association, the Petersburg Indian Association, and the Wrangell Cooperative Association.

[13] Docket 129 at 15 (citations omitted).

[14] Docket 20.

[15] Docket 20 at ¶¶ 1 (twice), 13, 16, 19, 34, 35(f), 37, 38; *see e.g.*, Docket 20 at ¶ 38 ("Since time immemorial, ancestors of the Community members fished the waters of Southeastern Alaska, including the areas surrounding the Annette Islands that are now designated as Areas 1 and 2 by the State of Alaska.").

The phrase "time immemorial" is referenced 11 times in total in the SAC: nine times in the factual allegations, Docket 40 at ¶¶ 1 (twice), 13, 16, 21, 33, 38(f), 40, 41, once in the SAC's claim for relief, Docket 40 at ¶ 57, and once in the SAC's prayer for relief, Docket 40 at 21.

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 4 of 31
Case 5:20-cv-00008-SLG    Document 151    Filed 07/20/26    Page 4 of 31

immemorial" five times in the amended opinion.[16]  And yet the Circuit's amended opinion was reviewing a Rule 12(b)(6) dismissal and thus its repeated use of the phrase "since time immemorial" is assuming the truth of the FAC's factual allegations.[17]  Notably, the 1891 Act creating the reservation does not state that the Metlakatlans had fished in Alaskan waters "since time immemorial."[18]  To the contrary, the 1891 Act states that the Metlakatlans "had recently emigrated from British Columbia to Alaska."[19]

After the case was remanded to this Court, Metlakatla filed a Second Amended Complaint ("SAC").[20]  Like the FAC, the SAC also alleges that "since first moving to the Annette Islands Reserve in 1887, the Community fished predominantly in areas within a day's travel of the Reserve - currently designated by the State of Alaska Department of Fish & Game as Areas 1 and 2."[21]  And the section of the SAC titled "Emigration to the Annette Islands Reserve" similarly contains allegations relating to the Metlakatlans' emigration from Canada to Alaska.[22]  Accordingly, the Court

---

[16] *See Amended Opinion*, 58 F.4th at 1036, 1040, 1044, 1046, 1048.

[17] *See Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1161 (9th Cir. 2022) (holding that in reviewing the dismissal of a complaint under Rule 12(b)(6), "we accept all well-pleaded factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff.'" (quoting *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1086 (9th Cir. 2020))).

[18] *See supra* note 8.

[19] *Amended Opinion*, 58 F.4th at 1038 (quoting § 15, 26 Stat. at 1101).

[20] The mandate was issued on February 8, 2023. Docket 34 (USCA Mandate).  Metlakatla filed its SAC on May 12, 2023. Docket 40 (2d Am. Compl.).

[21] Docket 40 at ¶ 1; Docket 20 at ¶ 1.

[22] Docket 40 at ¶¶ 11-23; Docket 40 at ¶ 11 ("In 1887, a group of approximately 823 Coast

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 5 of 31

clarifies that the most relevant time period for assessing fishing practices in this action is from 1887, the year when the Metlakatlans began the move from British Columbia to the Annette Islands, to 1891, the year when the Act was passed by Congress.[23]

Next, the Court reiterates that this case does not concern aboriginal rights. "The Circuit Court's decision did not rest on aboriginal rights; rather, it was based on an implied reserved right from the 1891 Act."[24] The traditional fishing grounds of the Metlakatlans need not be exclusive. While the existence of exclusive fishing rights may be informative, the key question on remand is whether the Community's "traditional off-reservation fishing grounds," particularly from 1887 to 1891, included

---

Tsimshian and Alaskan Native Indians, facing conflict with the Canadian government over land claims and tribal sovereignty, emigrated from 'Old' Metlakatla (which means 'place beside calm water' in Tsimshian) in British Columbia, Canada, to what is now the Annette Islands Reserve. With the help of Father William Duncan a missionary of the Anglican Church of England, the Metlakatlan people's emigration occurred at the invitation, and with the permission, of President Grover Cleveland and the United States Congress."); Docket 40 at ¶ 12 ("The Community's current membership includes numerous members who are direct descendants of members of the initial 1887 emigration.").

[23] While both Complaints are substantially similar, the SAC departs from the FAC in two main aspects. First, the SAC provides additional detail and allegations concerning the initial Metlakatlans as it (1) replaces "820 Tsimshian Indians" with "823 Coast Tsimshian and Alaskan Native Indians"; (2) adds that Tsimshian fishermen "engaged in frequent trading voyages to the villages of other Alaskan Native tribes, such as the Tlingit and Haida tribes"; and (3) newly alleges that "103 of the approximately 823 original inhabitants of the Annette Islands Reserve were Alaskan natives." *Compare* Docket 20 at ¶¶ 11, 13, *with* Docket 40 at ¶¶ 11, 13, 17.

Second, the SAC supplants much of the legal authority that the FAC previously relied upon. The SAC replaced allegations citing *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985), *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985), *Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir. 1995), *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45 (1962), and *Confederated Tribes of Chehalis Indian Rsrv. v. Washington*, 96 F.3d 334 (9th Cir. 1996) [hereinafter *Chehalis*], with the Circuit's amended opinion. *Compare* Docket 20 at ¶¶ 29, 31-34, *with* Docket 40 at ¶ 33.

[24] Docket 70 at 14 (first citing *Amended Opinion*, 58 F.4th at 1044; and then citing *Chehalis*, 96 F.3d at 341-42).

fishing grounds within Alaska's Districts 1 and 2.[25]

## II.      Waters Within Alaska's Districts 1 and 2

According to Defendants, the Community's traditional fishing grounds based on "[h]istoric harvests from freshwater streams, which are closed to commercial fishing, [are] irrelevant because they do not prove a tradition of fishing in the marine waters that are open to commercial salmon fishing in fishing districts 1 and 2."[26]  The Court turns to Alaska law to define "waters within Alaska's Districts 1 and 2."[27]  The "waters of Alaska" are defined in state law as "the internal waters of the state including rivers, streams, lakes and ponds, the tidal zone of the state from mean higher high water to mean lower low water, and those waters extending three miles seaward of a line (the baseline) between" certain enumerated points.[28]  Fishing in freshwater

---

[25] *See* Docket 70 at 19-20 ("To be clear, the Court does not equate the Ninth Circuit's use of the phrases 'traditional fishing grounds' and 'the areas where [the Metlakatlans] have fished since time immemorial and where they continued to fish in 1891 when their reservation was established' with the requirement to prove aboriginal rights in the legal sense—that is, 'actual, exclusive, and continuous use and occupancy for a long time of the claimed area.'" (citations omitted)).

[26] Docket 95-1 at 29; *see also* Docket 95-1 at 30 ("Consistent with State law, the Community does not allege the right to commercially fish in freshwater streams. Under State regulations, freshwater streams (as well as within 500 yards of a salmon stream) in Southeast Alaska are closed to *all* commercial fishing even for those who hold a limited entry permit." (emphasis in original)).

Defendants also assert that fishing in intertidal waters similarly does not serve as a basis for a traditional fishing ground for purposes of this case for the same reasons: "However, large portions of Moira Sound and Quadra Bay are also closed to commercial fishing and it is likely those 'intertidal areas' . . . are also closed to commercial fishing." Docket 143 at 20.

[27] *Amended Opinion*, 58 F.4th at 1045; *see also* Docket 40 at ¶ 19 ("The Metlakatlan people fished predominantly in areas within a day's travel of the Reserve − currently designated by the State of Alaska Department of Fish & Game as Areas 1 and 2.  . . .  Many of those regularly used fishing areas were well outside of the exclusive fishery boundary, a fact that was well-known to the Territorial, State and federal authorities.").

[28] Alaska Admin. Code tit. 5, § 39.975(13).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 7 of 31

streams, deep saltwater seas, or intertidal regions could all be considered "fishing grounds" in "the waters within Alaska's Districts 1 and 2."[29] District 1 covers the waters from North Behm Canal, down to Portland Canal, and other specific regions around Ketchikan.[30] District 2 contains the waters that are predominantly on the eastern side of Prince of Wales Island and Clarence Straight.[31]

These waters are managed by the Alaska Department of Fish and Game and the Commercial Fisheries Entry Commission. Since approximately 1982, commercial salmon fishing has been prohibited in the waters of Alaska that are (1) "within the fresh water of streams and rivers of this state"; (2) "within 500 yards of the fresh water of a stream that is a salmon stream"; or (3) over the intertidal region.[32] However, whether a location was closed to all commercial fishing in the 20th century does not narrow the geographic scope of "the Community's traditional off-reservation fishing grounds" of the "waters within Alaska's Districts 1 and 2." The Court's inquiry on remand is to determine where Metlakatlans fished within Districts 1 and 2 at the time of the reservation's establishment, even if those waters later became closed to commercial fishing in the late 20th century or early 21st century.

---

[29] The waters of Yakutat, Alaska, and British Columbia are not within Districts 1 and 2, and are not within the scope of remand.

[30] Docket 135-2 at 2-3; *see also* Alaska Admin. Code tit. 5, § 33.200(a).

[31] Docket 135-2 at 2-3; *see also* Alaska Admin. Code tit. 5, § 33.200(b).

[32] *See* Alaska Admin. Code tit. 5, § 39.290. Elsewhere, certain fishing locations in Districts 1 and 2 are expressly listed as closed to commercial trolling (since approximately 1998) and net salmon fishing (since approximately 1982). *Id.* §§ 29.150(b)-(c), 33.350(b)-(c).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 8 of 31

Defendants further assert that "[t]he Tribe has no evidence that the Metlakatlans historically and regularly fished in the open, deep saltwater seas outside of the Annette Islands Reserve up to 1891."[33] The Community disagrees that the Metlakatlans only fished exclusively in freshwater streams because "the seining equipment used by the Metlakatlans for their commercial fishing simply could not have been used in such a shallow freshwater stream."[34] This appears to be a genuine issue of disputed fact to be resolved at trial.

Metlakatla asserts that it engaged in commercial fishing activities and had recorded landings in the late 1800s and early 1900s.[35] On an accompanying map, Metlakatla identifies 15 fishing locations: nine fishing grounds that were identified in historian Jefferson Moser's 1902 report and six "fishing grounds identified in other historical documents, such as letters."[36] One of the fishing grounds, Tamgas, is an on-reservation fishery, and another, the Skeena River, is a fishing ground in Canada; these areas are both outside the scope of the issue before this Court on remand.[37] Of the remaining 13 fishing grounds, six are in District 1 (Duke Island, Quadra Bay, Naha Bay, Cape Fox, Kah Shakes, and Wards Cove) and the other seven are in

---

[33] Docket 143 at 16.

[34] Docket 147 at 15.

[35] Docket 135-3 at 3. The Community also provided an accompanying annotated map showing where those landings occurred. Docket 135-3 at 2.

[36] Docket 135-3 at 2-3 (citing Jefferson Moser, The Salmon and Salmon Fisheries of Alaska, Report of The Alaskan Salmon Investigations of the United States Fish Commission Steamer Albatross in 1900 and 1901 (1902)); *see also* Docket 148-1 (1899 Moser Rep.) at 1-18.

[37] Docket 135-3 at 2-3.

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 9 of 31
Case 5:20-cv-00008-SLG     Document 151     Filed 07/20/26     Page 9 of 31

District 2 (Karta Bay, Kithraum, Peter Johnson, Nowiskay, Old Johnson, Kegan, and Cape Chacon).[38]  Whether any of these 13 areas were the Metlakatlans' traditional fishing grounds when the reservation was established is a disputed issue for trial.

### III.   Off-Reservation Fishing Grounds

Defendants assert that the legal framework for evaluating the Community's off-reservation fishing rights should mirror the "usual and accustomed" standard applied to the Palmer-Stevens treaties cases.[39]  To establish a "usual and accustomed" fishing ground under that standard, a tribe has the burden of showing "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters."[40]  Defendants maintain that "[t]his Court should not apply a lower standard to an implied off-reservation fishing right than courts use to evaluate an expressed off-reservation fishing right."[41]

By contrast, Metlakatla asserts that the usual and accustomed standard would "artificially narrow the Community's 'traditional off-reservation fishing grounds."[42]

---

[38] Docket 135-3 at 2-3; Dockets 143-1 to 143-9.

[39] Docket 95-1 at 20 ("The 'usual and accustomed fishing location' case law should guide this Court's fact finding."); Docket 143 at 7 ("The usual and accustomed fishing right case law should guide this Court's review of the Tribe's evidence.").

[40] *United States v. Washington*, 384 F. Supp. 312, 332 (W.D. Wash. 1974) [*hereinafter Final Decision I*], *aff'd and remanded*, 520 F.2d 676, 693 (9th Cir. 1975) (remanding so that the district court could maintain continuing jurisdiction).

[41] Docket 95-1 at 24.

[42] Docket 147 at 9.

According to Metlakatla, "[t]he State's position is contrary to the Ninth Circuit's stated test for determining whether the Community's reserved fishing rights include Areas 1 and 2, which refers to 'traditional *areas*,' not specific 'locations.'"[43]   Metlakatla appears to assert that if the Community makes a sufficient showing of a traditional off-reservation fishing ground anywhere in Districts 1 and 2, Community members would then be able to commercially fish everywhere in these districts without a limited entry permit.[44]

Metlakatla further asserts that the "usual and accustomed" standard is inapplicable because it violates the law of the case: "The Ninth Circuit and this Court have repeatedly held that this is not an aboriginal rights case. Ignoring those holdings, the State yet again attempts to resurrect an aboriginal rights standard in disguise" because, according to Metlakatla, it would improperly require the Community to prove that it "had exclusive rights to the areas where they fished.[45] Metlakatla contends that this Court's prior order already set the test and cites to this Court's previous statement that "it 'need not reference . . . *any other cases* to determine what test a court would use to determine the scope of a tribe's implied off-reservation fishing rights[.]'"[46]

Defendants respond that "[t]he Ninth Circuit did not, as this Court previously

---

[43] Docket 147 at 9 (emphasis in original).

[44] *See* Docket 134 at 24-30.

[45] Docket 134 at 5-6.

[46] Docket 134 at 28 (emphasis in original) (quoting Docket 70 at 23).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 11 of 31
Case 5:20-cv-00008-SLG   Document 151   Filed 07/20/26   Page 11 of 31

implied, detail the amount and type of evidence the Tribe needed to present to prove certain locations are included in the Tribe's implied off-reservation fishing right."[47] Defendants note that the Ninth Circuit applied the *Winters* Doctrine in the amended opinion.[48] The Supreme Court has recently defined the *Winters* Doctrine as follows:

> Under this Court's longstanding reserved water rights doctrine, sometimes referred to as the *Winters* doctrine, the Federal Government's reservation of land for an Indian tribe also implicitly reserves the right to use needed water from various sources—such as groundwater, rivers, streams, lakes, and springs—that arise on, border, cross, underlie, or are encompassed within the reservation.[49] Under the *Winters* doctrine, the Federal Government reserves water only "to the extent needed to accomplish the purpose of the reservation."[50]

The Ninth Circuit has since extended the *Winters* Doctrine from reserved water rights to reserved hunting and fishing rights.[51]

Defendants maintain that "the *Winters* Doctrine could be used to find that the

---

[47] Docket 143 at 9-10.

[48] Docket 143 at 7; Docket 150 (Oral Arg. Tr.) at 19 ("But at the end of the day it appears that the Ninth Circuit felt that there was adequate evidence and information presented that Congress intended to then grant an off-reservation fishing right and used the *Winters* Doctrine to do so and to get there."); Docket 150 (Oral Arg. Tr.) at 20 ("[T]he Ninth Circuit already decided what the standard would be. That's a *Winters* Doctrine standard."); *see Winters v. United States*, 207 U.S. 564 (1908).

[49] *Arizona v. Navajo Nation*, 599 U.S. 555, 561 (2023) (first citing *Winters*, 207 U.S. at 576-77; then citing *Cappaert v. United States*, 426 U.S. 128, 138-39 (1976); then citing *Arizona v. California*, 373 U.S. 546, 598-600 (1963); and then citing F. Cohen, Handbook of Federal Indian Law § 19.03(2)(a), pp. 1212-1213 (N. Newton ed. 2012)).

[50] *Id.* (first citing *Sturgeon v. Frost*, 587 U.S. 28, 46 (2019); and then citing *United States v. New Mexico*, 438 U.S. 696, 700–02 (1978))).

[51] *United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983) ("We therefore have no difficulty in upholding the district court's finding that at the time the Klamath Reservation was established, the Government and the Tribe intended to reserve a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands.").

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 12 of 31
Case 5:20-cv-00008-SLG    Document 151    Filed 07/20/26    Page 12 of 31

Tribe had an implied right to harvestable fish being available at the Tribe's usual and accustomed fishing locations."[52] Defendants acknowledge that Metlakatla's off-reservation fishing right need not be exclusive.[53]

### a. *United States v. Washington*

In the first *United States v. Washington* decision, *Final Decision I*, the United States sued the State of Washington, the State Department of Fisheries, the State Game Commission, their respective directors, and the Washington Reef Net Owners Association, seeking to enforce compliance with several treaties between the federal government and 14 Indian tribes in Western Washington.[54] Each treaty in that case, commonly referred to as the Palmer-Stevens Treaties, contained a substantially identical provision stating: "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing, . . . ."[55]

In *Final Decision I*, Judge Boldt defined "usual and accustomed grounds and stations" as "every fishing location where members of a tribe customarily fished from

---

[52] Docket 143 at 10 (citing *United States v. Washington*, 853 F.3d 946, 965 (9th Cir. 2017) [hereinafter *Washington V*]). The Amended Opinion discusses three Ninth Circuit cases applying the *Winters* Doctrine: *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) [hereinafter *Colville*]; *Adair*, 723 F.2d 1394; and then *Washington V*, 853 F.3d 946. *Amended Opinion*, 58 F.4th at 1042-44.

[53] Docket 95-1 at 19 ("The Ninth Circuit concluded that the Community has a non-exclusive right to fish in areas where the Community had 'traditionally fished' in 1891, and directed this Court to determine the scope of that right.").

[54] *Final Decision I*, 384 F. Supp. at 327-28 & nn.1-2.

[55] *Id.* at 331.

time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters."[56] "Stations" indicate fixed locations, while "grounds" refer to "larger areas which may contain numerous stations and other unspecified locations which . . . could not then have been determined with specific precision and cannot now be so determined."[57] The words "[u]sual and accustomed . . . indicate the exclusion of unfamiliar locations and those used infrequently or at long intervals and extraordinary occasions."[58]

In *Final Decision I*, Judge Boldt determined the usual and accustomed ("U&A") fishing grounds and stations for all party tribes.[59] He described the treaty fishing right as "a reserved right, which is linked to the marine and freshwater areas where the Indians fished during treaty times, and which exists in part to provide a volume of fish which is sufficient to the fair needs of the tribes."[60] For example, Judge Boldt found

---

[56] *Id.* at 331-32.

[57] *Id.* at 332.

[58] *Id.*

[59] *Id.* at 359-82.

[60] *Id.* at 401.  *See, e.g.*, *id.* at 364 (finding a usual and accustomed Makah fishing ground where evidence showed villages and seasonal camps "provided access to places for taking fish from the salmon runs" and "at treaty times the Makah took chinook, sockeye, chum and coho salmon . . . using fishing techniques which included beach seining, spearing and trolling"); *id.* at 367 (finding a usual and accustomed Muckleshoot fishing ground where evidence showed "[v]illages and weir sites were often located together" and "at least three groups of important weir sites" were used by the tribe "to intercept returning salmon on those rivers"); *id.* at 372 (finding a usual and accustomed Quileute fishing ground where evidence showed pre-treaty "villages were located where the conditions of the river were best for catching fish and, consequently, each village obtained its principal supply from a trap located nearby . . . built in shallow water"); *United States v. Washington*, 459 F. Supp. 1020, 1059 (W.D. Wash. 1978) [hereinafter *Final Decision II*] (finding a usual and accustomed Tulalip fishing ground where "the findings of the [Indian] Claims Commission of the Indian coastal and river villages, from which fishing activities may be presumed, coincide[d] with the findings of Dr. Lane and the testimony of [tribal elder] Mrs. Dover" "regarding

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 14 of 31
Case 5:20-cv-00008-SLG    Document 151    Filed 07/20/26    Page 14 of 31

that for the Lummi Tribe, "the Lummi reef net sites in Northern Puget Sound, the Makah halibut banks, Hood Canal and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fishing grounds and stations in marine waters."[61]

The Court acknowledges that a "traditional fishing ground" is not identical to a "usual and accustomed fishing" place, ground or station. Nonetheless, the Court agrees with Defendants that the usual and accustomed analysis is the most appropriate analog and that "[t]he 'usual and accustomed fishing location' case law should guide this Court's fact finding."[62] The Ninth Circuit, referencing Judge Boldt's two decisions, remarked in a subsequent treaty case, that "we cannot think of a more comprehensive and complex case than this."[63]

However, Metlakatla correctly asserts that Defendants miscited *Upper Skagit Indian Tribe v. Suquamish Indian Tribe* in their briefing in support of requiring Metlakatla to show "regular and frequent and continuous" use of fishing grounds and stations.[64] Indeed, "[w]hat *Skagit* does say is that the term 'usual and accustomed grounds and stations' standard is defined as 'every fishing location where members

---

marine fishery areas"), *aff'd*, 645 F.2d 749 (9th Cir. 1981).

[61] *Final Decision I*, 384 F. Supp. at 353.

[62] Docket 95-1 at 20; Docket 143 at 7.

[63] *Upper Skagit Indian Tribe v. Washington*, 590 F.3d 1020, 1022 (9th Cir. 2010) [hereinafter *Upper Skagit I*] (alteration omitted) (quoting *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) [hereinafter *Suquamish*]).

[64] Docket 147 at 19; Docket 143 at 12 (quoting *Upper Skagit Indian Tribe v. Suquamish Indian Tribe*, 871 F.3d 844, 846 (9th Cir. 2017) [hereinafter *Upper Skagit II*]).

of a tribe customarily fished *from time to time . . . .*'"[65]  At oral argument, Defendants acknowledged that the Ninth Circuit has not used the phrase "regular, frequent, and continuous" as the applicable standard.[66]  The Court will not expand the "usual and accustomed" standard;  Metlakatla need not establish "regular, frequent, and continuous" use of a fishing ground.

Metlakatla asserts that because the fishing right here is an implied right, then the usual and accustomed legal standard derived from the Palmer-Stevens treaties should not apply.[67]  Metlakatla correctly notes that Judge Boldt analyzed "the express language of the Palmer Stevens' treaties at issue in those cases."[68]  Nonetheless, although the fishing rights at issue here are implied, not express, the Court finds that the usual and accustomed standard is compatible with an implied rights *Winters* analysis to determine Metlakatla's non-exclusive fishing rights.

The reserved rights usual and accustomed standard is not an aboriginal rights standard.[69]  An aboriginal rights standard would require the Community to prove

---

[65] Docket 147 at 19-20 (emphasis in original) (additional emphasis omitted) (quoting *Upper Skagit II*, 871 F.3d at 846). This portion of *Upper Skagit II* quotes *Final Decision I,* 384 F. Supp. 312 at 332.

[66] *See* Docket 150 (Oral Arg. Tr.) at 8-9 ("That citation should have had two more cases in it to really be robust. It should have cited to the 1974 Bol[d]t decision of *U.S. v. Washington*, and it also should have included the Ninth Circuit's decision here."); *see also* Docket 147 at 19 ("In fact, nowhere in Indian law does that phrase or standard exist.") (first citing Docket 148 (Suppl. Lundberg Decl.) at ¶ 3; and then citing Docket 148-2 at 1-4).

[67] Docket 147 at 3 n.1 ("The State's preferred test - the 'usual and accustomed' standard established in the Puget Sound line of cases - is inapplicable because it ignores (and alters) this Court's clear direction.").

[68] Docket 134 at 27 (citing *Final Decision I*, 384 F. Supp. at 331.

[69] *See Final Decision I,* 384 F. Supp. at 332 ("[E]very fishing location where members of a tribe

"actual, exclusive, and continuous use and occupancy for a long time of the claimed area."[70] By contrast, the "usual and accustomed" standard includes customary fishing locations "*whether or not other tribes then also fished in the same waters*."[71] Although *Final Decision I* uses the word "aboriginal," the case does not rely on aboriginal rights as the basis for the district court's findings as to each tribe's usual and accustomed fishing grounds.[72]

To the extent that Defendants are asserting that Metlakatla must prove that it had a paramount or preemptive right to fish in an area to establish a usual and accustomed fishing ground,[73] the Court disagrees. While primary and invitee fishing rights may be one consideration in determining whether a fishing ground is "usual and accustomed" of the Metlakatlans, paramount or preemptive usage is not a requirement.[74]

---

customarily fished . . . is a usual and accustomed ground or station at which the treaty tribe reserved, and its members presently have, the right to fish."); *United States v. Washington,* 157 F.3d 630, 638 (9th Cir.) [hereinafter *Shellfish II*] ("The Treaties also reserved to the Tribes the 'right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory . . . .'"), *amended by* 157 F.3d 630 (9th Cir. 1998).

[70] *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (internal quotation marks and citations omitted); *see also* Docket 70 at 18 n.85.

[71] *Final Decision I,* 384 F. Supp. at 332 (emphasis added).

[72] *See generally Final Decision I*, 384 F. Supp. 312.

[73] *See* Docket 95-1 at 31 ("The determination of any area as a usual and accustomed fishing ground or station of a particular tribe must consider all of the factors relevant to (1) use of that area as a usual or regular fishing area, (2) any treaty-time exercise or recognition of *paramount or preemptive fisheries control* (primary right control) by a particular tribe . . . ." (emphasis in original) (first citing *United States v. Washington*, 626 F. Supp. 1405, 1531 (W.D. Wash. 1985); then citing *Final Decision I*, 384 F. Supp. at 332; and then citing *Final Decision II*, 459 F. Supp. at 1059)).

[74] *See Washington*, 626 F. Supp. at 1473 ("The terms PRIMARY and INVITEE FISHING RIGHTS refer to areas which are the usual and accustomed fishing areas of more than one tribe, but where

The Court disagrees with Metlakatla's assertion that "[t]he standard for determining the extent of the Community's Congressionally reserved fishing rights is the Community's fishing *practices* engaged in by its Tsimshian, Tlingit and Haida members and ancestors since time immemorial and at the time the Reserve was established."[75]   Contrary to Metlakatla's assertion, the Court did not "recently reiterate[] that test as requiring an examination of the 'prior fishing practices of those in the Community in 1891, including those Alaska Natives, including Tlingit & Haida, that joined them at that time'" as the applicable legal standard.[76]   The Court's prior order on the Southeast Alaska tribes' motion to dismiss stated that it would "look to" the fishing practices of those Alaska Natives that had joined the Community by 1891.[77]   But the Court clarifies now that it did not hold, and does not hold now, that these fishing practices established a new legal test that would accord to Metlakatla a non-exclusive fishing right to the traditional fishing grounds of all the Tsimshian and Tlingit and Haida since time immemorial.

This Court's 2024 summary judgment order primarily addressed whether the Alaska Native Claims Settlement Act bars this litigation and whether the Community

---

one tribe has primary rights in that area ('primary tribe'), and by virtue of that status has the right to exclude all other tribes from fishing in that area." (emphasis in original)).

[75] Docket 134 at 23 (emphasis in original).

[76] Docket 147 at 3 (quoting Docket 129 at 17).

[77] Docket 129 at 17 (citing Docket 70 at 20).

had to show actual, exclusive, and continuous use of its fishing grounds.[78] The scope of Metlakatla's implied fishing rights was not then before the Court. Although that 2024 order stated that the Circuit Court had "already spoken to that issue here," as to the scope of the right, the Ninth Circuit's amended opinion did not set forth the standard to apply to determine that scope, which, for the reasons explained in this order, will be substantially similar to Judge Boldt's analysis set forth in *Final Decision I*. The Court agrees with Defendants that the quoted sentence from this Court's prior order should not be interpreted as broadly as the Community asserts.[79]

Similarly, Metlakatla's assertion—that the Ninth Circuit's use of "areas" means that if the Community can establish a traditional fishing ground in one location it then has fishing rights in all of Districts 1 and/or 2—is overbroad.[80] Metlakatla must identify specific usual and accustomed fishing locations as its "traditional off-reservation fishing grounds."

For the foregoing reasons, to determine the geographic scope of "the Community's traditional off-reservation fishing grounds,"[81] the Court will apply the "usual and accustomed" standard employed by Judge Boldt in *Final Decision I*.

---

[78] Docket 70 at 9-10.

[79] *See* Docket 143 at 9-10.

[80] *See* Docket 147 at 9.

[81] *Amended Opinion*, 58 F.4th at 1045.

### b. Consideration of the Community's Future Needs

The Community broadly asserts that "[t]he Indian canons of construction support the Community's off-reservation fishing rights."[82]   Metlakatla cites two portions of the Ninth Circuit's amended opinion discussing *Colville*[83] to argue that this Court must consider the future needs of the Community when determining the scope of the Community's non-exclusive traditional fishing grounds.[84]

The first cite to *Colville* concerns the Indian canon of construction generally.[85] The amended opinion then discusses *Colville* in the context of how the Ninth Circuit applied the *Winters* implied-rights rule in prior cases.[86]  The amended opinion cites *Chehalis*, which in turn cites *Colville*, for another general proposition that when determining the purposes of a reservation, courts "must keep in mind that the specific

---

[82] Docket 147 at 5; *see generally* Docket 147 at 5-9.

[83] 647 F.2d 42.

[84] Docket 134 at 26 ("In other words, this Court must construe the Community's fishing rights to allow it to survive in its permanent home by successfully prosecuting the commercial fishery in today's fishing environment."); *see supra* note 52.

[85] That portion of the amended opinion states as follows:

> Because the purposes of reservations are often unarticulated in a statute, treaty, or executive order, we consider "the circumstances surrounding their creation[ ] and the history of the Indians for whom they were created." *Chehalis*, 96 F.3d at 342 (citing [*Colville*, 647 F.2d at 47]). "We also consider their need to maintain themselves under changed circumstances." *Colville*, 647 F.2d at 47.

*Amended Opinion*, 58 F.4th at 1042.

[86] *Id.* at 1043 (quoting *Colville*, 647 F.2d at 45, 47-48).

purposes of an Indian reservation"[87] "are often unarticulated."[88]  The Community also relies on *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Department of Natural Resources*.[89]  In that case, the Sixth Circuit held that the treaty fishing rights of the Grand Traverse Band of Ottawa and Chippewa Indians ("GTB") included an "easement of access" to two public marinas on the shores of Lake Michigan.[90]  In upholding GTB's right of access, the Sixth Circuit reasoned that the tribe's fishing rights included the right to access the designated fishing waters and that without use of the marinas, GTB's fishing rights would be "destroy[ed]."[91]

Metlakatla highlights that "Congress expected the Community to not only successfully pursue the commercial fishery 'at the time the reservation was created,' but also to be successful '*in the future*.'"[92]  And indeed, the Ninth Circuit's amended opinion states: "Congress' intent in the 1891 Act was that the Metlakatlans would have off-reservation fishing rights that would 'satisfy the future as well as the present needs' of the Community."[93]  Nonetheless, the Ninth Circuit's holding is that the scope of the Community's implied off-reservation rights is limited to those traditional fishing

---

[87] *Chehalis*, 96 F.3d at 342 (citing *Colville*, 647 F.2d at 47).

[88] *Amended Opinion*, 58 F.4th at 1042-43 (quoting *Colville*, 647 F.2d at 47).

[89] Docket 147 at 7-9 (citing 141 F.3d 635 (6th Cir. 1998)).

[90] *Grand Traverse Band*, 141 F.3d at 638-39.

[91] *Id.* at 640.

[92] Docket 147 at 6 (emphasis in original) (quoting *Amended Opinion*, 58 F.4th at 1044-45).

[93] *Amended Opinion*, 58 F.4th at 1047 (quoting *Arizona*, 373 U.S. at 600); *see supra* note 7.

grounds where the Metlakatlans "continued to fish in 1891 when their reservation was established" and not to other fishing areas the Community may need or seek today.[94]

For the foregoing reasons, the Court will not look to the future needs of the Community after 1891 when determining the scope of the implied fishing rights accorded to Metlakatla in the 1891 Act.

### c. Evidentiary Standard

Metlakatla bears the burden of proving the scope of its off-reservation traditional fishing grounds.[95] The Court will make its findings "upon a preponderance of the evidence found credible and inferences reasonably drawn therefrom."[96]

In their reply, Defendants assert "[t]hat the Tribe's members fished in state waters open to commercial fishing years after 1891 does not prove the Metlakatlans actually fished in those waters up to 1891."[97] While the Court agrees with Defendants that the relevant inquiry is the Community's "traditional off-reservation fishing grounds" in 1891, the Court recognizes that "[d]ocumentation of Indian fishing during

---

[94] *Id.* at 1045, 1048.

[95] *United States v. Lummi Indian Tribe*, 841 F.2d 317, 318 (9th Cir. 1988) [hereinafter *Lummi*] ("The burden is on the petitioning tribe to produce evidence that disputed waters were usual and accustomed fishing grounds." (citing *Final Decision II*, 459 F. Supp. at 1059)).

[96] *Final Decision I*, 384 F. Supp. at 348; *id.* at 350 (finding that Dr. Lane's reports "have been exceptionally well researched and reported and are established by a preponderance of the evidence"); *Tulalip Tribes v. Suquamish Indian Tribe*, 794 F.3d 1129, 1132 (9th Cir. 2015) ("In determining the tribes' [usual and accustomed fishing grounds and stations], Judge Boldt found anthropological reports prepared by Dr. Barbara Lane, an expert witness, to be 'highly credible' and 'very helpful in determining by direct evidence or reasonable inferences the probable location and extent of' [usual and accustomed fishing grounds and stations]." (citing *Final Decision II*, 459 F. Supp. at 1059)).

[97] Docket 143 at 30-33.

treaty times is scarce."[98]  Further, "[i]n determining usual and accustomed fishing places [a] court cannot follow stringent proof standards because to do so would likely preclude a finding of any such fishing areas."[99]  Thus, "the stringent standard of proof that operates in ordinary civil proceedings is relaxed" when determining the Community's traditional fishing grounds in 1891.[100]  For example, evidence of landing locations in reports from the 1930's would appear to have little relevance to the Metlakatlans' traditional fishing grounds from 1887 to 1891.  But evidence from 1899 reports may permit the Court to draw a reasonable inference of fishing practices in 1891.[101]

### d.    Purchased Fishing Rights

Defendants assert that any off-reservation fishing by Metlakatlans was a purely transactional purchase privilege and cannot constitute a traditional fishing ground.[102]  The Court disagrees.  Areas the Metlakatlans fished during the relevant time frame may constitute traditional fishing grounds, regardless of how the ability to fish there was obtained.

---

[98] *Lummi*, 841 F.2d at 318.

[99] *Final Decision II*, 459 F. Supp. at 1059.

[100] *Lummi*, 841 F.2d at 318 (citing *United States v. Washington*, 730 F.2d 1314, 1317 (9th Cir. 1984)).

[101] *See* Docket 143 at 38-39.

[102] *See* Docket 143 at 38 ("Fishing the east side of Prince of Wales Island, even gathering the fish caught there by Haida or Tlingit fishermen, was not a tradition or a right held by the Metlakatlans, but rather it was a purchased privilege offered to the Metlakatlan fishermen." (emphasis omitted) (quoting Docket 148-1 (1899 Moser Rep.) at 6-8)).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 23 of 31
Case 5:20-cv-00008-SLG     Document 151     Filed 07/20/26     Page 23 of 31

## IV.    The Community

The 1891 Act reserved an implied right to non-exclusive off-reservation fishing for two groups: (1) "those people known as Metlakahtlans" [sic]; and (2) "and such other Alaskan natives as may join them."[103]   The first group consists of those individuals who emigrated from Metlakatla, Canada, and were part of the original Metlakatlan community.[104]   The Court clarifies that this first group does not include all Tsimshian.[105]   Metlakatla highlights that "Tsimshian have been present in the area that is now Southeast Alaska since time immemorial" and that precontact Tsimshian fished throughout Districts 1 and 2.[106]   But the traditional fishing grounds of all Tsimshian since time immemorial (whether from Southeast Alaska or Canada) cannot form the basis of the Community's traditional fishing grounds.

The Court proceeds to inform the parties of how Metlakatla may make the showing of who was in the second group: "such other Alaskan natives as may join them."

Metlakatla appears to assert that all of the Tlingit and Haida's traditional fishing grounds since time immemorial became the Metlakatlans' traditional fishing grounds because some Tlingit and Haida may have joined the Community from 1887 to

---

[103] *See supra* note 7.

[104] The individuals considered "people known as Metlakahtlans" [sic] might include non-Indian Christian missionaries.

[105] *See supra* notes 22-23.

[106] Docket 134 at 13-19.

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 24 of 31

1891.[107]  Defendants maintain that Congress did not intend that the entirety of the Tlingit and Haida's traditional fishing grounds would be transferred to the Metlakatlans.[108]  The Court agrees with Defendants that "the Ninth Circuit did not find that Congress intended that all of the Tlingit and Haida traditional fishing grounds were transferred to the Metlakatlans by the 1891 Act."[109]  Rather, Metlakatla must establish by a preponderance of the evidence that specific Tlingit, Haida, and/or Tsimshian individuals joined and integrated into the Community on or before 1891. If it can make that showing, then the traditional fishing grounds of those specific individuals in Districts 1 and 2 may be considered part of the Metlakatlans' traditional fishing grounds.[110]

---

[107] *See* Docket 117 (Smith Decl.) at ¶ 8 ("[W]e are simply seeking to restore the fishing rights Congress reserved for the Community to continue to live as our original members, including the Tlingit and Haida, had always lived and to engage in the newly emerging commercial fisheries.").

[108] Docket 143 at 24.  Defendants cite to *United States v. Oregon* and *United States v. Washington* as a persuasive legal standard this Court should apply to determine the identity of "such other Alaskan natives as may join them." Docket 143 at 24-25 (first citing *United States v. Oregon*, 29 F.3d 481, 484-85 (9th Cir.) [hereinafter *Oregon*], *amended by*, 43 F.3d 1284 (9th Cir. 1994); and then citing *United States v. Washington*, 18 F. Supp. 3d 1172, 1189 (W.D. Wash. 1991)).  The Ninth Circuit's holding in *Oregon* relied on *United States v. Suquamish*, decided four years prior. *See Oregon*, 29 F.3d at 484 (first citing *Suquamish*, 901 F.2d 772, 776, (9th Cir. 1990) then quoting *Suquamish*, 901 F.2d at 777).

In both *Oregon* and *Suquamish*, a tribe asserted that it was the successor tribe to a tribe with treaty fishing rights and thus entitled to exercise the former tribe's fishing rights under the treaty. *See Suquamish*, 901 F.2d at 776-77; *Oregon*, 29 F.3d at 484-85.  The Court finds the Ninth Circuit's approach in *Oregon* and *Suquamish* persuasive.  These cases generally support the proposition that a tribe such as Metlakatla cannot acquire fishing rights simply because the tribe has members with Tlingit or Haida ancestry, through intermarriage or otherwise.

[109] Docket 143 at 24.

[110] *See* Docket 95-2 (Gulig Rep.) at 41 n.79 ("Joining the Metlakatlan community was no casual event. Doing so required joiners to commit to a fifteen-point pledge and was not intended to be trivial or symbolic. Joining the community required commitment and change." (citation omitted)).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 25 of 31

However, the Court disagrees with Defendants' arguments that a traditional fishing ground used by one Metlakatlan family, but not used by the entire Community, cannot serve as the basis for a traditional fishing ground.[111]  Rather, a traditional fishing ground used by a family that joined the Metlakatlan Community on or before 1891 could potentially be imputed to the Community as a traditional fishing ground, depending on the evidence presented on this topic at trial.[112]

### V.  Occasional and Incidental Fishing

The Court agrees with Defendants that occasional and incidental fishing alone does not establish a traditional off-reservation fishing ground.[113]  The Ninth Circuit has held that "travel through an area and incidental trolling are not sufficient to establish an area as a usual and accustomed fishing ground."[114]  Similarly, in *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, the Ninth Circuit affirmed the district court's finding that "[t]he statement that the Sauk tribe traveled to the saltwater [from

---

[111] *See* Docket 95-1 at 14 ("The only evidence that the Community provided regarding a fishing right that a Metlakatlan family held was in Kegan Creek, and the right belonged to a family, not the Community as a whole.").

[112] *But see Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 774 (9th Cir. 2023) ("Nor does evidence that *some* Sauk tribal members fished with friends and relatives on the Skagit River establish [a tribe's usual and accustomed fishing grounds] for the tribe." (emphasis in original)).

[113] Docket 95-1 at 39 ("Occasional and incidental fishing in Southeast Alaska's deeper marine fisheries for salmon and halibut by Metlakatlans and Tsimshian during trading voyages does not provide sufficient evidence of regular and frequent use establishing a 'traditional fishing location, station, or ground.'").

[114] *Lummi*, 841 F.2d at 320 (citing *Final Decision I*, 384 F. Supp. at 353 ("Marine waters were also used as thoroughfares for travel by Indians who trolled en route . . . . [s]uch occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians." (citations omitted))).

the main river system], without more, does not establish customary fishing on the Skagit River to support [finding usual and accustomed fishing] on it."[115]  By contrast, "*frequent* travel and visits to trading posts may support other testimony that a tribe regularly fished certain waters."[116]

## VI.    Ceremonial and Commercial Purposes

The Ninth Circuit's amended opinion held that "the 1891 Act preserved for the Community and its members an implied right to non-exclusive off-reservation fishing in the traditional fishing grounds for personal consumption and ceremonial purposes, as well as for commercial purposes."[117]

Based on the foregoing, evidence of Metlakatlans fishing within Alaska's Districts 1 and 2 for the purpose of supplying potlatches and ceremonies in 1891 and the years prior to 1891 could establish a traditional fishing ground.

Likewise, fishing by Metlakatlans for purely commercial purposes can form the basis of Metlakatla's traditional off-reservation fishing grounds.  This extends to fishing by Metlakatlans in waters that Metlakatla may have leased from other tribes,[118] including from Tlingit and Haida, so long as the fishing occurred prior to or in 1891.  Defendants, relying on Dr. Gulig's expert report, highlight several instances

---

[115] 66 F.4th at 774.

[116] *Lummi*, 841 F.2d at 320 (emphasis in original).

[117] *Amended Opinion*, 58 F.4th at 1045.

[118] *See* Docket 95-2 at 48 ("Though [Father] Duncan talked of 'the streams we use on Prince of Wales Islands,' that use was leased from Haida owners.").

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 27 of 31
Case 5:20-cv-00008-SLG    Document 151    Filed 07/20/26    Page 27 of 31

when "William Duncan purchased salmon from Tlingit and Haida that had the right to harvest salmon from [the waters of Districts 1 and 2] for the Annette Island Reserve's cannery."[119]  The waters from which fish were harvested solely by non-Metlakatlans will not be considered "the Community's traditional off-reservation fishing grounds,"[120] even if those fishers used Metlakatla's fishing equipment and vessels.[121]  The Ninth Circuit's amended opinion held that "[w]hen Congress passed the 1891 Act establishing the Metlakatlans' reservation, it did so with the expectation that the Metlakatlans would continue to support themselves by fishing."[122]  The subsequent sentences of the amended opinion make clear that the focus was on the Metlakatlans' fishing—not  Tlingit or Haida fishers who were not part of the Community but may have been supplying the cannery:

> That is, Congress passed the Act with the expectation not only that *Metlakatlans would catch fish* for ceremonial purposes and personal consumption, but that they would also pursue the commercial fishery

---

[119] Docket 143 at 18 (citing Docket 95-2 (Gulig Rep.) at 21, 42-43, 51-52). *See e.g.*, Docket 95-2 (Gulig Rep.) at 42 ("Metlakatlans were operating the sawmill and the cannery, and Tlingits were supplying the fish."); Docket 95-2 (Gulig Rep.) at 52 ("Only when Tlingit refused to sell fish to Metlakatla, did Duncan send Tsimshians into Tlingit territory, violating the Tlingit's traditional stations.").

[120] *Amended Opinion*, 58 F.4th at 1045.

[121] Docket 95-2 (Gulig Rep.) at 43 (Duncan "offered, however, to purchase all [of the Tongass Tlingits'] salmon and supply [the Tongass Tlingits] with an outfit for fishing if they (Tongass are very unreliable workmen) would take into Company one or two of [Metlakatla's] Natives."); Docket 143 at 19 ("But the historic record suggests a more accurate inference is that Duncan purchased the gear to outfit commercial fishermen that he contracted with to supply salmon to the cannery." (citation omitted)).

[122] *Amended Opinion*, 58 F.4th at 1044-45 (citing *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 89 (1918) ("The purpose of creating the reservation was to encourage, assist[,] and protect the Indians in their effort to . . . become self-sustaining . . . . Without [fishing rights] the [Community] could not prosper.")).

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 28 of 31

that had provided, and continued to provide, essential economic support for the Community. Congress clearly contemplated that *Metlakatlans would continue to fish* off-reservation toward those ends.[123]

Nor would an area where Community members were "gathering the fish caught by Haida or Tlingit fishermen" via tendering vessels constitute a traditional fishing ground of the Metlakatlans.[124] However, as noted above, Community members fishing for the purpose of supplying Metlakatla's cannery could constitute traditional off-reservation fishing grounds, even when Metlakatla had to seek permission to fish in the waters of another tribe or clan's territory due to customary protocol.[125]

### VII. Fish

Defendants assert that Metlakatla's off-reservation fishing rights are limited to salmon.[126] Metlakatla asserts that narrowly construing "fish" to only include salmon ignores both the factual record and the Indian canon of interpretation.[127]

In both its FAC and SAC, the Community pled that the Metlakatlans relied not just on salmon, but on other fish species.[128] The Court agrees with Metlakatla "that,

---

[123] *Id.* at 1045 (emphasis added).

[124] Docket 143 at 38 (emphasis omitted) (quoting Docket 148-1 (1899 Moser Rep.) at 6-8).

[125] *See* Docket 148-3 (Gulig Dep.) at 4 ("I would describe that as a tradition of process versus a tradition of place.").

[126] Docket 95-1 at 25 ("'Fish' as to the Metlakatlans 'traditional fishing grounds,' is salmon.").

[127] Docket 134 at 28-29.

[128] *See*, *e.g.*, Docket 40 (Second Am. Compl.) at ¶ 41 ("Since time immemorial, ancestors of the Community members fished the waters of Southeastern Alaska, including the areas surrounding the Annette Islands that are now designated as Areas 1 and 2 by the State of Alaska. Like their ancestors, Community members rely on several species of fish for both subsistence and commercial purposes including, but not limited to, salmon, halibut, cod, rockfish and herring.").

unless *specifically excluded*, a tribe's reserved rights include the right to *all* species within the fishery."[129]   The amended opinion observed that "Community members also fish for herring" and held that "Alaska's limited entry program restricts access to the herring by Community members."[130]   This more inclusive definition of fish also aligns with Judge Boldt's analysis.[131]   And following *Final Decision I* and *Final Decision II*, in cases where the applicable treaty did not specify limitations on species or harvest methods, the Ninth Circuit has used the same approach.[132]

### VIII.   Participation in Limited Entry

Defendants assert that the historical evidence "confirms that the Metlakatlans that did participate in state fisheries—this is well after 1891—were awarded limited entry permits, just like other commercial fishermen."[133] The Community disputes this; it maintains that "the State would not recognize the fish landed by Community fishermen in the Community's reserve waters."[134]   Regardless of whether

---

[129] Docket 134 at 28 (emphasis in original) (first citing *Shellfish II,* 157 F.3d at 643; and then citing *Kimball v. Callahan*, 493 F.2d 564, 566 (9th Cir. 1974)).

[130] *Amended Opinion*, 58 F.4th at 1041.

[131] *Final Decision I,* 384 F. Supp. at 401 ("The right secured by the treaties to the Plaintiff tribes is not limited as to species of fish, the origin of fish, the purpose or use or the time or manner of taking . . . .").

[132] *See Shellfish II,* 157 F.3d at 643 (holding "that the [Palmer-Stevens] Treaties grant the Tribes a right to take shellfish of every species found anywhere within the Tribes' usual and accustomed fishing areas, except as expressly limited by the Shellfish Proviso").

[133] Docket 143 at 32-33 (citation omitted); *see* Docket 143 at 33 ("It would be affording Metlakatlans a benefit that no commercial fishermen that historically participated in these fisheries has ever received.").

[134] Docket 40 at ¶ 52.

Case No. 5:20-cv-00008-SLG, *Metlakatla Indian Community v. Dunleavy, et al.*
Order of Clarification
Page 30 of 31
Case 5:20-cv-00008-SLG   Document 151   Filed 07/20/26   Page 30 of 31

Metlakatlans have been able to fish under Limited Entry "just like other commercial fishermen," the Circuit Court has "held that 'Alaska's limited entry program, as currently administered, is incompatible with the Metlakatlans' off-reservation fishing rights,' and that '[a]ny regulation by Alaska of off-reservation fishing by the Community must be consistent with such rights.'"[135]  As was the case in this Court's June 6, 2024 order, the Court again "finds that genuine issues remain as to what aspects of the State's limited entry program are incompatible with the Community's off-reservation fishing rights"[136] that must be addressed at trial.

## CONCLUSION

In light of the foregoing, **IT IS ORDERED THAT**:

A telephonic Trial Scheduling Conference is scheduled for **July 28, 2026, at 11:15 a.m.** to set a trial date and to establish pretrial deadlines.  The parties should also be prepared to address whether supplemental expert reports are necessary or warranted in light of this order.  All parties may participate telephonically at the conference by dialing 571-353-2301 (Call ID 020262828, Pin 487051) approximately five minutes before the scheduled hearing time.

DATED this 20th day of July 2026, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[135] Docket 70 at 26 (alteration in original) (quoting *Amended Opinion*, 58 F.4th at 1047).

[136] Docket 70 at 26-27.